IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POLAROID CORPORATION,

    Plaintiff and Counterclaim-Defendant,

    v.

HEWLETT-PACKARD COMPANY,

    Defendant and Counterclaim-Plaintiff.

C.A. No. 06-738 (SLR)

## DEFENDANT HEWLETT-PACKARD COMPANY'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

FISH & RICHARDSON P.C.
William J. Marsden, Jr. (#2247)
919 N. Market Street, Suite 1100
Wilmington, DE 19801
Telephone: (302) 652-5070

John E. Giust
Matthew E. Bernstein
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070

Bradley D. Coburn
111 Congress Avenue, Suite 810
Austin, TX 78701
Telephone: (512) 472-5070

CHOATE, HALL & STEWART
Robert S. Frank
Daniel C. Winston
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000

*Attorneys for Defendant and Counterclaim-Plaintiff
Hewlett-Packard Company*

January 25, 2008

## TABLE OF CONTENTS

I.  INTRODUCTION……………………………………………………......... ...........1

II.  THE "RATIO"………………………………………....................................2

   A.  The Numerator…………………………………… ...........................................2

      1.  "Averaging means an "Arithmetic mean" and Does Not Include Mode
          Or Other Non-Averaging Intermediate Operations ............................................2

         a.  Extrinsic Evidence. .......................................................................3

         b.  Intrinsic Evidence .........................................................................4

   B.  The Denominator: ...................................................................................5

      1. Claim 7 ...............................................................................................6

      2. Claim 1 ...............................................................................................6

III.  HEWLETT-PACKARD IS NOT READING LIMITATIONS FROM THE
      SPECIFICATION INTO THE CLAIM ...............................................................7

      1.  In the Specification, Electronic Information Signals are Luminance
          Signals ..............................................................................................8

         a.  The only Embodiement Disclosed in the '381 Patent Relates to
             Luminance .......................................................................................8

         b.  The Summary of the Invention Describes Only Light Intensity
             Levels, i.e., Luminance ...................................................................9

         c.  The Problem to be Solved by the '381 Patent is the Compression
             of Luminance ................................................................................11

      2.  The Dynamic Range must be limited to integer values .....................................12

      3.  For the "Means for Selecting…and for Subsequently Transforming",
          the Only Structure Disclosed, if any, is the Circuit-Based of Figure 4 ............12

         a.  Figure 1 is Not a Disclosed Structure. .......................................................13

         b.  If the Court Should Find that Figure 1 is Structure, the Structure
             Must be Limited to a Circuit-Based Structure……… .............................14

## TABLE OF CONTENTS CONTINUED

IV.  HEWLETT-PACKARD'S PROPOSED CONSTRUCTION IMPROVES
CLAIM CLARITY WITHOUT CHANGING THE SCOPE OF THE
CLAIMED INVENTION. ...........................................................................15

V.  CONCLUSION...........................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Alloc, Inc. v. United States International Trade Commission*,
   342 F.3d 1361 (Fed. Cir. 2003)................................................................9

*Bell Atlantic Network Services, Inc. v. Covad Comm'ns Group, Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001)................................................................8

*C.R. Bard, Inc. v.  U.S. Surgical Corp.*,
   388 F.3d 858 (Fed. Cir. 2004)................................................................9, 10

*Cortland Line Co. v. Orvis Co.*,
   203 F.3d 1351 (Fed. Cir. 2000)................................................................15

*Faroudja Laboratories, Inc. v. Dwin Electrics, Inc.*,
   76 F.Supp.2d 999 (N.D. Cal. 1999) ................................................................13

*Honeywell International, Inc. v. ITT Industrial, Inc.*,
   452 F.3d 1312 (Fed. Cir. 2007)................................................................9, 11

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
   450 F.3d 1350 (Fed. Cir. 2006) ................................................................8

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
   344 F.3d 1205 (Fed. Cir. 2003)................................................................13, 14

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005)................................................................7

*Microsoft Corp. v. Multi-Tech System, Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004)................................................................10, 11

*Nystrom v. Trex Co., Inc.*,
   424 F.3d 1136 (Fed. Cir. 2005)................................................................7

*On Demand Machine Corp. v. Ingram Industrial, Inc.*,
   442 F.3d 1331 (Fed. Cir. 2006)................................................................3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................3, 7

*Scimed Life System, Inc. v. Advanced Cardiovascular System*,
   242 F.3d 1337 (Fed. Cir. 2001)................................................................11, 12

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997)................................................................16

]

## I.    INTRODUCTION

Polaroid's opening positions on claim construction confirm that Polaroid is seeking to broadly expand the scope of United States Patent No. 4,829,381 ("the '381 patent") beyond that which the PTO could have granted to Polaroid in the first instance.  Polaroid not only attempts to expand the scope of the asserted patent beyond its roots as a camera patent but also to expand the scope of the patent beyond the only embodiment disclosed, the enhancement of luminance signals.  Repeatedly, Polaroid seeks constructions that find no support in the intrinsic record.  By contrast, Hewlett-Packard's proposed constructions are faithful to the intrinsic evidence and give the patentee the broadest reasonable scope.  Because Polaroid cannot use claim construction to expand the scope of the claimed invention beyond that which was disclosed in the specification, Polaroid's constructions should be rejected.  Further, as Hewlett-Packard's proposed constructions are supported by the intrinsic record and provide the jury with proper guidance as to the application of the disputed terms, Hewlett-Packard's constructions should be adopted.

Although numerous claim terms are at issue and discussed fully in Hewlett-Packard's Opening Claim Construction Brief, ("Hewlett-Packard Br.", D.I. 97), this responsive brief will focus on the patent claims where Polaroid has advocated a construction that strips the claims of necessary meaning or most egregiously argued for a construction beyond that disclosed in the specification.  The construction issues addressed include: construction of ratio found in claims 1 and 7, including the construction of the claim term average; the construction of electronic information signals as luminance signals; the construction of dynamic range to be limited to integers; and the proper disclosed structure for the "Means for Selecting . . . and for Subsequently Transforming" as limited to Figure 4.

1

## II.    THE "RATIO"

The parties agree that a "ratio" as used in claims 1 and 7 of the '381 patent requires "both a numerator and a denominator."  (*See* Polaroid's Opening Claim Construction Brief ("Polaroid Br.") at 26, D.I. 100.)  Further, the parties agree that the "only ratio the specification describes is one where the average electronic information signal is divided by a number."  (*Id.*)  As such, the calculation of this ratio, *i.e.*, dividing a numerator by a denominator, must be performed as part of the function (claim 1) or method (claim 7) in the asserted claims.  The parties disagree, however, as to what the values of the numerator and denominator should be construed to be.

### A.    The Numerator

Hewlett-Packard proposes that the numerator used in the ratio be construed to be a "first existing data value representing the arithmetic mean of the electronic information signals.[1]"  Polaroid argues that the denominator should be a "calculated intermediate value."  Because Polaroid's "calculated intermediate value" bears no relationship to the plain language of the claim, which requires an "average", it should be rejected.

#### 1.    "Averaging" means an "Arithmetic Mean" and Does Not Include Mode or Other Non-Averaging Intermediate Operations.

Polaroid argues that "average" should be construed to be "of calculated intermediate value."  (Polaroid Br. at 20, D.I. 100.)  In support of this improperly broad construction, Polaroid relies on two extrinsic references, (*Id.* at 21), and argues that its construction is correct because a low-pass filter can be used to calculate values in addition to an average value.  At its core, Polaroid's broad construction starts with—and ends with—its dictionary-based construction.  As the Federal Circuit has warned, "Care must be taken lest word-by-word definition, removed from the context of the invention, leads to an overall result that departs significantly from the patented

2

invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1344 (Fed. Cir. 2006).  Only after Polaroid has offered a dictionary definition not grounded in the claimed invention, does Polaroid attempt to justify its overly broad construction by misinterpreting the intrinsic evidence.  Neither Polaroid's argument nor its evidence is persuasive.

### a.    Extrinsic Evidence.

Polaroid's proposed construction is taken directly from a secondary definition of the term "average" in a dictionary of the English language, without examination of the specification of the '381 patent.  This approach to claim construction has generally been rejected by the Federal Circuit as it "will systematically cause the construction of the claim to be unduly expansive." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (*en banc*).  Polaroid's choice of definition is particularly inappropriate in the present case because its proposed construction is refuted by the very same dictionary on which Polaroid relies.

The primary definition of "average" in Polaroid's reference—the definition Polaroid skips over—defines it to be "a quantity, rating or the like that represents [or] approximates an arithmetic mean."  (Polaroid Br. at Ex. 5, D.I. 100.)  This is the construction that Hewlett-Packard proposes.[2]  This discrepancy within the extrinsic evidence exposes the dangers of relying on a dictionary to provide the basis for claim construction.  *See Phillips*, 415 F.3d at 1321 (noting that "there may be a disconnect between the patentee's responsibility to describe and claim his invention, and the dictionary editors' objective of aggregating all possible definitions

---

[1] This is the combination of Hewlett-Packard's constructions for "average" and the other relevant terms.

[2] Similarly, mathematics textbooks routinely refer to "average" and "mean" as synonymous terms.  (See Ex. A, Zalman Usiskin et al., Transition Mathematics (2d ed. 1998), at 206 ("recall that the mean or average of a collection of number is their sum divided by the number of numbers in the collection") & ("[r]ecall that the mean (or average) temperature is found by adding up the numbers and dividing by 5 [the number of numbers in the

for particular words.")  Polaroid's proposed construction should be rejected on this basis alone but there are additional reasons to reject it.

Polaroid's construction should also be rejected because it is contrary to the only other extrinsic evidence that Polaroid relies on, the textbook "Introduction to Digital Image Processing" (Polaroid Br. at 22, D.I. 100.)  This reference does not support Polaroid's proposed construction.  First, although Polaroid states that the reference "uses the term 'average' to refer to weighted mean, mode, and median," (*id.* at 21 n.3), the reference does not stand for this proposition.  Instead, in a discussion of "smoothing filters", the reference describes twelve different smoothing filters, including among others: mean, weighted mean, mode and median. (*Id.*, Ex. 2 at 77-81.)  These descriptions, however, do not equate each of the described "smoothing" methods with the calculation of an "average" as Polaroid contends.  Second, when the textbook does refer to "mode", one of the mathematical calculations that Polaroid contends is included in the definition of "average," it explicitly differentiates "mode" from an "average." (*Id.*, Ex. 2 at 78.)  The reference states: "***Averaging*** labels makes no sense (what is the average of 'rib' and 'lung'?), but mode filters may clean up isolated points."  (*Id.* (emphasis added).)  Thus, the extrinsic evidence relied on by Polaroid does not support its construction.  In fact, Polaroid's extrinsic evidence supports Hewlett-Packard's construction that an "average" should be defined to be an "arithmetic mean."

### b.    Intrinsic Evidence

Polaroid's attempt to buttress its improperly broad construction by using intrinsic evidence also fails because it turns the specification on its head.  As Polaroid admits in its brief "[t]he specification teaches that a low-pass filter ***may be used*** to ***calculate the average***."

example]").  As such, Polaroid's inclusion of mode and similar values in its proposed

4

(Polaroid Br. at 21 (citing '381, 3:61–62 (emphasis added)), D.I. 100.)  Polaroid then attempts to use the fact that a low-pass filter *may be used* to calculate an average to argue that *all* values that can be calculated by a low-pass filter should qualify as average.[3]  This circular reasoning is logically unsound and is not supported by the specification.  The only value to be calculated in the specification is an average or mean—not a mode, median or weighted average as Polaroid argues.  Thus, Hewlett-Packard's construction is proper.

### B.    The Denominator:

According to the explicit language of the claims, the denominators of Claim 7 and Claim 1 are different.  Claim 7's denominator is "a select proportionate value of the dynamic range of the electronic information signals," whereas the denominator in Claim 1 is merely "the dynamic range of the electronic information signals."

Hewlett-Packard proposes that the Claim 7 denominator be construed as "any value within the determinate dynamic range of values, selected depending on where the least image enhancement is desired."  Because the claim language of claim 1 differs from claim 7, Hewlett-Packard proposes that denominator in claim 1 be "an integer representing the number of possible pixel values; for an 8-bit system, 256."  Polaroid argues by contrast that the denominator should

---

construction is completely unsupported and should  be rejected.

[3] Polaroid attempts to further confuse matters by incorrectly describing the difference between a low-pass filter and a block average in the technical background section of its brief.  Polaroid suggests that a low-pass filter implicitly involves the use of a non-averaging algorithms such as a mode whereas a block average is simply an arithmetic mean.  (Polaroid Br. at 3-4, D.I. 100.)  This is incorrect.  Both techniques employ an arithmetic mean.  The difference is that a low-pass filter employs a window in which each pixel appears at the center of the window and is averaged with the surrounding pixels, whereas – in a block average – each pixel appears in only a single window and the average of that window is used for every pixel in the block.  (*See* Hewlett-Packard Br. at 6-7, D.I. 97.)  The specification notes this difference: "[t]he low pass filter method results in a continuing change in the average value of the electronic information signal Av for each succeeding pixel" also noting that "the low pass filtering technique requires a substantially increased computational capacity in comparison to block averaging".  (J.A. at 9 ('381 Pat., col. 4, ll. 10-13 & 17-19), D.I. 99.)

be a "value that lies within the range of possible value" in claims 7 and 1, without regard for the additional claim language in claim 7. Polaroid's constructions cannot be correct because they ignore the very terms of, and differences between, the claims.

### 1.    Claim 7

The parties agree that "[o]ne of skill in the art would understand from reading the specification that a select proportionate value of the dynamic range is a value within the range of possible values." (Polaroid Br. at 36, D.I. 100.) The dynamic range is the number of possible pixel values, (J.A. at 9 ('381, col. 4, l. 38)), and a select proportionate value is some proportion of that number. The parties agree that the specification indicates that those proportions are limited to possible pixel values.

However, in its construction, Polaroid ignores the fact that the range of possible values consists only of integer values. In an analog system, fractional values make a certain degree of sense, but in a digital system[4] a fractional value is nonsensical. Polaroid quotes the specification at column 3, lines 47-48 as disclosing a dynamic range from 0 to 255, but ignores the full quote: "the analog luminance electronic signal values… are ***digitized*** to an 8-bit binary number so as to have a dynamic range of from 0 – 255 ***within which range are 256 intensity levels***." (J.A. at 9 ('381, col. 3, ll. 43-48 (emphasis added)).) The specification could not be more clear that the only possible values are integer values.

### 2.    Claim 1

Claim 1 lacks the "select proportionate value" phrase and, consequently, should be construed to be "an integer representing the number of possible pixel values; for an 8-bit system, 256." However, Polaroid ignores the difference between the terms of claim 1 and claim 7 and,

instead, improperly advances the same construction for both phrases. "When different words or phrases are used in separate claims, a difference in meaning is presumed." *Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005). Polaroid ignores this basic tenet of claim construction as Polaroid's proposed construction would render the phrase "select proportionate value" superfluous in claim 7. *See Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (rejecting construction of a claim that rendered other parts of the claim superfluous).

Hewlett-Packard's proposed construction, on the other hand, is entirely consistent with the claim language and the specification. If a select proportionate value of the dynamic range is a fraction of the total number of pixel values, then the dynamic range is simply the total number of pixel values.

## III.    HEWLETT-PACKARD IS NOT READING LIMITATIONS FROM THE SPECIFICATION INTO THE CLAIM.

For a number of its proposed constructions, Polaroid claims that Hewlett-Packard is improperly importing limitations into the claims from the specification. But, "[c]laims 'must be read in view of the specification, of which they are part.' . . . As [the Federal Circuit] stated in *Vitronics*, the specification is always highly relevant to the claim construction analysis. ***Usually it is dispositive***; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (emphasis added). Polaroid ignores this law and takes specific issue with Hewlett-Packard's construction of electronic information signals as luminance signals, requiring the dynamic range to only include integer values, and relying on the specification to find only circuit-based structures to be disclosed. In each case, however, Hewlett-Packard is only seeking

---

[4] The preferred embodiment, accused products and most of the prior art are all digital systems.

to prevent the claims of the '381 patent from exceeding the scope of the invention disclosed in the specification.

### 1.    In the Specification, Electronic Information Signals are Luminance Signals.

Polaroid claims that the inventors left the term luminance "out of the claim [term electronic information signals], and the Court should not import it through claim construction." (Polaroid Br. at 15, D.I. 100.)  Polaroid appears to argue that because the descriptions are found in the "Description of the Preferred Embodiment", this is sufficient to divorce the claimed language from the specification.  But, the mere use of the term "preferred" "does not of itself broaden the claims beyond their support in the specification."  *Bell Atlantic Network Servs., Inc. v. Covad Comm'ns Group, Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001); *see also Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1355 (Fed. Cir. 2006) ("Although claims need not be limited to the preferred embodiment when the invention is more broadly described, neither do the claims enlarge what is patented beyond what the inventor has described as the invention." (internal quotations omitted)).  The entire disclosure of the '381 patent relates to luminance and Polaroid's attempt to expand the scope of the invention beyond that which was disclosed in the specification should be rejected by the Court.

### a.    The Only Embodiment Disclosed in the '381 Patent Relates to Luminance.

The specification defines only a single embodiment of the claimed invention and, in this embodiment, the only electronic signal information that is averaged and transformed is Luminance, "Y".[5]  Figure 1 is described as "a block diagram for ***the system of this invention*** in

---

[5] Although Polaroid argues that the preferred embodiment includes color, (Polaroid Br. at 14-15, D.I. 100), this argument is not persuasive.  First, the portion of the specification that Polaroid relies on describes Figure 1 as "***the*** system of [the claimed] invention", not just a preferred embodiment.  In its description of Figure 1, the specification discloses the conversion of

which a continuous stream of electronic information signals each corresponding to one of a plurality of succeeding pixels from the recorded image are received at terminal $Y_{input}$." (*See* J.A. at 9 ('381, col. 3, ll. 1-6 (emphasis added)).) As is made clear later in the specification, Y refers to luminance. (*Id.* (col. 4, ll. 58-59) ("the image defining luminance electronic information signals (*Y*)"(emphasis added)).) Even in describing Figure 1, i.e. "the system of this invention", the specification makes it clear that "[t]he average value for the image defining *luminance electronic information signal* (A$_v$)is thereafter provided to a gamma determining circuit." (*Id.* ('381, col. 4, ll. 26-32).) Additionally, even the figures used by the patentee to define the claimed invention describe only luminance. (*See* J.A. at 6-7 ('381, Figs 1, 2 & 4).) *See Alloc, Inc. v. United States Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (limiting claim terms where all the "figures and embodiments disclosed in the asserted patents imply [the limitation] . . . or . . . expressly disclose [the limitation].")

In light of this consistent usage of "electronic information signal" to refer to a "luminance signal", the embodiment that uses luminance signals "is not a preferred embodiment, but *an only* embodiment" and it is proper to limit the claim terms in light of the specification. *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2007) (emphasis added).

### b.    The Summary of the Invention Describes Only Light Intensity Levels, i.e. Luminance.

The "Summary of the Invention" discloses only the use of luminance or light intensity levels. "*Statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention*." *C.R. Bard, Inc. v.*

---

color values to luminance and chrominance values, but *only* the luminance values are averaged and transformed by the disclosed invention. (*Compare* J.A. at 9 ('381, col. 3:35-38 (describing the conversion of color values to chrominance and luminance)) *with id.* ('381, col. 4, ll. 26-50 (describing the transformation of the luminance signals by the disclosed

*U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) (emphasis added).  And, "[s]tatements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term."  *Id.*  The Summary of the Invention of the '381 patent describes the system as "respond[ing] to an average electronic information signal indicative of low scene ***light intensity levels*** by transforming electronic information signals to provide a higher contrast and/or brightness to those electronic information signals corresponding to pixels having the lowest scene ***light intensity levels*.**"  (J.A. at 8 ('381, col. 2, ll. 15-22 (emphasis added)).  Alternatively, the Summary of the Invention describes the system as "respond[ing] to an average electronic information signal indicative of high scene ***light intensity levels*** by transforming electronic information signals to provide a higher contrast and/or lower brightness to those electronic information signals corresponding to pixels having the highest scene ***light intensity levels***."  (*Id.* ('381, col. 2, ll. 22-27 (emphasis added)).)  Thus, the only two descriptions of the invention relate to "light intensity levels" and a person of ordinary skill in the art would interpret "light intensity levels" to be "luminance."  Luminance is the ratio of light intensity to a given area (in particular, it is light intensity per square meter).  (Ex. B, McGraw-Hill Dict. of Sci. and Technical Terms (4th ed. 1989), at 1114 (defining luminance); *see also id.* at 1115 (stating that "luminous intensity" is "[a]lso known as light intensity").)  In contrast, chrominance is not about the intensity of the light, but is about the light's character, i.e. the difference between the color of the light and a reference color.  (*Id.* at 349 (defining "chrominance" to be "[t]he difference between any color and a specified reference color of equal brightness").)  Thus, these statements of the very essence of the invention limit the scope of the claims to luminance.  *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340,

---

invention)).)  There is no disclosure of what color information, if any, is averaged ***and*** transformed by the disclosed invention.  (*See* Hewlett-Packard Br. at 16-18, D.I. 97.)

1348 (Fed. Cir. 2004) (finding that statements including those in the "'Summary of the Invention' portion of the specification, are not limited to describing a preferred embodiment, but more broadly describe the overall invention[]").

### c.    The Problem to Be Solved by the '381 Patent is the Compression of Luminance.

Finally, the specification makes clear that the problem to be solved by the invention of the '381 patent is the problem of luminance compression.  (*See* J.A. at 8 ('381, col. 1, ll. 26-41 (discussing problems with the relative dynamic ranges of the scene and captured image and noting that "[t]he wide dynamic range of *luminance intensities* may thus be compressed or clipped . . ." (emphasis added)).)  This further supports the conclusion that use of luminance values is not a preferred embodiment, but the only embodiment of the claimed invention. *Honeywell Int'l, Inc.*, 452 F.3d at 1318 (limiting the claim term "fuel injection system component" to "fuel filters").

In light of these statements throughout the specification limiting the invention to luminance, the construction proposed by Hewlett-Packard is correct.  *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, (Fed. Cir. 2001) (noting that "the written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format").  Polaroid's construction is just an attempt to improperly broaden the scope of the claimed invention beyond that which was disclosed.  Indeed, there is *no disclosure* of averaging or transforming red, green and blue data signals.

**2.    The Dynamic Range must be limited to integer values.**

Polaroid also claims that Hewlett-Packard is improperly limiting the claims with its

construction of dynamic range to include only integer values . (Polaroid Br. at 26 (stating that

the proper construction of "dynamic range of the electronic information signals" is "value that

lies within the range of possible values"), D.I. 100.) There is no dispute, however, that the

invention at issue relates to digital images. (*See id.*. at 1 ("The asserted claims of the '381 patent

relate to the enhancement of digital images.").) Despite its admission that the invention is

digital, Polaroid continues to argue that the dynamic range should be construed to be a "value

that lies within the range of possible values." According to Polaroid's construction, the dynamic

range could include any value, including non-integer values. But, because it is a digital

invention, the claims of the '381 patent must be interpreted according to the rules applicable to

digital systems. And, in digital systems, only integer values are used. (*See, e.g.*, J.A. at 9 ('381,

col. 3, ll. 44-49 (discussing the conversion of analog to digital signals and noting that, once

digitized, the digital signals "have a dynamic *integer* range of from 0-255 within which range are

256 intensity levels and a maximum value of $Y_{MAX}$=255." (emphasis added)) Further, in the

specification there is no other system described but one where digital signals, i.e. integer-valued

signals, are used to represent the dynamic range. (*See id.*) For this reason, Hewlett-Packard's

construction is correct and the dynamic range should be limited to integer values, the only values

disclosed in the specification.

**3.    For the "Means for Selecting . . . and for Subsequently Transforming", the Only Structure Disclosed, if any, is the Circuit-Based Structure of Figure 4.**

Hewlett-Packard and Polaroid disagree as to the appropriate structure, if any, that is

disclosed by the specification for the claim term "means for selecting . . . and subsequently

transforming . . .". Hewlett-Packard argues that there is no clearly associated or linked structure

12

or, in the alternative, that the structure is limited to the circuit-based structure of Figure 4.

Polaroid, on the other hand, claims that the structure is simply the algorithm found in Figure 1.

### a.    Figure 1 is Not a Disclosed Structure.

Polaroid argues that Figure 1 is the disclosed structure for the means-plus-structure of

claim 1.  This argument, however, fails for two reasons.  First, there is no structure that is clearly

linked to the function described in the means-plus-function language.  (*See* Hewlett-Packard Br.

at 34-36, D.I. 97.)  Second, to the extent that the Court finds specific linkage, the only structure

described in the specification is Figure 4, the circuit diagram describing the claimed system.[6]

See *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir.

2003) (reversing a district court construction for improperly identifying a software algorithm as

structure when only circuitry was disclosed); *Faroudja Lab., Inc. v. Dwin Elecs., Inc.*, 76 F.

Supp. 2d 999, 1012 (N.D. Cal. 1999) ("Diagrams which do not depict any internal circuitry…

cannot be properly identified as the corresponding structure in a means-plus-function element.").

Although Polaroid attempts to frame this argument as the importation of the preferred

embodiment as claim limitation, the argument is about the proper interpretation of a means-plus-

function claim.  "The duty of a patentee to clearly link or associate structure with the claimed

function is the quid pro quo for allowing the patentee to express the claim in terms of function

under section 112, paragraph 6."  *Medical Instrumentation and Diagnostics Corp. v. Elekta AB,*

344 F.3d 1205, 1211 (Fed. Cir. 2003).  In its opening brief, Polaroid ignores this basic

requirement and argues that the corresponding structure "is the ***algorithm*** $Y_{OUT}$

$= Y_{MAX}(Y_{in}/Y_{MAX})^{\gamma}$, where $\bullet = (1 + C)^{(Av/M - 1)}$, and equivalents thereof." (Polaroid Br. at

---

[6] Even assuming *arguendo* that Figure 1 is a disclosed structure, the disclosure of
    the specification supports Hewlett-Packard's position that the structure should

26 (emphasis added), D.I. 100.)  The cited algorithm is not structure, it is a concept reflected by an equation, and it cannot form the basis for the "means" elements claimed.  And even if it could, Polaroid ignores the requirement that this algorithm be clearly associated structure to the claimed function.

As the Federal Circuit in *Medical Instrumentation* observed, the "correct inquiry" to determine if a structure is clearly associated with a claimed function "is to look at the *disclosure* of the patent and determine if one of ordinary skill in the art would have understood that *disclosure* to encompass software [to perform the claimed function] and been able to implement such function."  *Med. Instrumentation*, 344 F.3d at 1212.  Through its proposed structure of ***the algorithm***, Polaroid appears to be trying to include undisclosed software and processor structures as part of the claimed invention, which is improper.  In *Texas Digital Systems, Inc. v. Telegenix, Inc.*, the Federal Circuit rejected a similar construction that included "'firmware, software and/or hardware'" because it had "no basis in the specification."  308 F.3d 1193, 1213 (Fed. Cir. 2002). This is the exact situation confronted by the Court in Polaroid's proposed construction. Although Polaroid has avoided using the language of "software" or "processor" in its proposed structure, Polaroid nonetheless seeks to include these terms by using the proxy of "algorithm". The problem is that neither "software" nor "processor" appear anywhere in the specification. The disclosed "algorithm" is not structure, it is a concept for which Polaroid seeks claim coverage in *any* structure.  For this reason, Polaroid's proposed structure is improper and should be rejected.

---

be circuit-based.  As noted above, even Figure 1 relies on circuit elements to form the system claimed.

**b.** **If the Court Should Find that Figure 1 is Structure, the Structure Must be Limited to a Circuit-Based Structure.**

Contrary to Polaroid's assertion that "[t]he specification [] describes Figure 1 as 'a block diagram showing the system for enhancing electronic image data in the manner of this invention,' *without further limitation*" (Polaroid Br. at 27 (emphasis added), D.I. 100), the description of Figure 1 limits the figure to a system that contains circuit elements in a block diagram format. (*See* J.A. at 9 ('381, col. 4, ll. 26-33 (referring to Figure 1's "gamma determining circuit"); *id.* ('381, col. 4, ll. 56-62) (referring to Figure 1's "transfer function imposing circuit"). Thus, although Polaroid argues that Figure 1 discloses a structure that can be made up of algorithms, software or processors, the actual disclosure of Figure 1 is a block diagram of a system made up of circuit elements. Given that only one block (the averager) in Figure 1 is actually disclosed, Polaroid should be limited to its only disclosed structure, that of Figure 4. *See Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1357 (Fed. Cir. 2000) (limiting the structure in a means plus function claim to the only structure disclosed, connecting-threaded connectors). Because Figure 1 is actually not structure, Polaroid's argument that the "means" elements are found in Figure 1 should be rejected.

For these reasons, the only disclosed structure for the claim term "means for selecting . . . and for subsequently transforming . . . " is the structure disclosed in Figure 4 or, at the very least, a circuit-based system as disclosed by Figure 1.

## IV. HEWLETT-PACKARD'S PROPOSED CONSTRUCTION IMPROVES CLAIM CLARITY WITHOUT CHANGING THE SCOPE OF THE CLAIMED INVENTION.

Polaroid states, without support, that Hewlett-Packard is attempting to re-write the patent claims and that this is legally improper. (*See* Polaroid Br. at 20, 25 & 31, D.I. 100.) Hewlett-Packard's constructions, however, do not involve any substantive changes to the claimed

language but merely attempt to improve clarity within the asserted claim language. These changes are necessary as the language as claimed would be largely impenetrable to a lay jury. This simplification of the sometimes arcane claim language used in patent drafting is one of the primary purposes of claim construction. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, ***to clarify and when necessary to explain what the patentee covered by the claims***, for use in the determination of infringement." (emphasis added)). Nothing in Hewlett-Packard's proposed constructions changes the scope of the claimed invention and only seeks to describe the claimed technology in more accessible terms for the jury that will eventually determine infringement.

## V.      CONCLUSION

For the reasons set forth in its opening brief and the reasons set forth above, Hewlett-Packard's constructions should be adopted.

Dated:  January 25, 2008                    FISH & RICHARDSON P.C.

                                            By:    */s/ William J. Marsden, Jr.*
                                            _____
                                                William J. Marsden, Jr. (#2247)
                                                919 N. Market Street, Suite 1100
                                                Wilmington, DE  19801
                                                Telephone:  (302) 652-5070
                                                Facsimile:  (302) 652-0607
                                                Email:  marsden@fr.com

                                                John E. Giust *(pro hac vice)*
                                                Matthew E. Bernstein *(pro hac vice)*
                                                12390 El Camino Real
                                                San Diego, CA  92130
                                                Telephone:  (858) 678-5070
                                                Facsimile:  (858) 678-5099
                                                Emails:  giust@fr.com; bernstein@fr.com

                                                Bradley D. Coburn *(pro hac vice)*
                                                111 Congress Avenue, Suite 810
                                                Austin, TX  78701
                                                Telephone:  (512) 472-5070
                                                Facsimile:  (512) 320-8935
                                                Email:  coburn@fr.com

                                                Daniel C. Winston *(pro hac vice)*
                                                Choate Hall & Stewart, LLP
                                                Two International Place
                                                Boston, MA 02110
                                                Telephone:  (617) 248-5000
                                                Facsimile:  (617) 248-4000
                                                Email:  dwinston@choate.com

                                            Attorneys for Defendant and Counterclaim-Plaintiff
                                            Hewlett-Packard Company

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 25, 2008, I electronically filed with the Clerk of Court the foregoing **DEFENDANT HEWLETT-PACKARD COMPANY'S OPENING CLAIM CONSTRUCTION BRIEF** using CM/ECF which will send electronic notification of such filing(s) to the following counsel:

<u>*Via Electronic Mail*</u>
Jack B. Blumenfeld (#1014)
Julie Heaney (#3052)
Morris, Nichols, Arsht & Tunnell, LLP
1201 North Market Street
Wilmington, DE 19899-1347
Phone:  302-658-9200
Fax:  302-658-3989
Emails:  jblumenfeld@mnat.com; jheaney@mnat.com

Attorneys for Plaintiff and
Counterclaim-Defendant
Polaroid Corporation

In addition, service will be made on the following counsel of record as indicated:

<u>*Via Electronic Mail*</u>
Russell E. Levine, P.C./C. Graham Gerst
Michelle W. Skinner/David W. Higer
Maria A. Meginnes/Courtney Holohan/C. Beasley
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601
Phone:  312-861-2000
Fax:  312-861-2200
Emails:  rlevine@kirkland.com;
ggerst@kirkland.com; skinnerm@kirkland.com;
dhiger@kirkland.com; mmeginnes@kirkland.com;
cholohan@kirkland.com; cbeasley@kirkland.com

Attorneys for Plaintiff and
Counterclaim-Defendant
Polaroid Corporation

<u>*Courtesy Copy Via Overnight Mail*</u>
Michelle W. Jordan
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601
Phone:  312-861-2000
Fax:  312-861-2200

  */s/ William J. Marsden, Jr.*
William J. Marsden, Jr. (#2247)

1