IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| POLAROID CORPORATION, | |
| Plaintiff and Counterclaim Defendant, | C.A. No. 06-738-SLR |
| v. | **REDACTED** |
| HEWLETT-PACKARD COMPANY, | |
| Defendants and Counterclaim Plaintiff. | |

**DECLARATION OF WILLIAM J. MARSDEN, JR.
IN SUPPORT OF DEFENDANT HEWLETT-PACKARD'S MOTION TO PRECLUDE
THE REPORT AND TESTIMONY OF POLAROID'S SURVEY EXPERT WALTER
MCCULLOUGH**

**FISH & RICHARDSON P.C.**
William J. Marsden, Jr. (#2247)
Raymond N. Scott, Jr. (#4949)
919 N. Market Street, Suite 1100
Wilmington, DE 19801
Tel.: (302) 652-5070
Fax: (302) 652-0607
Emails: marsden@fr.com
        rscott@fr.com

John E. Giust (pro hac vice)
Matthew E. Bernstein (pro hac vice)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, PC
5355 Mira Sorrento Place, Suite 600
San Diego, CA 92121-3039
Tel.: (858) 320-3000
Fax: (858) 320-3001
Emails: JGiust@mintz.com
        Mbernstein@mintz.com

Robert S. Frank, Jr. (pro hac vice)
Robert M. Buchanan, Jr. (pro hac vice)
Carlos Perez-Albuerne (pro hac vice)
Elizabeth A. Castellani (admission pro hac
vice pending)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02109
Tel.: (617) 248-5000
Fax: (617) 248-4000
        Emails:rfrank@choate.com;
        cperez@choate.com

Dated: May 23, 2008

I, William J. Marsden, Jr., declare as follows:

1.      I am an attorney with Fish & Richardson P.C., counsel for Defendant Hewlett-Packard Company.  I am a member of the Bar of the State of Delaware and of this Court.  I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

2.      Attached hereto as Exhibit A is a true and correct copy of the "Report on the Perceived Value of Adaptive Lighting Technology in Hewlett-Packard Printers" by Walter McCullough.

3.      Attached hereto as Exhibit B is a true and correct copy of the "Rebuttal Expert Report of Professor Jacob Jacoby, Ph.D."

4.      Attached hereto as Exhibit C is a true and correct copy of excerpts from the deposition of Ranjit Bhaskar.  **REDACTED**

5.      Attached hereto as Exhibit D is a true and correct copy of excerpts from the "Expert Report of Dr. Allyn D. Strickland."  **REDACTED**

6.      Attached hereto as Exhibit E is a true and correct copy of excerpts from the deposition of Walter McCullough.

7.      Attached hereto as Exhibit F is a true and correct copy of the May 12, 2008 letter from Robert M. Buchanan, Jr. to Colby Anne Kingsbury.

8.      Attached hereto as Exhibit G is a true and correct copy of the Report of Walter McCullough in *Levi Strauss & Co. v. RP55, Inc.*, No. C04-0468 (N.D. Cal. 2005).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd of May, 2008 at Wilmington, Delaware.

_/s/ William J. Marsden, Jr._____
William J. Marsden, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2008, I electronically filed with the Clerk of Court the foregoing document using CM/ECF which will send electronic notification of such filing(s) to the following counsel:

| | |
|---|---|
| ***Via Email***<br>Jack B. Blumenfeld (#1014)<br>Julia Heaney (#3052)<br>Morris, Nichols, Arsht & Tunnell, LLP<br>1201 North Market Street<br>Wilmington, DE 19899-1347<br>Phone: 302-658-9200<br>Fax: 302-658-3989<br>Emails: jblumenfeld@mnat.com; jheaney@mnat.com | Attorneys for Plaintiff and<br>Counterclaim-Defendant<br>Polaroid Corporation |
| ***Via Email***<br>Russell E. Levine, P.C.<br>Michelle W. Skinner/David W. Higer<br>Maria A. Meginnes/Courtney Holohan/C. Beasley<br>Kirkland & Ellis LLP<br>200 East Randolph Drive<br>Chicago, IL 60601<br>Phone: 312-861-2000<br>Fax: 312-861-2200<br>Emails: rlevine@kirkland.com; ggerst@kirkland.com;<br>mskinner@kirkland.com; dhiger@kirkland.com;<br>mmeginnes@kirkland.com; mmeginnes@kirkland.com;<br>cbeasley@kirkland.com | Attorneys for Plaintiff and<br>Counterclaim-Defendant<br>Polaroid Corporation |

***Courtesy Copy Via Federal Express***
Michelle W. Skinner
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
Phone: 312-861-2000
Fax: 312-861-2200

/s/ *William J. Marsden, Jr.*
William J. Marsden, Jr.

4333117v1

# EXHIBIT A

**REPORT ON**
**THE PERCEIVED VALUE OF**
**ADAPTIVE LIGHTING TECHNOLOGY**
**IN HEWLETT-PACKARD PRINTERS**

PREPARED BY
WALTER MCCULLOUGH, PRESIDENT
MONROE MENDELSOHN RESEARCH, INC.

MARCH 2008

# TABLE OF CONTENTS

Page

CONCLUSIONS .................................................................................. 3

BACKGROUND ................................................................................. 4

RESEARCH METHODOLOGY ............................................................. 5

FINDINGS ........................................................................................ 8

EXHIBITS

A. Screener and Main Questionnaires

B. Field Supervisor and Interviewer Instructions

C. Printer Descriptions

D. Validation Questionnaire

E. Survey Data - Verbatims

F. Fees and Professional and Academic Background of Walter McCullough

## CONCLUSIONS

Results of a carefully conducted survey reveal that eight in ten consumers thought that the model of printer in the description they viewed would cost less without the Adaptive Lighting Technology feature, and that the amount less would be in the range of 17% - 18% of the model's quoted price (based on the median value).

| | HP Photosmart C6180 All-in-One | | HP Officejet 5610 All-in-One | |
| --- | --- | --- | --- | --- |
| | Price: $299.99 | | Price: $109.99; after rebate: $99.99 | |
| | (409) # | (100) % | (422) # | (100) % |
| Model **without** Adaptive Lighting Technology feature | | | | |
| Would cost less ..................................... | 328 | 80 | 340 | 81 |
| Price would be the same ....................... | 54 | 13 | 58 | 14 |
| Don't know ............................................ | 27 | 7 | 24 | 6 |
| Dollar amount **less** model would cost **without** Adaptive Lighting Technology feature | | | | |
| Mean dollar amount ............................... | $49.23 | | $21.86 | |
| Median dollar amount ............................ | $50.00 | | $20.00 | |
| Median Percent of Price ........................ | 17% | | 18% | |

## BACKGROUND

Monroe Mendelsohn Research (MMR) was asked by attorneys from Kirkland & Ellis, counsel to Polaroid, to design and conduct research to determine consumers' perceived value of Hewlett-Packard's Adaptive Lighting Technology feature, used in printers.

Two color ink jet printers at differing price points, that were currently available for sale, were selected for these surveys.

Walter McCullough, MMR's president and CEO, was responsible for the design, implementation and analysis of this research.  The details of this research project follow.

# RESEARCH METHODOLOGY

## The Sample

Between January 24th and February 24th, 2008, two surveys in which a color ink jet printer description was shown were conducted with males and females, aged 18 and over, in eight geographically dispersed shopping mall facilities. All respondents were required to have purchased a color ink jet printer in the past twelve months, or to say that they might buy one in the next twelve months.

The interviewing locations were:

| | | | |
|---|---|---|---|
| Trumbull, CT | Cleveland, OH | Atlanta, GA | Denver, CO |
| East Meadow, NY | St. Louis, MO * | Jackson, MS | Phoenix, AZ |
| | Detroit, MI * | | |

_____

\* Due to mall availability, Detroit replaced St. Louis on the HP Officejet 5610 printer survey.

Before determining whether they were eligible for the interview, potential respondents were first screened into one of six age and sex groups that were established to represent each group's proportion of the population aged 18 and over. This screening procedure ensures that any subsequently defined group of respondents is representative of the population of interest with respect to age and gender.

In addition to the printer purchase requirement, each potentially eligible respondent:

1. Could not work in the shopping mall in which the interviews were conducted.

2. If applicable, had to have his or her eyeglasses or contact lenses available.

3. Could not work for, or have any household member work for, "an advertising agency, a marketing research firm, or in the production, distribution or sale of computers, cameras or printers."

4. Could not have been interviewed in any mall in the past three months.

All interviews were conducted by trained interviewers who did not know the purpose of the survey or the sponsor of the research project. In addition to the in-field supervision of the interviews as they were conducted, callback validations were attempted for all completed interviews by an independent field organization that was not involved in the survey data collection. Several attempts were made to contact each respondent and attempts were curtailed when more than half (60%) were reached and validated. This is far in excess of the usual market research validation level. It should also be noted that most research companies validate only that the interview was conducted, while MMR validates that the interview was conducted, as well as that the respondent answers the screening questions in a consistent manner.

### *Interview*

After completing the screening process, respondents were taken to a private room at the interviewing facility. The interviewer said:

> I'd like you to look at this description of a color ink jet printer and review the information as if you were considering whether or not to buy it. After you have reviewed the product description, I will ask you a few questions. If you don't know the answer to any of my questions, please don't hesitate to say that.

The interviewer then handed the product description, which included the model's price, to the respondent. The description shown with each survey is as follows:

Printer Survey #1 description: HP Photosmart C6180 All-in-One (Price $299.99)

Printer Survey #2 description: HP Officejet 5610 All-in-One (Price $109.99; Price after rebate $99.99)

Respondents were allowed sufficient time to review the description thoroughly, and the description was left with the respondent for the duration of the interview.

1. This particular color ink jet printer contains a feature called, "Adaptive Lighting Technology". Adaptive Lighting Technology is a breakthrough technology that enables printers to produce photos that look more like what people see with their own eyes. It accomplishes this by balancing relationships between bright and dark areas in a photo, preserving gentle contrasts by smoothing out harsh contrasts.

    If there were a color ink jet printer model that contained all of the features of the printer whose description I just showed you, but it did **not** have the Adaptive Lighting Technology feature, do you think that model would cost less than the model with the Adaptive Lighting Technology feature, or would the price be the same as the model with the Adaptive Lighting Technology feature? **

---

** There were 2 versions of Q.1, changing the order in which the response choices were read. The second version read ".... do you think that the price would be the same as the model with the Adaptive Lighting Technology feature, or would that model cost less than the model with the Adaptive Lighting Technology feature?"

If respondents answered that the "price would be the same" or "don't know," they were not asked any further questions. If respondents answered "would cost less," the interview continued with:

2. About how much less do you think the model **without** the Adaptive Lighting Technology feature would cost? **(RECORD VERBATIM RESPONSE.)**

If respondents answered with an amount, they were not asked any further questions. If respondents answered "don't know," the interview continued with:

3. **(IF "DON'T KNOW" IN Q.2 HAND RESPONDENT CARD Q.3 AND ASK:)** Which of the choices on this card indicates how much less you think the model **without** the Adaptive Lighting Technology feature would cost? Just tell me the letter of the choice you select.

> I believe that the model **without** the Adaptive Lighting Technology feature would be a savings of:
>
> A. Less than $1.00
>
> B. $1.00 - $4.99
>
> C. $5.00 - $9.99
>
> D. $10.00 - $19.99
>
> E. $20.00 or more

All respondents were then thanked and excused.

The questionnaire appears as Exhibit A of the Appendix.

# FINDINGS

Eight in ten consumers thought that the model of printer in the description they viewed would cost less without the Adaptive Lighting Technology feature, and that the amount less would be in the range of 17% - 18% of the model's quoted price (based on the median value).

The table below displays the findings for each printer.

| | HP Photosmart C6180 All-in-One | | HP Officejet 5610 All-in-One | |
| --- | --- | --- | --- | --- |
| | | | Price: $109.99; after rebate: $99.99 | |
| | Price: $299.99 | | | |
| | (409) # | (100) % | (422) # | (100) % |
| Model **without** Adaptive Lighting Technology feature | | | | |
| Would cost less ..................................... | 328 | 80 | 340 | 81 |
| Price would be the same ....................... | 54 | 13 | 58 | 14 |
| Don't know ............................................ | 27 | 7 | 24 | 6 |
| Dollar amount **less** model would cost **without** Adaptive Lighting Technology feature | | | | |
| Mean dollar amount ............................... | $49.23 | | $21.86 | |
| Median dollar amount ............................ | $50.00 | | $20.00 | |
| Median Percent of Price ........................ | 17% | | 18% | |

See Appendix Exhibit E for verbatim responses.

Submitted by:                          Date:  March 5, 2008

*Walter McCullough*

Walter McCullough, President
Monroe Mendelsohn Research, Inc.

# EXHIBITS

A. Screener and Main Questionnaires

B. Field Supervisor and Interviewer Instructions

C. Printer Descriptions

D. Validation Questionnaire

E. Survey Data - Verbatims

F. Fees and Professional and Academic Background of Walter McCullough

EXHIBIT A. Screener and Main Questionnaires

MMR #4450 P January 2008

**GREEN**

**PRINTER SURVEY**

**SCREENER**

---

Screener Interviewer: _____    4-    5-    6-    7-

---

> **APPROACH MALES AND FEMALES WHO APPEAR TO BE**
> **18 YEARS OF AGE OR OLDER**

**INTRODUCTION:** Hello, I'm _____ representing Monroe Mendelsohn Research, a survey research company. We're conducting a survey in this area and your participation would be especially important to us. We are not selling anything. This is only a survey.

A.    First, do you work in this mall?

    Yes ................. [ ]1 ⟶ **TERMINATE AND TALLY. RE-USE SCREENER.**    8-

    No ................. [ ]2 ⟶ **CONTINUE**

B.    Do you usually wear contact lenses or eyeglasses when you read?

    Yes ................. [ ]1 ⟶ **ASK Q.C**    9-

    No ................. [ ]2 ⟶ **SKIP TO Q.D**

C.    **(IF "Yes" IN Q.B, ASK:)** Do you have them with you today?

    Yes ................. [ ]1 ⟶ **SAY: "During this interview, please feel free**    10-
                                **to use them whenever you need them"**
                                **AND CONTINUE.**

    No ................. [ ]2 ⟶ **TERMINATE AND TALLY. RE-USE SCREENER.**

D.    Which letter on this card **(HAND RESPONDENT AGE CARD)** includes your age?  **(RECORD RESPONDENT'S AGE UNDER THE APPROPRIATE GENDER COLUMN.)**

|  | **MALE** | **FEMALE** | |
|---|---|---|---|
| A. Under 18 ......... | [ ]1 | [ ]1 | ⟶ TERMINATE AND TALLY. RE-USE SCREENER. |
| B. 18-34 .............. | [ ]2 | [ ]2 | CHECK AGE/GENDER SCREENING QUOTA. |
| C. 35-49 .............. | [ ]3 | [ ]3 | ⟶ IF OPEN, CONTINUE WITH Q.E. OTHERWISE, TERMINATE AND TALLY. |
| D. 50 and over ..... | [ ]4 | [ ]4 | RE-USE SCREENER. |
| Refused .......... | [ ]5 | [ ]5 | ⟶ TERMINATE AND TALLY. RE-USE SCREENER. |

11-12

**(TAKE BACK AGE CARD.)**

E.    Do you or does anyone in your household work for an advertising agency, marketing research firm, or in the production, distribution or sale of computers, cameras or printers?

Yes .................. [  ]1 ➞ **TERMINATE AND TALLY. RE-USE SCREENER.**    13-

No ................... [  ]2 ➞ **CONTINUE**

F.    Have you been interviewed in this or any other mall in the past three months?

Yes .................. [  ]1 ➞ **TERMINATE AND TALLY. RE-USE SCREENER.**    14-

No ................... [  ]2 ➞ **CONTINUE**

G1.   Which of the following products, if any, have you bought in the past 12 months?  **(READ LIST. RECORD ALL "Yes" MENTIONS UNDER COL Q.G1 BELOW.  IF RESPONDENT DID NOT BUY ANY OF THE LISTED PRODUCTS, 'X' "NONE OF THESE.")**

G2.   And, which of the following products do you think you might buy in the next 12 months? **(READ LIST. RECORD ALL "Yes" MENTIONS UNDER COL Q.G2 BELOW.  IF RESPONDENT DOESN'T THINK HE/SHE MIGHT BUY ANY OF THE LISTED PRODUCTS, 'X' "NONE OF THESE.")**

|  | Q.G1 Bought In Past 12 Months | Q.G2 Might Buy In Next 12 Months |  |
|---|---|---|---|
| A laptop computer ............................ | [  ]1 | [  ]1 | 15-16 |
| A digital camera ................................. | [  ]2 | [  ]2 | |
| **A color ink jet printer .....................** | [  ]3 ↓ CONTINUE | [  ]3 ↓ CONTINUE | |
| **(DO NOT READ)** None of these ................................... | [  ]0 | [  ]0 | |

**RESPONDENTS MUST ANSWER "A color ink jet printer" IN Q.G1 AND/OR Q.G2 TO CONTINUE.**

**IF NOT "A color ink jet printer" IN EITHER Q.G1 OR Q.G2, TERMINATE AND TALLY. RE-USE SCREENER.**

H.    I have a few more questions I'd like to ask you. The interview will take about 5-10 minutes and I think you will find it interesting.  Are you willing to help us out?

17-

Yes .................. [  ]1 ➞ **TAKE RESPONDENT TO INTERVIEWING AREA.**

No ................... [  ]2 ➞ **THANK RESPONDENT AND SAY, "Perhaps some other time you'll be able to participate.  Thanks anyway!" TERMINATE AND TALLY. RE-USE SCREENER.**

Day of the Week: _____    Date: _____

Time of Day Screener Completed: _____

**GREEN**

RESPONDENT'S NAME: _____

ADDRESS: _____

CITY: _____

STATE: _____    ZIP: _____

PHONE: (        ) _____

## PRINTER SURVEY

## SCREENER

| Screener Interviewer: _____ | 4-  5-  6-  7- |

```
┌──────────────────────────────────────────────────────┐
│        APPROACH MALES AND FEMALES WHO APPEAR TO BE     │
│                18 YEARS OF AGE OR OLDER                │
└──────────────────────────────────────────────────────┘
```

**INTRODUCTION:**  Hello, I'm _____ representing Monroe Mendelsohn Research, a survey research company.  We're conducting a survey in this area and your participation would be especially important to us. We are not selling anything.  This is only a survey.

A.   First, do you work in this mall?                                                                8-

        Yes .................. [  ]1 ➞ **TERMINATE AND TALLY. RE-USE SCREENER.**

        No ................... [  ]2 ➞ **CONTINUE**

B.   Do you usually wear contact lenses or eyeglasses when you read?                                  9-

        Yes .................. [  ]1 ➞ **ASK Q.C**

        No ................... [  ]2 ➞ **SKIP TO Q.D**

C.   **(IF "Yes" IN Q.B, ASK:)** Do you have them with you today?                                     10-

        Yes .................. [  ]1 ➞ **SAY:  "During this interview, please feel free to use them whenever you need them" AND CONTINUE.**

        No ................... [  ]2 ➞ **TERMINATE AND TALLY.  RE-USE SCREENER.**

D.   Which letter on this card **(HAND RESPONDENT AGE CARD)** includes your age?  **(RECORD RESPONDENT'S AGE UNDER THE APPROPRIATE GENDER COLUMN.)**

|  | **MALE** | **FEMALE** | | 11-12 |
|---|---|---|---|---|
| A.  Under 18 ......... | [  ]1 | [  ]1 | ➞ TERMINATE AND TALLY. RE-USE SCREENER. | |
| B.  18-34 .............. | [  ]2 | [  ]2 | ➞ CHECK AGE/GENDER SCREENING QUOTA. | |
| C.  35-49 .............. | [  ]3 | [  ]3 | IF OPEN, CONTINUE WITH Q.E. | |
| D.  50 and over ..... | [  ]4 | [  ]4 | OTHERWISE, TERMINATE AND TALLY. RE-USE SCREENER. | |
| Refused .......... | [  ]5 | [  ]5 | ➞ TERMINATE AND TALLY. RE-USE SCREENER. | |

**(TAKE BACK AGE CARD.)**

E.    Do you or does anyone in your household work for an advertising agency, marketing research firm, or in the production, distribution or sale of computers, cameras or printers?

        Yes .................. [  ]1 ⟶  **TERMINATE AND TALLY. RE-USE SCREENER.**          13-

        No ................... [  ]2 ⟶  **CONTINUE**

F.    Have you been interviewed in this or any other mall in the past three months?

        Yes .................. [  ]1 ⟶  **TERMINATE AND TALLY. RE-USE SCREENER.**          14-

        No ................... [  ]2 ⟶  **CONTINUE**

G1.   Which of the following products, if any, have you bought in the past 12 months?  **(READ LIST. RECORD ALL "Yes" MENTIONS UNDER COL Q.G1 BELOW.  IF RESPONDENT DID NOT BUY ANY OF THE LISTED PRODUCTS, 'X' "NONE OF THESE.")**

G2.   And, which of the following products do you think you might buy in the next 12 months? **(READ LIST. RECORD ALL "Yes" MENTIONS UNDER COL Q.G2 BELOW.  IF RESPONDENT DOESN'T THINK HE/SHE MIGHT BUY ANY OF THE LISTED PRODUCTS, 'X' "NONE OF THESE.")**

|  | Q.G1<br>Bought<br>In Past<br>12 Months | Q.G2<br>Might Buy<br>In Next<br>12 Months |
|---|---|---|
| A laptop computer ............................ | [  ]1 | [  ]1 |
| A digital camera ............................... | [  ]2 | [  ]2 |
| **A color ink jet printer** ..................... | [  ]3<br>↓<br>**CONTINUE** | [  ]3<br>↓<br>**CONTINUE** |
| **(DO NOT READ)** None of these ................................... | [  ]0 | [  ]0 |

15-16

**RESPONDENTS MUST ANSWER "A color ink jet printer" IN Q.G1 AND/OR Q.G2 TO CONTINUE.**

**IF NOT "A color ink jet printer" IN EITHER Q.G1 OR Q.G2, TERMINATE AND TALLY. RE-USE SCREENER.**

H.    I have a few more questions I'd like to ask you. The interview will take about 5-10 minutes and I think you will find it interesting.  Are you willing to help us out?

        Yes .................. [  ]1 ⟶  **TAKE RESPONDENT TO INTERVIEWING AREA.**          17-

        No ................... [  ]2 ⟶  **THANK RESPONDENT AND SAY, "Perhaps some other time you'll be able to participate.  Thanks anyway!" TERMINATE AND TALLY. RE-USE SCREENER.**

Day of the Week: _____    Date: _____

Time of Day Screener Completed: _____

RESPONDENT'S NAME: _____

ADDRESS: _____

CITY: _____

STATE: _____     ZIP: _____

PHONE:  (          ) _____

# PRINTER SURVEY
# MAIN QUESTIONNAIRE

4-1

RESPONDENT'S NAME: _____

I'd like you to look at this description of a color ink jet printer and review the information as if you were considering whether or not to buy it.  After you have reviewed the product description, I will ask you a few questions.  If you don't know the answer to any of my questions, please don't hesitate to say that.

---

HAND RESPONDENT PRINTER DESCRIPTION (GREEN DOT) AND ALLOW HIM/HER SUFFICIENT TIME TO REVIEW IT THOROUGHLY BEFORE ASKING Q.1.

AFTER RESPONDENT HAS REVIEWED THE PRINTER DESCRIPTION,
***LEAVE THE PRINTER DESCRIPTION WITH THE RESPONDENT.***

---

1.      This particular color ink jet printer contains a feature called, "Adaptive Lighting Technology".  Adaptive Lighting Technology is a breakthrough technology that enables printers to produce photos that look more like what people see with their own eyes.  It accomplishes this by balancing relationships between bright and dark areas in a photo, preserving gentle contrasts by smoothing out harsh contrasts.

If there were a color ink jet printer model that contained all of the features of the printer whose description I just showed you, but it did **not** have the Adaptive Lighting Technology feature, do you think that model would cost less than the model with the Adaptive Lighting Technology feature, or would the price be the same as the model with the Adaptive Lighting Technology feature?

Would cost less ........................ [  ]1 ⟶ **ASK Q.2**                    5-

Price would be the same ........... [  ]2 ⟶ **END INTERVIEW**

Don't know ................................ [  ]3 ⟶ **END INTERVIEW**

2.      About how much less do you think the model **without** the Adaptive Lighting Technology feature would cost?  **(RECORD VERBATIM RESPONSE.)**

_____

Don't know ...... [  ]1 ⟶ **ASK Q.3**

6 - 8

3. **(IF "DON'T KNOW" IN Q.2 HAND RESPONDENT CARD Q.3 AND ASK:)** Which of the choices on this card indicates how much less you think the model **without** the Adaptive Lighting Technology feature would cost?  Just tell me the letter of the choice you select.

I believe that the model **without** the Adaptive Lighting Technology feature would be a savings of:

9-

A. Less than $1.00 ............................................. [  ]1

B. $1.00 - $4.99 ................................................ [  ]2

C. $5.00 - $9.99 ................................................ [  ]3

D. $10.00 - $19.99 ............................................ [  ]4

E. $20.00 or more ............................................. [  ]5

Don't know (RECORD IF VOLUNTEERED) ....... [  ]6

**(TAKE BACK CARD Q.3.)**

**THANK RESPONDENT AND END INTERVIEW.**

**MAKE SURE RESPONDENT INFORMATION (NAME, ADDRESS, PHONE NUMBER)
ON SCREENER IS COMPLETE.**

**Main Questionnaire Interviewer:** _____
                                                                    (10-13)

**INTERVIEWER CERTIFICATION:**

*I certify that I conducted this interview in accordance with my interviewer instructions.*

INTERVIEWER'S SIGNATURE: _____

**HAVE RESPONDENT DATE AND SIGN "RESPONDENT INTERVIEW VERIFICATION"
ON NEXT PAGE.**

**RESPONDENT INTERVIEW VERIFICATION**

Today's Date: _____

**I was interviewed on this date.  During the interview I was shown a product description and questioned about it.  I understand that all of the information I have supplied will remain confidential.**

_____
**Respondent Signature**

## PRINTER SURVEY
## MAIN QUESTIONNAIRE

4-2

RESPONDENT'S NAME: _____

I'd like you to look at this description of a color ink jet printer and review the information as if you were considering whether or not to buy it. After you have reviewed the product description, I will ask you a few questions. If you don't know the answer to any of my questions, please don't hesitate to say that.

---

HAND RESPONDENT PRINTER DESCRIPTION (GREEN DOT) AND ALLOW HIM/HER SUFFICIENT TIME TO REVIEW IT THOROUGHLY BEFORE ASKING Q.1.

AFTER RESPONDENT HAS REVIEWED THE PRINTER DESCRIPTION,
*LEAVE THE PRINTER DESCRIPTION WITH THE RESPONDENT.*

---

1.  This particular color ink jet printer contains a feature called, "Adaptive Lighting Technology". Adaptive Lighting Technology is a breakthrough technology that enables printers to produce photos that look more like what people see with their own eyes. It accomplishes this by balancing relationships between bright and dark areas in a photo, preserving gentle contrasts by smoothing out harsh contrasts.

    If there were a color ink jet printer model that contained all of the features of the printer whose description I just showed you, but it did **not** have the Adaptive Lighting Technology feature, do you think that the price would be the same as the model with the Adaptive Lighting Technology feature, or would that model cost less than the model with the Adaptive Lighting Technology feature?

    Price would be the same ........... [  ]1 ➝ **END INTERVIEW**     5-

    Would cost less ....................... [  ]2 ➝ **ASK Q.2**

    Don't know ............................... [  ]3 ➝ **END INTERVIEW**

2.  About how much less do you think the model **without** the Adaptive Lighting Technology feature would cost? **(RECORD VERBATIM RESPONSE.)**

    _____

    Don't know ...... [  ]1 ➝ **ASK Q.3**

6 - 8

Page M2.

3. **(IF "DON'T KNOW" IN Q.2 HAND RESPONDENT CARD Q.3 AND ASK:)** Which of the choices on this card indicates how much less you think the model **without** the Adaptive Lighting Technology feature would cost?  Just tell me the letter of the choice you select.

I believe that the model **without** the Adaptive Lighting Technology feature would be a savings of:

9-

A. Less than $1.00 ............................................  [  ]1

B. $1.00 - $4.99 ...............................................  [  ]2

C. $5.00 - $9.99 ...............................................  [  ]3

D. $10.00 - $19.99 ...........................................  [  ]4

E. $20.00 or more ............................................  [  ]5

Don't know (RECORD IF VOLUNTEERED) .......  [  ]6

**(TAKE BACK CARD Q.3.)**


**THANK RESPONDENT AND END INTERVIEW.**


**MAKE SURE RESPONDENT INFORMATION (NAME, ADDRESS, PHONE NUMBER)
ON SCREENER IS COMPLETE.**


**Main Questionnaire Interviewer:** _____
                                                         (10-13)


**INTERVIEWER CERTIFICATION:**

*I certify that I conducted this interview in accordance with my interviewer instructions.*


INTERVIEWER'S SIGNATURE: _____

**HAVE RESPONDENT DATE AND SIGN "RESPONDENT INTERVIEW VERIFICATION"
ON NEXT PAGE.**

## RESPONDENT INTERVIEW VERIFICATION

Today's Date: _____

**I was interviewed on this date.  During the interview I was shown a product description and questioned about it.  I understand that all of the information I have supplied will remain confidential.**

_____
**Respondent Signature**

# PRINTER SURVEY
# MAIN QUESTIONNAIRE

4-1

+-----------------------------------------------------------------------+
| RESPONDENT'S NAME: _____   |
+-----------------------------------------------------------------------+

I'd like you to look at this description of a color ink jet printer and review the information as if you were considering whether or not to buy it. After you have reviewed the product description, I will ask you a few questions. If you don't know the answer to any of my questions, please don't hesitate to say that.

+-----------------------------------------------------------------------+
| HAND RESPONDENT PRINTER DESCRIPTION (BLUE DOT) AND ALLOW HIM/HER       |
| SUFFICIENT TIME TO REVIEW IT THOROUGHLY BEFORE ASKING Q.1.            |
|                                                                       |
| AFTER RESPONDENT HAS REVIEWED THE PRINTER DESCRIPTION,                |
| *LEAVE THE PRINTER DESCRIPTION WITH THE RESPONDENT.*                   |
+-----------------------------------------------------------------------+

1.   This particular color ink jet printer contains a feature called, "Adaptive Lighting Technology". Adaptive Lighting Technology is a breakthrough technology that enables printers to produce photos that look more like what people see with their own eyes. It accomplishes this by balancing relationships between bright and dark areas in a photo, preserving gentle contrasts by smoothing out harsh contrasts.

     If there were a color ink jet printer model that contained all of the features of the printer whose description I just showed you, but it did **not** have the Adaptive Lighting Technology feature, do you think that model would cost less than the model with the Adaptive Lighting Technology feature, or would the price be the same as the model with the Adaptive Lighting Technology feature?

          Would cost less ........................ [  ]1 ⟶ **ASK Q.2**          5-

          Price would be the same ........... [  ]2 ⟶ **END INTERVIEW**

          Don't know ................................ [  ]3 ⟶ **END INTERVIEW**

2.   About how much less do you think the model **without** the Adaptive Lighting Technology feature would cost? **(RECORD VERBATIM RESPONSE.)**

     _____

          Don't know ...... [  ]1 ⟶ **ASK Q.3**

6 - 8

Page M2.

3. **(IF "DON'T KNOW" IN Q.2 HAND RESPONDENT CARD Q.3 AND ASK:)** Which of the choices on this card indicates how much less you think the model **without** the Adaptive Lighting Technology feature would cost?  Just tell me the letter of the choice you select.

I believe that the model **without** the Adaptive Lighting Technology feature would be a savings of:

9-

A. Less than $1.00 ............................................    [  ]1

B. $1.00 - $4.99 ..................................................    [  ]2

C. $5.00 - $9.99 ..................................................    [  ]3

D. $10.00 - $19.99 ............................................    [  ]4

E. $20.00 or more ..............................................    [  ]5

Don't know (RECORD IF VOLUNTEERED) .......    [  ]6

**(TAKE BACK CARD Q.3.)**


**THANK RESPONDENT AND END INTERVIEW.**


**MAKE SURE RESPONDENT INFORMATION (NAME, ADDRESS, PHONE NUMBER)
ON SCREENER IS COMPLETE.**


**Main Questionnaire Interviewer:** _____
                                                       (10-13)


**INTERVIEWER CERTIFICATION:**

***I certify that I conducted this interview in accordance with my interviewer instructions.***


INTERVIEWER'S SIGNATURE: _____


**HAVE RESPONDENT DATE AND SIGN "RESPONDENT INTERVIEW VERIFICATION"
ON NEXT PAGE.**

## RESPONDENT INTERVIEW VERIFICATION

Today's Date: _____

**I was interviewed on this date.  During the interview I was shown a product description and questioned about it.  I understand that all of the information I have supplied will remain confidential.**

_____
**Respondent Signature**

# PRINTER SURVEY
# MAIN QUESTIONNAIRE

4-2

RESPONDENT'S NAME: _____

I'd like you to look at this description of a color ink jet printer and review the information as if you were considering whether or not to buy it. After you have reviewed the product description, I will ask you a few questions. If you don't know the answer to any of my questions, please don't hesitate to say that.

---

HAND RESPONDENT PRINTER DESCRIPTION (BLUE DOT) AND ALLOW HIM/HER SUFFICIENT TIME TO REVIEW IT THOROUGHLY BEFORE ASKING Q.1.

AFTER RESPONDENT HAS REVIEWED THE PRINTER DESCRIPTION,
*LEAVE THE PRINTER DESCRIPTION WITH THE RESPONDENT.*

---

1.    This particular color ink jet printer contains a feature called, "Adaptive Lighting Technology". Adaptive Lighting Technology is a breakthrough technology that enables printers to produce photos that look more like what people see with their own eyes. It accomplishes this by balancing relationships between bright and dark areas in a photo, preserving gentle contrasts by smoothing out harsh contrasts.

If there were a color ink jet printer model that contained all of the features of the printer whose description I just showed you, but it did **not** have the Adaptive Lighting Technology feature, do you think that the price would be the same as the model with the Adaptive Lighting Technology feature, or would that model cost less than the model with the Adaptive Lighting Technology feature?

        Price would be the same ........... [  ]1 ⟶ **END INTERVIEW**            5-

        Would cost less ....................... [  ]2 ⟶ **ASK Q.2**

        Don't know ............................... [  ]3 ⟶ **END INTERVIEW**

2.    About how much less do you think the model **without** the Adaptive Lighting Technology feature would cost?  **(RECORD VERBATIM RESPONSE.)**

        _____

        Don't know ...... [  ]1 ⟶ **ASK Q.3**                                      6 - 8

3. **(IF "DON'T KNOW" IN Q.2 HAND RESPONDENT CARD Q.3 AND ASK:)** Which of the choices on this card indicates how much less you think the model **without** the Adaptive Lighting Technology feature would cost?  Just tell me the letter of the choice you select.

I believe that the model **without** the Adaptive Lighting Technology feature would be a savings of:

9-

A. Less than $1.00 ............................................  [  ]1

B. $1.00 - $4.99 ................................................  [  ]2

C. $5.00 - $9.99 ................................................  [  ]3

D. $10.00 - $19.99 ............................................  [  ]4

E. $20.00 or more .............................................  [  ]5

Don't know (RECORD IF VOLUNTEERED) .......  [  ]6

**(TAKE BACK CARD Q.3.)**

**THANK RESPONDENT AND END INTERVIEW.**

**MAKE SURE RESPONDENT INFORMATION (NAME, ADDRESS, PHONE NUMBER) ON SCREENER IS COMPLETE.**

**Main Questionnaire Interviewer:** _____
(10-13)

**INTERVIEWER CERTIFICATION:**

*I certify that I conducted this interview in accordance with my interviewer instructions.*

INTERVIEWER'S SIGNATURE: _____

**HAVE RESPONDENT DATE AND SIGN "RESPONDENT INTERVIEW VERIFICATION" ON NEXT PAGE.**

Page M3.

## RESPONDENT INTERVIEW VERIFICATION

Today's Date: _____

**I was interviewed on this date.  During the interview I was shown a product description and questioned about it.  I understand that all of the information I have supplied will remain confidential.**

_____
**Respondent Signature**

EXHIBIT B. Field Supervisor and Interviewer Instructions

**MONROE MENDELSOHN RESEARCH, INC.**
**841 BROADWAY**
**NEW YORK, NY 10003**
**(800) 223-7620**
**(212) 677-8833 (FAX #)**

TO:   **SUPERVISORS**
FROM:   **TOM JASORKA**
RE:   **PRINTER SURVEY - MMR #4450P (GREEN)**
DATE:   **JANUARY, 2008**

Enclosed please find the following materials:

 80   Screeners (GREEN)
 70   Main Questionnaires  (GREEN)
  6   Screeners "For Briefing Only" (GREEN)
  6   Main Questionnaires "For Briefing Only" (GREEN)
  8   Briefing Participation/Non Disclosure Forms (BLUE)
  2   Supervisor Instructions (WHITE)
  6   Interviewer Instructions (LAVENDER)
  6   Male Interim Report Forms (WHITE)
  6   Female Interim Report Forms (WHITE)
 40   Tally Sheets (WHITE)
  4   Age Cards (WHITE)
  4   Cards Q.3 (WHITE)

  2   Mall Quota Sheets - Screenings (WHITE)
 20   Validation Forms (YOU MAY NOT USE ANY OTHER VALIDATION FORMS OTHER THAN
      THE ONES WE SENT YOU, UNLESS SPECIFICALLY AUTHORIZED BY MMR.)
  4   Printer Descriptions (GREEN DOT)

Check that you have received the above materials in sufficient quantities.  Contact Monroe
Mendelsohn Research (MMR) immediately if any materials are missing.

MAIN QUESTIONNAIRES HAVE BEEN INTERCOLLATED.  DO NOT DISTURB THE ORDER.

## QUOTA

Your quota is 26 interviews, with males and females, 18 years of age or older, who have bought a
color ink jet printer in the past 12 months AND/OR think they might buy a color ink jet printer in the
next 12 months.  Additionally, they may not work in the mall, must have contact lenses or eyeglasses
with them if they wear them, and meet the occupation and past participation screening.

ALTHOUGH THE INTERVIEW QUOTA IS NOT BROKEN DOWN BY SEX AND AGE, THERE ARE
SCREENING QUOTAS BY SEX AND AGE.  **A COMPLETED SCREENING IS DEFINED AS
SOMEONE WHO ANSWERS AT LEAST Q.G1/G2 ON THE SCREENER.**  COMPLETED
INTERVIEWS, TERMINATES AT Q.G1/G2, Q. H AND TERMINATES MID-INTERVIEW COUNT AS
COMPLETED SCREENINGS.  TERMINATES AT Q's A, C, D, E OR F DO NOT COUNT AS
COMPLETED SCREENINGS.

## SUPERVISOR INSTRUCTIONS

YOUR **SCREENING QUOTAS** BY GENDER AND AGE ARE AS FOLLOWS:

| AGE | SCREENING QUOTA TOTAL QUOTA | | SCREENING QUOTA MALE QUOTA | | SCREENING QUOTA FEMALE QUOTA | |
|---|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| 18 to 34 years of age | 81 | 31% | 42 | 16% | 39 | 15% |
| 35 to 49 years of age | 78 | 30% | 39 | 15% | 39 | 15% |
| 50 years of age or older | 102 | 39% | 47 | 18% | 55 | 21% |
| TOTAL | 261 | 100% | 128 | 49% | 133 | 51% |

NOTE:     If you have not completed your quota of 26 interviews after completing your screening
quota of <u>261</u> screenings, call immediately for an adjusted screening quota.

IF YOU CANNOT OBTAIN AN ADJUSTED SCREENING QUOTA, <u>CONTINUE SCREENING</u> BY SEX
AND AGE IN THE PROPORTION SHOWN ABOVE UNTIL YOU <u>COMPLETE 26 INTERVIEWS</u>.

## CREW SIZE

**You will need 3-4 interviewers per shift to complete this project on schedule.**

No interviewer may complete more than 7 SCREENERS (QUALIFIED AND COOPERATIVE).

No interviewer may complete more than <u>7</u> MAIN QUESTIONNAIRES.

If circumstances arise in which an interviewer may need to complete more than <u>7</u> Screeners or <u>7</u>
Main Questionnaires in order to finish the study on schedule, you must contact our office first.  We will
inform you whether or not we can permit this.

## TALLY SHEETS

You have been provided with White Tally Sheets on which to record all terminates.

## MALL QUOTA CONTROL SHEETS

You have been provided with White Mall Quota Control Sheets.  Post the Mall Quota Control Sheet
near the area where the interviewing will take place so that interviewers can record each screening
and completed main interview by sex and age group.

## METHOD OF INTERVIEWING

All respondents are to be screened in the main mall.  All <u>qualified</u> respondents are to be taken to a
separate area, off the main mall, where a Printer Description will be shown and the interview will be
conducted.  Respondents must not be in either hearing or viewing distance of each other during the
interview phase.  All interviewers must record answers as clearly and as darkly as possible.

MMR #4450P                                                              Page 3
January, 2008

## SUPERVISOR INSTRUCTIONS

### RECORDING OF INTERVIEWER NAME

You must record the name of the Screener Interviewer where indicated on the Screener and the Main Questionnaire Interviewer where indicated on the Main Questionnaire.  If the Screener and Main Questionnaire Interviewer are the same person, you must still record the name in both locations.

### FIELD DATES

Interviewing is to begin on Thursday, January 24th and must be completed no later than Sunday, January 27, 2008.

### INTERVIEWING HOURS

WEEKDAYS: = 5:00PM - 9:30PM
WEEKENDS: = 10:00AM - 9:30PM

## NOTE:  WEEKDAY INTERVIEWING MUST NOT START BEFORE 5:00PM!  ANY INTERVIEWS NOT COMPLETED WITHIN THE TIME PERIOD INDICATED WILL NOT BE ACCEPTED.

### BRIEFING

You must conduct a personal briefing with all interviewers working on this study.  Each interviewer must complete a practice interview, including use of the Printer Description, so that any errors can be caught before field work begins.  You have been provided with Screeners and Main Questionnaires labeled "For Briefing Only" to be used for briefing purposes.  Go over these "For Briefing Only" interviews while the interviewers are still at the briefing so that mistakes can be corrected before actual interviewing begins.  "For Briefing Only" Screeners and Main Questionnaires must be returned to MMR with your first shipment of completed work.

### BRIEFING PARTICIPATION/NON-DISCLOSURE STATEMENT

Each interviewer working on this study is required to sign the Briefing Participation/Non-Disclosure Statement which must be returned to MMR with your first shipment.

### INTERIM REPORT

Fax or call MMR on Friday, January 25th by 10AM (NY Time) with a cumulative and complete report of all the Information required on the Interim Report Form.  Fax reports to (212) 677-8833.

### EDITING

All work must be edited by you.  Use only a green pencil for this purpose.  Never change an answer, simply indicate where an error has been made.  If a questionnaire is incorrect or illegible, it must be replaced.

## SUPERVISOR INSTRUCTIONS

### VALIDATION FORMS

The Validation Forms were customized for this study.   You may not substitute any other Validation Forms for the ones we sent you.

You must complete Validation Forms representing all completed interviews.  Each form should represent one Screener Interviewer's work.  Note: There is also a column for recording Main Questionnaire Interviewer.  You must record the Main Questionnaire Interviewer for every respondent listed on the Validation Form, even if the Main Questionnaire Interviewer is the same as the Screener Interviewer.

If a respondent refuses to give a telephone number, you must try to obtain it from your local directory.

YOU ARE NOT TO VALIDATE ANY PORTION OF THIS STUDY.   However, Validation Forms must be completed and returned to MMR.  We will validate up to 100% of the Questionnaires.

### VALIDATION OF WORKING PHONE NUMBER

While the Main Questionnaire is being administered to a respondent, the supervisor should dial the phone number provided by the respondent to verify that it is a working number.  If it isn't, the supervisor should re-check the number with the respondent.

### RETURN OF WORK

**Monday, January 28th**     All Completed Interviews to date with corresponding Validation Forms, "For Briefing Only" Questionnaires, and Briefing Participation/Non Disclosure Forms are to be shipped DHL Next Day 10:30 unless otherwise instructed.  **OUR DHL ACCOUNT NUMBER IS 803714331.**

**ALL MATERIALS MUST BE SEPARATED BY SCREENER INTERVIEWER WITHIN THE SHIPMENT WITH APPROPRIATE VALIDATION FORMS ON TOP OF EACH SCREENER INTERVIEWER'S WORK.  WE WILL ADVISE YOU OF ADDITIONAL SHIPMENTS.  DO NOT RETURN ANY OTHER MATERIALS TO MMR UNTIL INSTRUCTED TO DO SO.**

### BILLING

Submit a bill, addressed to Thomas Jasorka, on your own letterhead, within one week of completion of this study.

**MONROE MENDELSOHN RESEARCH, INC.**
**841 BROADWAY**
**NEW YORK, NY 10003**
**(800) 223-7620**
**(212) 677-8833 (FAX #)**

TO:      **SUPERVISORS**
FROM:    **TOM JASORKA**
RE:      **PRINTER SURVEY - MMR #4462 (BLUE)**
DATE:    **FEBRUARY, 2008**

Enclosed please find the following materials:

  80    Screeners (WHITE)
  70    Main Questionnaires  (BLUE)
   6    Screeners "For Briefing Only" (WHITE)
   6    Main Questionnaires "For Briefing Only" (BLUE)
   8    Briefing Participation/Non Disclosure Forms (BLUE)
   2    Supervisor Instructions (WHITE)
   6    Interviewer Instructions (LAVENDER)
   6    Male Interim Report Forms (WHITE)
   6    Female Interim Report Forms (WHITE)
  40    Tally Sheets (WHITE)
   4    Age Cards (WHITE)
   4    Cards Q.3 (WHITE)

   2    Mall Quota Sheets - Screenings (WHITE)
  20    Validation Forms (YOU MAY NOT USE ANY OTHER VALIDATION FORMS OTHER THAN
         THE ONES WE SENT YOU, UNLESS SPECIFICALLY AUTHORIZED BY MMR.)
   4    Printer Descriptions (BLUE DOT)

Check that you have received the above materials in sufficient quantities.  Contact Monroe
Mendelsohn Research (MMR) immediately if any materials are missing.

MAIN QUESTIONNAIRES HAVE BEEN INTERCOLLATED.  DO NOT DISTURB THE ORDER.

**<u>QUOTA</u>**

Your quota is <u>52</u> interviews, with males and females, 18 years of age or older, who have bought a
color ink jet printer in the past 12 months AND/OR think they might buy a color ink jet printer in the
next 12 months.  Additionally, they may not work in the mall, must have contact lenses or eyeglasses
with them if they wear them, and meet the occupation and past participation screening.

ALTHOUGH THE <u>INTERVIEW</u> QUOTA IS NOT BROKEN DOWN BY SEX AND AGE, THERE ARE
<u>SCREENING</u> QUOTAS BY SEX AND AGE.  **A COMPLETED SCREENING IS DEFINED AS
SOMEONE WHO ANSWERS AT LEAST Q.G1/G2 ON THE SCREENER.**  COMPLETED
INTERVIEWS, TERMINATES AT Q.G1/G2, Q. H AND TERMINATES MID-INTERVIEW COUNT AS
COMPLETED SCREENINGS.  TERMINATES AT Q's A, C, D, E OR F DO NOT COUNT AS
COMPLETED SCREENINGS.

### SUPERVISOR INSTRUCTIONS

YOUR **SCREENING QUOTAS** BY GENDER AND AGE ARE AS FOLLOWS:

| AGE | SCREENING QUOTA TOTAL QUOTA | | SCREENING QUOTA MALE QUOTA | | SCREENING QUOTA FEMALE QUOTA | |
|---|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| 18 to 34 years of age | 162 | 31% | 84 | 16% | 78 | 15% |
| 35 to 49 years of age | 153 | 30% | 78 | 15% | 75 | 15% |
| 50 years of age or older | 204 | 39% | 94 | 18% | 110 | 21% |
| TOTAL | 519 | 100% | 256 | 49% | 263 | 51% |

NOTE:    If you have not completed your quota of 52 interviews after completing your screening quota of 519 screenings, call immediately for an adjusted screening quota.

IF YOU CANNOT OBTAIN AN ADJUSTED SCREENING QUOTA, <u>CONTINUE SCREENING</u> BY SEX AND AGE IN THE PROPORTION SHOWN ABOVE UNTIL YOU <u>COMPLETE 52 INTERVIEWS.</u>

### CREW SIZE

**You will need 3-4 interviewers per shift to complete this project on schedule.**

No interviewer may complete more than 14 SCREENERS (QUALIFIED AND COOPERATIVE).

No interviewer may complete more than 14 MAIN QUESTIONNAIRES.

If circumstances arise in which an interviewer may need to complete more than 14 Screeners or 14 Main Questionnaires in order to finish the study on schedule, you must contact our office first.  We will inform you whether or not we can permit this.

### TALLY SHEETS

You have been provided with White Tally Sheets on which to record all terminates.

### MALL QUOTA CONTROL SHEETS

You have been provided with White Mall Quota Control Sheets.  Post the Mall Quota Control Sheet near the area where the interviewing will take place so that interviewers can record each screening and completed main interview by sex and age group.

### METHOD OF INTERVIEWING

All respondents are to be screened in the main mall.  All <u>qualified</u> respondents are to be taken to a separate area, off the main mall, where a Printer Description will be shown and the interview will be conducted.  Respondents must not be in either hearing or viewing distance of each other during the interview phase.  All interviewers must record answers as clearly and as darkly as possible.

MMR #4462
February, 2008

Page 3

## SUPERVISOR INSTRUCTIONS

### RECORDING OF INTERVIEWER NAME

You must record the name of the Screener Interviewer where indicated on the Screener and the Main Questionnaire Interviewer where indicated on the Main Questionnaire.  If the Screener and Main Questionnaire Interviewer are the same person, you must still record the name in both locations.

### FIELD DATES

Interviewing is to begin on Thursday, February 14th and must be completed no later than Monday, February 18th, 2008.

### INTERVIEWING HOURS

WEEKDAYS: = 5:00PM - 9:30PM
WEEKENDS: = 10:00AM - 9:30PM

## NOTE:  WEEKDAY INTERVIEWING MUST NOT START BEFORE 5:00PM!  ANY INTERVIEWS NOT COMPLETED WITHIN THE TIME PERIOD INDICATED WILL NOT BE ACCEPTED.

### FURTHER NOTE:   MONDAY, FEBRUARY 18TH IS A HOLIDAY.  DAYTIME INTERVIEWING IS ALLOWED.

### BRIEFING

You must conduct a personal briefing with all interviewers working on this study.  Each interviewer must complete a practice interview, including use of the Printer Description, so that any errors can be caught before field work begins.  You have been provided with Screeners and Main Questionnaires labeled "For Briefing Only" to be used for briefing purposes.  Go over these "For Briefing Only" interviews while the interviewers are still at the briefing so that mistakes can be corrected before actual interviewing begins.  "For Briefing Only" Screeners and Main Questionnaires must be returned to MMR with your first shipment of completed work.

### BRIEFING PARTICIPATION/NON-DISCLOSURE STATEMENT

Each interviewer working on this study is required to sign the Briefing Participation/Non-Disclosure Statement which must be returned to MMR with your first shipment.

### INTERIM REPORT

Fax or call MMR on Friday, February 25th by 10AM (NY Time) with a cumulative and complete report of all the Information required on the Interim Report Form.  Fax reports to (212) 677-8833.

## SUPERVISOR INSTRUCTIONS

### EDITING

All work must be edited by you.  Use only a BLUE pencil for this purpose.  Never change an answer, simply indicate where an error has been made.  If a questionnaire is incorrect or illegible, it must be replaced.

### VALIDATION FORMS

The Validation Forms were customized for this study.   You may not substitute any other Validation Forms for the ones we sent you.

You must complete Validation Forms representing all completed interviews.  Each form should represent one Screener Interviewer's work.  Note: There is also a column for recording Main Questionnaire Interviewer.  You must record the Main Questionnaire Interviewer for every respondent listed on the Validation Form, even if the Main Questionnaire Interviewer is the same as the Screener Interviewer.

If a respondent refuses to give a telephone number, you must try to obtain it from your local directory.

YOU ARE NOT TO VALIDATE ANY PORTION OF THIS STUDY.   However, Validation Forms must be completed and returned to MMR.  We will validate up to 100% of the Questionnaires.

### VALIDATION OF WORKING PHONE NUMBER

While the Main Questionnaire is being administered to a respondent, the supervisor should dial the phone number provided by the respondent to verify that it is a working number.  If it isn't, the supervisor should re-check the number with the respondent.

### RETURN OF WORK

**Tuesday, February 19th**  All Completed Interviews to date with corresponding Validation Forms, "For Briefing Only" Questionnaires, and Briefing Participation/Non Disclosure Forms are to be shipped DHL Next Day 10:30 unless otherwise instructed.

### OUR DHL ACCOUNT NUMBER IS 803714331.

**ALL MATERIALS MUST BE SEPARATED BY SCREENER INTERVIEWER WITHIN THE SHIPMENT WITH APPROPRIATE VALIDATION FORMS ON TOP OF EACH SCREENER INTERVIEWER'S WORK.  WE WILL ADVISE YOU OF ADDITIONAL SHIPMENTS.  DO NOT RETURN ANY OTHER MATERIALS TO MMR UNTIL INSTRUCTED TO DO SO.**

### BILLING

Submit a bill, addressed to Thomas Jasorka, on your own letterhead, within one week of completion of this study.

MONROE MENDELSOHN RESEARCH, INC.
841 BROADWAY
NEW YORK, NEW YORK 10003
(800) 223-7620
(212) 677-8833 (FAX #)

MMR #4450P
January, 2008

Printer Survey

### INTERVIEWER INSTRUCTIONS
### GREEN QUESTIONNAIRE

## I.  METHOD OF INTERVIEWING

All respondents are to be screened in the main mall.  All qualified respondents are to be taken to a separate area off the main mall where a Printer Description will be shown and the interview will be conducted.  Respondents must not be in hearing or viewing distance of each other.

### ALL INTERVIEWS MUST BE SIGNED BY THE RESPONDENT.

## II.  ELIGIBLE RESPONDENT

The eligible respondent is a male or female who:

**BE SURE TO RECORD THESE ACCURATELY.**

**WE VALIDATE EACH RESPONDENT ON EVERY ONE OF THESE QUALIFI-CATIONS**

QA.    Does not work in the mall.

QB/C.  Has eye wear with him/her, if required.

QD.    Is 18 years of age or older and qualifies for an Open Screening Quota.

QE.    Neither respondent, nor anyone in respondent's household works for an advertising agency, marketing research firm or in the production, distribution or sale of computers, cameras or printers.

QF.    Has not been interviewed in any mall in the past three months.

QG1/2.Has bought a color ink jet printer in the past 12 months AND/OR thinks he/she might buy a color ink jet printer in the next 12 months.

QH.    Is willing to participate.

A Screening Questionnaire has been provided to determine eligibility.

## III.  FIELD DATES

Interviewing is to begin on Thursday, January 24th and be completed by Sunday, January 27th, 2008.  Your supervisor will assign the specific hours you are to work.

INTERVIEWERS, PLEASE NOTE:  Your supervisor has accepted this assignment with the understanding that you will be paid on an hourly basis.  MMR strictly forbids the practice of interviewers being paid on a "flat rate" (i.e., price per interview) basis.

No interviewer may complete more than 7 Screeners.

No interviewer may complete more than 7 Main Questionnaires.

## INTERVIEWER INSTRUCTIONS

IV.  **MALL QUOTA SHEETS**

Mall Quota Control Sheets will be posted in the Mall near the area where the interviewing is taking place.  After a screening/interview has been completed, record it in the appropriate space under the appropriate column on the Mall Quota Control Sheet.

V.  **TALLY SHEETS**

You have been provided with Tally Sheets on which to record all terminates.

VI.  **VALIDATION FORMS**

Note that Validation Forms are customized for this study and those sent are the only ones to use.

Complete, in ink, a Validation Form, representing all completed interviews.  Each form should represent one <u>Screener</u> Interviewer's work.   Note: There is also a column for recording Main Questionnaire Interviewer.  You must record the Main Questionnaire Interviewer for every respondent listed on the Validation Form, even if the Main Questionnaire Interviewer is the same as the Screener Interviewer.

List each completed interview in sequential order.  Fill in (PRINT) the respondent's full name, address and telephone number.  Return the form(s) to your supervisor together with the corresponding completed work.

Be sure to obtain respondent's telephone number.  If it is not given, obtain the phone number from your local directory, if listed.

| NOTE:  WE WILL BE VALIDATING UP TO 100% OF THE INTERVIEWS ON THIS STUDY |
| --- |

VII.   **MAIN QUESTIONNAIRES**

MAIN QUESTIONNAIRES HAVE BEEN INTERCOLLATED.  USE THEM IN THE ORDER THEY WERE SHIPPED.

VIII.   **QUESTIONNAIRE INSTRUCTIONS**

These instructions are in addition to those on the questionnaire.  Read these instructions with a copy of the questionnaire in front of you.  All questions are straightforward.  Questionnaire instructions, including all skip patterns, are printed <u>ALL IN CAPS.  ALL SCREENERS AND QUESTIONNAIRES MUST BE COMPLETED AS CLEARLY AND DARKLY AS POSSIBLE. DO NOT ALLOW THE RESPONDENT TO LOOK AT OR SEE THE SCREENER OR MAIN QUESTIONNAIRE AT ANY TIME.</u>

### SCREENER:

<u>Q.A:</u>     Record response.  If "Yes", terminate and tally.  Erase and re-use Screener.  If "No", continue.

<u>Q.B:</u>     If "Yes", continue with Q.C.  If "No", skip to Q.D.

<u>Q.C:</u>     ASK IF "Yes" IN Q.B.  If "Yes", SAY: "During this interview, please feel free to  use them whenever you need them" and continue.  If "No", terminate and tally.  Erase and re-use Screener.

## INTERVIEWER INSTRUCTIONS

Q.D:    HAND RESPONDENT AGE CARD.  If "Under 18 years of age" or "Refused",
        terminate and tally.  Erase and re-use Screener.  All others, check quota.  If, open,
        continue with QE.  Otherwise, terminate and tally.  Erase and re-use Screener.
        TAKE BACK AGE CARD.

Q.E:    If "No", continue.  If "Yes", terminate and tally.  Erase and re-use Screener.

Q.F:    If "No", continue.  If "Yes", terminate and tally.  Erase and re-use Screener.

Q.G1/2: If no mention of "A color ink jet printer" in either Q.G1 OR Q.G2, terminate and tally.
        Erase and re-use Screener.  If "A color ink jet printer", is mentioned in either Q.G1
        OR Q.G2 OR BOTH, continue.

Q.H:    If "Yes", take respondent back to interviewing area.  If "No", terminate and tally.
        Erase and re-use Screener.

> **RECORD DAY OF WEEK, DATE AND TIME OF DAY SCREENER WAS COMPLETED IN
> THE BOX ON SCREENER PAGE S2.**

> **RECORD RESPONDENT'S NAME, COMPLETE ADDRESS, AND PHONE NUMBER IN THE
> BOX ON SCREENER PAGE S3.**

**TAKE RESPONDENT TO INTERVIEWING AREA.
MAIN QUESTIONNAIRE:**

> **RECORD RESPONDENT'S NAME IN THE BOX ON MAIN QUESTIONNAIRE PAGE M1.**

Read statement.

> **HAND RESPONDENT PRINTER DESCRIPTION (GREEN DOT) AND ALLOW HIM/HER
> SUFFICIENT TIME TO REVIEW IT THOROUGHLY BEFORE ASKING Q.1.  LEAVE THE
> PRINTER DESCRIPTION WITH RESPONDENT.**

Q.1:    If "Price would be the same"/"Don't know", END INTERVIEW.  If "Would
        cost less", ask Q.2.

Q.2:    Record verbatim response.  If, Don't know, ask Q. 3.  All other responses
        in Q.2, END INTERVIEW.

Q.3:    ASK ONLY IF "DON'T KNOW IN Q.2.  HAND RESPONDENT CARD Q.3.
        Record response.  TAKE BACK CARD Q.3.  THANK RESPONDENT AND
        END INTERVIEW.

        Make sure that all required information has been recorded on the Screener.

## INTERVIEWER INSTRUCTIONS

**UPON COMPLETION BE SURE TO RECORD (PRINT) MAIN QUESTIONNAIRE INTERVIEWER WHERE INDICATED ON THE MAIN QUESTIONNAIRE.**

**SIGN THE INTERVIEWER CERTIFICATION ON PAGE M2.**

**HAVE THE RESPONDENT DATE AND SIGN "RESPONDENT INTERVIEW VERIFICATION" ON PAGE M3.**

**STAPLE SCREENER TO TOP OF THE MAIN QUESTIONNAIRE.**

IX. **GENERAL INSTRUCTIONS**

In order to obtain an interview of the highest quality, we must insist on the implementation of the following techniques:

1. If the respondent refuses to answer a question indicate this by writing "REF" (standing for "Refused") in the area where the answer is to be recorded.

2. Questions must be asked word-for-word, exactly as they are printed on the questionnaire or screener.

3. Questions must be asked in the order they appear on the questionnaire.

4. There should not be any explanations, interpretations or additions to a question. If a respondent does not understand a question, merely re-read it. DO NOT EXPLAIN IT.

5. When appropriate, place an "X" in the box next to the answer given by the respondent.

6. If it is necessary to make a correction, cross out the original answer and then circle the correct number or box.

7. Write legibly AND AS DARK AS POSSIBLE. If we cannot read your writing, your work cannot be used.

8. Immediately after the close of the interview, the questionnaire is to be checked for completeness, legibility, etc. Incomplete or illegible questionnaires will have to be replaced.

MONROE MENDELSOHN RESEARCH, INC.
841 BROADWAY
NEW YORK, NEW YORK 10003
(800) 223-7620
(212) 677-8833 (FAX #)

MMR #4462
February, 2008

<u>Printer Survey</u>

## <u>INTERVIEWER INSTRUCTIONS</u>
### <u>BLUE QUESTIONNAIRE</u>

### I.  <u>METHOD OF INTERVIEWING</u>

All respondents are to be screened in the main mall.  All qualified respondents are to be taken to a separate area off the main mall where a Printer Description will be shown and the interview will be conducted.  Respondents must not be in hearing or viewing distance of each other.

### <u>ALL INTERVIEWS MUST BE SIGNED BY THE RESPONDENT.</u>

### II.  <u>ELIGIBLE RESPONDENT</u>

The eligible respondent is a male or female who:

**BE SURE TO RECORD THESE ACCURATELY.**

**WE VALIDATE EACH RESPONDENT ON EVERY ONE OF THESE QUALIFI-CATIONS**

| | |
|---|---|
| QA. | Does not work in the mall. |
| QB/C. | Has eye wear with him/her, if required. |
| QD. | Is 18 years of age or older and qualifies for an Open Screening Quota. |
| QE. | Neither respondent, nor anyone in respondent's household works for an advertising agency, marketing research firm or in the production, distribution or sale of computers, cameras or printers. |
| QF. | Has not been interviewed in any mall in the past three months. |
| QG1/2. | Has bought a color ink jet printer in the past 12 months AND/OR thinks he/she might buy a color ink jet printer in the next 12 months. |
| QH. | Is willing to participate. |

A Screening Questionnaire has been provided to determine eligibility.

### III.  <u>FIELD DATES</u>

Interviewing is to begin on <u>Thursday, February 14th</u> and be completed by <u>Monday, February 18th, 2008</u>.  Your supervisor will assign the specific hours you are to work.

INTERVIEWERS, PLEASE NOTE:  Your supervisor has accepted this assignment with the understanding that you will be paid on an hourly basis.  MMR strictly forbids the practice of interviewers being paid on a "flat rate" (i.e., price per interview) basis.

No interviewer may complete more than <u>14</u> Screeners.

No interviewer may complete more than <u>14</u> Main Questionnaires.

## INTERVIEWER INSTRUCTIONS

IV.  **MALL QUOTA SHEETS**

Mall Quota Control Sheets will be posted in the Mall near the area where the interviewing is taking place.  After a screening/interview has been completed, record it in the appropriate space under the appropriate column on the Mall Quota Control Sheet.

V.  **TALLY SHEETS**

You have been provided with Tally Sheets on which to record all terminates.

VI.  **VALIDATION FORMS**

Note that Validation Forms are customized for this study and those sent are the only ones to use.

Complete, in ink, a Validation Form, representing all completed interviews.  Each form should represent one <u>Screener</u> Interviewer's work.   Note: There is also a column for recording Main Questionnaire Interviewer.  You must record the Main Questionnaire Interviewer for every respondent listed on the Validation Form, even if the Main Questionnaire Interviewer is the same as the Screener Interviewer.

List each completed interview in sequential order.  Fill in (PRINT) the respondent's full name, address and telephone number.  Return the form(s) to your supervisor together with the corresponding completed work.

Be sure to obtain respondent's telephone number.  If it is not given, obtain the phone number from your local directory, if listed.

| NOTE:  WE WILL BE VALIDATING UP TO 100% OF THE INTERVIEWS ON THIS STUDY |
| --- |

VII.  **MAIN QUESTIONNAIRES**

MAIN QUESTIONNAIRES HAVE BEEN INTERCOLLATED.  USE THEM IN THE ORDER THEY WERE SHIPPED.

VIII.  **QUESTIONNAIRE INSTRUCTIONS**

These instructions are in addition to those on the questionnaire.  Read these instructions with a copy of the questionnaire in front of you.  All questions are straightforward.  Questionnaire instructions, including all skip patterns, are printed <u>ALL IN CAPS.  ALL SCREENERS AND QUESTIONNAIRES MUST BE COMPLETED AS CLEARLY AND DARKLY AS POSSIBLE. DO NOT ALLOW THE RESPONDENT TO LOOK AT OR SEE THE SCREENER OR MAIN QUESTIONNAIRE AT ANY TIME.</u>

**SCREENER:**

Q.A:  Record response.  If "Yes", terminate and tally.  Erase and re-use Screener.  If "No", continue.

Q.B:  If "Yes", continue with Q.C.  If "No", skip to Q.D.

Q.C:  ASK IF "Yes" IN Q.B.  If "Yes", SAY: "During this interview, please feel free to  use them whenever you need them" and continue.  If "No", terminate and tally.  Erase and re-use Screener.

Page 3.

## INTERVIEWER INSTRUCTIONS

Q.D:     HAND RESPONDENT AGE CARD.  If "Under 18 years of age" or "Refused",
         terminate and tally.  Erase and re-use Screener.  All others, check quota.  If, open,
         continue with QE.  Otherwise, terminate and tally.  Erase and re-use Screener.
         TAKE BACK AGE CARD.

Q.E:     If "No", continue.  If "Yes", terminate and tally.  Erase and re-use Screener.

Q.F:     If "No", continue.  If "Yes", terminate and tally.  Erase and re-use Screener.

Q.G1/2:  If no mention of "A color ink jet printer" in either Q.G1 OR Q.G2, terminate and tally.
         Erase and re-use Screener.  If "A color ink jet printer", is mentioned in either Q.G1
         OR Q.G2 OR BOTH, continue.

Q.H:     If "Yes", take respondent back to interviewing area.  If "No", terminate and tally.
         Erase and re-use Screener.

| RECORD DAY OF WEEK, DATE AND TIME OF DAY SCREENER WAS COMPLETED IN THE BOX ON SCREENER PAGE S2. |

| RECORD RESPONDENT'S NAME, COMPLETE ADDRESS, AND PHONE NUMBER IN THE BOX ON SCREENER PAGE S3. |

**TAKE RESPONDENT TO INTERVIEWING AREA.**
 **MAIN QUESTIONNAIRE:**

| RECORD RESPONDENT'S NAME IN THE BOX ON MAIN QUESTIONNAIRE PAGE M1. |

Read statement.

| HAND RESPONDENT PRINTER DESCRIPTION (BLUE DOT) AND ALLOW HIM/HER SUFFICIENT TIME TO REVIEW IT THOROUGHLY BEFORE ASKING Q.1.  LEAVE THE PRINTER DESCRIPTION WITH RESPONDENT. |

Q.1:     If "Price would be the same"/"Don't know", END INTERVIEW.  If "Would
         cost less", ask Q.2.

Q.2:     Record verbatim response.  If, Don't know", ask Q. 3.  All other responses
         in Q.2, END INTERVIEW.

Q.3:     ASK ONLY IF "DON'T KNOW IN Q.2.  HAND RESPONDENT CARD Q.3.
         Record response.  TAKE BACK CARD Q.3.  THANK RESPONDENT AND
         END INTERVIEW.

         Make sure that all required information has been recorded on the Screener.

## INTERVIEWER INSTRUCTIONS

---

**UPON COMPLETION BE SURE TO RECORD (PRINT) MAIN QUESTIONNAIRE INTERVIEWER WHERE INDICATED ON THE MAIN QUESTIONNAIRE.**

**SIGN THE INTERVIEWER CERTIFICATION ON PAGE M2.**

**HAVE THE RESPONDENT DATE AND SIGN "RESPONDENT INTERVIEW VERIFICATION" ON PAGE M3.**

**STAPLE SCREENER TO TOP OF THE MAIN QUESTIONNAIRE.**

---

IX.  **GENERAL INSTRUCTIONS**

In order to obtain an interview of the highest quality, we must insist on the implementation of the following techniques:

1.  If the respondent refuses to answer a question indicate this by writing "REF" (standing for "Refused") in the area where the answer is to be recorded.

2.  Questions must be asked word-for-word, exactly as they are printed on the questionnaire or screener.

3.  Questions must be asked in the order they appear on the questionnaire.

4.  There should not be any explanations, interpretations or additions to a question. If a respondent does not understand a question, merely re-read it. DO NOT EXPLAIN IT.

5.  When appropriate, place an "X" in the box next to the answer given by the respondent.

6.  If it is necessary to make a correction, cross out the original answer and then circle the correct number or box.

7.  Write legibly <u>AND AS DARK AS POSSIBLE</u>. If we cannot read your writing, your work cannot be used.

8.  Immediately after the close of the interview, the questionnaire is to be checked for completeness, legibility, etc. Incomplete or illegible questionnaires will have to be replaced.

EXHIBIT C. Printer Descriptions

# HP Photosmart C6180 All-in-One



Price $299.99

## Overview

In a hurry for your prints? Our Photosmart C6180 is the world's fastest photo All-in-One![1]
It's also a pro at color faxing, it uses six separate ink cartridges that you only replace as needed. With built-in wireless networking, it's ready for connecting to all your home PCs. More time savers: the 50-sheet automatic document feeder and 4 x 6" automated tray for dedicated photo printing.

## Networkable, easy, speedy

- **Connect your whole home computer system,** with or without wires[2] to go wireless, plug it into the Ethernet port of a wireless router
- **Print efficiently** with the 50-sheet automatic document feeder and automated 4 x 6" photo tray
- **Fax fast, in color,** with or without a PC, plus eliminate unwanted junk faxes[3]
- **Print documents fast** at up to 32 pages per minute black, 31 color
- **Print photos** in as little time as 12 seconds with the world's fastest photo All-in-One[1]
- **Save ink and money:** with the six individual HP Vivera ink jet cartridges, you replace only the ones that run out

## Photo versatility

- **Print photos** and reprints without a PC using memory cards[4]
- **Print rich, realistic photos** and laser-quality text using HP's Vivera inks
- **Print quick snapshots from your PC** via the Hi-Speed USB 2.0 connection[5]
- **Do borderless shots[6]** and panoramas
- **Make professional-quality reprints** with consistently accurate color reproduction, no PC needed
- **Do superb scans** of photos and documents and restore damaged photos with the 4800 x 4800 dpi scanning resolution[7], plus remove scratches on images
- **Easily print, e-mail, and save photos** using the HP Photosmart Express software
- **Resist photo fading[8]** for generations and retain document clarity for decades[9]
- **Remove red eye and enhance detail** with the touch of a button using HP's convenient Photo Fix feature
- **Get creative:** do artsy projects using the HP Photosmart software

## Accessories and options

- **Personalize CDs and DVDs** with tattoos featuring your photos and text[10]
- **Print on both sides** of the page with optional automatic two-sided printing[11]

## Award-winning support

- **Get peace of mind** with the one-year limited warranty plus HP's Total Care advice and support
- **Rely on printing excellence:** HP has won PC Magazine's Readers' Choice Award for service and reliability (as a result of its reader satisfaction survey) for 15 years running
- **Get product questions answered toll-free, 24 x 7,** or via e-mail in as little time as an hour—at www.HP.com/go/totalcare

# HP Officejet 5610 All-in-One



| | |
|---|---|
| Price | $109.99 |
| Save $10 with instant rebate | -$10.00 |
| Price after rebate | $99.99 |

## Overview

Put speed and efficiency into play in your home office with the compact and reliable HP Officejet 5610 All-in-One. Highlights include a junk fax barrier[1], a versatile glass surface for increased flexibility, and a 25-sheet automatic document feeder.

## Speed plus high quality . . . right in your own home

- **Get everything done fast and efficiently**—print and copy up to 20 pages per minute in black and up to 13 pages per minute in color
- **Automatically copy, scan, and send faxes** with the 25-sheet document feeder
- **Get high-quality scanning** of documents and photos with 1200 x 2400 dpi optical resolution and 48-bit color depth
- **Get first-rate black and color faxing** fast, at 33.6 Kbps, with or without a PC connection
- **Save money** with HP inkjet cartridges, which are designed for optimal ink usage

## Professional-looking reports, brochures, photos

- **Print and copy text in laser quality**, plus get true-to-life-color photos in optional six-ink color[2]
- **Give your photos great fade resistance** when you use select HP papers and inks
- **Automatically remove red eye and enhance detail** in dark areas of photos with HP's Real Life technologies
- **Print and copy 4 x 6" borderless prints**[3] or with borders in any size up to 8.5 x 11"

## A wealth of productivity features

- **Use the one-touch buttons** to fax, copy, and scan without your computer
- **Automatically block junk-fax numbers** displayed on your caller ID[1]
- **E-mail photos without large attachments** with HP Instant Share[4]
- **Enhance photos and image-rich brochures** with HP Image Zone
- **Stay on top of ink replacement** with HP SureSupply[5]: receive alerts when a cartridge is low, monitor its remaining life, and enjoy easy on-line ordering or check stock and prices at nearby stores
- **Get exclusive offers and rewards discounts** on HP ink, toner, and paper, plus shop from a list of customized printing supplies and get free next-day shipping with our "My Print Rewards" program

## Award-winning support

- **Get peace of mind** with the one-year limited warranty plus HP's Total Care advice and support
- **Rely on printing excellence:** HP has won PC Magazine's Readers' Choice Award for service and reliability (as a result of its reader satisfaction survey) for 15 years running
- **Get product questions answered toll-free, 24 x 7,** or via e-mail in as little time as an hour—at www.HP.com/go/totalcare.

EXHIBIT D. Validation Questionnaire

**MONROE MENDELSOHN RESEARCH, INC.**
**841 BROADWAY  NEW YORK, NY 10003**
**(800) 223-7620    (212) 677-8971 (FAX #)**

MMR #4450P                                                                    **PRINTER SURVEY**
January, 2008

### VALIDATION QUESTIONNAIRE

INTRODUCTION:  Hello, my name is_____.  Our records indicate that you recently participated in a survey. I'm not trying to sell you anything, I just need to ask you a few short questions about that survey.

1.    Did you recently participate in an interview in a shopping mall where you were shown a description of a color ink jet printer, asked to read it and then asked some questions about it?

Yes..........(  )                                        No...........(  )---**MAKE NOTE**

2.    Do you work in that mall?

Yes..........(  )---**MAKE NOTE**                        No...........(  )

3.    Prior to this interview, had you been interviewed in any mall in the past three months?

Yes..........(  )---**MAKE NOTE**                        No...........(  )

4.    Do you or does anyone in your household work for an advertising agency, marketing research firm or in the production, distribution or sale of computers, cameras or printers?

Yes..........(  )---**MAKE NOTE**                        No...........(  )

5.    When you were interviewed, did you say that you had either bought a color ink jet printer in the past 12 months **and/or** thought you might buy a color ink jet printer in the next 12 months?

Yes..........(  )                                        No...........(  )---**MAKE NOTE**

6.    Finally, are you 18 years of age or older?

Yes..........(  )                                        No...........(  )---**MAKE NOTE**

**The following abbreviations are to be used:**

| | |
|---|---|
| NA = | No answer |
| BZ = | Busy |
| DS = | Disconnect/Not in service |
| AM = | Answering machine |
| RRN# = | Respondent reported not at that number |
| RF = | Refused to complete validation questions |
| CB = | Callback |
| RNA = | Respondent not available |
| CM = | Complete |
| LB = | Language barrier |

MONROE MENDELSOHN RESEARCH, INC.
841 BROADWAY  NEW YORK, NY 10003
(800) 223-7620    (212) 677-8971 (FAX #)

MMR #4462                                                                                                              PRINTER SURVEY
February, 2008

### VALIDATION QUESTIONNAIRE

INTRODUCTION:  Hello, my name is_____.  Our records indicate that you recently participated in a survey.
I'm not trying to sell you anything, I just need to ask you a few short questions about that survey.

1.      Did you recently participate in an interview in a shopping mall where you were shown a description of a color ink
        jet printer, asked to read it and then asked some questions about it?

                        Yes..........(  )                                          No...........(  )---**MAKE NOTE**

2.      Do you work in that mall?

                        Yes..........(  )---**MAKE NOTE**                          No...........(  )

3.      Prior to this interview, had you been interviewed in any mall in the past three months?

                        Yes..........(  )---**MAKE NOTE**                          No...........(  )

4.      Do you or does anyone in your household work for an advertising agency, marketing research firm or in the
        production, distribution or sale of computers, cameras or printers?

                        Yes..........(  )---**MAKE NOTE**                          No...........(  )

5.      When you were interviewed, did you say that you had either bought a color ink jet printer in the past 12 months
        **and/or** thought you might buy a color ink jet printer in the next 12 months?

                        Yes..........(  )                                          No...........(  )---**MAKE NOTE**

6.      Finally, are you 18 years of age or older?

                        Yes..........(  )                                          No...........(  )---**MAKE NOTE**

**The following abbreviations are to be used:**

|        |                                              |
|--------|----------------------------------------------|
| NA =   | No answer                                    |
| BZ =   | Busy                                         |
| DS =   | Disconnect/Not in service                    |
| AM =   | Answering machine                            |
| RRN# = | Respondent reported not at that number       |
| RF =   | Refused to complete validation questions     |
| CB =   | Callback                                     |
| RNA =  | Respondent not available                     |
| CM =   | Complete                                     |
| LB =   | Language barrier                             |

EXHIBIT E. Survey Data - Verbatims

| Q're ID # | Q.1 | Q.2 Verbatim | Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|---|
| 107 | same price | | | $0.00 | 0.26738 |
| 116 | same price | | | $0.00 | 0.534759 |
| 118 | same price | | | $0.00 | 0.802139 |
| 157 | same price | | | $0.00 | 1.069519 |
| 160 | same price | | | $0.00 | 1.336898 |
| 164 | same price | | | $0.00 | 1.604278 |
| 166 | same price | | | $0.00 | 1.871658 |
| 170 | same price | | | $0.00 | 2.139037 |
| 175 | same price | | | $0.00 | 2.406417 |
| 187 | same price | | | $0.00 | 2.673797 |
| 189 | same price | | | $0.00 | 2.941176 |
| 196 | same price | | | $0.00 | 3.208556 |
| 197 | same price | | | $0.00 | 3.475936 |
| 209 | same price | | | $0.00 | 3.743316 |
| 210 | same price | | | $0.00 | 4.010695 |
| 212 | same price | | | $0.00 | 4.278075 |
| 221 | same price | | | $0.00 | 4.545455 |
| 225 | same price | | | $0.00 | 4.812834 |
| 226 | same price | | | $0.00 | 5.080214 |
| 233 | same price | | | $0.00 | 5.347594 |
| 238 | same price | | | $0.00 | 5.614973 |
| 248 | same price | | | $0.00 | 5.882353 |
| 252 | same price | | | $0.00 | 6.149733 |
| 254 | same price | | | $0.00 | 6.417112 |
| 262 | same price | | | $0.00 | 6.684492 |
| 300 | same price | | | $0.00 | 6.951872 |
| 352 | same price | | | $0.00 | 7.219251 |
| 367 | same price | | | $0.00 | 7.486631 |
| 374 | same price | | | $0.00 | 7.754011 |
| 394 | same price | | | $0.00 | 8.02139 |
| 397 | same price | | | $0.00 | 8.28877 |
| 409 | same price | | | $0.00 | 8.55615 |
| 413 | same price | | | $0.00 | 8.823529 |
| 419 | same price | | | $0.00 | 9.090909 |
| 423 | same price | | | $0.00 | 9.358289 |
| 424 | same price | | | $0.00 | 9.625668 |
| 427 | same price | | | $0.00 | 9.893048 |
| 431 | same price | | | $0.00 | 10.16043 |
| 434 | same price | | | $0.00 | 10.42781 |
| 435 | same price | | | $0.00 | 10.69519 |
| 436 | same price | | | $0.00 | 10.96257 |
| 442 | same price | | | $0.00 | 11.22995 |
| 444 | same price | | | $0.00 | 11.49733 |
| 453 | same price | | | $0.00 | 11.76471 |
| 475 | same price | | | $0.00 | 12.03209 |
| 478 | same price | | | $0.00 | 12.29947 |
| 479 | same price | | | $0.00 | 12.56684 |
| 480 | same price | | | $0.00 | 12.83422 |
| 499 | same price | | | $0.00 | 13.1016 |
| 500 | same price | | | $0.00 | 13.36898 |
| 505 | same price | | | $0.00 | 13.63636 |

MMR #4450 Printer Survey          HP Photosmart C6180 All-in-One          Price: $299.99

| Q're ID # | Q.1 | Q.2 Verbatim | Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|---|
| 506 | same price | | | $0.00 | 13.90374 |
| 507 | same price | | | $0.00 | 14.17112 |
| 516 | same price | | | $0.00 | 14.4385 |
| 288 | cost less | Don't know | Less than $1.00 | $0.50 | 14.70588 |
| 345 | cost less | Don't know | Less than $1.00 | $0.50 | 14.97326 |
| 177 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 15.24064 |
| 292 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 15.50802 |
| 425 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 15.7754 |
| 456 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 16.04278 |
| 466 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 16.31016 |
| 473 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 16.57754 |
| 474 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 16.84492 |
| 172 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 17.1123 |
| 184 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 17.37968 |
| 185 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 17.64706 |
| 204 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 17.91444 |
| 207 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 18.18182 |
| 260 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 18.4492 |
| 299 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 18.71658 |
| 370 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 18.98396 |
| 457 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 19.25134 |
| 463 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 19.51872 |
| 464 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 19.7861 |
| 476 | cost less | I think without that, the product will be $5 dollars cheaper. | | $5.00 | 20.05348 |
| 174 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 20.32086 |
| 186 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 20.58824 |
| 203 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 20.85561 |
| 243 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 21.12299 |
| 253 | cost less | $10.00 | | $10.00 | 21.39037 |
| 265 | cost less | $10.00 | | $10.00 | 21.65775 |
| 268 | cost less | $10.00 Less | | $10.00 | 21.92513 |
| 271 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 22.19251 |
| 287 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 22.45989 |
| 426 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 22.72727 |
| 460 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 22.99465 |
| 461 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 23.26203 |
| 482 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 23.52941 |
| 484 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 23.79679 |
| 486 | cost less | 10.00 | | $10.00 | 24.06417 |
| 489 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 24.33155 |
| 498 | cost less | 10.00 | | $10.00 | 24.59893 |
| 517 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 24.86631 |
| 294 | cost less | 15.00 | | $15.00 | 25.13369 |
| 343 | cost less | 15.00 | | $15.00 | 25.40107 |
| 410 | cost less | Taking a stab at the dark but $15.00 dollars comes to mind. | | $15.00 | 25.66845 |
| 450 | cost less | $10 - $20 | | $15.00 | 25.93583 |
| 101 | cost less | 20 | | $20.00 | 26.20321 |
| 106 | cost less | Don't know | $20.00 or more | $20.00 | 26.47059 |
| 111 | cost less | Don't know | $20.00 or more | $20.00 | 26.73797 |

MMR #4450 Printer Survey          HP Photosmart C6180 All-in-One          Price: $299.99

| Q're ID # | Q.1 | Q.2 Verbatim | Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|---|
| 130 | cost less | $20 | | $20.00 | 27.00535 |
| 135 | cost less | $20 | | $20.00 | 27.27273 |
| 144 | cost less | Don't know | $20.00 or more | $20.00 | 27.54011 |
| 162 | cost less | $20.00 | | $20.00 | 27.80749 |
| 167 | cost less | Don't know | $20.00 or more | $20.00 | 28.07487 |
| 208 | cost less | $20 | | $20.00 | 28.34225 |
| 211 | cost less | $20 | | $20.00 | 28.60963 |
| 257 | cost less | $20.00 | | $20.00 | 28.87701 |
| 261 | cost less | Don't know | $20.00 or more | $20.00 | 29.14439 |
| 270 | cost less | About 20.00 Less | | $20.00 | 29.41176 |
| 272 | cost less | Don't know | $20.00 or more | $20.00 | 29.67914 |
| 274 | cost less | Don't know | $20.00 or more | $20.00 | 29.94652 |
| 277 | cost less | $20.00 | | $20.00 | 30.2139 |
| 280 | cost less | 20.00 | | $20.00 | 30.48128 |
| 290 | cost less | Don't know | $20.00 or more | $20.00 | 30.74866 |
| 295 | cost less | Don't know | $20.00 or more | $20.00 | 31.01604 |
| 302 | cost less | Don't know | $20.00 or more | $20.00 | 31.28342 |
| 303 | cost less | Don't know | $20.00 or more | $20.00 | 31.5508 |
| 304 | cost less | Don't know | $20.00 or more | $20.00 | 31.81818 |
| 305 | cost less | Don't know | $20.00 or more | $20.00 | 32.08556 |
| 306 | cost less | Don't know | $20.00 or more | $20.00 | 32.35294 |
| 337 | cost less | Don't know | $20.00 or more | $20.00 | 32.62032 |
| 340 | cost less | 20 less | | $20.00 | 32.8877 |
| 342 | cost less | 20.00 | | $20.00 | 33.15508 |
| 381 | cost less | 20.00 | | $20.00 | 33.42246 |
| 401 | cost less | Like $20 less | | $20.00 | 33.68984 |
| 412 | cost less | Don't know | $20.00 or more | $20.00 | 33.95722 |
| 422 | cost less | Don't know | $20.00 or more | $20.00 | 34.2246 |
| 449 | cost less | Don't know | $20.00 or more | $20.00 | 34.49198 |
| 458 | cost less | Don't know | $20.00 or more | $20.00 | 34.75936 |
| 459 | cost less | Don't know | $20.00 or more | $20.00 | 35.02674 |
| 485 | cost less | About $20 less | | $20.00 | 35.29412 |
| 494 | cost less | Don't know | $20.00 or more | $20.00 | 35.5615 |
| 497 | cost less | Don't know | $20.00 or more | $20.00 | 35.82888 |
| 501 | cost less | 20.00 | | $20.00 | 36.09626 |
| 502 | cost less | Don't know | $20.00 or more | $20.00 | 36.36364 |
| 503 | cost less | Don't know | $20.00 or more | $20.00 | 36.63102 |
| 508 | cost less | 20.00 | | $20.00 | 36.8984 |
| 104 | cost less | $25 | | $25.00 | 37.16578 |
| 158 | cost less | $25 | | $25.00 | 37.43316 |
| 188 | cost less | $25 | | $25.00 | 37.70053 |
| 190 | cost less | The model would be about $25 cheaper. | | $25.00 | 37.96791 |
| 199 | cost less | About twenty or thirty. | | $25.00 | 38.23529 |
| 247 | cost less | $25.00 | | $25.00 | 38.50267 |
| 266 | cost less | Around twenty or thirty bucks. | | $25.00 | 38.77005 |
| 338 | cost less | $25 | | $25.00 | 39.03743 |
| 369 | cost less | Things with new technology always cost more. $25.00 | | $25.00 | 39.30481 |
| 375 | cost less | $25.00 less | | $25.00 | 39.57219 |
| 380 | cost less | 25.00 | | $25.00 | 39.83957 |
| 399 | cost less | $25 | | $25.00 | 40.10695 |

MMR #4450 Printer Survey          HP Photosmart C6180 All-in-One          Price: $299.99

| Q're ID # | Q.1 | Q.2 Verbatim          Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|
| 481 | cost less | I think without the adaptive lighting, this would be $25 cheaper. | $25.00 | 40.37433 |
| 487 | cost less | $25.00 less | $25.00 | 40.64171 |
| 496 | cost less | 20 or 30 bucks, don't know. | $25.00 | 40.90909 |
| 115 | cost less | 30 bucks | $30.00 | 41.17647 |
| 125 | cost less | $30 | $30.00 | 41.44385 |
| 127 | cost less | $30 | $30.00 | 41.71123 |
| 180 | cost less | $30.00 | $30.00 | 41.97861 |
| 441 | cost less | $30 | $30.00 | 42.24599 |
| 451 | cost less | 30.00 | $30.00 | 42.51337 |
| 518 | cost less | $30.00 | $30.00 | 42.78075 |
| 113 | cost less | Ummm, 40ish | $40.00 | 43.04813 |
| 147 | cost less | 40.00 | $40.00 | 43.31551 |
| 200 | cost less | Fifty dollars difference, probably $259. NOTE: $50 LESS WOULD BE $249 | $40.00 | 43.58289 |
| 278 | cost less | $40.00 | $40.00 | 43.85027 |
| 347 | cost less | 40.00 | $40.00 | 44.11765 |
| 372 | cost less | 40.00 | $40.00 | 44.38503 |
| 417 | cost less | $40.00 | $40.00 | 44.65241 |
| 452 | cost less | $40.00 | $40.00 | 44.91979 |
| 492 | cost less | About fifteen percent less. | $45.00 | 45.18717 |
| 109 | cost less | $50 | $50.00 | 45.45455 |
| 112 | cost less | Probably like $50 | $50.00 | 45.72193 |
| 114 | cost less | $50 | $50.00 | 45.9893 |
| 117 | cost less | Like fifty dollars | $50.00 | 46.25668 |
| 126 | cost less | $50 | $50.00 | 46.52406 |
| 134 | cost less | $50 | $50.00 | 46.79144 |
| 138 | cost less | 50.00 | $50.00 | 47.05882 |
| 143 | cost less | 50.00 | $50.00 | 47.3262 |
| 145 | cost less | 50.00 | $50.00 | 47.59358 |
| 146 | cost less | 50.00 | $50.00 | 47.86096 |
| 148 | cost less | $50 | $50.00 | 48.12834 |
| 152 | cost less | $50 | $50.00 | 48.39572 |
| 153 | cost less | $50 | $50.00 | 48.6631 |
| 161 | cost less | $50.00 | $50.00 | 48.93048 |
| 163 | cost less | $50.00 | $50.00 | 49.19786 |
| 165 | cost less | $50.00 | $50.00 | 49.46524 |
| 168 | cost less | $50 | $50.00 | 49.73262 |
| 179 | cost less | $50.00 | $50.00 | 50 |
| 191 | cost less | I would say about fifty dollars less. | $50.00 | 50.26738 |
| 195 | cost less | $50 | $50.00 | 50.53476 |
| 215 | cost less | $50 | $50.00 | 50.80214 |
| 216 | cost less | $50 | $50.00 | 51.06952 |
| 217 | cost less | $50 | $50.00 | 51.3369 |
| 218 | cost less | $50 | $50.00 | 51.60428 |
| 222 | cost less | 50.00 | $50.00 | 51.87166 |
| 224 | cost less | 50.00 | $50.00 | 52.13904 |
| 239 | cost less | 50.00 | $50.00 | 52.40642 |
| 241 | cost less | 50.00 | $50.00 | 52.6738 |
| 242 | cost less | 50.00 | $50.00 | 52.94118 |
| 245 | cost less | 50.00 | $50.00 | 53.20856 |

MMR #4450 Printer Survey          HP Photosmart C6180 All-in-One          Price: $299.99

| Q're ID # | Q.1 | Q.2 Verbatim          Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|
| 246 | cost less | 50.00 | $50.00 | 53.47594 |
| 249 | cost less | $50 | $50.00 | 53.74332 |
| 250 | cost less | 50 | $50.00 | 54.0107 |
| 255 | cost less | $50 | $50.00 | 54.27807 |
| 258 | cost less | $50.00 | $50.00 | 54.54545 |
| 264 | cost less | About fifty bucks | $50.00 | 54.81283 |
| 269 | cost less | 50.00 Less | $50.00 | 55.08021 |
| 276 | cost less | Maybe 50.00 less | $50.00 | 55.34759 |
| 281 | cost less | $50.00 | $50.00 | 55.61497 |
| 283 | cost less | $50 less | $50.00 | 55.88235 |
| 284 | cost less | $50 less | $50.00 | 56.14973 |
| 310 | cost less | 50.00 | $50.00 | 56.41711 |
| 313 | cost less | 50.00 | $50.00 | 56.68449 |
| 314 | cost less | $50 | $50.00 | 56.95187 |
| 316 | cost less | $50 | $50.00 | 57.21925 |
| 317 | cost less | $50 | $50.00 | 57.48663 |
| 319 | cost less | $50 | $50.00 | 57.75401 |
| 325 | cost less | $50 | $50.00 | 58.02139 |
| 327 | cost less | 50.00 | $50.00 | 58.28877 |
| 328 | cost less | 50.00 | $50.00 | 58.55615 |
| 329 | cost less | 50.00 | $50.00 | 58.82353 |
| 330 | cost less | 50.00 | $50.00 | 59.09091 |
| 332 | cost less | 50.00 | $50.00 | 59.35829 |
| 341 | cost less | 50.00 | $50.00 | 59.62567 |
| 344 | cost less | 50.00 | $50.00 | 59.89305 |
| 346 | cost less | $50.00 less | $50.00 | 60.16043 |
| 349 | cost less | $50.00 | $50.00 | 60.42781 |
| 355 | cost less | $50.00 | $50.00 | 60.69519 |
| 358 | cost less | 50.00 | $50.00 | 60.96257 |
| 363 | cost less | 50.00 | $50.00 | 61.22995 |
| 365 | cost less | 50.00 | $50.00 | 61.49733 |
| 368 | cost less | $50.00 | $50.00 | 61.76471 |
| 378 | cost less | $50 less | $50.00 | 62.03209 |
| 384 | cost less | $50.00 less | $50.00 | 62.29947 |
| 389 | cost less | $50 | $50.00 | 62.56684 |
| 396 | cost less | $50 | $50.00 | 62.83422 |
| 403 | cost less | About $50 less | $50.00 | 63.1016 |
| 404 | cost less | $50 less | $50.00 | 63.36898 |
| 405 | cost less | $50 less | $50.00 | 63.63636 |
| 411 | cost less | Maybe fifty dollars | $50.00 | 63.90374 |
| 415 | cost less | $50 | $50.00 | 64.17112 |
| 421 | cost less | $50.00 | $50.00 | 64.4385 |
| 428 | cost less | Probably like $50.00 | $50.00 | 64.70588 |
| 432 | cost less | Maybe $50.00 less | $50.00 | 64.97326 |
| 437 | cost less | $50.00 less | $50.00 | 65.24064 |
| 439 | cost less | $50.00 | $50.00 | 65.50802 |
| 440 | cost less | $50.00 | $50.00 | 65.7754 |
| 445 | cost less | $50.00 | $50.00 | 66.04278 |
| 446 | cost less | $50.00 | $50.00 | 66.31016 |
| 454 | cost less | 50.00 | $50.00 | 66.57754 |

MMR #4450 Printer Survey          HP Photosmart C6180 All-in-One          Price: $299.99

| Q're ID # | Q.1 | Q.2 Verbatim          Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|
| 477 | cost less | I think the product would be about $50 cheaper. | $50.00 | 66.84492 |
| 483 | cost less | Maybe a extra 50.00 | $50.00 | 67.1123 |
| 504 | cost less | $50.00 | $50.00 | 67.37968 |
| 510 | cost less | $50.00 | $50.00 | 67.64706 |
| 513 | cost less | $50.00 | $50.00 | 67.91444 |
| 406 | cost less | $55 less | $55.00 | 68.18182 |
| 110 | cost less | $60 | $60.00 | 68.4492 |
| 132 | cost less | $60 | $60.00 | 68.71658 |
| 229 | cost less | 60.00 | $60.00 | 68.98396 |
| 291 | cost less | $60.00 | $60.00 | 69.25134 |
| 312 | cost less | 60.00 | $60.00 | 69.51872 |
| 366 | cost less | 60.00 | $60.00 | 69.7861 |
| 385 | cost less | 60.00 | $60.00 | 70.05348 |
| 390 | cost less | Well, $60 about | $60.00 | 70.32086 |
| 429 | cost less | $60.00 | $60.00 | 70.58824 |
| 198 | cost less | Maybe fifty or seventy five dollars. | $62.50 | 70.85561 |
| 282 | cost less | $50 - 75 less | $62.50 | 71.12299 |
| 128 | cost less | $70 | $70.00 | 71.39037 |
| 131 | cost less | $70 | $70.00 | 71.65775 |
| 392 | cost less | $70 | $70.00 | 71.92513 |
| 400 | cost less | $70 less | $70.00 | 72.19251 |
| 455 | cost less | $70 | $70.00 | 72.45989 |
| 140 | cost less | 75.00 | $75.00 | 72.72727 |
| 214 | cost less | $75 | $75.00 | 72.99465 |
| 219 | cost less | $75 | $75.00 | 73.26203 |
| 232 | cost less | 75.00 | $75.00 | 73.52941 |
| 315 | cost less | $75 | $75.00 | 73.79679 |
| 318 | cost less | $75 | $75.00 | 74.06417 |
| 321 | cost less | $75 | $75.00 | 74.33155 |
| 336 | cost less | $75 | $75.00 | 74.59893 |
| 359 | cost less | 75.00 | $75.00 | 74.86631 |
| 361 | cost less | 50 - 100 | $75.00 | 75.13369 |
| 362 | cost less | 75.00 | $75.00 | 75.40107 |
| 373 | cost less | 75.00 | $75.00 | 75.66845 |
| 490 | cost less | Between fifty or 100 bucks. | $75.00 | 75.93583 |
| 511 | cost less | $75 | $75.00 | 76.20321 |
| 137 | cost less | $80 | $80.00 | 76.47059 |
| 331 | cost less | 80.00 | $80.00 | 76.73797 |
| 391 | cost less | Around $80 less | $80.00 | 77.00535 |
| 416 | cost less | Eighty dollars | $80.00 | 77.27273 |
| 237 | cost less | 85.00 | $85.00 | 77.54011 |
| 279 | cost less | $89.00 | $89.00 | 77.80749 |
| 387 | cost less | $90.00 | $90.00 | 78.07487 |
| 393 | cost less | Around $90 less | $90.00 | 78.34225 |
| 443 | cost less | $90.00 | $90.00 | 78.60963 |
| 103 | cost less | $100 | $100.00 | 78.87701 |
| 105 | cost less | $100 | $100.00 | 79.14439 |
| 108 | cost less | $100 | $100.00 | 79.41176 |
| 119 | cost less | Hundred dollars less | $100.00 | 79.67914 |
| 122 | cost less | $100 | $100.00 | 79.94652 |

MMR #4450 Printer Survey          HP Photosmart C6180 All-in-One                Price: $299.99

| Q're ID # | Q.1 | Q.2 Verbatim          Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|
| 123 | cost less | $100 or more | $100.00 | 80.2139 |
| 124 | cost less | $100 | $100.00 | 80.48128 |
| 129 | cost less | $100 | $100.00 | 80.74866 |
| 133 | cost less | $100 | $100.00 | 81.01604 |
| 136 | cost less | $100 | $100.00 | 81.28342 |
| 139 | cost less | 100.00 | $100.00 | 81.5508 |
| 141 | cost less | 100.00 | $100.00 | 81.81818 |
| 142 | cost less | 100.00 | $100.00 | 82.08556 |
| 149 | cost less | $100 | $100.00 | 82.35294 |
| 150 | cost less | $100 | $100.00 | 82.62032 |
| 151 | cost less | $100 | $100.00 | 82.8877 |
| 155 | cost less | $100 | $100.00 | 83.15508 |
| 156 | cost less | $100 | $100.00 | 83.42246 |
| 159 | cost less | $100.00 | $100.00 | 83.68984 |
| 227 | cost less | 100.00 | $100.00 | 83.95722 |
| 228 | cost less | $100.00 less | $100.00 | 84.2246 |
| 230 | cost less | 100.00 | $100.00 | 84.49198 |
| 235 | cost less | 100.00 | $100.00 | 84.75936 |
| 236 | cost less | 100.00 | $100.00 | 85.02674 |
| 244 | cost less | $100.00 | $100.00 | 85.29412 |
| 259 | cost less | 100.00 | $100.00 | 85.5615 |
| 273 | cost less | 100.00 | $100.00 | 85.82888 |
| 275 | cost less | Around a 100.00 less. | $100.00 | 86.09626 |
| 289 | cost less | $100.00 | $100.00 | 86.36364 |
| 296 | cost less | Expensive 100.00 | $100.00 | 86.63102 |
| 311 | cost less | 100.00 | $100.00 | 86.8984 |
| 320 | cost less | $100 | $100.00 | 87.16578 |
| 323 | cost less | $100 | $100.00 | 87.43316 |
| 326 | cost less | $100 | $100.00 | 87.70053 |
| 334 | cost less | 100.00 | $100.00 | 87.96791 |
| 335 | cost less | 100.00 | $100.00 | 88.23529 |
| 339 | cost less | 100 less | $100.00 | 88.50267 |
| 354 | cost less | $100.00 | $100.00 | 88.77005 |
| 360 | cost less | 100.00 | $100.00 | 89.03743 |
| 376 | cost less | $100 | $100.00 | 89.30481 |
| 379 | cost less | $100 less | $100.00 | 89.57219 |
| 386 | cost less | $100.00 | $100.00 | 89.83957 |
| 388 | cost less | $100 | $100.00 | 90.10695 |
| 395 | cost less | $100 | $100.00 | 90.37433 |
| 398 | cost less | $100.00 | $100.00 | 90.64171 |
| 402 | cost less | Around $100 less | $100.00 | 90.90909 |
| 407 | cost less | 100 dollars less | $100.00 | 91.17647 |
| 408 | cost less | Probably like a hundred dollars less | $100.00 | 91.44385 |
| 418 | cost less | $100 | $100.00 | 91.71123 |
| 420 | cost less | $100.00 | $100.00 | 91.97861 |
| 430 | cost less | $100.00 less | $100.00 | 92.24599 |
| 433 | cost less | Like a $100.00 less | $100.00 | 92.51337 |
| 438 | cost less | $100.00 | $100.00 | 92.78075 |
| 447 | cost less | $100.00 | $100.00 | 93.04813 |
| 448 | cost less | $100 | $100.00 | 93.31551 |
| 493 | cost less | About 100 bucks. | $100.00 | 93.58289 |

MMR #4450 Printer Survey          HP Photosmart C6180 All-in-One                    Price: $299.99

| Q're ID # | Q.1 | Q.2 Verbatim          Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|
| 495 | cost less | One hundred bucks. | $100.00 | 93.85027 |
| 514 | cost less | $100.00 | $100.00 | 94.11765 |
| 515 | cost less | $100.00 or more | $100.00 | 94.38503 |
| 383 | cost less | $200.00 more | $100.00 | 94.65241 |
| 353 | cost less | 120.00 less | $120.00 | 94.91979 |
| 512 | cost less | $120 | $120.00 | 95.18717 |
| 251 | cost less | $99.00 - 150.00 | $124.50 | 95.45455 |
| 286 | cost less | $100 - 150 less | $125.00 | 95.72193 |
| 377 | cost less | $125 less | $125.00 | 95.9893 |
| 193 | cost less | $150.00 | $150.00 | 96.25668 |
| 223 | cost less | 150.00 | $150.00 | 96.52406 |
| 263 | cost less | 150.00 | $150.00 | 96.79144 |
| 298 | cost less | 150.00 | $150.00 | 97.05882 |
| 333 | cost less | 150.00 | $150.00 | 97.3262 |
| 348 | cost less | 150.00 | $150.00 | 97.59358 |
| 509 | cost less | 150.00 | $150.00 | 97.86096 |
| 301 | cost less | I'd probably have to say $159.99. | $159.99 | 98.12834 |
| 324 | cost less | $175 | $175.00 | 98.39572 |
| 154 | cost less | $200 | $200.00 | 98.6631 |
| 182 | cost less | $200.00 | $200.00 | 98.93048 |
| 183 | cost less | $200.00 | $200.00 | 99.19786 |
| 194 | cost less | 200 | $200.00 | 99.46524 |
| 322 | cost less | $200 | $200.00 | 99.73262 |
| 364 | cost less | 200 | $200.00 | 100 |
| | | SUM: | $18,411.49 | |
| | | MEAN: | $49.23 | |
| | | MEDIAN: | $50.00 | |
| | | | | |
| | | | | |

MMR #4450 Printer Survey          HP Photosmart C6180 All-in-One                    Price: $299.99

| Q're ID # | Q.1 | Q.2 Verbatim | Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|---|
| FOLLOWING RESP NOT IN MEAN/MEDIAN (Q.1/2 = Don't know) | | | | | |
| 307 | dk | | | NA | |
| 350 | dk | | | NA | |
| 351 | dk | | | NA | |
| 414 | dk | | | NA | |
| 462 | dk | | | NA | |
| 465 | dk | | | NA | |
| 472 | dk | | | NA | |
| 488 | dk | | | NA | |
| 309 | dk | | | NA | |
| 356 | dk | | | NA | |
| 357 | dk | | | NA | |
| 469 | dk | | | NA | |
| 470 | dk | | | NA | |
| 471 | dk | | | NA | |
| 173 | dk | | | NA | |
| 178 | dk | | | NA | |
| 181 | dk | | | NA | |
| 201 | dk | | | NA | |
| 205 | dk | | | NA | |
| 220 | dk | | | NA | |
| 234 | dk | | | NA | |
| 240 | dk | | | NA | |
| 256 | dk | | | NA | |
| 102 | dk | | | NA | |
| 169 | dk | | | NA | |
| 176 | dk | | | NA | |
| 231 | dk | | | NA | |
| 285 | cost less | Don't know | Don't know | NA | |
| 308 | cost less | Don't know | Don't know | NA | |
| 382 | cost less | Don't know | Don't know | NA | |
| 297 | cost less | Don't know | Don't know | NA | |
| 202 | cost less | Don't know | Don't know | NA | |
| 206 | cost less | Don't know | Don't know | NA | |
| 171 | cost less | Don't know | Don't know | NA | |
| | | | | | |
| | | | | | |
| FOLLOWING RESP NOT IN MEAN/MEDIAN (Q.2 = questionable response) | | | | | |
| 192 | cost less | 250 | | NA | |

MMR #4462 Printer Survey          HP Officejet 5610 All-in-One          Price: $109.99
Price after rebate: $99.99

| Q're ID # | Q.1 | Q.2 Verbatim | Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|---|
| 128 | same price | | | $0.00 | 0.268097 |
| 143 | same price | | | $0.00 | 0.536193 |
| 337 | same price | | | $0.00 | 0.80429 |
| 191 | same price | | | $0.00 | 1.072386 |
| 320 | same price | | | $0.00 | 1.340483 |
| 322 | same price | | | $0.00 | 1.608579 |
| 327 | same price | | | $0.00 | 1.876676 |
| 330 | same price | | | $0.00 | 2.144772 |
| 196 | same price | | | $0.00 | 2.412869 |
| 198 | same price | | | $0.00 | 2.680965 |
| 212 | same price | | | $0.00 | 2.949062 |
| 460 | same price | | | $0.00 | 3.217158 |
| 240 | same price | | | $0.00 | 3.485255 |
| 241 | same price | | | $0.00 | 3.753351 |
| 278 | same price | | | $0.00 | 4.021448 |
| 279 | same price | | | $0.00 | 4.289544 |
| 290 | same price | | | $0.00 | 4.557641 |
| 304 | same price | | | $0.00 | 4.825737 |
| 305 | same price | | | $0.00 | 5.093834 |
| 310 | same price | | | $0.00 | 5.36193 |
| 311 | same price | | | $0.00 | 5.630027 |
| 315 | same price | | | $0.00 | 5.898123 |
| 317 | same price | | | $0.00 | 6.16622 |
| 484 | same price | | | $0.00 | 6.434316 |
| 486 | same price | | | $0.00 | 6.702413 |
| 385 | same price | | | $0.00 | 6.970509 |
| 395 | same price | | | $0.00 | 7.238606 |
| 398 | same price | | | $0.00 | 7.506702 |
| 111 | same price | | | $0.00 | 7.774799 |
| 116 | same price | | | $0.00 | 8.042895 |
| 507 | same price | | | $0.00 | 8.310992 |
| 161 | same price | | | $0.00 | 8.579088 |
| 164 | same price | | | $0.00 | 8.847185 |
| 166 | same price | | | $0.00 | 9.115282 |
| 169 | same price | | | $0.00 | 9.383378 |
| 180 | same price | | | $0.00 | 9.651475 |
| 333 | same price | | | $0.00 | 9.919571 |
| 342 | same price | | | $0.00 | 10.18767 |
| 349 | same price | | | $0.00 | 10.45576 |
| 455 | same price | | | $0.00 | 10.72386 |
| 199 | same price | | | $0.00 | 10.99196 |
| 201 | same price | | | $0.00 | 11.26005 |
| 210 | same price | | | $0.00 | 11.52815 |
| 459 | same price | | | $0.00 | 11.79625 |
| 245 | same price | | | $0.00 | 12.06434 |
| 252 | same price | | | $0.00 | 12.33244 |
| 520 | same price | | | $0.00 | 12.60054 |
| 282 | same price | | | $0.00 | 12.86863 |
| 286 | same price | | | $0.00 | 13.13673 |
| 483 | same price | | | $0.00 | 13.40483 |
| 301 | same price | | | $0.00 | 13.67292 |

MMR #4462 Printer Survey          HP Officejet 5610 All-in-One          Price: $109.99
Price after rebate: $99.99

| Q're ID # | Q.1 | Q.2 Verbatim | Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|---|
| 302 | same price | | | $0.00 | 13.94102 |
| 309 | same price | | | $0.00 | 14.20912 |
| 313 | same price | | | $0.00 | 14.47721 |
| 318 | same price | | | $0.00 | 14.74531 |
| 354 | same price | | | $0.00 | 15.0134 |
| 363 | same price | | | $0.00 | 15.2815 |
| 374 | same price | | | $0.00 | 15.5496 |
| 431 | cost less | Don't know | Less than $1.00 | $0.50 | 15.81769 |
| 406 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 16.08579 |
| 412 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 16.35389 |
| 417 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 16.62198 |
| 419 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 16.89008 |
| 435 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 17.15818 |
| 442 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 17.42627 |
| 447 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 17.69437 |
| 448 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 17.96247 |
| 405 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 18.23056 |
| 416 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 18.49866 |
| 437 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 18.76676 |
| 441 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 19.03485 |
| 450 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 19.30295 |
| 452 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 19.57105 |
| 453 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 19.83914 |
| 215 | cost less | Don't know | $1.00 - $4.99 | $1.00 | 20.10724 |
| 440 | cost less | 2.00 | | $2.00 | 20.37534 |
| 102 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 20.64343 |
| 103 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 20.91153 |
| 133 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 21.17962 |
| 423 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 21.44772 |
| 115 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 21.71582 |
| 497 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 21.98391 |
| 413 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 22.25201 |
| 427 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 22.52011 |
| 439 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 22.7882 |
| 444 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 23.0563 |
| 446 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 23.3244 |
| 292 | cost less | Don't know | $5.00 - $9.99 | $5.00 | 23.59249 |
| 396 | cost less | 5.00 | | $5.00 | 23.86059 |
| 489 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 24.12869 |
| 490 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 24.39678 |
| 491 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 24.66488 |
| 506 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 24.93298 |
| 493 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 25.20107 |
| 125 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 25.46917 |
| 131 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 25.73727 |
| 171 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 26.00536 |
| 324 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 26.27346 |
| 454 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 26.54155 |
| 202 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 26.80965 |
| 220 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 27.07775 |
| 221 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 27.34584 |

MMR #4462 Printer Survey          HP Officejet 5610 All-in-One          Price: $109.99
                                                                        Price after rebate: $99.99

| Q're ID # | Q.1 | Q.2 Verbatim | Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|---|
| 414 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 27.61394 |
| 418 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 27.88204 |
| 445 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 28.15013 |
| 451 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 28.41823 |
| 101 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 28.68633 |
| 498 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 28.95442 |
| 122 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 29.22252 |
| 123 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 29.49062 |
| 341 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 29.75871 |
| 203 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 30.02681 |
| 428 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 30.29491 |
| 443 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 30.563 |
| 213 | cost less | Don't know | $10.00 - $19.99 | $10.00 | 30.8311 |
| 120 | cost less | $10.00 | | $10.00 | 31.0992 |
| 514 | cost less | $10.00 | | $10.00 | 31.36729 |
| 141 | cost less | $10.00 | | $10.00 | 31.63539 |
| 297 | cost less | 10.00 | | $10.00 | 31.90349 |
| 353 | cost less | $10 | | $10.00 | 32.17158 |
| 359 | cost less | $10 | | $10.00 | 32.43968 |
| 372 | cost less | $10 | | $10.00 | 32.70777 |
| 377 | cost less | $10 | | $10.00 | 32.97587 |
| 402 | cost less | $10 | | $10.00 | 33.24397 |
| 488 | cost less | $10 | | $10.00 | 33.51206 |
| 167 | cost less | $10.00 | | $10.00 | 33.78016 |
| 186 | cost less | $10 | | $10.00 | 34.04826 |
| 326 | cost less | $10 | | $10.00 | 34.31635 |
| 473 | cost less | 10.00 | | $10.00 | 34.58445 |
| 476 | cost less | 10.00 | | $10.00 | 34.85255 |
| 480 | cost less | $10.00 | | $10.00 | 35.12064 |
| 308 | cost less | $10.00 | | $10.00 | 35.38874 |
| 316 | cost less | 10.00 | | $10.00 | 35.65684 |
| 371 | cost less | $10 | | $10.00 | 35.92493 |
| 407 | cost less | 10.00 | | $10.00 | 36.19303 |
| 250 | cost less | $10.00 less maybe | | $10.00 | 36.46113 |
| 505 | cost less | about $10.00 | | $10.00 | 36.72922 |
| 522 | cost less | I would think it would cost about 10 dollars less. | | $10.00 | 36.99732 |
| 524 | cost less | Maybe $10 less. | | $10.00 | 37.26542 |
| 519 | cost less | Maybe 10 - 15 dollars less | | $12.50 | 37.53351 |
| 397 | cost less | 14.00 | | $14.00 | 37.80161 |
| 114 | cost less | $15.00 | | $15.00 | 38.06971 |
| 121 | cost less | $15.00 | | $15.00 | 38.3378 |
| 137 | cost less | $15.00 | | $15.00 | 38.6059 |
| 177 | cost less | $15.00 | | $15.00 | 38.87399 |
| 472 | cost less | 15.00 | | $15.00 | 39.14209 |
| 477 | cost less | 15.00 | | $15.00 | 39.41019 |
| 399 | cost less | 15.00 | | $15.00 | 39.67828 |
| 135 | cost less | $15.00 | | $15.00 | 39.94638 |
| 340 | cost less | $15 | | $15.00 | 40.21448 |
| 182 | cost less | $15 | | $15.00 | 40.48257 |
| 329 | cost less | $15.00 | | $15.00 | 40.75067 |

MMR #4462 Printer Survey          HP Officejet 5610 All-in-One                    Price: $109.99
                                                                                 Price after rebate: $99.99

| Q're ID # | Q.1 | Q.2 Verbatim | Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|---|
| 209 | cost less | $15.00 | | $15.00 | 41.01877 |
| 283 | cost less | $15.00 | | $15.00 | 41.28686 |
| 380 | cost less | $15 | | $15.00 | 41.55496 |
| 421 | cost less | $15.00 | | $15.00 | 41.82306 |
| 346 | cost less | $10 - 20 | | $15.00 | 42.09115 |
| 183 | cost less | $10 - 20 | | $15.00 | 42.35925 |
| 517 | cost less | $15 less | | $15.00 | 42.62735 |
| 104 | cost less | $15.00 less | | $15.00 | 42.89544 |
| 471 | cost less | 17.00 | | $17.00 | 43.16354 |
| 492 | cost less | Don't know | $20.00 or more | $20.00 | 43.43164 |
| 494 | cost less | Don't know | $20.00 or more | $20.00 | 43.69973 |
| 127 | cost less | Don't know | $20.00 or more | $20.00 | 43.96783 |
| 132 | cost less | Don't know | $20.00 or more | $20.00 | 44.23592 |
| 139 | cost less | Don't know | $20.00 or more | $20.00 | 44.50402 |
| 200 | cost less | Don't know | $20.00 or more | $20.00 | 44.77212 |
| 223 | cost less | Don't know | $20.00 or more | $20.00 | 45.04021 |
| 404 | cost less | Don't know | $20.00 or more | $20.00 | 45.30831 |
| 429 | cost less | Don't know | $20.00 or more | $20.00 | 45.57641 |
| 430 | cost less | Don't know | $20.00 or more | $20.00 | 45.8445 |
| 434 | cost less | Don't know | $20.00 or more | $20.00 | 46.1126 |
| 499 | cost less | Don't know | $20.00 or more | $20.00 | 46.3807 |
| 124 | cost less | Don't know | $20.00 or more | $20.00 | 46.64879 |
| 126 | cost less | Don't know | $20.00 or more | $20.00 | 46.91689 |
| 129 | cost less | Don't know | $20.00 or more | $20.00 | 47.18499 |
| 130 | cost less | Don't know | $20.00 or more | $20.00 | 47.45308 |
| 148 | cost less | Don't know | $20.00 or more | $20.00 | 47.72118 |
| 168 | cost less | Don't know | $20.00 or more | $20.00 | 47.98928 |
| 172 | cost less | Don't know | $20.00 or more | $20.00 | 48.25737 |
| 173 | cost less | Don't know | $20.00 or more | $20.00 | 48.52547 |
| 187 | cost less | Don't know | $20.00 or more | $20.00 | 48.79357 |
| 219 | cost less | Don't know | $20.00 or more | $20.00 | 49.06166 |
| 420 | cost less | Don't know | $20.00 or more | $20.00 | 49.32976 |
| 426 | cost less | Don't know | $20.00 or more | $20.00 | 49.59786 |
| 449 | cost less | Don't know | $20.00 or more | $20.00 | **49.86595** |
| 495 | cost less | $20 | | $20.00 | **50.13405** |
| 118 | cost less | $20.00 | | $20.00 | 50.40214 |
| 119 | cost less | $20.00 | | $20.00 | 50.67024 |
| 513 | cost less | $20.00 | | $20.00 | 50.93834 |
| 150 | cost less | $20 | | $20.00 | 51.20643 |
| 156 | cost less | $20 | | $20.00 | 51.47453 |
| 162 | cost less | $20.00 | | $20.00 | 51.74263 |
| 178 | cost less | $20 | | $20.00 | 52.01072 |
| 331 | cost less | $20 | | $20.00 | 52.27882 |
| 339 | cost less | $20 | | $20.00 | 52.54692 |
| 189 | cost less | $20 | | $20.00 | 52.81501 |
| 323 | cost less | $20 | | $20.00 | 53.08311 |
| 217 | cost less | $20.00 | | $20.00 | 53.35121 |
| 457 | cost less | $20 | | $20.00 | 53.6193 |
| 227 | cost less | $20 | | $20.00 | 53.8874 |
| 299 | cost less | $20.00 | | $20.00 | 54.1555 |
| 481 | cost less | $20.00 | | $20.00 | 54.42359 |

MMR #4462 Printer Survey          HP Officejet 5610 All-in-One          Price: $109.99
Price after rebate: $99.99

| Q're ID # | Q.1 | Q.2 Verbatim          Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|
| 355 | cost less | $20 | $20.00 | 54.69169 |
| 357 | cost less | $20 | $20.00 | 54.95979 |
| 361 | cost less | $20 | $20.00 | 55.22788 |
| 376 | cost less | $20.00 | $20.00 | 55.49598 |
| 378 | cost less | $20 | $20.00 | 55.76408 |
| 382 | cost less | 20.00 | $20.00 | 56.03217 |
| 384 | cost less | 20.00 | $20.00 | 56.30027 |
| 401 | cost less | 20.00 | $20.00 | 56.56836 |
| 432 | cost less | 20.00 | $20.00 | 56.83646 |
| 105 | cost less | $20.00 | $20.00 | 57.10456 |
| 109 | cost less | $20.00 | $20.00 | 57.37265 |
| 110 | cost less | $20.00 | $20.00 | 57.64075 |
| 504 | cost less | $20.00 | $20.00 | 57.90885 |
| 149 | cost less | $20.00 | $20.00 | 58.17694 |
| 153 | cost less | $20 | $20.00 | 58.44504 |
| 332 | cost less | $20 | $20.00 | 58.71314 |
| 321 | cost less | $20.00 | $20.00 | 58.98123 |
| 207 | cost less | $20.00 | $20.00 | 59.24933 |
| 214 | cost less | $20.00 | $20.00 | 59.51743 |
| 216 | cost less | $20.00 | $20.00 | 59.78552 |
| 218 | cost less | $20.00 | $20.00 | 60.05362 |
| 243 | cost less | $20 | $20.00 | 60.32172 |
| 280 | cost less | $20.00 | $20.00 | 60.58981 |
| 479 | cost less | $20.00 | $20.00 | 60.85791 |
| 478 | cost less | $20.00 | $20.00 | 61.12601 |
| 350 | cost less | $20 | $20.00 | 61.3941 |
| 375 | cost less | $20.00 | $20.00 | 61.6622 |
| 386 | cost less | 20.00 | $20.00 | 61.93029 |
| 389 | cost less | 20.00 | $20.00 | 62.19839 |
| 392 | cost less | 20.00 | $20.00 | 62.46649 |
| 393 | cost less | 20.00 | $20.00 | 62.73458 |
| 394 | cost less | 20.00 | $20.00 | 63.00268 |
| 400 | cost less | 20.00 | $20.00 | 63.27078 |
| 229 | cost less | $20 less | $20.00 | 63.53887 |
| 303 | cost less | 10-30.00 | $20.00 | 63.80697 |
| 411 | cost less | 20.00 less | $20.00 | 64.07507 |
| 344 | cost less | About $20 cheaper | $20.00 | 64.34316 |
| 521 | cost less | About $20 less | $20.00 | 64.61126 |
| 508 | cost less | about 20 bucks | $20.00 | 64.87936 |
| 246 | cost less | About 20 dollars | $20.00 | 65.14745 |
| 515 | cost less | about 20 dollars | $20.00 | 65.41555 |
| 523 | cost less | It would be $20 less. | $20.00 | 65.68365 |
| 249 | cost less | Like 20 bucks | $20.00 | 65.95174 |
| 251 | cost less | Probably like $20 bucks less | $20.00 | 66.21984 |
| 242 | cost less | Probably like 20 bucks | $20.00 | 66.48794 |
| 174 | cost less | $20 - $25.00 | $22.50 | 66.75603 |
| 192 | cost less | $20 - 25 | $22.50 | 67.02413 |
| 470 | cost less | 23.00 | $23.00 | 67.29223 |
| 509 | cost less | $25.00 | $25.00 | 67.56032 |
| 144 | cost less | $25.00 | $25.00 | 67.82842 |
| 146 | cost less | $25 | $25.00 | 68.09651 |

MMR #4462 Printer Survey          HP Officejet 5610 All-in-One          Price: $109.99
                                                                        Price after rebate: $99.99

| Q're ID # | Q.1 | Q.2 Verbatim          Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|
| 179 | cost less | $25 | $25.00 | 68.36461 |
| 181 | cost less | $25 | $25.00 | 68.63271 |
| 211 | cost less | 25.00 | $25.00 | 68.9008 |
| 485 | cost less | $25.00 | $25.00 | 69.1689 |
| 360 | cost less | $25 | $25.00 | 69.437 |
| 117 | cost less | $25.00 | $25.00 | 69.70509 |
| 503 | cost less | $25.00 | $25.00 | 69.97319 |
| 157 | cost less | $25.00 | $25.00 | 70.24129 |
| 197 | cost less | $25.00 | $25.00 | 70.50938 |
| 222 | cost less | $25.00 | $25.00 | 70.77748 |
| 284 | cost less | $25.00 | $25.00 | 71.04558 |
| 300 | cost less | 25.00 | $25.00 | 71.31367 |
| 358 | cost less | $25 | $25.00 | 71.58177 |
| 370 | cost less | $25 | $25.00 | 71.84987 |
| 373 | cost less | $25 | $25.00 | 72.11796 |
| 343 | cost less | $25 if that | $25.00 | 72.38606 |
| 312 | cost less | 20-30.00 | $25.00 | 72.65416 |
| 510 | cost less | about $25 | $25.00 | 72.92225 |
| 244 | cost less | I would say $25 less | $25.00 | 73.19035 |
| 525 | cost less | It(sic) think it would be about $25 less. | $25.00 | 73.45845 |
| 136 | cost less | $30.00 | $30.00 | 73.72654 |
| 152 | cost less | $30 | $30.00 | 73.99464 |
| 165 | cost less | $30.00 | $30.00 | 74.26273 |
| 188 | cost less | $30 | $30.00 | 74.53083 |
| 233 | cost less | $30 | $30.00 | 74.79893 |
| 293 | cost less | $30.00 | $30.00 | 75.06702 |
| 294 | cost less | $30.00 | $30.00 | 75.33512 |
| 296 | cost less | $30.00 | $30.00 | 75.60322 |
| 367 | cost less | $30 | $30.00 | 75.87131 |
| 369 | cost less | $30 | $30.00 | 76.13941 |
| 496 | cost less | $30 | $30.00 | 76.40751 |
| 142 | cost less | $30.00 | $30.00 | 76.6756 |
| 158 | cost less | 30.00 | $30.00 | 76.9437 |
| 224 | cost less | $30.00 | $30.00 | 77.2118 |
| 257 | cost less | $30 | $30.00 | 77.47989 |
| 365 | cost less | $30 | $30.00 | 77.74799 |
| 368 | cost less | $30 | $30.00 | 78.01609 |
| 255 | cost less | About $30 less | $30.00 | 78.28418 |
| 424 | cost less | Less 30 | $30.00 | 78.55228 |
| 502 | cost less | Oh $30.00 bucks | $30.00 | 78.82038 |
| 511 | cost less | probably $30.00 | $30.00 | 79.08847 |
| 347 | cost less | $25 - 40 less | $32.50 | 79.35657 |
| 388 | cost less | 35.00 | $35.00 | 79.62466 |
| 362 | cost less | $35 | $35.00 | 79.89276 |
| 190 | cost less | $30 - 40 | $35.00 | 80.16086 |
| 195 | cost less | $30 - 40 | $35.00 | 80.42895 |
| 348 | cost less | $30 - 40 less | $35.00 | 80.69705 |
| 160 | cost less | 40.00 | $40.00 | 80.96515 |
| 334 | cost less | 40 | $40.00 | 81.23324 |
| 185 | cost less | $40 | $40.00 | 81.50134 |
| 256 | cost less | $40 | $40.00 | 81.76944 |

MMR #4462 Printer Survey          HP Officejet 5610 All-in-One          Price: $109.99
Price after rebate: $99.99

| Q're ID # | Q.1 | Q.2 Verbatim          Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|
| 271 | cost less | $40.00 | $40.00 | 82.03753 |
| 145 | cost less | $40.00 | $40.00 | 82.30563 |
| 147 | cost less | $40 | $40.00 | 82.57373 |
| 155 | cost less | $40 | $40.00 | 82.84182 |
| 458 | cost less | $40 | $40.00 | 83.10992 |
| 352 | cost less | $40 | $40.00 | 83.37802 |
| 387 | cost less | $40.00 | $40.00 | 83.64611 |
| 518 | cost less | $40.00 less | $40.00 | 83.91421 |
| 106 | cost less | 40.00 less | $40.00 | 84.18231 |
| 410 | cost less | 40.00 less | $40.00 | 84.4504 |
| 501 | cost less | about 40 bucks | $40.00 | 84.7185 |
| 259 | cost less | probably $40 | $40.00 | 84.9866 |
| 516 | cost less | $50.00 | $50.00 | 85.25469 |
| 134 | cost less | $50.00 | $50.00 | 85.52279 |
| 159 | cost less | 50.00 | $50.00 | 85.79088 |
| 204 | cost less | $50.00 | $50.00 | 86.05898 |
| 456 | cost less | $50 | $50.00 | 86.32708 |
| 461 | cost less | $50.00 | $50.00 | 86.59517 |
| 236 | cost less | $50 | $50.00 | 86.86327 |
| 260 | cost less | $50 | $50.00 | 87.13137 |
| 277 | cost less | $50.00 | $50.00 | 87.39946 |
| 482 | cost less | $50.00 | $50.00 | 87.66756 |
| 319 | cost less | 50.00 | $50.00 | 87.93566 |
| 487 | cost less | 50.00 | $50.00 | 88.20375 |
| 381 | cost less | $50 | $50.00 | 88.47185 |
| 140 | cost less | $50.00 | $50.00 | 88.73995 |
| 205 | cost less | $50.00 | $50.00 | 89.00804 |
| 469 | cost less | 50.00 | $50.00 | 89.27614 |
| 225 | cost less | $50.00 | $50.00 | 89.54424 |
| 228 | cost less | $50 | $50.00 | 89.81233 |
| 238 | cost less | $50 | $50.00 | 90.08043 |
| 274 | cost less | $50.00 | $50.00 | 90.34853 |
| 287 | cost less | 50.00 | $50.00 | 90.61662 |
| 298 | cost less | $50.00 | $50.00 | 90.88472 |
| 379 | cost less | $50 | $50.00 | 91.15282 |
| 390 | cost less | 50.00 | $50.00 | 91.42091 |
| 107 | cost less | $50.00 less | $50.00 | 91.68901 |
| 306 | cost less | $50.00 less | $50.00 | 91.9571 |
| 307 | cost less | $50.00 less | $50.00 | 92.2252 |
| 512 | cost less | 50 dollars less | $50.00 | 92.4933 |
| 247 | cost less | Like $50 bucks less | $50.00 | 92.76139 |
| 231 | cost less | maybe $50 less | $50.00 | 93.02949 |
| 465 | cost less | 59.99 | $59.99 | 93.29759 |
| 462 | cost less | $60 | $60.00 | 93.56568 |
| 467 | cost less | 60.00 | $60.00 | 93.83378 |
| 262 | cost less | $60 less | $60.00 | 94.10188 |
| 268 | cost less | about $60 | $60.00 | 94.36997 |
| 433 | cost less | 70.00 | $70.00 | 94.63807 |
| 264 | cost less | $70 | $70.00 | 94.90617 |
| 466 | cost less | 75.00 | $75.00 | 95.17426 |
| 170 | cost less | $75.00 | $75.00 | 95.44236 |

MMR #4462 Printer Survey          HP Officejet 5610 All-in-One          Price: $109.99
                                                                        Price after rebate: $99.99

| Q're ID # | Q.1 | Q.2 Verbatim          Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|
| 475 | cost less | 75.00 | $75.00 | 95.71046 |
| 230 | cost less | $75 | $75.00 | 95.97855 |
| 237 | cost less | $75 | $75.00 | 96.24665 |
| 409 | cost less | 75.00 | $75.00 | 96.51475 |
| 176 | cost less | $75.00 | $75.00 | 96.78284 |
| 463 | cost less | $75 | $75.00 | 97.05094 |
| 239 | cost less | $75 | $75.00 | 97.31903 |
| 276 | cost less | $75.00 | $75.00 | 97.58713 |
| 194 | cost less | $50 - 100 | $75.00 | 97.85523 |
| 338 | cost less | $70 - 80 | $75.00 | 98.12332 |
| 232 | cost less | $75 less | $75.00 | 98.39142 |
| 270 | cost less | $75 or more | $75.00 | 98.65952 |
| 265 | cost less | maybe $75 | $75.00 | 98.92761 |
| 438 | cost less | 78.00 | $78.00 | 99.19571 |
| 415 | cost less | $79.00 | $79.00 | 99.46381 |
| 403 | cost less | $79.00 | $79.00 | 99.7319 |
| 314 | cost less | $80.00 | $80.00 | 100 |
| | | SUM: | $8,153.49 | |
| | | MEAN: | $21.86 | |
| | | MEDIAN: | $20.00 | |

MMR #4462 Printer Survey          HP Officejet 5610 All-in-One                    Price: $109.99
                                                                          Price after rebate: $99.99

| Q're ID # | Q.1 | Q.2 Verbatim | Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|---|---|---|---|---|---|
| **FOLLOWING RESP NOT IN MEAN/MEDIAN (Q.1/2 = Don't know)** | | | | | |
| 113 | dk | | | NA | |
| 163 | dk | | | NA | |
| 336 | dk | | | NA | |
| 208 | dk | | | NA | |
| 248 | dk | | | NA | |
| 289 | dk | | | NA | |
| 291 | dk | | | NA | |
| 383 | dk | | | NA | |
| 408 | dk | | | NA | |
| 425 | dk | | | NA | |
| 436 | dk | | | NA | |
| 500 | dk | | | NA | |
| 154 | dk | | | NA | |
| 193 | dk | | | NA | |
| 325 | dk | | | NA | |
| 328 | dk | | | NA | |
| 345 | dk | | | NA | |
| 206 | dk | | | NA | |
| 464 | dk | | | NA | |
| 266 | dk | | | NA | |
| 295 | dk | | | NA | |
| 356 | dk | | | NA | |
| 364 | dk | | | NA | |
| 422 | dk | | | NA | |
| 253 | cost less | Don't know | Don't know | NA | |
| 351 | cost less | Don't know | Don't know | NA | |
| | | | | | |
| **FOLLOWING RESP NOT IN MEAN/MEDIAN (Q.2 = questionable response)** | | | | | |
| 175 | cost less | $150.00 | | NA | |
| 272 | cost less | $200.00 | | NA | |
| 108 | cost less | $200.00 less | | NA | |
| 184 | cost less | $20 - 40 hardware based; $100 - 120 software based | | NA | |
| 468 | cost less | 90.00 | | NA | |
| 474 | cost less | 90.00 | | NA | |
| 335 | cost less | $90 | | NA | |
| 269 | cost less | 90 bucks | | NA | |
| 138 | cost less | $99.00 | | NA | |
| 112 | cost less | $100.00 | | NA | |
| 151 | cost less | $100.00 | | NA | |
| 226 | cost less | $100 | | NA | |
| 234 | cost less | $100 | | NA | |
| 235 | cost less | $100 | | NA | |
| 273 | cost less | $100.00 | | NA | |
| 281 | cost less | $100.00 | | NA | |
| 285 | cost less | $100.00 | | NA | |
| 366 | cost less | $100 | | NA | |
| 258 | cost less | $100 | | NA | |
| 261 | cost less | $100 | | NA | |
| 275 | cost less | $100.00 | | NA | |

MMR #4462 Printer Survey             HP Officejet 5610 All-in-One                    Price: $109.99
                                                                                    Price after rebate: $99.99

| Q're ID # | Q.1 | Q.2 Verbatim | Q.3 | VALUE USED IN MEAN/ MEDIAN | CUM % |
|-----------|-----------|--------------|-----|------------|-------|
| 288 | cost less | 100.00 | | NA | |
| 267 | cost less | $100 or less | | NA | |

**EXHIBIT F**

**FEES AND PROFESSIONAL AND ACADEMIC
BACKGROUND OF WALTER MCCULLOUGH**

Mr. McCullough's qualifications are shown below. The cost of this project was $150,000. Additional consulting time will be billed at Mr. McCullough's usual consulting rate of $600 per hour.

Mr. McCullough is the President and owner of Monroe Mendelsohn Research (MMR), one of the country's leading marketing and opinion research firms. The company is located in New York City and concentrates on custom research projects. MMR also has a subsidiary, Mendelsohn Media Research, which is best known for its annual Affluent Survey.

Mr. McCullough is actively involved in the design, implementation and analysis of research projects for major U.S. manufacturers, service firms, advertising agencies and law firms. Some of the types of research he conducts are:

- exploratory market studies,
- concept tests,
- product tests,
- test market evaluations,
- package tests,
- attitude and usage projects,
- habits studies,
- readership studies,
- various other media surveys,
- claim substantiation studies,
- advertising support and false advertising surveys,
- trademark, trade dress, and service mark infringement surveys,
- various other forms of legal research, and
- many other types of marketing, media and opinion research tests and surveys.

Mr. McCullough has presented the findings of research projects he has conducted to many of the nation's largest firms. He has also testified in numerous trials, NAD (National Advertising Division of the Council of Better Business Bureaus) and other proceedings as an expert witness.

Prior to joining MMR in 1968, Mr. McCullough was a marketing research Group Head at Datatab, providing computer processing and statistical consulting services to marketing research companies, advertising agencies and advertisers.

Mr. McCullough has a BA in Psychology from Lafayette College and a MBA in marketing research from Baruch College of the City University of New York.

# PRIOR TESTIMONY

**Testimony:**
The cases in which Mr. McCullough testified, either in person or by Declaration, as a survey research expert within the preceding four years are:

| Year | Description of Litigating Parties | Court |
|------|----------------------------------|-------|
| 2008 | American Eagle Outfitters, Inc. vs. Lyle & Scott Limited | Federal Court, Western District of Pennsylvania (Deposition Only) |
| 2007 | BenQ America Corp. vs. The United States | United States Court of International Trade-NYC (Deposition Only) |
| 2007 | GlaxoSmithKline Consumer Healthcare vs. Merix Pharmaceutical Corporation | Federal Court, Southern District of New York (NYC) (Deposition Only) |
| 2006 | The Glazier Group, Inc., and T-Bone Restaurant, LLC vs. Mandalay Corp., et al | Federal Court, Southern District of Texas, Houston Division (Deposition Only) |
| 2006 | Classic Foods International Corporation vs. Kettle Foods, Inc. | Federal Court, Central District of California, Southern Division |
| 2006 | Top Tobacco, L.P. vs. North Atlantic Operating Company, Inc. | Federal Court, Northern District of Illinois, Eastern Division (Deposition Only) |
| 2005 | James A. Lewis d/b/a B&H Vendors, et al, vs. Philip Morris Incorporated | Federal Court, Middle District Of Tennessee, Nashville Division |
| 2004 | The Steak N Shake Company, et al vs. The Burger King Corporation et al | Federal Court, Eastern District of Missouri |
| 2004 | Louis Vuitton Malletier vs. Burlington Coat Factory et al | Federal Court, Southern District of New York (NYC) |
| 2004 | Exide Technologies, et al vs. Enersys Corporation | United States Bankruptcy Court For The District of Delaware |
| 2003 | Peaceable Planet, Inc. vs. Ty Inc. | Federal Court, Northern District of Illinois, Eastern Division |
| 2003 | Eco Manufacturing, Inc., vs. Honeywell International, Inc. | Federal Court, Southern District of Indiana, Indianapolis Division |
| 2003 | Anheuser-Busch, Inc. vs. Caught-On-Bleu, Inc. | Federal Court, District of New Hampshire |

## ARTICLE AND PAPERS

Mr. McCullough had three papers on the subject of surveys or other research techniques published in the past ten years.  The most recent one was presented at the 10th Worldwide Readership Research Symposium, held in Venice, Italy from October 22-26, 2001 and was entitled, "Varying The Monetary Incentives In Mail Surveys: (1) Does It Change Survey Results? (2) Can It Create Sample Improvement Opportunities?"

In 1999, Mr. McCullough presented a paper at the 9th Worldwide Readership Research Symposium, held in Florence, Italy.  That paper was entitled, "Ways To Increase Mail Survey Response Rates: An Update."

Two years earlier, in October 1997, Mr. McCullough presented a paper at Worldwide Readership Research Symposium 8, held in Vancouver, Canada entitled "Ways To Increase Mail Survey Response Rates."

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| POLAROID CORPORATION | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 06-738 (SLR) |
| HEWLETT-PACKARD COMPANY | ) |
| Defendant. | ) |

## REBUTTAL EXPERT REPORT OF PROFESSOR JACOB JACOBY, Ph.D.

As an expert witness on behalf of Defendant Hewlett-Packard Co. ("HP"), I declare as follows:

### I. PERSONAL INFORMATION

1.     My full name is Jacob Jacoby.  I reside at 160 West 66th Street, New York, New York 10023.  A description of my qualifications and credentials is provided in Appendix A attached hereto.  Also provided in Appendix A are a copy of my academic Curriculum Vita as well as other information responsive to the Rule 26 requirement that I indicate my trial and deposition testimony during the past four years and the fees I am charging.

### II. THE PRESENT MATTER

2.     On March 18, 2008, I received from counsel for HP a copy of a survey report entitled "Report on the Perceived Value of Adaptive Lighting

1

Technology in Hewlett-Packard Printers" prepared by Mr. Walter McCullough of Monroe Mendelsohn Research, Inc. and dated March 2008. (Hereinafter, this survey will be referred to as "the McCullough Survey".) Counsel asked that I review the McCullough report and comment upon the scientific adequacy of the research described therein. This Rebuttal Report describes my review and conclusions.

3.    My qualifications for reviewing the scientific adequacy of the McCullough Survey include the following. In obtaining a doctorate, I majored in (social) psychology and minored in sociology, according to the Federal Judicial Center's *Reference Manual on Scientific Research*, two of the principal disciplines required for survey research[1]. In the more than 40 years since obtaining my doctorate, I have been involved in thousands of surveys conducted for both scholarly and commercial research. Since 1968, I have taught courses on research methodology and trained scores of doctoral students, many of whom have gone on to distinguished careers of their own. For much of my career, I have been a member of the editorial and/or article review boards of distinguished scholarly and professional peer review journals. In those capacities, my job was to review and comment on the adequacy of research done by others. I have held an endowed chair as the Merchants Council Professor of Consumer Behavior and Retail Management at New York University's Stern School of Business since 1981. Appendix B states my qualifications more fully.

4.    I am being compensated at the rate of $800 per hour. My compensation is not contingent upon the outcome of this dispute.

2

5.    My review rests on the analytic principles developed in my academic and professional work in the field known as consumer psychology. These principles, as applied to surveys used in litigation, are summarized in seven factors cited in the Federal Judicial Center's *Manual for Complex Litigation* (4th, Section 11.493). These factors are quoted verbatim below in an order that corresponds, generally, to the sequence followed by the research process itself. According to the *Manual for Complex Litigation*, a properly conducted survey would contain and conform to the following:

    a.  The population was properly chosen and defined.

    b.  The sample chosen was representative of that population.

    c.  The questions asked were clear and not leading.

    d.  The survey was conducted by qualified persons following proper interview procedures.

    e.  The data gathered were accurately reported.

    f.  The data were analyzed in accordance with accepted statistical principles.

    g.  The process was conducted so as to ensure objectivity.

6.    In reviewing and evaluating the McCullough Survey, I also remained mindful of several other sources of criteria for evaluating surveys proffered as evidence in litigated matters. One set of criteria emanates from the opinions expressed by the U.S. Supreme Court in regard to science and "junk science."[2]  Other pertinent criteria are to be found in the "Reference Guide on

---

[1]  Shari Seidman Diamond, Reference Guide on Survey Research, (2000) at 238.
[2]  See: *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 118 S. Ct. 512 (1997); *Kumho Tire Co., Ltd. et al. v. Carmichael et al.*, 526 U.S 137 (1999).

3

Survey Research" and "Reference Guide on Statistics" that appear in the Federal Judicial Center's *Reference Manual on Scientific Evidence*. Additional criteria include those articulated in the pertinent social science and professional literature.

### III. OVERALL OPINION OF THE MCCULLOUGH SURVEY

7.    In my opinion, the questions asked in the McCullough Survey and the manner in which they were asked render the data – and the findings and interpretations based on these data – of little or no value. In the section that follows (Section III), I address the most fundamental flaws in the McCullough Survey. In the next section (Section IV) additional problems I find with the McCullough Survey are discussed in the order in which they surface in his report.

### IV. FUNDAMENTAL FLAWS OF THE MCCULLOUGH SURVEY

#### A.    It Studied the Wrong Issue.

8.    The most fundamental flaw with Mr. McCullough's survey is that it is misdirected; it addresses the wrong issue. It asks lay consumers who have no qualifications, training or expertise for evaluating the cost of Adaptive Lighting how much such a feature would cost. In my opinion, a more productive approach – one more in keeping with the capabilities of lay consumers -- would have been to ask "How much are you willing to pay for such a feature?" To address the question "How much should Adaptive Lighting cost?" requires selecting a sample of respondents with the proper qualifications, training or expertise for rendering such evaluations.

### B.    Its Core Question is Inherently Misleading

9.    Question 1 of the Main Questionnaire asks: "*do you think that model would cost less than the model with the Adaptive Lighting Technology feature, or would the price be the same as the model with the Adaptive Lighting Technology feature?*" How this question is phrased and what it asks of respondents is fatally flawed.

10.    The printers at issue have numerous features. The McCullough Report provides a copy of the fact sheet for the HP Photosmart C6180 All-In-One. I am informed this is the type of marketing material that is actually released by HP. The fact sheet notes features such as:

- "the world's fastest photo All-in-One"

- "a pro at color faxing"

- "built-in wireless networking"

- "fax fast, in color, with or without a PC, plus eliminate unwanted junk faxes"

- "Print photos and reprints without a PC using memory cards"

- "print rich, realistic photos and laser-quality text using Hp's Vivera inks"

- "Do superb scans of photos and documents and restore damages photos"

- "Resist photo fading"

- "Print on both sides of the page"

The McCullough survey does not ask about any of these features.

11.    After respondents reviewed a one-page flyer describing an HP printer, in its entirety, Question 1 told them as follows:

*This particular color ink jet printer contains a feature called, "Adaptive Lighting Technology." Adaptive Lighting Technology is a breakthrough technology that enables people to produce photos that look more like what they see with their own eyes. It accomplishes this by balancing relationships between bright and dark areas in a photo, providing gentle contrasts by smoothing out harsh contrasts.*

Question 1 then asked:

*If there were a color inkjet printer model that contained all of the features of the printer whose description I just showed you, but it did not have the Adaptive Lighting Technology feature, do you think that model would cost less than the model with the Adaptive Lighting Technology feature, or would the price be the same as the model with the Adaptive Lighting Technology feature?*

12.    Respondents were asked only about the Adaptive Lighting feature. They were not asked about any other features. In this way, without any frame of reference that would enable them to recognize that their guesses must be in error, respondents are able to provide preposterous answers. For example, in addition to printing photos, most all-in-one color ink-jet printers also serve the following functions: printing alphanumeric and graphic documents sent from computers to which they are attached, making copies, scanning documents and sending and receiving FAXes. As I understand it, the Adaptive Lighting

6

Technology in printing only comes into play in regard to printing photographs, and not all photographs at that. That being so, in order to provide a proper framework and reduce the extent of uninformed guesses, respondents should have first been asked about the value of each of these general functions before being asked about the value of a specific feature applicable to one or two of these functions.

13.    Moreover, McCullough presented a full paragraph of superlative language to describe the Adaptive Lighting feature, but did not present such language to describe any of the other features. This approach is inherently misleading because not only does it draw attention to the one feature and not the other features, but it does so in a manner that makes it seem so much more important and desirable than the other features.

14.    Question 1 also incorporates some questionable language. The respondents were provided with copies of two authentic HP flyers (of the HP Photosmart C6180 All-in-One printer and the HP Officejet 5610 All-in-One printer) to examine, and the term "Adaptive Lighting" did not appear in either flyer. However, HP does use this term in some of its other publicly available literature which, I understand, is much less prominent. In this background literature, HP uses language such as:

> *Ground-breaking technology that automatically adjusts high*
> *contrast photos to reveal detail that would otherwise be lost in*
> *shadows. For images with extreme light/shadow contrast or after*

> *using flash.  Improves dark areas in images without affecting bright*
>
> *areas.[3]*

Note that HP's language properly qualifies when the Adaptive Lighting feature comes into play.  It comes into play with "high contrast photos," not all photos.  It comes into play "for images with *extreme* light/shadow contrast or after using flash" [italics supplied], not most of the time for most images.  Although Mr. McCullough went to some effort to provide authentic HP flyers that did not contain mention of Adaptive Lighting, rather than provide the properly qualified language that HP does in fact use when it describes Adaptive Lighting, he used other language that ignores these qualifications.  Specifically, he tells his respondents that Adaptive Lighting is used:

> *to produce photos that look more like what [people] see with their*
>
> *own eyes.  It accomplishes this by balancing relationships between*
>
> *bright and dark areas in a photo, providing gentle contrasts by*
>
> *smoothing out harsh contrasts.*

McCullough does not cite any source document that sets forth this language.  [It appears to be taken from a fact sheet titled "HP Photosmart 945 digital camera – Technology Backgrounder – HP Adaptive Lighting Technology."  See HP POL 7522306.  This is language describing a camera, not a printer.  Moreover, it is my understanding that the Adaptive Lighting feature in that camera is based on Retinex, not on LACE.  Thus, presenting this question in the instant lawsuit is greatly misleading.

---

[3] See: http://h41257.www4.hp.com/cda/hpcc/display/main/hpcc_content.jsp?zn=hho&cp=2-705-706-712%5E19166_4022_19_

15.    To me (and most likely to some unknown number of respondents) the description chosen by Mr. McCullough suggests that Adaptive Lighting comes into play all the time to "*balanc[e] relationships between bright and dark areas in a photo*" so as "to produce photos that look more like what [people] see with their own eyes." It should thus be appreciated that instead of reacting to anything that HP said regarding Adaptive Lighting, the respondents are reacting to the particular spin Mr. McCullough chose to use in describing this feature. His presentation makes it seem Adaptive Lighting is a more frequent and useful component of printing photographs than actually may be the case.

### C.    It Calls For Respondents To Make Guesses.

16.    The vast majority (perhaps even all) respondents likely have no qualifications, training or expertise for evaluating the cost of such a feature. Thus Question 1 (quoted in Paragraph 11, above) essentially asks respondents to provide guesses. Since guesses are not probative, why ask such questions? Many authorities have commented and studies have shown that respondents will give reasonable sounding answers to questions when their answers can be nothing other than meaningless nonsense. As one example, the classic work on questionnaire construction by Stanley Payne describes 70% of respondents answering questions and making judgments about a fictitious Metallic Metals Act.[4] A number of other examples are described in Nisbett and Wilson.[5] At the very least, Question 1 should have been preceded by a filter question asking

---

[4] *The Art of Asking Questions.* Princeton University Press. 1951. At pages 17-18.

respondents if they were, or felt they were, qualified or capable of making such estimates, then asked only of those who answered "yes" to the filter question.

### D.    It Calls For Respondents To Make High Guesses.

17.    In order to provide proper context, the respondents should have been asked to indicate the value of other features associated with making and printing photographs, such as the ability to scan, the ability to use different paper types, the ability to edit photographs, etc. In turn, editing photographs may include many components, such as the ability to eliminate red-eyes from pupils, to crop photos, to rotate photos, to enhance low-resolution camera phone images, to convert color photos to black and white, to select warmer or cooler colors, etc. Having different groups of respondents each evaluate only a single one of the printer's many features, then adding these estimates up, likely would result in a total value many times the list price of the printers themselves. To appreciate that this likely would be so, note that at least 50 respondents estimated the Adaptive Lighting feature of the C-6180 as being $100 or more. When the entire machine costs $299.99, answers like these make no sense. Rather, they reveal that a whole lot of uniformed guessing was going on. People purchase more than a single feature and the evaluation of any feature needs to be done not in isolation, but in the context of other features.

18.    Question 3 was asked of respondents who had already answered "don't know" to Question 2 ( Q.2: *"About how much less do you think the model without the Adaptive Lighting feature would cost?"*). Despite this, instead of

---

[5] Nisbett, R.E. and Wilson, T.D. (1977) Telling more than we can know. *Psychological Review*, 84, 231-259.

containing a "don't know" option, the set of answers provided to respondents forced them to make a choice from among the answers provided on the card. Thus, Mr. McCullough knew (or should have known) that he would be receiving guesses in the answers to Question 3. Moreover, as described in the two paragraphs that follow, the set of answers that were provided were unquestionably biased toward generating high guesstimates.

19.    Question 1 asks: "*do you think that model would cost less than the model with the Adaptive Lighting Technology feature, or would the price be the same as the model with the Adaptive Lighting Technology feature?*" Respondents who answered "would be the same" or "don't know" to Question 1 were not asked any further questions. Those who answered "would cost less" were asked Question 2: "*About how much less do you think the model without the Adaptive Lighting feature would cost?*" While those who answered "don't know" to Question 1 were not asked any further questions, in marked contrast, those who answered "don't know" to Question 2 were handed a card (described below) and asked Question 3: "*Which of the choices on this card indicates how much less you think the model without the Adaptive Lighting Technology feature would cost? Just tell me the letter of the choice you select.*" The card said the following:

> *I believe the model without the Adaptive Lighting Technology feature would be a savings of:*
>
> > *A. Less than $1.00*
> >
> > *B. $1.00 - $4.99*

11

    *C.  $5.00 - $9.99*

    *D.  $10.00 - $19.99*

    *E.  $20.00 or more*

20.    All questions communicate information to respondents.  Further, it is incontestable that a question's contents -- namely, its wording, the answer options provided along with the question, etc. -- can and often do exert a substantial influence over how the question is interpreted and answered.  In the present instance, the respondents were provided with an answer scale ranging from "less than $1.00" to "$20.00 or more."  This scale informs the respondents of the kind of answers the researcher expects.  In this instance, it is telling respondents that the researcher most likely expects them to give an answer in dollars that is somewhere between $1 and $20; it certainly does not tell them that the researcher expects answers such as "less than $0.05, between $0.05 and $0.09, between $0.10 to $0.19, between $0.20 and $0.49, between $0.50 and $0.99.  Research shows that providing such scale information can dramatically influence the answers respondent give to such questions.[6]  This seems especially likely when the respondents have no experience or other firm basis for answering the question, as is the case here.  Consider the answers that would have resulted had respondents been provided with a scale using the following response alternatives:

---

[6] See Elizabeth Loftus, 1982, "Interrogating Eyewitnesses – Good Questions and Bad."  In Robin M. Hogarth, Editor, *Question Framing and Response Consistency*. Jossey-Bass Social and Behavioral Science Series, 51-64.  Also see discussion of "positional cues" in Roger Tourangeau, Lance K. Rips and Kenneth Rasinski (2000) *The Psychology of Survey Response*.  Cambridge University Press.  At 246-248.

   A.  Less than $0.05

   B.  $0.05 to $0.09

   C.  $0.10 to $0.19

   D.  $0.20 to $0.49

   E.  $0.50 to $0.99

   F.  $1.00 - $4.99

   G.  $5.00 - $9.99

   H.  $10.00 - $19.99

   I.  $20.00 or more

Based upon my more than 40 years of experience, I am certain that asking the question this way would have obtained dramatically different results. A survey is improper if only a closed set of potential answers are provided, where they fail to offer the full range of plausible alternatives. *See, e.g., American Home Products v. Johnson & Johnson,* 654 F. Supp. 568, 581 (S.D.N.Y. 1987).

## V. ADDITIONAL DEFICIENCIES WITH
## THE MCCULLOUGH SURVEY

21.     In addition to these obvious fundamental flaws, the McCullough Survey has numerous other deficiencies that render of little or no value. I address these below in the order in which they appear in the conduct of a survey.

22.     A properly conducted survey needs to eliminate potential distractions. The McCullough survey did not do this. Under the heading

13

"Interview" on page 6, Mr. McCullough writes: "After completing the screening process, respondents were taken to a private room at the interviewing facility" where they underwent the main interview. Yet this description clearly disagrees with the instructions given to the Supervisors and Interviewers as to how the main interviews should be conducted. Specifically, under the heading "Method of Interviewing" on page 2 of the Supervisor instructions (in Exhibit B), the Supervisors are instructed:

> All respondents are to be screened in the main mall. [After being screened,] All <u>qualified</u> respondents are to be taken to a separate area, off the main mall, where a Printer Description will be shown and the interview will be conducted. Respondents must not be in either hearing or viewing distance of each other during the interview phase.

As can be seen from "Method of Interviewing" paragraph at the top of the first page of the Interviewer Instructions sheet (in Exhibit B), the exact same instruction as above was also provided to all the interviewers.

23.    Contrary to what is asserted on page 6 of the McCullough Report, it seems clear that, after completing the screening process, those respondents who qualified were <u>not</u> "taken to a private room at the interviewing facility" where they underwent the main interview. Instead, they were "taken to a separate area, off the main mall" where, according to the instruction "Respondents must not be in either hearing or viewing distance of each other during the interview phase," they were interviewed. In other words, it appears they were interviewed in a mall corridor. Since interviewers do not have eyes in the back of their heads, without

14

constantly turning around and being distracted from conducting the interview (not

to mention possibly distracting the respondents as well), there would be no way

for interviewers to know whether others – who might themselves later be

intercepted and invited to be respondents – were in viewing or hearing distance.

Moreover, we have no idea of what retail windows might have been viewable by

the respondent or whether they might have displayed ink jet printers or posters

regarding printers.

24.    Question 1 exemplifies numerous and serious problems. In

addition to those I have already mentioned, some of the further problems are as

follows.

25.    The McCullough survey purports to state an opinion of value. A

survey of this nature needs to have a control. Question 1 was not asked

regarding any "control" features (including potentially fictitious features) in order

to gauge measurement "noise." Without any noise estimate, we cannot take at

face value the numbers and conclusions being propounded by Mr. McCullough.

Specifically, both the original *Daubert* ruling and Federal Rule of Evidence 702[7]

speak of the need for research experts to discuss "the known or potential error

---

[7]At points in this declaration, I refer to or cite legal treatises and pertinent case law. It should be
emphasized that I am a social scientist, not a lawyer. On the other hand, as someone who, for the past 30
years, has been designing and conducting surveys to be proffered as evidence in litigated matters, it is
responsible for me to be mindful of what courts -- particularly the U.S. Supreme Court in *Daubert* and
successor rulings (*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric
Co. v. Joiner*, 118 S. Ct. 512 (1997); *Kumho Tire Co., Ltd. et al. v. Carmichael et al.*, 526 U.S 137 (1999).)
-- and other authoritative sources (as examples, the Federal Judicial Center's *Reference Manual on
Scientific Evidence*, Prof. McCarthy's tome *McCarthy on Trademarks and Unfair Competition*, pertinent
articles in law journals) have said regarding what needs to be studied and what constitutes proper and
improper survey methodology in this context.

rate of the technique" being applied. Because he employed no "controls," Mr. McCullough has no basis for identifying the applicable error rate.

26.     Question 1 is not comprehensive. It asks: "do you think that model would cost less than the model with the Adaptive Lighting Technology feature, or would the price be the same as the model with the Adaptive Lighting Technology feature?" As asked, it did not include a "costs more" response option. Thus the question actually telegraphs to the respondent the way in which the researcher expects him/her to answer the question. Although it might not seem logical that the absence of a feature may cause some people to think the product might cost more, in my experience with thousands of surveys, the presence of such seemingly unreasonable responses is not an infrequent occurrence. Because McCullough's question never provided a "cost more" option, we will never know if they would have been found here.

27.     Question 1 also is ambiguous. In part, it says: "If there were a color inkjet printer model that contained all of the features of the printer whose description I just showed you, but it did not have the Adaptive Lighting Technology feature, ..." This description is unclear as to whether the hypothetical machine might contain a compensating feature or some other additional features not available on the model shown.

28.     I also find problems with the entity that conducted the post-survey validation effort and the questions used in this effort. As stated in the Federal Judicial Center's *Reference Manual on Scientific Evidence*, the independent validation interviews "by a third party rather than by the field service that

16

conducted the interviews increases the trustworthiness of the survey results."[8] This validation serves to check that the survey firm did not fabricate answers. This checking needs to be done by an independent thirty party. Contrary to this recommendation, Mendelsohn Research, not an independent third party, conducted the post-survey validation interviews. In addition, Question 5 on the Validation Questionnaire ("When you were interviewed, did you say that you had either bought a color ink jet printer in the past 12 months and/or thought you might buy a color ink jet printer in the next 12 months?" – see Exhibit D) is a seriously leading question. Instead of being neutral (for example, "Have you bought a color ink jet printer in the past 12 months?"), this question essentially directs the respondents to remember the answer they gave during the Screening interview and give an answer now that was consistent with what they said then.

29.    Examination of the verbatim answers in Exhibit E of the McCullough report is revealing for several reasons.

30.    The dollar values reported by many respondents have little to no "face validity" – they are not reasonable. More than half of the respondents who evaluated the HP Photosmart C6180 (approximately 55%) guessed that the Adaptive Lighting feature was worth at least $50; more than 20% guessed it was worth at least $100. Yet the entire printer with all its features costs $299.99. Given everything else this printer does, it is facially unreasonable for anyone to think that this one feature would be worth one-sixth to more than one-third of the printer's entire value. As to the HP Officejet 5610, approximately 15% of the

---

[8] Shari S. Diamond, *Reference Guide on Survey Research*, at 267.

respondents guessed that the Adaptive Lighting feature was worth at least $50; approximately 7% guessed it was worth at least $60. Yet the entire printer with all its features costs $109.99. [Given everything else this printer does, it seems unreasonable for anyone to think that this one feature would be worth nearly half, or more than half, of the printer's entire value.]

31.     More than 20 respondents (whose answers appear not to have been counted) said that this Adaptive Lighting feature on the HP Officejet 5610 printer was worth between $90 and $200. Given that the entire printer cost $109.99, these guesses were ridiculous. Perhaps recognizing this, Mr. McCullough appears not to have included them in his calculations. This raises the following question: At what dollar point does it become patently obvious that the answers must be meaningless and should not be counted? For the HP Officejet 5610, Mr. McCullough arbitrarily selected $90 -- i.e. 81.8% of the price -- as a cutoff. Although he used no cutoff for the HP Photosmart C6180, given that the unit's price was $299.99, should answers of $200 be considered reasonable? I don't believe so.

32.     It is astounding to me that Mr. McCullough counts as valid and reliable the guesses provided by the respondents who answered "don't know" in response to Question 2, but then were forced to select from among the biased set of response options provided on the card accompanying Question 3. By my count, there were 54 such individuals in the HP Photosmart C6180 group and another 80 such individuals in the HP Officejet 5610 group. In my opinion, none of these individual's answers should be given any weight.

## VI. CONCLUSIONS AND OPINIONS

33.    For the reasons set forth above, in my opinion, the survey being proffered by Mr. McCullough fails to provide any scientifically valid or reliable evidence that would support the conclusions and opinions that are being predicated upon them.  Rather than being a legitimate scientific effort, in my opinion, the survey and its procedures seem designed to gather and give credence to pure speculation.

34.    It is my understanding that Mr. McCullough will be deposed and additional pertinent documents may be forthcoming.  I reserve the right to supplement or revise this report based on a review of Mr. McCullough's deposition testimony and any other documents that may be provided to me.


Pursuant to 28 U.S.C. Section 1746, I declare that, based upon the information available to me, to the best of my knowledge, the foregoing is true and correct.


April 17, 2008
_____
Date

Jacob Jacoby, Ph.D.

**APPENDIX A**

1.      My full name is Jacob Jacoby. I reside at 160 West 66th Street, New York, New York 10023.

2.      I hold a Ph.D. degree in Psychology (with minors in Statistics and Sociology) awarded by Michigan State University in 1966.  From 1965 through 1968, I served as a First Lieutenant in the United States Air Force.  From 1968 through 1981, I was a Professor of Psychology at Purdue University (West Lafayette, Indiana).  In addition to heading the consumer psychology program, my principal responsibilities at Purdue University were to teach and do research on the subjects of consumer behavior and research methodology.

3.      Since 1981, I have held an endowed chair as the Merchants Council Professor of Consumer Behavior and Retail Management at the Leonard N. Stern School of Business at New York University.  In that capacity, I continue to do research and teach Ph.D., M.B.A. and undergraduate students on the subjects of consumer behavior and research methodology.

4.      A copy of my academic curriculum vita is provided as Appendix A. Included therein is a list of the publications I have authored during the past ten years.  Also included therein is a list of all my trial and deposition testimony for the past four years.

5.      Research by other scholars identified me as the most frequently cited scholar in the field of consumer behavior during much of the latter third of the 20th Century.  Conducted by Donna Hoffman (University of Tennessee) and Morris Holbrook (Columbia University) and published in the field's leading peer-

20

reviewed scholarly journal (the *Journal of Consumer Research*, 1993, 19, 507-517), the first study revealed that I had the highest "influence index" of any of the field's 42 most-published scholars whose work was accepted and published by the *Journal of Consumer Research* during the 15 year period spanning 1974-1989. The second study, an August 1990 working paper issued by Washington State University and authored by Joseph Cote (WSU), Seu Leong (National University of Singapore) and Jane Cote (WSU), indicated that, based on my scholarly publications appearing in the *Journal of Marketing, Journal of Marketing Research* and *Journal of Consumer Research* (which traditionally had been considered the field's three most rigorous peer-reviewed journals), I was the second most often cited marketing (and first-most often cited consumer) scholar in the *Social Science Citation Index* for the 20 year period spanning 1968 through 1988. The *Social Science Citation Index* covers more than 1,400 journals worldwide.

6.    Approximately once every thirty years or so, an encyclopedia is published that covers all the social and behavioral sciences. The third such compendium, is the 24 volume International *Encyclopedia of the Social and Behavioral Sciences* (Elsevier Science Ltd./Pergamon: Oxford, UK; 2001). Of the thousands of scholars whose principal focus is the study of consumer behavior, I was the one invited to write the chapter on consumer psychology.

7.    I have also been fortunate to have my empirical research and scholarly writings accorded significant recognition. This recognition has included the following:

21

a.    In 1978, I received the American Marketing Association's Harold H. Maynard award for an article of mine judged to have made "the most significant contribution to marketing theory and thought" during the preceding year.

b.    In 1991, I received the American Academy of Advertising's first "Outstanding Contribution to Advertising" award for having made "a significant and sustained contribution to advertising research through a systematic program of research."

c.    In 1995, I received the American Psychological Association's Society for Consumer Psychology bi-annual "Distinguished Scientist Award" for "sustained, outstanding contributions to the field of consumer psychology."

d.    Based upon my research productivity, I have been elected a Fellow in the following organizations: American Psychological Association, American Psychological Society, Association for Consumer Research, Society for Consumer Psychology, Society for Law and Psychology, Society for Personality and Social Psychology.  The honor of being elected a Fellow generally is accorded to less than 10% of the membership.  In the case of the Association for Consumer Research, it is 1%.  Additionally, I am an Academic Research Fellow at New York University's Center for Law and Business.

e.    I am listed in numerous "Who's Who" compilations, including: *Who's Who in the World, Who's Who in America, Who's Who in Science*

22

*and Engineering, Who's Who in Frontier Science and Technology, Who's Who in Advertising* and *Who's Who of Emerging Leaders in America.*

8.　　I am also the President of Jacob Jacoby Research, Inc., a firm specializing in social science research to address issues regarding consumer psychology and behavior that surface in litigated disputes.  Since 1973, I have rendered expert opinions, under oath, in more than one hundred matters heard before U.S. District Courts, state courts and federal regulatory bodies.  As required by the federal rules, a listing of the cases in which I have testified during the past four years is attached in Appendix B.

9.　　Since 1968, I have played a lead role in conducting more than 1,500 consumer, marketing and communication (including advertising) studies.  More than 500 of these studies have been in support of litigation, of which approximately two-thirds have dealt with secondary meaning or likelihood of confusion involving trademarks and/or trade dress.

10.　　Examination of Section X ("Survey Evidence") in Chapter 32 of Professor J. Thomas McCarthy's six-volume tome, *McCarthy on Trademarks and Unfair Competition*, reveals more than 10 citations to and reliance upon my *scholarly* work in this area, many more than for any other behavioral scientist in this arena.  (See Sections 32:158 through 32:178.)　Note that these citations to my *scholarly* writings are in addition to Professor McCarthy's citations of District and Appellate court decisions in numerous cases where I have proffered evidence and testimony.

11.    I have been an invited speaker on the subjects of litigation surveys and consumer confusion/deception before various groups.  These include invited presentations before the International Trademark Association, the International Bar Association, the Federal Trade Commission, the National Association of Attorneys General, the Practicing Law Institute, several law schools (e.g., New York University, Fordham University, Roger Williams University, Benjamin Cardozo Law School) and several local intellectual property and bar associations (e.g., the California State Bar Association, the Virginia State Bar Association, the Association of the Bar of New York City, etc.).  Form 1993 through 2003, I was a member of the Editorial Board of *The Trademark Reporter*.

12.    In 1995, in conjunction with issuing its *Reference Manual on Scientific Evidence* and discussing how it dovetailed with *Daubert v. Merrill-Dow*, the Federal Judicial Center (FJC) held three workshops for District Court judges and magistrates.  At the invitation of the FJC, I presented the lectures on survey research evidence for judges attending the workshops in Atlanta and Seattle. (Though the invitation was extended, prior plans precluded me from accepting the third invitation.)  As indicated in the "List of Peer Reviewers" provided at the end of the Federal Judicial Center's *Reference Manual on Scientific Evidence,* in 1994 and again in 2000, I served as a peer reviewer for the "Reference Guide on Survey Research" appearing in both editions of that Manual.

## ACADEMIC CURRICULUM VITA OF JACOB JACOBY

Name: **Jacob (Jack) Jacoby**                     Vita updated: January 1, 2008

Home address and phone:                         N.Y.U. office address & phone:

  160 West 66th Street                         Stern School of Business
  Apartment PHA                               New York University
  New York, N.Y. 10023                        40 West 4th Street, Room 909
                             New York, NY 10012
  212-721-9005                                212-998-0515

EDUCATION:

      Ph.D.  Michigan State University (1966 –  Major: Social Psychology;
                                    Minors: Statistics, Sociology)
      M.A.  Brooklyn College, The City University of New York      (1963 - Psychology)
      B.A.  Brooklyn College, The City University of New York      (1961 - Psychology)

PROFESSIONAL EXPERIENCE:

| | |
|---|---|
| 1981 - present: | **Merchants Council Professor of Consumer Behavior and Retail Management,** Stern School of Business, New York University. |
| 1981 - 1985: | Director of the Institute of Retail Management and Merchants Council Professor of Retailing, New York University. |
| 1975 - 1981: | Professor, Department of Psychology, Purdue University |
| 1971 - 1975: | Associate Professor, Department of Psychology, Purdue University. |
| 1968 - 1971: | Assistant Professor, Department of Psychology, Purdue University |
| 1976 (Jun.-Jul.) and 1975 (May): | Guest Professor, SFB 24, University of Mannheim, Mannheim, Germany |
| 1965 - 1968: | Active duty (U.S. Air Force).  Served as Chief, Behavioral Science Branch, the National Security Agency, Fort George G. Meade, Maryland.  Duties were primarily to plan and conduct    applied research in industrial/organizational psychology. (Security clearance: Top Secret). |

1966 - 1968:          (Part-time) Assistant Professorial Lecturer, Department of Business and
                      Public Administration , George Washington University.  Promoted to
                      Associate Prof. Lecturer the semester I left.

## MEMBERSHIPS IN PROFESSIONAL ORGANIZATIONS:

American Association for Public Opinion Research (1967-1968,
1972-1973; 1982-present)

American Marketing Association (1968-present)

American Psychological Association (Associate, 1963-1967; Member, 1968-1972;
Fellow, 1973-present.  Also elected to Fellow status by Divisions 8, 23 and 41.)

American Psychological Society (1996-present; Fellow 1998)

American Psychology-Law Society (1988-present; Fellow 1994)

Association for Consumer Research (1969-present, Fellow 1993)

International Trademark Association (1991-present)

Market Research Council (1990-present)

Midwestern Psychological Association (Member, 1968-1975)

Sigma Xi, The Scientific Research Society of North America (Associate Member, 1962-
1968; Member, 1969-1981)

Society for the Psychological Study of Social Issues (Member, 1963-1968)

Society for Judgment and Decision Making (Member, 1986-1990)


## ACTIVITIES IN PROFESSIONAL ORGANIZATIONS:

1.    American Psychological Association
      - Member, Council of Representatives (governing body of APA), 1971-1973
      - Member, ad hoc Committee on Student Aid (COSA), 1973.

2.    **Society of Consumer Psychology** (Division 23) of the American
            Psychological Association
      - **PRESIDENT**, September 1973 to August 1974
      - Representative to APA Council of Representatives, 1971-1973
      - Member, Committee on Scientific and Professional Affairs, 1968-1971
      - Chairman, Convention Program Committee, 1970-1971
      - Contributing Editor, The Communicator, Division 23 Newsletter,
        1970-1973

26

- Chairman, Membership Committee, 1971-1971
- Member, Membership Committee, 1972-73
- Policy Board Representative to the Journal of Consumer Research, 1971-1974, 1976-1978; Alternate Representative, 1974-1975
- Chairman, Fellowship Committee, 1975; 1980; Member, 1979, 1981
- Chairman, Election Committee, 1975

3. **Association for Consumer Research**

   - **PRESIDENT**, 1975
   - Member, Advisory Council (ACR's governing body thru 1972), 1969-1972
   - Member, Executive Committee, 1973-1974, 1976
   - Member, Program Committee, 1970-1971
   - Member, Publications Committee, 1970-1972
   - Chairman, Publications Committee, 1973
   - Editor, ACR Newsletter, 1973
   - Chairman, Election Committee, 1976
   - Member, Election Committee, 1975, 1977
   - Policy Board rep., *Journal of Consumer Research,* 1981-1984

4. American Association of Public Opinion Research

   - Member, Professional Standards Revision Committee, 1983-1984
   - Policy Board rep., *Journal of Consumer Research,* 1984-1986
   - Member, ad hoc committee on changing *P.O.Q.* publisher, 1986

5. Market Research Council

   - Executive Committee, Member at Large, 1991-1992
   - Chairman, Marketing "Hall of Fame" Award Committee 1991-1992

6.  International Trademark Association

    – Member, Editorial Board, *The Trademark Reporter*, 1993-2003
    – Member, Advisory Board, Brand Names Educational Foundation,2004-6

**OTHER PROFESSIONAL ACTIVITIES:**

1. Reviewer of Manuscripts and Editorial Board Memberships.

   - *Journal of Consumer Research,* Member, Editorial Board, 1973-1974.
     Member, Policy Board
       Representing APA-Division 23, 1971-1974, 1976-78
         Alternate, 1974-1975
       Representing ACR: 1981-1984
       Representing AAPOR: 1984-1986
       Vice Chairman of Policy Board: 1984-1986
   - *Journal of Marketing Research,* Member, Editorial Board, 1972-1974.

- *Computers in Human Behavior*, Member, Editorial Board, 1984-1994.
- *Trademark Reporter*, member, Editorial Board, 1993-present.

- American Psychological Association, Annual Conventions: 1970-1976

- Association for Consumer Research, Annual Conventions: 1971, 1972,
  1974, 1978, 1979, 1986, 1989, 1990
- ACR European Conference, 1995

- *Organization Behavior and Human Performance* - 1971
- 1972 American Marketing Association, Fall Convention
- 1972 Research Design Competition, APA-Division 23
- *Journal of Applied Social Psychology* 1972, 1984
- *Journal of Applied Psychology* 1972
- *Public Opinion Quarterly*, 1973, 1974
- *Journal Supplement Abstract Service*, Am. Psych. Assn. 1975
- American Marketing Association, 1979 Ph.D. dissertation competition
- *Journal of Marketing* (1980)
- *Journal of Finance* (1985)
- *Journal of Nonverbal Behavior* (1988)
- *International Journal of Research in Marketing* (1988)
- "Marketing and Public Policy" conference 1995,
- *Journal of Public Policy and Marketing*, 1997-1999
- *Reference Manual on Scientific Evidence.*
  Federal Judicial Center 1994 and 1999

2. Reviewer of Proposals
   - Food and Drug Administration(1975)
   - National Science Foundation (1973, 1974, 1975, 1976, 1979, 1980,
     1986, 1988)
   - Social Science Research Council of Canada (1981)
   - Million Dollar Round Table (1979)

3. Reviewer of Advertising

   - Judge, 1991 Effie Awards


HONORS AND AWARDS:

1969 - Admitted into Sigma Xi, the National Honorary Society of Science.

1973 - Elected a Fellow of the American Psychological Association
       1973 - Elected a Fellow of the Division of Consumer Psychology
       1981 - Elected a Fellow of the Division of Personality and Social
              Psychology
       1995 - Elected a Fellow of the Division of Law and Psychology

1973 - **President**, Division of Consumer Psychology, the American
Psychological Association.

1975 - **President**, the Association of Consumer Research.

1978 – Recipient of the American Marketing Association's **Harold H. Maynard
Award** for the article making the most "significant contribution of
marketing theory and thought" in the *Journal of Marketing*, 1978.

1991 - First recipient, American Academy of Advertising's **Outstanding
Contribution to Advertising Award** for having "made a significant
and sustained contribution to advertising research through a
systematic program of research."

1993 - Elected a **Fellow** of the Association of Consumer Research

1995 – Recipient of the Society of Consumer Psychology's fifth
**Distinguished Scientific Research Award.**

2001 - Appointed an Academic Fellow, the Center for Law and Business, New York
University.

Listed in:
*Who's Who in the World*
*Who's Who in America*
*Who's Who in the East*
*Who's Who in Frontier Science and Technology*
*Who's Who of Emerging Leaders in America*
*Who's Who in Advertising*
*Who's Who in American Education*
*Men of Achievement* (13th edition)


## MAJOR RESEARCH GRANTS:

$148,000
from the National Science Foundation for studying: "Amount, type, and order of
package information acquisition in purchasing decision." For the period from June 1,
1974 to December 30, 1976. (GI-43687).

$155,000
from the Federal Trade Commission for: "Study of likely impact of disclosure of
life insurance costs on agent and consumer behavior." For the period from January 1,
1977 to August 4, 1978. (L0226).

$181,000

from the American Association of Advertising Agencies for studying: "The Miscomprehension of Televised Communication". For the period from February 1978 through February 1980.

$353,000

from the National Science Foundation for studying: "Assessing the effects of science based information on consumer technological choices." (Co-authored with James J. Jaccard). For the period from February 15, 1980 through August 31, 1983 (PRA7920585).

$270,000

from The Advertising Educational Foundation, Ind. (Co-sponsored by the American Association of Advertising Agencies and the American Advertising Federation) for studying: "The Miscomprehension of Print Communication". For the period from January 1983 through December 1985.


BOARD OF DIRECTORS

1991-1994 - Advertising Educational Foundation. (New York)
                    Member, Board of Directors

# PUBLICATIONS

## M.S. THESIS AND Ph.D. DISSERTATION:

Jacoby, J. "Imprinting: An experimental approach to a biphasic interpretation." Unpublished Master's Thesis, Brooklyn College, 1963. (Major Professor: Howard Moltz)

Jacoby, J. "Situational anxiety and ordinal birth position as determinants of dogmatism and authoritarianism." Unpublished Doctoral Dissertation. Michigan State University, 1966. (Major Professor: Milton Rokeach) See: *Dissertation Abstracts A. Humanities and Social Science*, 1967, 27, p. 4338-A.

## PUBLISHED TEST:

Jacoby J. and Terborg, J.R. (1975) <u>The Managerial Philosophies Scale</u>. Teleometrics International, The Woodlands, Texas. Copyright. This is a 36-item Likert-type instrument designed to assess McGregor's Theory X-Theory Y managerial orientations. An Examiner's Manual is available (through Teleometrics), as is a manuscript describing the scale's empirical development (entitled: "Development and Validation of Theory X and Y scales for assessing McGregor's Managerial Philosophies").

## BOOKS AND MONOGRAPHS:

1. Uhl, J.N., Armstrong, J., Courtenay, H.V., Ishida, J.T., Kepner, K.W., Potter, H.C., and Jacoby, J. (1970) <u>Survey and evaluation of consumer education programs in the United States</u>. (2 volumes). Purdue Research Foundation, Lafayette, Indiana. March. 666 pages. Microfilm $2.50; hard copy $33.40 (Available from: ERIC Document Reproduction Service, ED-038-549, Fairmont Avenue, Bethesda, Maryland 20014).

2. Jacoby, J., Olson, J.C., Szybillo, G.J., and Hart, E.W. Jr. (1975) <u>Affirmative nutritional disclosure in advertising and selected alternatives: The likely impact on consumer behavior</u>. Washington, D.C.: Consumer Research Institute (Grocery Manufacturers of America, Inc.), December.

3. Jacoby, J. and Chestnut, R.W. (1977) <u>Amount, type, and order of package information acquisition in purchasing decisions</u>. Final report to the National Science Foundation (GI-43687), June.

4. Jacoby, J. and Olson, J.C. (1976) <u>Consumer reaction to price: An attitudinal, information-processing perspective</u>. Unpublished; 100 pages. (A 30-page condensation was published as article #69; see below).

5. Jacoby, J. and Chestnut, R.W. (1978) Brand loyalty:  Measurement and management. New York: John Wiley and Sons.

6. Jacoby, J., Hoyer, W.D. and Sheluga, D.A., (1980) The miscomprehension of televised communication.  New York: American Association of Advertising Agencies.

7. Jacoby, J. (1980) Psychological foundations of consumer behavior:  Lecture notes. Bloomington, Indiana:  TIS Incorporated, Publishing Division.  (160 pages).

8. Jacoby, J. and Craig, C.S. (Eds.), (1984) Personal selling:  Theory, Research and practice. Lexington Books, Lexington, Mass.

9. Jacoby, J. and Jaccard, J.J. (1984)  The influence of health and safety information on consumer decision making concerning new technological products.  Final report to the National Science Foundation, June.

10. Jacoby, J. and Olson, J.C., (Eds.), (1984) Perceived quality: How consumer view stores and merchandise.  Lexington Books, Lexington, Mass.

11. Jacoby J. and Hoyer, W.D., (1987) The comprehension and miscomprehension of print communications: An investigation of mass media magazines.  (Sponsored by The Advertising Educational Foundation, Inc.)  Lawrence Erlbaum Associates, Hillsdale, New Jersey.

12. James Jaccard and Jacob Jacoby (In press) *Theory Construction: A Practical Guide for Social Scientists.* Guilford Press (New York).

**ARTICLES:**

1. Jacoby, J. (1967) The construct of abnormality:  Some cross-cultural considerations. Journal of Experimental Research in Personality, 2, 1-15.

2. Jacoby, J. (1967) Open-mindedness and creativity.  Psychological Reports, 20, 822.

3. Jacoby, J. (1968) Birth-rank and pre-experimental anxiety.  Journal of Social Psychology, 76, 9-11.

4. Jacoby, J. (1968) Examining the other organization:  A methodology for studying informal organizational structure of complex organizations.  Personnel Administration, 31, 36-42.

5. Jacoby, J. (1968) Work music and morale:  A neglected but important relationship. Personnel Journal, 47, 882-886.

6. Jacoby, J. (1968)  Creative ability of task-oriented versus person-oriented leaders. Journal of Creative Behavior, 2, 249-253.

32

7. Jacoby, J. (1969) Time perspective and dogmatism: A replication. <u>Journal of Social Psychology</u>, <u>7</u>, 281-82.

8. Jacoby, J. (1969) Accuracy of person perception as a function of dogmatism. <u>Proceedings, 77th Annual Convention</u>, American Psychological Association, <u>4</u>, 347-348.

9. Jacoby, J. (1970) The plight of the uniformed Air Force Psychologist. <u>Professional Psychology</u>, <u>1</u>, 383-387.

10. Jacoby, J. (1971) Innovation proneness as a function of personality. <u>Journal of Marketing Research</u>, <u>8</u>, 244-247. Reprinted in: H.H. Kassarjian and T.S. Robertson (Eds.), <u>Perspectives in Consumer Behavior</u> (2nd ed.). Glenview, Illinois: Scott Foresman, 1973, pp. 149-155. (A one-page abstract appears in David L. Sparks (Ed.). <u>Broadening the Concept of Marketing</u>. Chicago: American Marketing Association, 1970.)

11. Jacoby J. (1971) An attitudinal model of multi-brand loyalty: Preliminary results and promotional strategies. <u>Journal of Advertising Research</u>, <u>11</u>(3), 25-31.

12. Jacoby, J. (1971) Training consumer psychologists: The Purdue University program. <u>Professional Psychology</u>, <u>2</u>, 300-302.

13. Jacoby, J. (1971) A multi-indicant approach for studying new product adopters. <u>Journal of Applied Psychology</u>, <u>55</u>, 384-388. Reprinted in M. Wallendorf and G. Zaltman (Eds.), <u>The Consumer Behavior of Individuals and Organizations</u>. N.Y.: John Wiley, 1979.

14. Jacoby, J. ( 1971) Interpersonal perceptual accuracy as a function of dogmatism. <u>Journal of Experimental Social Psychology,</u>, <u>7</u>, 221-236.

15. Jacoby, J. (1971) Brand loyalty: A conceptual definition. <u>Proceedings 79th Annual Convention</u>, American Psychological Association, <u>6</u>, 655-656.

16. Jacoby, J. and Aranoff, D. (1971) Political polling and the lost letter technique. <u>Journal of Social Psychology</u>, <u>83</u>, 209-212.

17. Jacoby, J. and Matell, M. (1971) Three point Likert scales are good enough. <u>Journal of Marketing Research</u>, <u>8</u>, 495-500.

18. Jacoby, J., Olson, J.C., and Haddock, R.A. (1971) Price, brand name, and product composition characteristics as determinants of perceived  quality. <u>Journal of Applied Psychology</u>, <u>55</u>, 570-579.

19. Deering, B.J. and Jacoby, J. (1971) The effect of "alternative relationships" and "relative resources" on consumer decisions between mother and child. In David M. Gardner (Ed.) Proceedings, Second Annual Conference, The Association for Consumer research, 1, 135-142.

20. Matell, M.S. and Jacoby, J. (1971) Is there an optimal number of alternatives for Likert scale items? Study I: Reliability and validity. Educational and Psychological Measurement, 31, 657-674.

21. Olson, J.C. and Jacoby, J. (1971) A construct validation study of brand loyalty. Proceedings, 79th Annual Convention, American Psychological Association, 6, 657-658.

22. Jacoby, J. (1972) Opinion leadership and innovativeness: Overlap and validity. In M. Venkatesan (Ed.), Proceedings, Third Annual Conference, The Association for Consumer Research, 2, 632-649.

23. Jacoby, J. and Kaplan, L.B. (1972) The components of perceived risk, In M. Venkatesan (Ed.), Proceedings, Third Annual Conference, The Association for Consumer Research, 2 382-393.

24. Bowen, D.D., Perloff, R. and Jacoby, J. (1972) Improving manuscript evaluation procedures. American Psychologist, 27, 221-225.

25. Deering, B.J. and Jacoby, J. (1972) Price intervals and individual price limits as determinants of product evaluation and selection. In M. Venkatesan (Ed.), Proceedings, Third Annual Conference, The Association for Consumer Research, 2, 145-166.

26. Deering, B. J. and Jacoby, J. (1972) Risk enhancement and risk reduction strategies for handling perceived risk. In M. Venkatesan (Ed.), Proceedings, Third Annual Conference, The Association for Consumer Research, 2, 404-416.

27. Heimbach, J.T. and Jacoby, J. (1972) The Zeigarnik effect in advertising. In M. Venkatesan (Ed.), Proceedings, Third Annual Conference, The Association for Consumer Research, 2 746-748.

28. Matell, M.S. and Jacoby, J. (1972) Is there an optimal number of alternatives for Likert scale items? Effects of testing time and scale properties. Journal of Applied Psychology, 56, 506-509.

29. Olson, J.C. and Jacoby, J. (1972) Cue utilization in the quality perception process. In M. Venkatesan (Ed.), Proceedings, Third Annual Conference, The Association for Consumer Research, 2, 167-179.

30. Szybillo, G.J. and Jacoby, J. (1972) The relative effects of price, store image, and intrinsic product differences on product quality evaluation. In M. Venkatesan (Ed.), Proceedings, Third Annual Conference, The Association for Consumer Research, 2, 180-186.

31. Jacoby, J., Kohn, C.A. and Speller, D.E. (1973) Time spent acquiring product information as a function of information load and organization. Proceedings, 81st Annual Convention, American psychological Association, 8 (2), 813-814.

32. Jacoby, J. and Kyner, D.B. (1973) Brand loyalty vs. repeat purchasing behavior. Journal of Marketing Research, 10, 1-9.

33. Hart, E.W. and Jacoby, J. (1973) The relationship of perceived newness to novelty, recency, and scarcity. Proceedings, 81st Annual Convention, American Psychological Association, 8 (2), 839-840.

34. Hollander, S.W. and Jacoby, J. (1973) Recall of crazy, mixed-up TV commercials. Journal of Advertising Research, 13 (3), 39-42.

35. Kohn, C.A. and Jacoby, J. (1973) Operationally defining the consumer innovator. Proceedings, 81st Annual Convention, American Psychological Association, 8 (2), 837-839.

36. Szybillo, G.J., Jacoby, J. and Busato, J. (1973) Effects of integrated advertising on perceived corporate hiring policy. Proceedings, 81st Annual Convention, American Psychological Association, 8 (2), 815-816.

37. Jacoby, J. (1974) Consumer reaction to information displays: Packaging and advertising. In S.F. Divita (Ed.), Advertising and the Public Interest. Chicago: American Marketing Association, 101-118.

38. Jacoby, J. (1974) Consumer behavior: A neglected but fertile field for psychological research. Contemporary Psychology, 19 (7), 543. (Review of S. Ward and T.S. Robertson, Eds., Consumer Behavior: Theoretical Sources. Englewood Cliffs, N.J., Prentice-Hall.)

39. Jacoby, J. (1974) The construct validity of opinion leadership. Public Opinion Quarterly, 38 (1), 81-8

40. Jacoby, J. and Olson, J.C. (1974) An extended expectancy model of consumer comparison process. In S. Ward and P. Wright (Eds.), Advances in Consumer Research, 1 319-333. Urbana, Illinois: Association for Consumer Research.

41. Jacoby, J., Speller, D.E. and Kohn, C.A. (1974) Brand choice behavior as a function of information load. Journal of Marketing Research, 11 (1), 63-69.

42. Jacoby, J., Speller, D.E. and Berning, C.A.K. (1974) Brand choice behavior as a function of information load: Replication and extension. Journal of Consumer Research, 1 (1), 33-42.

43. Berning, C.A.K. and Jacoby, J. (1974) Patterns of information acquisition in new product purchases. Journal of Consumer Research, 1 (2). 18-22.

44. Kaplan, L.B., Szybillo, G.J. and Jacoby, J. (1974) Components of perceived risk in product purchase: A cross-validation. Journal of Applied Psychology, 59 (3), 287-291.

45. Szybillo, G.J. and Jacoby, J. (1974) Intrinsic vs. extrinsic cues as determinants of perceived product quality. Journal of Applied Psychology, 59 (1), 74-78.

46. Szybillo, G.J. and Jacoby, J. (1974) Effects of different levels of integration on advertising preference and intention to purchase. Journal of Applied Psychology, 59 (3), 274-280.

47. Jacoby, J. (1975) Consumer psychology as a social psychological sphere of action. American Psychologist, 30 (10), 977-987. APA-Division 23 Presidential Address (Reprinted in: M. Wallendorf and G. Zaltman (Eds.), The Consumer Behavior of Individuals and Organizations, New York: John Wiley and Sons.)

48. Jacoby, J. (1975) Perspectives on a consumer information processing research program. Communication Research, 2 (3), 203-215. (Reprinted in: Michael Ray and Scott Ward (Eds.), Communicating with Consumers: The Information Processing Approach. Beverly Hills, Calif.: Sage, 13-25.)

49. Jacoby, J. (1975) A brand loyalty concept: Comments on a comment. Journal of Marketing Research, 12 (4), 484-487.

50. Jacoby, J. (1975) Ruminations of a consumer psychologist on the emerging energy crisis. In R. N. Andrews (Ed.), Can we meet our energy needs? President's Council Symposium, Purdue University. West Lafayette, Indiana: Purdue Research Foundation, 32-44.

51. Jacoby, J. and Small, C.B. (1975) The FDA approach to defining misleading advertising. Journal of Marketing, 39 (4), 65-68. Reprinted In: Jeffrey S. Edelstein (Ed.)(1999) Advertising Law in the New Media Age. New York: Practicing Law Institute.

53.    Jacoby, J., Speller, D.E. and Berning, C.A.K. (1975) Constructive criticism and programmatic research: Reply to Russo. Journal of Consumer Research, 2 (2), 154-156.

54. Edel, E.C. and Jacoby, J. (1975) Examiner reliability in polygraph chart analysis: Identification of physiological responses. Journal of Applied Psychology, 60 (5), 632-634.

55. Jacoby, J. and Terborg, James R. (1975) How to interpret your scores on the Managerial Philosophies scale. Teleometrics Int'l., 1-7.

56. Jacoby, J. (1976) Consumer psychology: An octennium. In P. Mussen and M. Rosenzweig (Eds.), Annual Review of Psychology, 27, 331-358.

57. Jacoby, J. (1976) Consumer and industrial psychology: Prospects for theory corroboration and mutual contribution. In M.D. Dunnette (Ed.), The Handbook of Industrial and Organizational Psychology. Chicago: Rand McNally, 1031-1061.

58. Jacoby, J. (1976) Consumer research: Telling it like it is. In B.B. Anderson (Ed.), Advances in Consumer Research, 3, 1-11. ACR Presidential Address (Reprinted in M. Wallendorf and G. Zaltman (Eds.), The Consumer Behavior of Individuals and Organizations. New York: John Wiley and Sons, 1979.)

59. Jacoby, J. (1976) Defining misleading advertising: Reply to Preston. Journal of Marketing, 40(3), 57-58.

60. Jacoby, J., Chestnut, R.W., Weigl, K.C. and Fisher, W. (1976) Pre-purchase information acquisition: Description of a process methodology, research paradigm, and pilot investigation. In B.B. Anderson (Ed.), Advances in Consumer Research, 3, 306-314.

61. Jacoby, J., Szybillo, G.J. and Berning, C.A.K. (1976) Time and consumer behavior: An interdisciplinary overview. Journal of Consumer Research, 2 (3), 320-339. (Reprinted in: R. Ferber (Ed.), Selected Aspects of Consumer Behavior: A Summary from the Perspective of Different Disciplines. Prepared for the National Science Foundation. Directorate for Research Applications (RANN). NSF/RA 77-0013. Superintendent of Documents, U.S. Government Printing Office, Washington, D.C., 451-476.)

62. Bettman, J.R. and Jacoby, J. (1976) Patterns of processing in consumer information acquisition. In B.B. Anderson (Ed.), Advances in Consumer Research, 3, 315-320.

63. Kyner, D.B., Jacoby, J. and Chestnut, R.W. (1976) Dissonance resolution by grade school consumers. In B.B. Anderson (Ed.), Advances in Consumer Research, 3, 315-320.

64. Raffee, H., Hefner, M., Scholer, M., Grabicke, K. and Jacoby, J. (1976) Informationsverhalten und Markenwahl. Die Unternehmung, 2, 95-107.

65. Jacoby, J. (1977) Information load and decision quality: Some contested issues. Journal of Marketing Research, 14 (4), 569-573.

66. Jacoby, J. (1977) The emerging behavioral process technology in consumer decision making research. In W.D. Perrault, Jr. (Ed.), Advances in Consumer Research, 4, 263-265.

67. Jacoby, J. (1977) History and objectives underlying the formation of ACR's Professional Affairs Committee in W.D. Perrault, Jr. (Ed.) Advance in Consumer Research 4, 256-257.

68. Jacoby, J. (1977) Laboratory experiments: Faulty and necessary. Journal of Consumer Policy, 1 (2), 183-185.

69. Jacoby, J., Berning, C.A.K., and Dietvorst, T.F. (1977) What about disposition? Journal of Marketing, 41 (2) 22-28.

70. Jacoby, J., Chestnut, R.W. and Silberman, W. (1977) Consumer use and comprehension of nutrition information. Journal of Consumer Research, 4 (2), 119-128.

71. Jacoby, J. and Olson, J.C. (1977) Consumer reaction to price: An attitudinal, information-processing perspective. In Y. Wind an M. Greenberg (Eds.), Moving Ahead with Attitude Research. Chicago: American Marketing Association, 73-86.

72. Jacoby, J., Szybillo, G.J. and Busato-Schach, J. (1977) Information acquisition behavior in brand choice situations. Journal of Consumer Research, 3 (4), 209-216.

73. Chestnut. R.W. and Jacoby, J. (1977) Consumer information processing: Emerging theory and findings. In A. Woodside, PhD. Bennett, and J.N. Sheth (Eds.), Foundations of Consumer and Industrial Buying Behavior. New York: Elsevier, North-Holland, Inc., 119-133.

74. Jacoby, J. (1978) Consumer Research: A state of the art review. Journal of Marketing, 87-96.

75. Jacoby, J., Chestnut, R.W. and Fisher, W. (1978) A behavioral process approach to information acquisition in non-durable purchasing. Journal of Marketing Research, 15 532-544.

76. Jacoby, J., Chestnut, R.W., Hoyer, W., Sheluga, D.A. and Donahue, M.J. (1978) Psychometric characteristics of behavioral process data: Preliminary findings on validity and reliability, In Keith Hunt (Ed.) <u>Advances in consumer research</u>, <u>5</u>, 546-554.

77. Jacoby, J., Sheluga, D., and Major, B. (1978) Does format make a difference?: Three studies. In C. Leavitt (Ed.), <u>Proceedings of the Division 23 Program</u>, 85th Annual Convention of the American Psychological Association, 15-16.

78. Sheluga, D.A. and Jacoby, J. (1978) Do comparative claims encourage comparison shopping? -- the impact of comparative claims on consumers' acquisition of product information. In J. Leigh and C.R. Martin (Eds.), <u>Current Issues and Research in Advertising</u>. Ann Arbor, Michigan: University of Michigan Press, <u>5</u>, 23-28.

79. Sheluga, D.A., Jacoby, J. and Major, B.N. (1978) Whether to agree disagree or disagree-agree: The effects of anchor order on item response. In Keith Hunt (Ed.) <u>Advances in consumer research</u>, <u>5</u>, 109-113.

80. Jacoby, F. and Jacoby, J. (1979) You're twenty years behind your market. <u>1979 Proceedings of the Million Dollar Round Table, Volume II</u>. Des Plaines, Illinois: MDRT, 895-898.

81. Jacoby, F. and Jacoby, J. (1979) The psychology of persuasion. <u>1979 Proceedings of the Million Dollar Round Table, Volume II</u>. Des Plaines, Illinois: MDRT, 899-906.

82. Kulich, R.J., Curran, J.P., Jacoby, J. and Mariotto, M.J. (1979) The application of assertiveness training to the consumer-salesperson interaction. In F.M. Nicosia (Ed.), <u>Proceedings of the Division 23 program</u>, 86th Annual Convention of the American Psychological Association, 60-63.

83. Raffee, H., Jacoby, J., Hefner, M., Scholer, M. and Grabicke, (1979) K. Informationsentscheidungen bei unterschiedlichen Entscheidungsobjeckten (Information-decisions over different decision-objects). In H. Meffert, H.Steffenhagen, and H.Freter (Eds.), <u>Konsumenten-verhalton und Information (Consumer Behavior and Information)</u> Weisbaden, West Germany, 113-159.

84. Sheluga, D.A., Jaccard, J.J. and Jacoby, J. 1979, Preference, search and choice: An integrative approach. <u>Journal of Consumer Research</u>, <u>6</u> (2), 166-176.

85. Chestnut, R.W. and Jacoby, J. (1980) Product comprehension: The case of permanent vs. term life insurance. In J.C. Olson (Ed.), <u>Advances in Consumer Research</u>, <u>7</u> 424-428.

86. Jacoby, J. (1981) Some perspectives on risk acceptance. In K.B. Monroe (Ed.), <u>Advances in Consumer Research</u>, <u>8</u> 511-516.

87. Jacoby, J. and Hoyer, W.D. (1981) What if opinion leaders didn't know more? A question of nomological validity. In k. Monroe (Ed.), <u>Advances in Consumer Research</u>, <u>8</u>, 299-303.

88. Jacoby, J., Hoyer, W.D., Raffee, H., Hefner, M. and Chestnut, R.W. (1981) Intra- and Inter-individual consistency in information acquisition: A cross-cultural examination. In H. Raffee, G. Silberer (Eds.), <u>Informationsverhalten des Konsumenten: Ergegrisse empirischer Studien (Empirical Research in Consumer Information Behavior)</u>. Weisbaden, West Germany: Gabler, 87-110.

89. Jacoby, J., Hoyer, W.D. and Sheluga, D.A. (1981) Miscomprehending televised communication: A brief report of findings. In K. Monroe (Ed.), <u>Advances in Consumer Research</u>, <u>8</u>, 410-413.

90. Jacoby, J. and Jaccard, J.J. (1981) The sources, meaning and validity of consumer complaint behavior: A psychological analysis. <u>Journal of Retailing</u>, <u>57</u> (3), 4-24.

91. Jacoby, J., Nelson, M.C. and Hoyer, W.D. (1981) Correcting corrective advertising. In K. Monroe (Ed.), <u>Advances in Consumer Research</u>, <u>8</u>, 416-   418.

92. Jacoby, J., Olson, J.C., Szybillo, G.J. and Hart, E.W. Jr. (1981) Behavioral science perspectives on conveying nutrition information to consumers. In J. Solms and R.W. Hall (Eds.), <u>Criteria of food acceptance: How man chooses what he eats</u>. Zurich, Switzerland: Forster Publishing Ltd., p. 12-26.

93. Jacoby, J. and Hoyer, W.D. (1981) Reply to Mizerski's criticisms: 4 A's TV miscomprehension researchers say study's flaws aren't serious enough to change major conclusions. <u>Marketing News</u>, July 24, <u>15</u> (2), p. 35-36.

94. Jacoby, J. and Hoyer, W.D. (1982) The miscomprehension of televised communication: Selected findings. <u>Journal of Marketing</u>, <u>46</u> (4), 12-26. (Reprinted in E. Wartella and D.C. Whitney, Eds., <u>Mass Communication Review Yearbook: Volume 4</u>. Sage Publications: Beverly Hills, Calif., 129-144.)

95. Jacoby, J. and Hoyer, W.D. (1982) On the miscomprehension of televised communication: A rejoinder. <u>Journal of Marketing</u>, <u>46</u> (4), 35-43. (Reprinted in E. Wartella and D.C. Whitney, Eds., <u>Mass Communication Review Yearbook: Volume 4</u>. Sage Publications: Beverly Hills, Calif., 155-164.

96. Jacoby, J., Nelson, M.C. and Hoyer, W.D. (1982) Corrective advertising and affirmative disclosure statements: Their potential for confusing and misleading the consumer, <u>Journal of Marketing</u>, <u>46</u> (1), 61-72.  (Reprinted in M. Wallendorf and J. Zaltman, Eds., <u>Readings in Consumer Behavior</u>. N.Y.:  Wiley, 395-403.)

97. Chestnut, R.W. and Jacoby, J. (1982) Behavioral process research: Applications to business and public policy. In:  Ungson, G.R. and Braunstein, D.N. (Eds.), <u>Decision Making:  An Interdisciplinary Inquiry</u>.  Boston: Kent Publishing Co., Pp. 232-248.

98. Hoyer, W.D., Jacoby, J. and Nelson M.C. (1982) A model for evaluating the impact of remedial advertising statements. In D.R. Corrigan, F.B. Kraft and R.H. Ross (Eds.), <u>Proceedings, Southwestern Marketing Association</u>, 9-12.

99. Jacoby, J., Hoyer, W.D. and Zimmer, O.R.  (1983) To read, view or listen? A cross-media comparison of comprehension. In:  J.H. Leigh and C.R. Martin Jr. (Eds.), <u>Current Issues and Research in dvertising</u>. Ann Arbor:  The University of Michigan, 201-218.

100. Hoyer, W. D. and Jacoby, J. (1983)  Three-dimensional information acquisition:  An application to contraceptive decision making.  In R.P. Bagozzi and A. Tybout (Eds.), <u>Advances in consumer Research</u>, <u>10</u>, 618-623.

101. Hoyer, W.D., Jacoby, J. and Jaccard, J.J. (1983) Encoding and retention in an information acquisition choice task.  In M.B. Mazis (Ed.), <u>Proceedings of the Division 23 Program</u>, 1982 Annual Convention of the American Psychological Association, 16-19.

102. Jacoby, J. (1984) Perspectives on information overload.  <u>Journal of Consumer Research</u>, <u>10</u> (4), 432-435.

103. Jacoby, J. (1984) Some social psychological perspectives on closing.  In J. Jacoby and C.S. Craig (Eds.), <u>Personal Selling:  Theory, Research and Practice</u>. Lexington Books, Lexington Mass., P. 73-92.

104. Jacoby, J. (1984) Managing consumer reaction to the emerging financial services revolution.  In A. W. Sametz (Ed.), <u>The emerging financial industry: Implications for insurance products, portfolios, & planning</u>.  D.C. Heath: Lexington Books, Lexington, Mass. p. 69-72.

105. Jacoby, J. and Mazursky, D. (1984) Linking brand and retailer images: Do the potential risk outweigh the potential benefits? <u>Journal of Retailing</u>, <u>60</u> (2), 105-122.

106. Jacoby, J. and Mazursky, D. (1984) The impact of linking brand and retailer images on perceptions of quality. In Jacoby, J. and Olson, J.C. (Eds.), <u>Perceived quality: How consumers view stores and merchandise</u>. Lexington Books, Lexington, Mass., 155-160. (N.B. This is a briefer version of a portion of the immediately preceding paper.)

107. Jacoby, M., Mazursky, D., Troutman, T. and Kuss, A. (1984) When feedback is ignored: The disutility of outcome feedback. <u>Journal of Applied Psychology</u>, <u>69</u>, 531-545.

108. Jacoby, J., Nelson, M., Hoyer, W.D., and Gueutal, H.G. (1984) Probing the locus of causation in the miscomprehension of remedial advertising statements. In T.C. Kinnear (Ed.), <u>Advances in Consumer Research, Vol. XI.</u> Provo, Utah: Association for Consumer Research, <u>11</u> 379-384.

109. Jacoby, J., Zimmer, M.R. and Hoyer, W.D. (1984) A note on the reliability of content analysis. In J.R. Lumpkin & J.C. Crawford (Eds.), <u>1984 Proceedings of the Southwest Marketing Association</u>, 131-134.

110. Chestnut, R.W. and Jacoby, J. (1984) The impact of interpersonal attraction on salesperson effectiveness. In J. Jacoby and C.S. Craig (Eds.), <u>Personal selling: Theory, research and practice</u>. Lexington Books, Lexington, Mass., 261-268.

111. Hoyer, W.D., (1984) Srivastava. R.K. and Jacoby, J. Sources of miscomprehension in television advertising. <u>Journal of Advertising</u>, 13 (2), 17-26.

112. Mazursky, D. and Jacoby, J. (1984) Forming impressions of merchandise and service quality: An exploratory study. In Jacoby, J. and Olson, J.C. (Eds.), <u>Perceived quality: How consumers view stores and merchandise</u>. Lexington Books, Lexington, Mass., p. 139-154.

113. Zimmer, M.R. and Jacoby, J. (1984) The selection of a contraceptive method as a joint decision of married couples. In J.C. Anderson(Ed.), <u>Proceedings of the Division of Consumer Psychology</u>, American Psychological Association. 25-28.

114. Jacoby, J. (1985) Survey and field experimental evidence. In S. Kassin and L. Wrightsman (Eds.), <u>The psychology of evidence and courtroom procedure</u>. Beverly Hills, Calif.: Sage. 175-200.

115. Jacoby, J. (1985) The vices and virtues of consulting: Responding to a fairy tale. In E. Hirschman and M.B. Holbrook (Eds.), <u>Advances in Consumer Research</u>, 12, 157-163.

116. Jacoby, J., Kuss, A., Mazursky, D. and Troutman, T. (1985) Effectiveness of security analyst information accessing strategies; A computer interactive assessment. <u>Computers in Human Behavior</u>, <u>1</u>, 95-113.

117. Hoyer, W.D. and Jacoby, J. (1985) The public's miscomprehension of public affairs programming, Journal of Broadcasting and Electronic Media, 29 (4), 437-443.

118. Jacoby, J., Troutman, T., Kuss, A., and Mazursky, D. (1986) Experience and expertise in complex decision making. R. Lutz, ed., Advances in Consumer Research, 13, 469-472.

119. Jacoby, J. and Raskopf, R.L. (1986) Disclaimers in trademark infringement litigation: More trouble than they are worth?  The Trademark Reporter, 76, (1) 35-58.

120. Jacoby, J., Troutman, T. and Whittler, T. (1986) Viewer miscomprehension of the 1980 Presidential Debate, Political Psychology, 7 (2), 297-308.

121. Mazursky, D. and Jacoby, J. (1986) Exploring the development of store image, Journal of Retailing, 62 (2), 145-165.

122. Jacoby, J., Jaccard, J.J., Kuss, A., Troutman, T. and Mazursky, D. (1987) New directions in behavioral process research:  Implications for social psychology, Journal of Experimental Social Psychology, 23 (2), 146-174.

123. Jacoby, J. (1987) Book review: "Survey questions: Handcrafting the standardized questionnaire" Journal of Marketing Research, 24 (3), 322.

124. Jacoby, J. and Hoyer, W.D. (1988) The Miscomprehension of Print communications: Selected findings. Journal of Consumer Research, 15, 434-443.

125. Jacoby, J. (1988) Research quality and the frailty of verbal report data. The Sixth Annual ARF Research Quality Workshop, Transcript Proceedings. Sept., 103-108.

126. Jacoby, J. and Hoyer, W.D. (1990) The Miscomprehension of Mass Media Advertising Claims:  A Re-Analysis of Benchmark Data. Journal of Advertising Research, June, 30 (3), 9-16.

127. Jacoby, J. (1991).  Experimental designs in deceptive advertising and claim substantiation research. In: Cynthia M. Hampton-Sosa (Eds.) Advances in Claims Substantiation. NAD: Council of Better Business Bureaus, pages 119-141. Reprinted In: Jeffrey S. Edelstein (Ed.)(1996) False Advertising and the Law: Coping with Today's Challenges. New York: Practicing Law Institute. Also reprinted In: Jeffrey S. Edelstein (Ed.)(1999) Advertising Law in the New Media Age. New York: Practicing Law Institute.

128. Jacoby, J. and Handlin, A.H. (1991) Non-probability designs for litigation surveys, The Trademark Reporter, 81, 169-179.

129. Jacoby, J., Hoyer, W.D. and Brief, A. (1992) Consumer and Industrial Psychology: Prospects for theory corroboration and mutual contribution. In Marvin Dunnette (ED.) The Handbook of Industrial and Organizational Psychology, 2nd edition, 377-441.

130. Jacoby, J. (1993) Consumer psychology: Whither vs. wither. The Communicator, Newsletter of APA-Division 23, Volume 27 (4), (June), 7-8.

131. Jacoby, J. (1993) "Scholarly impact" in consumer research: Evidence of convergent validity. ACR Newsletter (December), 16-18.

132. Jacoby, J. (1994) Misleading research on the subject of misleading advertising. The Food and Drug Law Journal, 49 (1), 21-36. REPRINTED IN: Advertising Law Anthology. Volume 17, Part II (July-December 1994). International Library, Arlington, VA. Pages 231-248. Reprinted In: Jeffrey S. Edelstein (Ed.)(1996) False Advertising and the Law: Coping with Today's Challenges. New York: Practicing Law Institute.

133. Jacoby, J. (1994) Erratum and supplementary data for "Scholarly impact in consumer research." ACR Newsletter (March) page 12.

134. Jacoby, J. (1994) Ethical issues in consumer research. In C.T. Allen and D. Roedder-John (Eds) Advances in Consumer Research. (Eds.) Vol. 21, p. 565.

135. Jacoby, J., Handlin, A.H. and Simonson, A. (1994) Survey evidence in deceptive advertising cases under the Lanham Act: An historical review of comments from the bench. The Trademark Reporter, 84 (5), 541-585. REPRINTED IN: Advertising Law Anthology. Volumn 17, Part II (July-December 1994). International Library, Arlington, VA. Pages 857-904. REPRINTED IN: Jeffrey S. Edelstein (Ed.)(1996) False Advertising and the Law: Coping with Today's Challenges. New York: Practicing Law Institute. Also reprinted In: Jeffrey S. Edelstein (Ed.)(1999) Advertising Law in the New Media Age. New York: Practicing Law Institute.

136. Jacoby, J., Jaccard, J.J. Currim, I., Kuss, A., Ansari, A., & Troutman, T. (1994) Tracing the impact of item-by-item information accessing uncertainty reduction. Journal of Consumer Research, 21 (2), 291-303.

137. Jacoby, J. and Szybillo, G.J. (1994) Why disclaimers fail. The Trademark Reporter, 84 (2), 224-244.

138.    Jacoby, J. (1995) Ethics, morality and the dark side of ACR: Implications for our future.  In Frank Kardes and Mita Sujan (Eds.) <u>Advances in Consumer Research</u>, Association for Consumer Research.  Vol. 22, 21-47.

139. Jacoby, J. and Szybillo, G.J.  (1995) The FTC v. Kraft: A case of Heads we win, Tails you lose?  <u>Journal of Public Policy and Marketing</u>, 14 (1), 1-14. Reprinted In: Jeffrey S. Edelstein (Ed.)(1996) <u>False Advertising and the Law: Coping with Today's Challenges</u>. New York: Practicing Law Institute.  Also reprinted In: Jeffrey S. Edelstein (Ed.)(1999) <u>Advertising Law in the New Media Age</u>. New York: Practicing Law Institute.

140.    Warwick, Ken, Jacoby, Jacob, Kover, Arthur, Lehman, Donald R., Masterson, James W., and Root, H. Paul (1995) Bridging theory and practice in marketing and marketing research: A roundtable discussion. <u>Marketing Review</u>, 51 (2), 12-21.

141. Johar, J., Jeddidi, K. and Jacoby, J. (1997) A varying parameter averaging model of on-line brand evaluations. *Journal of Consumer   Research.* 24, 232-247.

142. Jacoby, J. (1997)  Beyond brand equity: Marketing warfare in the '90s. *Stern Business*. Fall 13-15.

143.    Jacoby, J., Johar, J. and Morrin, M. (1998) Consumer Behavior: A Quadrennium. *Annual Review of Psychology*, 49, 319-344.

144. Jacoby, J. and Morrin, M. (1998) "Not manufactured or authorized by..." Recent federal cases involving disclaimers. 17 (1), 97-107. *Journal of Public Policy and Marketing*

145. Morrin, M. and Jacoby J.  (2000) Trademark dilution: Empirical measures for an elusive concept.  *Journal of Public Policy & Marketing.* 19 (2) 265-276.

146. Jacoby, J. (2000) "Is it Rational to Assume Consumer Rationality? Some consumer psychological perspectives on Rational Choice Theory." *Roger Williams University Law Review*. Vol 6 (1), 81-161.

147. Jacoby, J.  (2001) The Psychological Foundations of Trademark Law: Secondary Meaning, Genericism, Fame, Confusion and Dilution.  *The Trademark Reporter.* 91 (5), 1013-1071.

148.    Jacoby, J., Morrin, M., Johar, G., Gürhan, Z., Kuss, A. and Mazursky, M.(2001) "Training novice investors to become more expert: The role of information

accessing strategy." *Journal of Psychology and Financial Markets.* (since renamed the *Journal of Behavioral Finance*) 2 (2), 69-79.

149. Jacoby, J. (2001) "Consumer psychology." In: *The International Encyclopedia of the Social and Behavioral Sciences.* Elsevier Science Ltd./Pergamon: Oxford, UK. 2674-2678.

150. Jacoby, J (2002). "Stimulus-Organism-Response Reconsidered: An evolutionary step in modeling (consumer) behavior." *Journal of Consumer Psychology.* 12 (1), 51-57.

151. Jacoby, J., Morrin, M., Jaccard, J. Gurhan, Z. & Maheswaran, D. (2002) "Attitude formation as a function of incremental information input: A procedure for studying on-line processing models of attitude formation." *Journal of Consumer Psychology.* 12 (1), 21-34.

152. Morrin, M., Jacoby, J., Johar, G., He, X., Kuss, A. and Mazursky, D. (in press). Taking stock of stock brokers: Exploring investor information accessing strategies via verbal protocols. In Susan Broniarczyk and Kent Nakamoto (Eds.) *Advances in Consumer Research, Vol. 29.* pages 164-165.

153. Morrin, M., Jacoby, J., Johar, G., He, X., Kuss, A. and Mazursky, D. (2002) Taking stock of stock brokers: Exploring investor information accessing strategies via process tracing. *Journal of Consumer Research.* 29 (2), 188-198.

154. Jacob Jacoby (2002) Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys. *The Trademark Reporter* 92 (4) 890-956.

155. Jacob Jacoby (2002) A critique of Rappeport's "Litigation Surveys - Social 'Science' as Evidence." 92 (5) *The Trademark Reporter.* 1480-1501.

156. Jacob Jacoby (2006) Sense and nonsense in measuring sponsorship confusion. *Cardozo Arts and Entertainment Law Journal.* 24:1, 63-97.

157. Gideon Mark and Jacob Jacoby (2006) Continuing Commercial Impression and its measurement. *Marquette Intellectual Property Law Review.* 10:3, 431-454.

158.    Jacob Jacoby and Mark Sableman (2007) Keyword-Based
        Advertising: Filling in Factual Voids (*GEICO v.
        Google*). 97:3   *The Trademark Reporter.* 681-731.

159.    Jacob Jacoby (2008) Considering the Who, What,
        When, Where and How of Measuring Dilution.   *Santa
        Clara Computer & High Tech Law Journal.* 24:101-139.

Jacob Jacoby -- Publications
1997 – 2008

Johar, J., Jeddidi, K. and Jacoby, J. (1997) A varying parameter averaging model of on-line brand evaluations. *Journal of Consumer Research. 24* (2), 232-247.

Jacoby, J. (1997) Beyond brand equity: Marketing warfare in the '90s. *Stern Business.* Fall 13-15.

Jacoby, J., Johar, J. and Morrin, M. (1998) Consumer Behavior: A Quadrennium. *Annual Review of Psychology, 49*, 319-344.

Jacoby, J. and Morrin, M. (1998) "Not manufactured or authorized by…" : Recent federal cases involving trademark disclaimers. *Journal of Public Policy and Marketing,* Spring 1998, *17* (1), 97-107.

Morrin, M. and Jacoby J. (2000) "Trademark dilution: Empirical measures for an elusive concept." *Journal of Public Policy & Marketing.* 19 (2) 265-276.

Jacoby, J. (2000) "Is it Rational to Assume Consumer Rationality? Some consumer psychological perspectives on Rational Choice Theory." *Roger Williams University Law Review.* Vol 6 (1), 81-161.

Jacoby, J. (2001) The Psychological Foundations of Trademark Law: Secondary Meaning, Genericism, Fame, Confusion and Dilution. *The Trademark Reporter,* 91 (5), 1013-1071.

Jacoby, J. (2001) "Consumer psychology." In: *The International Encyclopedia of the Social and Behavioral Sciences.* Elsevier Science Ltd./Pergamon: Oxford, UK. 2674-2678.

Jacoby, J., Morrin, M., Johar, G., Gürhan, Z., Kuss, A. and Mazursky, M.(2001) "Training novice investors to become more expert: The role of information accessing strategy." *Journal of Psychology and Financial Markets* (since renamed the *Journal of Behavioral Finance*) 2 (2), 69-79.

Jacoby, J (2002). "Stimulus-Organism-Response Reconsidered: An evolutionary step in modeling (consumer) behavior." *Journal of Consumer Psychology.* 12 (1), 51-57.

Jacoby, J., Morrin, M., Jaccard, J. Gurhan, Z. & Maheswaran, D. (2002) "Attitude formation as a function of incremental information input: A procedure for studying on-line processing models of attitude formation." *Journal of Consumer Psychology.* 12 (1), 21-34.

Morrin, M., Jacoby, J., Johar, G., He, X., Kuss, A. and Mazursky, D. (in press, 2002). Taking stock of stock brokers: Exploring investor information accessing strategies via

verbal protocols. In Susan Broniarczyk and Kent Nakamoto (Eds.) *Advances in Consumer Research, Vol. 29,* pages 164-165.

Morrin, M., Jacoby, J., Johar, G., He, X., Kuss, A. and Mazursky, D. (2002) Taking stock of stock brokers: Exploring investor information accessing strategies via process tracing. *Journal of Consumer Research.* 29 (2), 188-198.

Jacob Jacoby (2002) Experimental design and the selection of controls in trademark and deceptive advertising surveys. 92 (4) *The Trademark Reporter* 890-956.

Jacob Jacoby (2002) A Critique of Rappeport's "Litigation Surveys—Social 'Science' as Evidence" 92 (6) *The Trademark Reporter* 1480-1501.

Jacob Jacoby (2006) Sense and Nonsense in Measuring Sponsorship Confusion. *Cardozo Arts and Entertainment Law Journal.* 24:1 (June) 63-97.

Gideon Mark and Jacob Jacoby (2006) Continuing Commercial Impression and its Measurement. *Marquette Intellectual Property Law Review.* 10:3, 431-454.

Jacob Jacoby and Mark Sableman (2007) Keyword-Based Advertising: Filling in Factual Voids (*GEICO v. Google*). 97:3 *The Trademark Reporter.* 681-731.

Jacob Jacoby (2008) Considering the Who, What, When, Where and How of Measuring Dilution. *Santa Clara Computer & High Tech Law Journal.* 24:101-139.

## JACOB JACOBY - 2003 COURTROOM TESTIMONY

Mar 11          Before Senior Judge Samuel A. Crow

                        USDC, D. Kansas (Topeka)
                        Hill's Pet Nutrition, Inc. v. **Nutro Products, Inc.**
                        Deceptive advertising/packaging


Apr 8           Before Judge Deborah A. Batts
                        USDC, SDNY
                         1-800-Contacts v. **WhenU.com, Inc.**
                        Likelihood of confusion

Sep 8           Before Judge Nancy G. Edmunds
                        USDC, ED Michigan
                        Wells Fargo et al. v. **WhenU.com, Inc.**
                        Likelihood of confusion


## JACOB JACOBY - 2004 COURTROOM TESTIMONY

Jan 22          Before Judge Preston Huff
                        Louisiana State Court (New Orleans)
                        A. O. Smith et al. v. **Perfection Corp.** et al.,
                        No. 99-15646
                        Business reputation survey

Mar 31          TTAB (testimony given via expert report),
                        **Jacob Zimmerman v.** National Ass'n of Realtors

May 5          Before Administrative Law Judge Stephen J. McGuire
Federal Trade Commission
In the Matter of **Telebrands Corp. et al.**
Deceptive advertising matter

June 15        Before Judge Catherine Perry
USDC, EDMo
**Steak n Shake** v. Burger King
Genericness/secondary meaning matter

Aug 2, 5       Before Judge Shira Scheindlin
USDC, SDNY
**Louis Vuitton Malletier** v. Dooney & Bourke
Trademark matter


## JACOB JACOBY - 2005 COURTROOM TESTIMONY


Mar 2         Before Judge William E. Smith
USDC, D. Rhode Island
**The Beacon Mutual Insurance Company** v.
OneBeacon Insurance Group
Trademark matter

Jun 24        Before Judge Thomas Mcavoy
U.S.D.C. N.D.N.Y.
**FiberMark Inc.** v.
Brownville Specialty Paper Products, Inc
Trade dress matter

Sep 21-22     Before Judge A. Howard Matz
U.S.D.C. C.D. California (Western Div)
Hill's Pet Nutrition, Inc. v. **Nutro Products, Inc.**
Deceptive advertising matter

Nov 18       Before Judge John F. Walter
U.S.D.C. C.D. California (Western Div)
**Red Bull, Inc.** v. Matador Concepts, Inc.
Trade dress matter

### JACOB JACOBY  -  2006 COURTROOM TESTIMONY

Apr 11
           Before Judge Denise Cote
               U.S.D.C. S.D.N.Y.
               Juicy Couture, Inc. et al. v.
                  **L'Oreal USA, Inc., Lancome, et. al.**
               Trademark matter

### JACOB JACOBY  -  2007 COURTROOM TESTIMONY

Jan 12
           **Nextel Communications,** Inc. v. Motorola, Inc
           T.T.A.B., Washington, D.C.
           Deposition here equates to providing direct testimony before
               the TTAB and cross-examination.
           Trademark matter (acquired distinctiveness of 911 Hz chirp)

Oct 11
           Before Judge Arthur Tarnow,
           U.S.D.C., E. D. Michigan
           Citizens Banking Corp. v. **Citizens First Bancorp, et al.**
           Trademark matter

Dec 20
           **Nextel Communications,** Inc. v. Motorola, Inc
           T.T.A.B., Washington, D.C.
           Deposition here equates to providing direct testimony before
               the TTAB and cross-examination.
           Trademark matter (acquired distinctiveness of 1800 Hz
           chirp)

## JACOB JACOBY  -  2003 DEPOSITION TESTIMONY

Feb 18      1-800-Contacts v. **WHENU.COM** and Vision Direct, Inc.
Trademark matter (U.S.D.C. S.D.N.Y.)

Aug 8       Julie Turner, et al. v. **R.J. Reynolds Tobacco**
Third Judicial Circuit, Madison County, Illinois

Aug 27      American Water Heater Co.,  A. O. Smith Corporation, Bradford White
Corporation, and  Rheem Manufacturing Co. V. **Perfection Corp.**
Circuit Court Of Cook County, Illinois

Sep 24      Medical Mutual of Ohio v. **American Medical Security Group, Inc.**
Trademark matter  USDC No. District of Ohio, Eastern Div.

## JACOB JACOBY  -  2004 DEPOSITION TESTIMONY

Feb 26      Federal Trade Commission v. **Telebrands**
Deceptive advertising matter
Washington, D.C.

Apr 22      Diarama Trading Co. v. **J. Walter Thompson, USA, Inc. et al.**
Trademark matter
USDC SDNY

May 17      **Robert P. Heffner, Jr. et al.** v. Blue Cross/Blue Shield of Alabama
ERISA document comprehension matter
USDC Middle District of Alabama, Northern Division

June 8      **Kubota Corp.** v. Daedong (Kioiti)
Trade dress matter

June 10     Verizon Directories Corp. v. **Yellow Book USA, Inc.**
Advertising matter
U.S.D.C.  E.D.N. Y.

June 13     **Louis Vuitton Malletier** v. Dooney & Burke, Inc.
Trademark matter  U.S.D.C.  S.D.N. Y.

July 22     Cellco Partnership dba Verizon Wireless v. **Nextel Communications**
Genericism-descriptiveness-secondary meaning matter
U.S.D.C.  D. Delaware, Civ Action 03-725-KAJ

Sep 14      **Chicago Mercantile Exchange, Inc.** v. Commodities Management
Exchange, Inc.
Trademark confusion matter

U.S.D.C.  N.D. Illinois, Civ Action 03-C 4919

Nov 18     GEICO v. **Google** and Overture
Trademark confusion matter
U.S.D.C.  E.D.  VA. (LBrinkema)

Dec 10     **Fibermark, Inc.** v. Brownville Specialty Paper Products, Inc.
Trade dress matter
U.S.D.C  N.D.N.Y.


## JACOB JACOBY  -  2005 DEPOSITION TESTIMONY

Feb 9     **Mylan Pharmaceuticals, Inc.** v. The Procter & Gamble Company
Deceptive Advertising matter
U.S.D.C. S.D.N.Y.  03-CV-10150

Mar 9     Mag Instrument, Inc. v. **Dollar Tree Stores, Inc.**
Trademark matter
U.S.D.C  Central District of California  #03-6215 RSWL

June 7     Hill's Pet Nutrition, Inc. v. **Nutro Products, Inc**.
Advertising matter
U.S.D.C. C.D. CA (Western Division)

June 28     **City of New York (and NYPD)** v. Elowitz
Trademark matter
U.S.D.C. S.D.N.Y.

July 14     E.T. Browne Drug Co., Inc. v. **Cococare Products, Inc.,**
Genericism matter
U.S.D.C. D.N.J.


## JACOB JACOBY  -  2006 DEPOSITION TESTIMONY

Jan 23     Liz Claiborne v. **L'Oreal (Lancome)**
Trademark matter
U.S.D.C. S.D.N.Y.

Jan 30     FTC v. QVC and **VitaQuest**
Deceptive advertising matter
U.S.D.C. E.D. PA

Apr 7     **Red Bull et al.** v. Mon Chong Loong Trading Co & Foodmart Int'l.
Trademark and Trade dress matter
U.S.D.C. C.D. CA

| June 22 | K-Swiss, Inc. v. **Payless Shoe Source, Inc.**<br>Trade dress matter<br>U.S.D.C.  C.D. CA (Western Division) |
|---|---|
| Aug 29 | **Hansen Bev. Co.** v. Rockstar, Inc. et al<br>Trade dress matter<br>U.S.D.C.  D. Nevada |
| Sep 28 | **WG Security Products et. al.** v. Tyco Int'l Ltd, et al.<br>Deceptive advertising matter<br>U.S.D.C.  C.D. CA (Western Div.) |
| Nov 20 | **Wal-Mart Stores, Inc.** v. Charles Smith<br>Trademark matter |
| Dec 18 | **Republic Tobacco, L.P.** v. North Atlantic Trading Co., Inc. et al.<br>Trade dress matter |

## JACOB JACOBY  -  2007 DEPOSITION TESTIMONY

| Jan 12 | **Nextel Communications,** Inc. v. Motorola, Inc<br>Trademark matter (acquired distinctiveness of 911 Hz chirp)<br>T.T.A.B., Washington, D.C.<br>Deposition in this instance equates to direct testimony before the<br>    TTAB and cross-examination. |
|---|---|
| Jan 19 | Vital Pharmaceutical (RedLine) v. **Red Bull**<br>Trademark and Trade dress matter |
| Mar 05 | Chicago Tribune Co. v. **Fox News Network**<br>Trademark matter<br>No. D. Illinois (Eastern Division) |
| Mar 12 | Bayer Healthcare v. **Merial LLC**<br>Deceptive advertising matter<br>District of Kansas |
| Apr 19 | **Hansen Beverage Co**. v. National Beverage Corp.<br>Trade dress matter<br>Central District of California |
| Apr 24 | TPI Holdings, Inc. v. **Josh Bond, d/b/a/ Rainforest Consulting Inc.**<br>Trade Dress Matter<br>Middle District of Tennessee |
| May 31 | Adidas-Salomon AG et al. v. **Payless ShoeSource, Inc.**<br>Trade dress matter |

District of Oregon

July 19      **Nextel Communications** v. Motorola, Inc.
             Secondary meaning matter
             USPTO, TTAB

Nov 1        **Claimants** v. W.R. Grace & Co.
             U.S. Bankruptcy Court, D. Delaware

Dec 12       **Raymond Weil** v. Charlize Theron
             USDC, SDNY

## JACOB JACOBY  -  2008 DEPOSITION TESTIMONY

Jan 24       Brighton Collectibles v. **Marc Chantal**
             Trade dress confusion matter
             USDC, SD CA

# EXHIBIT C

SEALED DOCUMENT

# EXHIBIT D

SEALED DOCUMENT

# EXHIBIT E

Walter McCullough

Page 1

1

2          IN THE UNITED STATES DISTRICT COURT

3             FOR THE DISTRICT OF DELAWARE

4

   POLAROID CORPORATION,

5

                 Plaintiff,

6

           vs.                    No. 6-738 (SLR)

7

   HEWLETT-PACKARD COMPANY,

8

                 Defendant.

9  ---------------------)

10

11

12

13          VIDEOTAPED DEPOSITION OF

14            WALTER J. McCULLOUGH

15            New York, New York

16           Tuesday, May 6, 2008

17

18

19

20

21

22

23

24  Reported by:
    SHAUNA STOLTZ-LAURIE
25  CSR NO. 810490
    JOB NO. 202738

### Walter McCullough

Page 14

1 McCullough
2 but then a second study was done on a second
3 printer. That was done I think probably
4 February.
5 Q. Did you do some interviews
6 involving cameras?
7 A. I did.
8 Q. I don't recall reading about
9 cameras in your report.
10 A. I was called by the client at one
11 point, and said that the cameras were no
12 longer going to be an issue from -- from my
13 -- in my situation.
14 Q. Had you collected a --
15 questionnaire responses pertaining to the
16 cameras?
17 A. I did have interviews on cameras,
18 just like I did on printers. Counsel had
19 told me that the cameras were out.
20 MS. KINGSBURY: I'm going to just
21 object -- excuse me -- at this point for
22 attorney work product.
23 MR. BUCHANAN: Let me explore that
24 -- the scope of your objection.
25 Q. So at the same time that you

Page 15

1 McCullough
2 conducted an initial phase of interviewing
3 about printers, you also conducted an initial
4 phase of interviewing about cameras?
5 A. That's correct.
6 Q. And so people directed by you went
7 out to shopping malls and asked questions
8 about the cameras as well as printers?
9 MS. KINGSBURY: I want to object
10 about any questioning on the -- this
11 camera survey, based on the agreement
12 that we have on -- that's in the case,
13 that shows that only documents -- or
14 only things that were relied upon in Mr.
15 McCullough's opinions is something
16 that's subject to deposition and to
17 production. So I'm not going to allow
18 any questions on -- on the cameras
19 surveyed.
20 MR. BUCHANAN: Well, I'm going to
21 first test some scope questions, Colby,
22 and then I'll come back and respond to
23 your objection.
24 Q. Is it the case that you saw or
25 heard preliminary results from interviews

Page 16

1 McCullough
2 with consumers pertaining to cameras?
3 A. Yes.
4 Q. Did you have those in your mind as
5 you went ahead with further interviews later
6 about printers?
7 A. No.
8 The two are completely separate. I
9 did -- one survey was about cameras, one
10 survey was about printers, and then the
11 follow-up survey was about printers. The
12 initial survey, cameras and printers, are two
13 different surveys.
14 Q. So the survey that I have a report
15 about, does that survey include both the
16 questions from the initial round of printer
17 questions and the later round of printer
18 questions?
19 A. Yes. The report you have is based
20 on both the initial survey on the printer, I
21 guess the C6180, and also the second printer,
22 which is five something, if I remember. Yes,
23 that -- that report shows both of the results
24 from both of those surveys.
25 Q. So both, the same or substantially

Page 17

1 McCullough
2 the same questions were asked to the
3 consumers about the C6180 printer and later
4 the other printer.
5 A. Identical question, yes.
6 Q. And so the report that you wrote
7 covers both sets.
8 A. That's correct.
9 Q. When you were writing the report
10 did you have in your mind the preliminary
11 results that you had heard from the interview
12 of the camera people?
13 A. No. That had nothing to do with my
14 report on the printers.
15 Q. You didn't have it in your mind at
16 all?
17 A. That's correct.
18 Q. So it's your testimony that you did
19 not -- well, let me ask you. Did you
20 consider, have conscious awareness of, the
21 preliminary results that you had heard about
22 cameras as you wrote your report about
23 printers?
24 A. No.
25 Q. So it's your testimony that you

5 (Pages 14 to 17)

Walter McCullough

Page 22

1       McCullough
2    Q. Did you yourself have those
3 discussions?
4    A. Yes.
5    Q. And who did you speak with?
6    A. Courtney Holohan I believe.
7    Q. And was this in January '08?
8    A. It's hard to remember dates on
9 these things. It's either January, February
10 that she spoke to me about it.
11    Q. Was it all in one phone call that
12 you spoke about preliminary results and she
13 said no, don't go forward with that?
14    A. No. I think -- let me correct
15 something, because maybe I gave you the wrong
16 impression. I believe we actually finished
17 the interviews on the cameras. We did the
18 preliminary results. The results were
19 acceptable to the client to proceed with
20 that, and I think we finished the interviews
21 up on that, and then I got a call from
22 Courtney saying that the cameras are out of
23 the case or they're out of the -- you know,
24 they're off the table; you don't need to
25 report anything on cameras. But we had

Page 23

1       McCullough
2 finished the interviews on that, I believe.
3    Q. Do you have any further
4 understanding of why cameras were, to repeat
5 your phrase, off the table?
6       MS. KINGSBURY: I'll object as to
7    attorney work product.
8       You can only answer to the extent
9    that there was anything you considered
10    in forming your opinions.
11    A. I -- I -- I was not given any
12 information about why. I was surprised about
13 it, but that's -- we were told they're off
14 the table.
15 REQ    MR. BUCHANAN: Okay. Let me state
16    for the record that it would seem to me
17    that a survey expert who designs a
18    survey, continues forward with a further
19    round of the survey, then writes a
20    report about it, in doing so is
21    necessarily considering the information
22    that he learned in the initial phase of
23    his interviewing, so it's our position
24    on behalf of HP that we are entitled to
25    all of the documents that he considered

Page 24

1       McCullough
2 in forming his opinions, and I think
3 these are included. We'll need to take
4 that up in the appropriate time at in
5 the appropriate way, but that's my
6 position.
7       MS. KINGSBURY: Okay. Well, just
8 in response to that, the documents that
9 were not used that were relevant to the
10 camera survey are not anything that are
11 part of the survey that was -- the
12 report that was produced. You have all
13 the documents that he relied on in the
14 opinions that he has set forth in this
15 case.
16       MR. BUCHANAN: I understood it to
17 be or I think I understand it to be your
18 position that all the documents that are
19 relating to the questions asked about
20 printers have been provided to us, and
21 my comment is as this expert develops
22 his opinions in the case, necessarily he
23 also considers what he has learned about
24 his own survey about cameras, survey
25 questions that he developed at the same

Page 25

1       McCullough
2 time for the same case for the same
3 reason. And so we will reserve our
4 right to seek to compel the production
5 of those documents, and if we prevail in
6 that, then we'll also reserve the right
7 for a further deposition on that
8 subject.
9       MS. KINGSBURY: Okay. And
10 obviously we object, but we'll get into
11 that more, if you prefer, off the
12 record.
13       MR. BUCHANAN: Yeah, that was my
14 objective, was to --
15       MS. KINGSBURY: Okay.
16       MR. BUCHANAN: -- at the moment set
17 out our positions so that there's no
18 misunderstandings, and then move
19 forward.
20    Q. Let me return your -- direct your
21 attention back to Exhibit 1 again. The -- I
22 see there was -- it's stated here, estimated
23 billing of 144,000 broken out between an
24 amount for a printer and an amount for
25 camera. Could you explain that estimate to

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

Walter McCullough

Page 54

1          McCullough
2     Q.  Do you remember the name of the
3 camera?
4     A.  No.  I can barely remember these
5 names.  I don't remember the name, no.
6     Q.  It was an HP camera, I take it?
7     A.  Yes, it was an HP camera.
8          MR. BUCHANAN:  Let me ask to mark
9 the next exhibit.
10          ([McCullough] Exhibit 7, invoice to
11 Polaroid, marked for identification, as
12 of this date.)
13     Q.  Do you recognize Exhibit 7 as a
14 further invoice from your firm to Polaroid
15 with a copy to Kirkland & Ellis?
16     A.  Yes.
17     Q.  And this one covers both job
18 numbers 4450 and 4462?
19     A.  Yes.
20     Q.  And is this the most recent invoice
21 that you have submitted to date?
22     A.  Yes.
23     Q.  I assume there will be another
24 invoice after the deposition, but this is as
25 you've gotten so far?

Page 55

1          McCullough
2     A.  Correct.
3     Q.  What is the work reflected in this
4 invoice?
5     A.  I don't know the exact nature of
6 it, but obviously I spent some time with
7 counsel after -- after the report is
8 completed I bill for my time at $600 an hour
9 and other time appropriately.  It probably --
10 some of this probably is related to the
11 production.  That's probably what it is,
12 thinking back on it, production and
13 conversation with counsel, because I have
14 clerical staff here, and they are probably,
15 just you know, making copies of the
16 questionnaire, and then I see there's
17 photocopies and shipping down there.  So this
18 is basically the cost that relates to
19 production but possibly some conversations I
20 had with counsel about some issues.
21     Q.  And do you recall who, which
22 counsel you spoke with?
23     A.  It's probably Maria Meginnes,
24 because I think Courtney Holohan was still in
25 trial at this time.  So I think it was her,

Page 56

1          McCullough
2 but I'm not sure.  I don't remember the
3 details of the conversations.
4     Q.  And there's a reflection for time
5 of senior project staff.  Who was that?
6     A.  Probably at that point it was
7 Jackie Cummings, who is -- used to be the
8 person that was my project director working
9 on projects with me on these types of
10 projects.
11     Q.  And I see that the "Re" line of
12 this invoice is "Printer and camera surveys."
13 Was the work reflected in this
14 invoice involve both printers and cameras?
15     A.  Where do you see "printers and
16 cameras"?
17     Q.  Underneath the address --
18     A.  Oh.
19     Q.  -- above the line.
20     A.  Now, the reason for that is the
21 carry-over from the last bill, which is -- I
22 used the last invoice as a model, and just
23 never changed it.  It could have been just
24 printer surveys.  I just carried over the --
25 the title from the previous invoices.  I

Page 57

1          McCullough
2 probably should have just said printer
3 surveys, because at that time camera survey
4 was not an issue.
5     Q.  So is it your testimony that the
6 work reflected on the March 31 invoice
7 involves only printers and not cameras?
8     A.  No.
9          MR. BUCHANAN:  So I suggest we take
10 a break.  It's been about an hour.
11          THE VIDEOGRAPHER:  Going off the
12 record.  The time is 10:01 a.m.  This is
13 the end of tape one.
14          (Recess taken.)
15          THE VIDEOGRAPHER:  We are back on
16 the record.  The time is 10:23 a.m.
17 This is the beginning of tape two.
18     Q.  Mr. McCullough, how many surveys
19 roughly have you done in your career?
20     A.  Thousands.
21     Q.  And how many for litigation have
22 you done roughly?
23     A.  Hundreds.
24     Q.  How many times have you testified
25 in court?

15 (Pages 54 to 57)

Walter McCullough

| Page 58 |
| --- |

1         McCullough
2    A.  I'd be really guessing at this, but
3 probably 30, 40 times maybe?
4    Q.  And how many depositions would you
5 guess?
6    A.  Maybe twice that number.
7    Q.  Your report tells us, does it, the
8 instances where you have provided testimony
9 during the last four years?
10    A.  That's correct.
11    Q.  And that's at the very end of your
12 report?
13    A.  That's correct.
14    Q.  Do you know how it came about that
15 Kirkland & Ellis contacted you?
16       Had you worked with them before?
17    A.  I'd worked with a Mr. Paul Garcia
18 previously, and that may be how they found
19 out about it.
20    Q.  Who is Paul Garcia?
21    A.  He's an attorney from Kirkland &
22 Ellis.
23    Q.  Which city?
24    A.  Chicago.
25    Q.  How did you get into the business

| Page 59 |
| --- |

1         McCullough
2 of doing surveys?
3    A.  About 20, 20, 25 years ago an
4 attorney asked me if I would critique a
5 survey that was done by another expert, and I
6 agreed to do that, and the judge relied upon
7 my decision and mentioned me several times or
8 relied upon my testimony, and relied upon
9 that in his decision, and he said "Ed
10 McCullough said," and he went on and
11 mentioned something Ed McCullough said, and
12 all of a sudden the phone started ringing.
13    Q.  What was the name of that case?
14    A.  It was a case that involved Advil
15 and -- and Motrin I believe.
16    Q.  And what court was it in?
17    A.  Southern District of New York.
18    Q.  How long ago?
19    A.  Oh, 20 to 25 years ago.
20       I think I was -- the law firm I was
21 working with at that point was (inaudible) --
22       (Noise interruption.)
23 A.  -- from Washington --
24       THE COURT REPORTER:  I couldn't
25 hear you.

| Page 60 |
| --- |

1         McCullough
2       THE WITNESS:  Arnold & Porter, I'm
3 sorry.
4    A.  -- Arnold & Porter from Washington,
5 law firm, and it had something to do -- I
6 think it was a false advertising case.
7    Q.  Was there a reported decision in
8 that case; do you know?
9    A.  Yes.  That's how the lawyers
10 started calling me, I think, from the
11 decision.
12    Q.  And was there a Court of Appeals
13 decision in that case; do you know?
14    A.  I don't know.
15    Q.  You went to -- you had an
16 undergraduate degree, yes?
17    A.  Yes.
18    Q.  And where and when?
19    A.  1963, Lafayette College, in
20 psychology.
21    Q.  And any further degrees after that?
22    A.  Yes.  I have an MBA with a market
23 research specialization from Baruch that I
24 obtained I think it was '77 or something like
25 that.

| Page 61 |
| --- |

1         McCullough
2    Q.  Any further degrees?
3    A.  No.
4    Q.  Have you done teaching in an
5 academic setting?
6    A.  Not on a regular basis, no.
7    Q.  On an occasional basis?
8    A.  I have occasionally gone to a law
9 school class for -- to talk to the students
10 on a just a one-time basis here and there.
11    Q.  Have you written articles in
12 academic journals?
13    A.  No.
14    Q.  Your report, on the very last page
15 lists three papers that you've provided, that
16 you've given --
17       MR. BUCHANAN:  Strike that.
18    Q.  Are these the papers -- is this a
19 full listing of the papers that you've
20 authored over the last ten years?
21    A.  That's correct.
22    Q.  And those were about ways to
23 increase survey response rates in mail
24 surveys?
25    A.  That's correct.

16 (Pages 58 to 61)

Walter McCullough

Page 90

1       McCullough
2 printers use that feature?
3    A.  I don't think that's a necessary
4 component.  That's an additional piece of
5 information.
6    Q.  Is it -- in determining consumers'
7 perceived value of the feature, is it of
8 interest to try and project how often they
9 think they will use it?
10    A.  Again, that's something that they
11 would take into consideration potentially
12 when they're giving answers to the questions.
13 That's not something that I would seek to
14 find out separately.
15    Q.  Are you aware of any sorts of
16 information of how often owners of HP
17 printers actually use this feature?
18    A.  I'm not.
19    Q.  Are you aware of any --
20       MR. BUCHANAN:  Strike that.
21    Q.  Did you consider conducting a
22 survey of people who actually owned them?
23    A.  No.
24    Q.  Are you aware of any information on
25 as to whether those who own the printers and

Page 91

1       McCullough
2 use this feature are caused to print photos
3 more often than they would have absent the
4 feature?
5    A.  I'm not aware of that either way.
6    Q.  And are you aware of any source of
7 information on that subject?
8    A.  No, I'm not.
9    Q.  If we asked you to think about it,
10 can you design a survey to study that
11 question?
12    A.  The question of -- once again?
13 Would you repeat it?
14    Q.  Can we read it back, and see how
15 well did I frame the question.
16    A.  Good test.
17       (Discussion off the record.)
18       (Record read, as follows:
19       "Question:  Are you aware of any
20       information on as to whether those who
21       own the printers and use this feature
22       are caused to print photos more often
23       than they would have absent the
24       feature?")
25    A.  No.  I can design surveys to just

Page 92

1       McCullough
2 about do anything, so I could design a survey
3 to try to elicit that information, but it
4 would depend upon a number of factors, you
5 know, in terms of whether people are using
6 the feature actually even know they're using
7 the feature, in terms of whether they
8 understand if they had to reprint the
9 product, reprint it, at least (inaudible)
10 printing for one reason versus another.
11 There would be a lot of issues involved, but
12 I can design surveys to test for virtually
13 anything.
14    Q.  In the -- do you have any current
15 plans to do any further surveys related to
16 this case?
17    A.  No, I do not.
18    Q.  And are there any others besides --
19 that you've done in this case besides the
20 printers and cameras that you've told us
21 about?
22    A.  No.  There are no others.
23    Q.  Before you set off on those surveys
24 did you do before -- in advance any pre-tests
25 or focus groups or any other preliminary

Page 93

1       McCullough
2 work?
3    A.  No, I did not.
4    Q.  How did you go about --
5       MR. BUCHANAN:  Strike that.
6    Q.  Of the -- or of the past surveys that
7 you've done either in business settings or in
8 litigation, are there any of the past ones
9 that are particularly similar to the one that
10 you did here?
11    A.  As I sit here I can't think of any.
12 No.
13    Q.  Is this -- is the design of this
14 survey particularly different from ones that
15 you have done in the past?
16    A.  By definition of "last," last
17 answer, yes.  Most of the surveys I work on
18 in a litigation context are either trademark
19 surveys or false advertising surveys, so this
20 kind of survey is somewhat different than
21 what I usually do.  So yes, it is different.
22    Q.  And is this the first time that
23 you've done a perceived value survey for
24 litigation purposes?
25    A.  Probably is, yes.

24 (Pages 90 to 93)

## Walter McCullough

Page 110

1        McCullough
2 answers about the Officejet 5610, which had a
3 price, after rebate, of one penny less than a
4 hundred dollars; is that right?
5     A.   That's correct.
6     Q.   And the median that's reported to
7 you was $20.
8     A.   That's correct.
9     Q.   Why would I pay $50 for a feature
10 in one printer if I could get it for $20 in
11 another printer?
12    A.   Well, of course, you have to
13 recognize that these are completely different
14 respondents that are reacting to completely
15 different stimuli, and it's apparent from the
16 results is that people are looking at this
17 feature as being a certain value relative to
18 the total price, and that's why I put down
19 the bottom on the next line that the percent
20 of price turns out to be about the same in
21 each case, 17 or 18 percent, which tends to
22 suggest that respondents are saying, well,
23 this is a feature that's worth, on average,
24 17, 18 percent of the price of the printer.
25    Q.   So as you would -- based on your

Page 111

1        McCullough
2 experience, as you would understand what's
3 driving these results, the main driver is
4 people view the value of the feature in the
5 context of the price of the printer as a
6 whole?
7     A.   Yes.
8     Q.   So when the price of the printer is
9 reduced, then they perceive the value of that
10 feature as reduced.
11    A.   Well, yes, except the price of the
12 printer's not reduced; it's a different
13 printer.  When you have a different printer
14 at a lower price, it's going to result in a
15 lower expectation of what the -- how much
16 less it would cost.
17    Q.   And you showed me the -- so one
18 group of people were shown the fact sheet for
19 the 300-dollar printer --
20    A.   Yes.
21    Q.   -- and the other group of people
22 were shown the fact sheet for the 100-dollar
23 printer; is that right?
24    A.   Yes.
25    Q.   And then the question number one

Page 112

1        McCullough
2 that we saw on the main survey questionnaire,
3 that question was the same for both groups,
4 correct?
5     A.   Yes.
6     Q.   So they were both told the same
7 thing about the adaptive lighting feature.
8     A.   That's right.
9     Q.   As you had a chance to think about
10 the results of your survey applying to your
11 experience, is there any other driver that
12 you would identify as a main component of
13 driving these results?
14    A.   Driver -- other driver as -- which
15 one are you referring to?
16    Q.   You told me that one of the main
17 drivers is view this feature in the context
18 of the overall price for the printer.
19    A.   Right.
20    Q.   Any other major driver?
21    A.   My -- my assumption in looking at
22 the results is people are making a judgment
23 as to what value this feature has to them,
24 and they are putting it in proportion to the
25 price of the total printer.

Page 113

1        McCullough
2     Q.   Do you believe that the people who
3 were respondents had any experience in
4 themselves setting prices for products?
5     A.   Setting prices?
6     Q.   Yes.
7     A.   No.
8     Q.   By the way, did you use a
9 subcontractor firm to set up the actual
10 interviewers?
11    A.   All of the interviewing that's done
12 in malls is done by subcontract.
13    Q.   Did you have a single subcontractor
14 or multiple --
15    A.   No --
16    Q.   -- for the various malls?
17    A.   -- multiple subcontractors.
18    Q.   And are their names stated
19 somewhere?
20    A.   I don't know.
21    Q.   Do you remember their names?
22    A.   No, because I don't deal with them
23 directly; my field director does.
24    Q.   Who is your field director?
25    A.   Tom Jasorka, J-a-s-o-r-k-a.

29 (Pages 110 to 113)

## Walter McCullough

Page 122

1      McCullough
2      (Recess taken.)
3      THE VIDEOGRAPHER: We are back on
4 the record. The time is 11:49 a.m.
5 This is the beginning of tape three.
6      ([McCullough] Exhibit 14, Mr.
7 McCullough expert report in Levi Strauss
8 case, marked for identification, as of
9 this date.)
10      Q. I've handed you what's been marked
11 as Exhibit 14. Is this a report that you
12 submitted in a case involving Levi Strauss?
13      A. (Reading) Well, it appears to be,
14 although I have no recollection of this case.
15      Q. You have no recollection of
16 submitting a report in a case involving Levi
17 Strauss?
18      A. A couple of cases I've been
19 involved with where they've been on the --
20 they've been on the other side.
21      Q. So let me --
22      A. I don't remember this particular --
23      Q. To --
24      A. -- case.
25      Q. -- walk through this for a moment,

Page 123

1      McCullough
2 let me ask you to turn to page two.
3      A. Okay.
4      Q. Under the heading "Information
5 Provided For Evaluation" it says you reviewed
6 a report of the Professor Scott December '04,
7 and reviewed a transcript of the deposition
8 of Professor Scott February --
9      A. Um-hm.
10      Q. -- '05. Do you remember that?
11      A. No. (Laughing).
12      Q. Have you from time to time been
13 retained to critique surveys done by other
14 people?
15      A. Yes, I have.
16      Q. Do you recall ever being retained
17 to critique a report by Professor Scott?
18      A. You're refreshing my memory, but I
19 don't recall it. Honestly don't remember it.
20      Q. Are you familiar with Professor
21 Scott?
22      A. Not as we sit here, I'm not.
23      Q. Okay. I -- I happen to be familiar
24 with a Professor Carol Scott. If I mention
25 the first name Carol, does that ring a bell?

Page 124

1      McCullough
2      A. No.
3      Q. Okay. Are you able to -- having
4 taken a look at this for a moment, have you
5 been able to determine that this is not a
6 report by you?
7      A. Well, I have to assume that since
8 the beginning talks about -- well, it has my
9 name and it says I've done research for 30
10 years or so. (Reading).
11      Q. Look --
12      A. It looks like it's a description of
13 me, but I just don't remember the actual
14 project.
15      Q. Okay. But reading the first page,
16 your name and title and the qualifications
17 stated, those look like you, yes?
18      A. Yes, they do.
19      Q. Have you -- let's like at page two.
20 Have you from time to time in the course of
21 your work referred to the "Reference Guide on
22 Survey Research" chapter of the Reference
23 Manual on Scientific Evidence from the
24 Federal Judicial Center, by Sheri Diamond?
25      A. Yes, I have.

Page 125

1      McCullough
2      Q. Are you familiar with that work?
3      A. Yes, I am.
4      Q. And do you regard that as an
5 appropriate reference tool?
6      A. It's an appropriate reference tool,
7 yes.
8      Q. Is that an authoritative statement
9 on standards for research surveys?
10      A. As a basic guideline, yes. Most of
11 what she says in there I would agree with.
12 Certain things I may not agree with. But as
13 a basic tool, particularly for people that
14 were not familiar with surveys, it's a good
15 starting point.
16      Q. Do you recall something in
17 particular in her work that you don't agree
18 with?
19      A. I recall that there was some things
20 -- well, I haven't read her recently, besides
21 this, several times over the years, but there
22 were a couple of things that I felt that she
23 was not really necessarily on target with. I
24 don't remember what they are now, though.
25      Q. All right. I think you

32 (Pages 122 to 125)

Walter McCullough

Page 126

1        McCullough
2 acknowledged that from time to time you have
3 been engaged to critique work by other survey
4 experts. In doing that, have you cited to
5 the Federal Judicial Center "Reference Guide
6 on Survey Research" chapter?
7      A.  Yes.  I've sometimes used her
8 outline as a guideline.
9      Q.  And would you agree that it's
10 appropriate to apply those same guidelines to
11 your own work?
12     A.  Yes.
13     Q.  So let me run through some of these
14 questions.
15        The first question listed here on
16 Exhibit 14 is "Was the survey designed to
17 address relevant questions?"  Do you regard
18 that as an appropriate question?
19     A.  Yes.
20     Q.  What was the question that your
21 survey was designed to address, and -- and --
22 and do you have an understanding one way or
23 the other as to whether it was -- that
24 question was relevant?
25     A.  Well, the question that the survey

Page 127

1        McCullough
2 addressed, as I indicated before, is -- is
3 the value that consumers would put on the
4 adaptive lighting technology.
5      Q.  And do you have an understanding or
6 opinion as to whether that question is
7 relevant in the context of this litigation?
8      A.  I'm told by counsel it's relevant.
9      Q.  Do you yourself have an opinion or
10 an understanding on the subject?
11     A.  Inasmuch as I don't know about the
12 rest of the case, it's hard for me to answer
13 that.
14     Q.  Do I take it, then, that -- is it a
15 correct statement, then, that based on the
16 information that you have currently, you
17 don't have an opinion as to whether it's
18 relevant?
19     A.  I don't have a personal opinion on
20 whether it's relevant.  I was refer -- I was
21 responding to the attorneys' request.  I
22 don't know about the rest of the case, so I
23 don't know how relevant my piece is to the
24 rest of the case.
25     Q.  Let's look at number two stated in

Page 128

1        McCullough
2 Exhibit 14.  Question two -- let me give a
3 copy to the court reporter just in case --
4 "Was participation in the design and
5 administration and interpretation of the
6 survey appropriately controlled to ensure the
7 objectivity of the survey?"  Is that an
8 appropriate question to apply?
9      A.  In general concept, yes.
10     Q.  In what way was your survey
11 designed so as to ensure objectivity?
12     A.  The -- the questions that -- the
13 method of showing respondents the stimulus
14 was an objective way of doing it, because
15 this is a piece that is available from the
16 websites, so the -- the stimulus information
17 was appropriate.  The questions -- the
18 questions I asked were a fair question.  They
19 were not leading questions.  And the answers
20 for the most part that we relied upon were
21 answers that were volunteered by respondents.
22 So I think it's a good, straightforward, fair
23 questionnaire.
24     Q.  When you ask about the perceived
25 value of the one feature, adaptive lighting,

Page 129

1        McCullough
2 and you don't ask about the perceived value
3 of other features, isn't that leading,
4 inherently?
5      A.  No.
6      Q.  Why not?
7      A.  Leading is a term that's basically
8 used to -- to -- to define a situation where
9 your question suggests an answer, and the
10 question doesn't suggest an answer in this
11 case.  The respondent is able to answer based
12 on their own beliefs.
13     Q.  Let's look at number three.
14 Question three reads "Are the experts who
15 designed, conducted or analyzed the survey
16 appropriately skilled and experienced?"
17 That's appropriate to ask, yes?
18     A.  Yes, it is.
19     Q.  Number four, "Are the experts who
20 will testify about others appropriately
21 skilled and experienced?", that, too, is
22 appropriate to ask, yes?
23     A.  I believe so.
24     Q.  Number five, "Was an appropriate
25 universe or population identified?", that's

33 (Pages 126 to 129)

Walter McCullough

Page 130

1          McCullough
2 appropriate to ask, yes?
3     A.   Yes, it is.
4     Q.   How did you identify the universe
5 or population for your question?
6     A.   Well, it was based upon, as you
7 probably know, people who had bought a color
8 printer in the past year or thought they
9 might buy one in the next year, so that's by
10 definition a relevant universe.
11    Q.   Point six on Exhibit 14, "Did the
12 sampling frame approximate the population?",
13 is that an appropriate question?
14    A.   Yes, it is.
15    Q.   What does "sampling frame" mean?
16    A.   Sampling frame is really the way in
17 which you obtain your respondents to meet the
18 population definition.
19         And the way I did that was, as we
20 described before, I described before, was to
21 talk to men and women who met the
22 qualification, involved after I had gone
23 through a screening of age and sex to make
24 sure that there is a good distribution of
25 people asking the screening questions that

Page 131

1          McCullough
2 come from six different age/sex groupings.
3     Q.   Question seven on Exhibit 14 reads
4 "How was the sample selected to approximate
5 the relevant characteristics of the
6 population?" That's an appropriate standard
7 to ask?
8     A.   Yes.
9     Q.   And do you have anything further to
10 add on what you just told me?
11    A.   I think I pretty much answered that
12 along with six.
13    Q.   Question eight on Exhibit 14 reads
14 "Was the level of non-response sufficient to
15 raise questions about the representativeness
16 of the sample? If so, what is the evidence
17 that non-response did not bias the results of
18 the survey?" Is that an appropriate question
19 to ask?
20    A.   It is an appropriate question to
21 ask.
22         And, as we indicated before, when
23 you do mall surveys, you really don't have a
24 way of calculating non-response rate, but it
25 is a -- it is an interviewing technique that

Page 132

1          McCullough
2 is widely used in the marketing research and
3 media research field, and one that the courts
4 have rarely excepted.
5     Q.   Is it -- do you have an opinion
6 here that in your particular survey,
7 non-response -- level of non-response did not
8 bias the results?
9     A.   I have no reason to suspect
10 non-response in any way biases the results.
11    Q.   And do you have reason to believe
12 that non-response did not bias the results?
13    A.   I'd actually say -- since I don't
14 know what the non-response rate was, I'd have
15 to say that based on the procedures we use,
16 that I don't think that non-response -- there
17 is no reason to think that non-response is an
18 issue here.
19    Q.   Is there a phenomenon in mall
20 intercept surveys that the people who are
21 friendly by nature are more likely to be
22 willing to stop and participate than people
23 who are less friendly by nature?
24    A.   I think that's true of all
25 interviewing, not just in malls.

Page 133

1          McCullough
2     Q.   And is there a phenomenon in malls
3 or everywhere that those people are more
4 likely to wish to please the interviewer than
5 people who decline to participate?
6     A.   There is a phenomenon that has been
7 described in the literature in certain
8 situations that people try to please the
9 interviewer.
10        You try to avoid that situation by
11 not asking questions where you have obvious
12 answers, like leading questions.
13    Q.   Number nine on Exhibit 14 reads
14 "What procedures were used to reduce the
15 likelihood of a biased sample?" That's an
16 appropriate question to ask, yes?
17    A.   Yes, I think --
18    Q.   And what procedures of that nature
19 were used in your survey?
20    A.   I was -- I think I described that
21 to a large degree when I talked about six and
22 seven. The screening process to make sure
23 that I started out with a representative
24 sample of men and women in those age groups
25 is a method that's used to reduce the

34 (Pages 130 to 133)

## Walter McCullough

Page 134

1           McCullough
2 likelihood of biased sample.
3       Q.   Question ten on Exhibit 14 reads
4 "What precautions were taken to ensure that
5 only qualified respondents were included in
6 the survey?"  That's an appropriate question
7 to ask in a survey, yes?
8       A.   Yes.
9           And basically we asked our
10 screening questions the way we've done it,
11 and then we also validate the question in a
12 vacuum.
13      Q.   Point 11 on the next page of
14 Exhibit 14 reads "Were questions on the
15 survey framed to be clear, precise and
16 unbiased?"  That is appropriate to ask of a
17 survey, yes?
18      A.   Yes.
19      Q.   And do you believe you met that
20 standard here?
21      A.   Absolutely.
22      Q.   Anything further to say on that
23 beyond what you've already told me?
24      A.   I don't think so.
25      Q.   Question 12 on Exhibit 14 asks

Page 135

1           McCullough
2 "Were filter questions provided to reduce
3 guessing?"  Is that appropriate to ask of a
4 survey?
5       A.   In the right circumstance, yes.
6       Q.   Should that -- does that
7 circumstance apply to your survey in this
8 case?
9       A.   There's no situation here where I
10 think a filter question as normally described
11 would be appropriate.
12      Q.   In this case, when you asked people
13 how much less would the printer cost without
14 the adaptive lighting feature, weren't they
15 guessing?
16      A.   No.  They were estimating --
17      Q.   What's the difference?
18      A.   -- what they thought --
19          Well, guessing is really just
20 picking a number out of the air or picking --
21 usually picking among choices that might be
22 provided.
23          We asked people if they thought it
24 should be the same price or a lower price,
25 and if they said it would cost less, then we

Page 136

1           McCullough
2 asked them, well, how much less do you think
3 that would be.  They're giving you an
4 estimate of what they think based upon the
5 information they've seen and based upon their
6 own needs and their own assessment of what
7 this -- what the feature's worth.  That's not
8 -- that's not guessing.  That's -- that's --
9 that's responding to the questions.
10      Q.   Where these are people who don't
11 have previous experience setting the price
12 for a product as a printer, why isn't it
13 guessing when you asked them how much less it
14 would cost without this feature?
15      A.   Well, they're not setting a price,
16 actually.  What they're doing is they're
17 giving an estimate of what the -- of what the
18 feature's worth to them by answering the
19 question of how much less would it cost if it
20 didn't have it.  They're not setting the
21 price in any way.  They're giving you their
22 estimate of how much less they think it would
23 cost, based on their own assessment of the
24 value as to them.
25      Q.   Why didn't you ask them what would

Page 137

1           McCullough
2 it be worth to them?
3       A.   Well, I did ask them that, but I
4 asked them in a better way.
5       Q.   What are instances where you
6 believe as a survey expert that filter
7 questions should -- should be provided?  Can
8 you give me an example?
9       A.   Well, let's say you're going to ask
10 people what comes to mind is an advertising
11 situation, and you show people a print ad,
12 and let's say you're interested in a certain
13 topic in the print ad.  You might ask people
14 when you looked at that print ad, do you
15 recall seeing anything about the topic, and
16 if they say yes, then you can ask them the
17 further questions about the topic.  If they
18 say no, then you skip them out, rather than
19 going right into the questions without asking
20 that filter.  That's what comes to mind.
21 There are a number of the cases.  And most
22 filters are like yes/no type questions.  And
23 there's probably many examples, but that's
24 the one that comes to mind.
25      Q.   Question 13 on this exhibit reads

35 (Pages 134 to 137)

### Walter McCullough

Page 146

1    McCullough
2    A.  Well, not here they weren't, but in
3 the paragraph, the preamble up above asks --
4 the sentence says "If you don't know the
5 answer to any of my questions, please don't
6 hesitate to say that."  So we give them a
7 global instruction, so any point during the
8 interview they want to say they don't know,
9 they feel free to say that.
10       But here, these two options that
11 they were given were the ones that in the --
12 that are written into the question, which is
13 "would cost less" or "price would be the
14 same," half the time in that order, half the
15 time in the reverse order.
16    Q.  And why did -- did you think of
17 also giving them as an option "would cost
18 more"?
19    A.  Well, I thought of it for a second,
20 and dismissed it as being silly, because it
21 really just doesn't make any sense.
22    Q.  By the way, reading the portion of
23 question one here that appears right before
24 those choices, might it be the case that some
25 respondents may wonder whether the feature

Page 147

1    McCullough
2 that does not have this -- excuse me, the
3 printer that does not have adaptive lighting
4 may have something else in addition beyond
5 the printer that you showed them?
6    A.  No, I can't guess what's in
7 somebody else's mind, but I don't see any
8 reason why they would think that.  I don't
9 know why they would think something like
10 that.
11    Q.  Did you give any thought to that as
12 you were designing question one?
13    A.  No.
14       I don't think it's a reasonable
15 thing for people to think about.
16    Q.  Back up to the main part of
17 question one, the part that begins "This
18 particular color Inkjet printer contains a
19 feature called adaptive lighting technology"
20 -- let me just read the rest of it so that
21 we'll have a clear record. "Adaptive
22 lighting technology is a break-through
23 technology that enables printers to produce
24 photos that look more like what people see
25 with their own eyes.  It accomplishes this by

Page 148

1    McCullough
2 balancing relationships between bright and
3 dark areas in a photo, preserving gentle
4 contrasts by smoothing out harsh contrasts."
5 Where did you get that language from?
6    A.  I believe it was kind of a
7 compilation of things I got from the
8 different sites that I visited, and I put
9 together what I thought was a good
10 description based upon various descriptions,
11 mostly from HP website.  It's not one -- it's
12 not one place I got it all from.  It was kind
13 of a composite of what I got from the various
14 sites.
15    Q.  And the various sites that you went
16 to, the various things that are now in your
17 folder are the things we went through earlier
18 in the deposition?
19    A.  Well, that's probably some of it,
20 but there's a lot of other stuff that I
21 didn't print out that I went to.  I did a lot
22 of searching around the HP website.  There
23 was a lot of stuff there.
24    Q.  Do you believe that you drew on
25 wording from somewhere else on the HP website

Page 149

1    McCullough
2 that you did not print out and keep?
3    A.  There probably were components of
4 it that I didn't print out and keep, because
5 I was visiting a lot of websites, a lot of
6 parts of the website at different points in
7 time, and it's very likely there that are
8 parts I didn't keep.
9    Q.  Let me ask you a more specific
10 question.  I'm sure that -- I understand that
11 in the course of your work, generally you
12 looked at many Web pages.
13    A.  Right.
14    Q.  As you were preparing the wording
15 for question one in particular, to the extent
16 that you drew on wording on the HP website,
17 did you print that out so that you would have
18 a record of it, or do you believe that
19 question one wording itself rests on portions
20 that you didn't keep?
21    A.  The latter.
22    Q.  What makes you think so?
23    A.  Because I don't -- I don't recall
24 taking just one definition from someplace and
25 not modifying it.  A number of the

38 (Pages 146 to 149)

Walter McCullough

Page 170

1       McCullough
2 that people speak sometimes.
3       Q.   So let's look at, for example --
4 I'm going to ask you to direct your attention
5 to your report, section E, second page of
6 data after tab -- after E.
7       A.   Okay.
8       Q.   Let me direct your attention to
9 questionnaire number 410, near the bottom.
10 Question one, "cost less," question two,
11 "taking a stab at the dark, but $15 comes to
12 mind," does that sound like a guess?
13           THE COURT REPORTER:   I didn't
14   understand you.
15           (Discussion off the record.)
16       A.   I think it's one person expressing
17 their opinion, and they're saying the way
18 that makes it sound more like a guess, but,
19 you know, they're not just -- they're not
20 just coming up with a number arbitrarily,
21 they're coming up with some kind of estimate,
22 even though the way they did it makes it
23 sound like some kind of guess.
24       Q.   And let me ask you to turn a couple
25 more pages to there's an answer for

Page 171

1       McCullough
2 questionnaire number 490, question one,
3 "costs less," question two, "between 15 or
4 100 bucks." Do you see that one?
5       A.   What happened to the page? Because
6 they're not in any order.
7           Can you tell me which page that is?
8       Q.   If you look in the column on the
9 next to the far right.
10       A.   How many pages in from the
11 beginning?
12           That might be easier --
13       Q.   Sure.
14       A.   -- because the pages aren't
15 numbered.
16       Q.   One, two, three, four, five --
17 sixth.
18       A.   And you said respondent 490?
19       Q.   490. The number in the next to the
20 right-hand column is 75.
21       A.   Oh.
22       Q.   In fact, there is a cumulative
23 percentage you can look at, 75.93583.
24       A.   Ah. 75, is that (inaudible) --
25       Q.   So the verbatim response was --

Page 172

1       McCullough
2       A.   Sure.
3       Q.   -- "between 50 or a hundred bucks."
4       A.   No, what was the percentage?
5 Because that's a good way. That's the way to
6 identify people.
7           You said a number on the right-hand
8 column?
9       Q.   Yes, 75.9358.
10       A.   Okay. Now I got it.
11       Q.   So is that person guessing?
12       A.   No. They're estimating between 50
13 and a hundred dollars.
14       Q.   And why did you put down for the --
15 am I correct in understanding from the next
16 to last column that the number you included
17 in your calculation of mean or median for
18 that person was 75?
19       A.   Correct.
20       Q.   Why 75?
21       A.   Because that's the midpoint between
22 50 and a hundred.
23       Q.   And when this person said between a
24 hundred -- "between 50 or 100," would 51
25 equally fall between 50 and a hundred?

Page 173

1       McCullough
2       A.   Well, the answer to that question
3 is, obviously, yes, because if you wanted
4 more than 50 but the answer -- I interpret
5 the answer is meaning they're giving me a
6 range, and I have to come up with one number
7 in the range, so I think it's the midpoint.
8       Q.   And let me ask you one more
9 question on these verbatims. It's a
10 methodology question. If you turn to the end
11 of this section on C6180, the last page of
12 C6180.
13       A.   (Perusing document) Okay.
14       Q.   Am I correct in understanding that
15 these are respondents at the top there, "DK,"
16 answered don't know?
17       A.   I'm not -- you said the last page?
18       Q.   The last page of C6180.
19       A.   Oh, I'm on the wrong page. Okay.
20           (Perusing documents)
21       Q.   So at the top there's a
22 questionnaire I.D. number 307.
23       A.   Oh, yeah. These are people that
24 said they don't know.
25       Q.   And am I right that you did not

44 (Pages 170 to 173)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

Walter McCullough

Page 226

1        McCullough
2 necessarily actually buy this -- you know,
3 that printer.
4     Q.  So then what does perceived value
5 mean in that context?
6     A.  Is what they think that feature is
7 worth if they were to buy that piece of
8 equipment.
9     Q.  So value is what it would be worth
10 if they are going to buy the printer, which
11 is different from the assertion that actually
12 these people would in fact buy the printer.
13 Is that the point?
14    A.  That's right.
15    Q.  And is -- how about if it's some
16 other printers that's not the 300-dollar
17 model and not the hundred-dollar model; have
18 you formed an opinion as to what the
19 perceived value of the adaptive lighting
20 feature would be in some other printer?
21    A.  I think a rule of thumb would be
22 probably taking 17 percent of the price of
23 the equipment, and assessing that as the
24 value, since that seems to be the level it
25 came out for two printers at two different

Page 227

1        McCullough
2 printers.
3     Q.  And have you formed an opinion as
4 to what would be the value, the perceived
5 value of customers of -- how -- of software,
6 of the opinion to buy stand-alone software
7 that contains an adaptive lighting feature?
8     A.  I have no opinion on that.
9     Q.  And how about have you formed an
10 opinion on what would be the value to
11 customers of receiving, or not -- not buying
12 specifically, but by any method obtaining
13 stand-alone software that has an inactive
14 lighting feature?
15    A.  My study doesn't give any
16 information about stand-alone software.
17    Q.  Have you formed any opinion as to
18 how often people who have the Hewlett-Packard
19 printers use the adaptive lighting feature?
20    A.  No.
21    Q.  Do the results of your survey and,
22 for that matter, the Jacoby survey give any
23 basis to draw a conclusion as to that
24 question?
25    A.  No.

Page 228

1        McCullough
2     Q.  Have you formed any opinion as to
3 whether people who have an HP printer are
4 likely to print more photos as a result of
5 having the adaptive lighting feature?
6     A.  I don't know that either way.
7     Q.  And so I take it the results of
8 your survey and, for that matter, the results
9 of the Jacoby survey do not provide a basis
10 to draw a conclusion on that question.
11    A.  That's correct.
12    Q.  Have you drawn -- formed any
13 opinion as to whether HP derives a benefit
14 from having the adaptive lighting feature
15 provided to people who own HP printers?
16    A.  I think just on the basis of the
17 fact that it has a perceived value of some --
18 of some amount, that would basically say yes,
19 it does provide a benefit.
20    Q.  And have you formed any opinion as
21 to what's the -- how to quantify that benefit
22 to Hewlett-Packard?
23    A.  Nothing precisely, no.  Just what I
24 volunteered in my report.
25    Q.  Nothing further on that subject.

Page 229

1        McCullough
2     A.  That's correct.
3     Q.  And so I take it the results of
4 your survey don't provide a basis to state
5 anything further to quantify that dollar
6 benefit.
7     A.  That's right.
8     Q.  And I -- and likewise, the Jacoby
9 survey that you've seen doesn't provide a
10 basis to quantify that benefit?
11    A.  That's also correct.
12    Q.  Your survey actually was conducted
13 in early 2008.  Do you have any opinion as to
14 what perceived value was in 2002?
15    A.  I can't really know that, since I
16 didn't do the survey then.
17    Q.  Do you have any opinion as to what
18 HP as of 2002 should have or did believe was
19 the perceived value on the adaptive lighting
20 feature?
21    A.  I have no information about that at
22 all.
23    Q.  Have you formed any opinion as to
24 what your survey results tell us about a
25 negotiation between HP and Polaroid if there

58 (Pages 226 to 229)

# EXHIBIT F

# CHOATE

CHOATE HALL & STEWART LLP

Robert M. Buchanan, Jr.
t 617-248-5027
f 617-502-5027
rbuchanan@choate.com

May 12, 2008

**VIA E-MAIL AND FIRST CLASS MAIL**

Colby Anne Kingsbury
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

Re:     *Polaroid Corporation v. Hewlett-Packard Company*
        USDC-D.Del.-C.A. No. 06-738 (SLR)
        -- Survey Materials of Walter McCullough

Dear Colby:

I am writing to pursue an issue that arose on May 6 at the deposition of Walter McCullough. Mr. McCullough testified that he has possession of survey materials that were prepared in conjunction with this case -- but were not disclosed in his Report and were not provided to Hewlett-Packard Co. ("HP"). HP hereby demands production of these materials pursuant to Fed R. Civ. P. 26.

Mr. McCullough was retained on behalf of Polaroid to conduct a survey concerning printers and cameras. After he received the results of his initial survey, Mr. McCullough was instructed to stop work with respect to cameras and to continue forward on additional survey work with respect to printers. Mr. McCullough's Report addressed the results of both surveys with respect to printers, but did not disclose any of the survey work with respect to cameras. On behalf of Polaroid, you asserted that Mr. McCullough's survey work with respect to cameras is protected as attorney work product.

Polaroid's assertion of the work product doctrine is not correct. Mr. McCullough's initial survey addressed both cameras and printers, and Mr. McCullough necessarily considered the camera results as he went on to prepare the additional printer survey. Likewise, Mr. McCullough necessarily considered the camera results as he wrote his Report and formed his opinions. Fed. R. Civ. P. 26(a)(2)(B)(i-ii) requires that Mr. McCullough disclose in his report all materials furnished to him (for purposes of his work on this case) that he considered in the course of forming his opinions. An expert submitting a report may not withhold such

Colby Anne Kingsbury
May 12, 2008
Page 2

materials on the ground that he did not "rely on" them;  rather, he must disclose all such
materials that he "considered" in the course of forming his opinion. *See* 1993 Advisory
Committee Notes to paragraph 2.  Accordingly, the survey materials and results with respect to
cameras should have been produced and disclosed in Mr. McCullough's Report.

If Polaroid maintains its position after review of this letter, please be advised that HP will seek
the Court's assistance to compel production of these materials (followed by an opportunity for
Dr. Jacoby to supplement his Expert Rebuttal Report and, to the extent appropriate, a renewed
deposition of Mr. McCullough).

I am aware that you have a heavy schedule of depositions.  I have some availability this week.
So that we may confer on this issue pursuant to the Local Rules, please advise whether you are
available for a telephone call at 10:00 a.m. Eastern on May 14, 15 or 16; or at 2:00 p.m.
Eastern on May 15 or 16.  Alternatively, if you are inclined to respond in writing, please let me
know and I will anticipate Polaroid's response no later than May 16.


Very truly yours,

Robert M. Buchanan, Jr.


RMB:tkd

cc:    Robert S. Frank, Jr.
       Daniel C. Winston
       Matthew E. Bernstein

4328422v1

# EXHIBIT G

Westlaw.

2005 WL 2414391                                                                     Page 1
2005 WL 2414391 (N.D.Cal.)

For docket see 3:04cv00468

United States District Court, N.D. California.
LEVI STRAUSS & CO. Plaintiff,
v.
RP55, INC., and Does through 10, Defendants.
**No. C04-0468.**
February 24, 2005.

(Report or Affidavit of Walter McCullough)

**Name of Expert:** Walter McCullough

**Area of Expertise:** Marketing >> Consumer Behavior

**Case Type:** Intellectual Property >> Trademark/Trade Name

**Jurisdiction:** N.D.Cal.

**Representing:** Defendant

PREPARED FOR: DEMLER, ARMSTRONG & ROWLAND, LLP

BY WALTER MCCULLOUGH, PRESIDENT MONROE MENDELSOHN RESEARCH, INC.

BACKGROUND

  I was asked by the Raymond Goettsch of Demler, Armstrong & Rowland, attorneys for
Indigo Red, to examine the report and collateral materials provided by Professor
Scott and provide an objective evaluation of the research methodology she used and
the opinions she offered and to render my opinion as to whether or not it supports
the findings and conclusions set forth in her report, dated December 17, 2004
(amended February 11, 2005).

QUALIFICATIONS OF WALTER MCCULLOUGH

  I have been in the marketing research field for over 30 years and have conducted
litigation surveys for 20 of those years. I have conducted hundreds of trademark
surveys, including a very large number of likelihood of confusion surveys covering
a wide range of consumer products. My credentials as a survey research expert are
based on my practical experience in the field and my educational background as an
undergraduate psychology major and my obtaining a MBA degree in marketing research.
I have been accepted as a survey expert whenever I have been offered in that role
and I have never been rejected in that capacity. A more detailed professional and
educational background is provided at the end of this document along with a listing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.


EXHIBIT
McCullough 14
5/6/08   SSL

2005 WL 2414391
2005 WL 2414391 (N.D.Cal.)

of my recent prior testimony and published papers.

INFORMATION PROVIDED FOR EVALUATION

In addition to Professor Scott's December 17, 2004, report (amended February 11, 2005), I have reviewed the transcript of her February 17 deposition as well as other information she has provided as part of the discovery process.

ANALYSIS OF INFORMATION PROVIDED

Methodologies Employed: To evaluate research results requires consideration of generally accepted standards of professional marketing research. The Reference Guide On Survey Research chapter of the Reference Manual On Scientific Evidence (Second Edition, Federal Judicial Center 2000), authored by Professor Shari Diamond, is widely accepted as a benchmark of standards of professional marketing research for use in the legal context. In particular, one must consider the following questions:

Purpose and Design Of The Survey

1. Was the survey designed to address relevant questions?

2. Was participation in the design, administration, and interpretation of the survey appropriately controlled to ensure the objectivity of the survey?

3. Are the experts who designed, conducted, or analyzed the survey appropriately skilled and experienced?

4. Are the experts who will testify about others appropriately skilled and experienced?

Population Definition and Sampling

5. Was an appropriate universe or population identified?

6. Did the sampling frame approximate the population?

7. How was the sample selected to approximate the relevant characteristics of the population?

8. Was the level of non-response sufficient to raise questions about the representativeness of the sample? If so, what is the evidence that non-response did not bias the results of the survey?

9. What procedures were used to reduce the likelihood of a biased sample?

10. What precautions were taken to ensure that only qualified respondents were included in the survey?

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2005 WL 2414391
2005 WL 2414391 (N.D.Cal.)

Survey Questions And Structure

11. Were questions on the survey framed to be clear, precise and unbiased?

12. Were filter questions provided to reduce guessing?

13. Did the survey use open-ended or closed-ended questions? How was the choice in each instance justified?

14. If probes were used to clarify ambiguous or incomplete answers, what steps were taken to ensure that the probes were not leading and were administered in a consistent fashion?

15. What approach was used to avoid or measure potential order or context effects?

16. If the survey was designed to test a causal proposition, did that survey include an appropriate control group or question?

17. What limitations are associated with the mode of data collection used in the survey?

Surveys Involving Interviewers

18. Were the interviewers appropriately selected and trained?

19. What did the interviewers know about the survey and its sponsorship?

20. What procedures were used to ensure and determine that the survey was administered to minimize error and bias?

Data Entry and Grouping Of Respondents

21. What was done to ensure that the data were recorded accurately?

22. What was done to ensure that the grouped data were classified consistently and accurately? Disclosure and Reporting

23. When was the information about the survey methodology and results disclosed?

24. Does the survey report include complete and detailed information on all relevant characteristics?

25. In surveys of individuals, what measures were taken to protect the identities of individual respondents?

The following evaluation examines Professor Scott's survey, keeping these important questions in mind.

2005 WL 2414391
2005 WL 2414391 (N.D.Cal.)

Evaluation of Methodology, Reported Results And Opinions Offered I conclude that Professor Scott's survey suffers from the following major flaws.

1. Professor Scott's sampling frame did not approximate the relevant universe. Based on Mr. Gilchrist's (the attorney who hired Professor Scott) representation, Professor Scott included only men in her survey, even though, as I discovered in my test, about half of those who buy men's jeans are women.

Additionally, Professor Scott's jeans price range for potential respondent inclusion in her survey was incorrect. Her qualification was that respondents had to have purchased jeans that cost $30 or more in the past year and plan to buy jeans that cost $30 or more in the next 12 months. Defendant, Indigo Red, sells jeans that normally retail for $50-$90. Respondents who only purchase jeans for less than $50 or over $90 should not have been allowed into the survey. And because of the way in which the question was asked, we do not know who they are, and therefore they cannot be analytically eliminated from the sample.

As well as Professor Scott's sample definition being incorrect, even the sample that she did obtain did not properly represent consumers who both bought and intend to buy jeans that cost $30 or more. Instead of using screening quotas, which would have delivered the proper proportion of interviews by age group, she used fixed interview quotas.

2. Professor Scott's validation procedures were sub-standard. Based on the sketchy information with which I was provided, it appears that less than 10% of the interviews were validated and the results of those validations are unknown. Typically, in litigation surveys, 50% or more of the interviews are validated, the validation questionnaire is included in the report or produced during discovery and the results of those validations are summarized in a Validation Report. Additionally, for Professor Scott's survey, there is no indication of who did the validations or what question or questions were asked.

3. Professor Scott's use of computer images of the jeans was unduly limiting and encouraged a disproportionate degree of attention to the pocket design. Whenever possible, it is always advisable to let consumers see the actual products about which they are being questioned. Such a showing allows them to look at the garment in a more realistic way and to focus their attention on what is important to them in examining and evaluating the product. Professor Scott could have used actual garments and removed or covered up any indicia on the jeans that she felt should not be shown to the respondents. Instead, she elected to show them computer images that allowed them to look only at the back of the garment where the pocket design at issue is found.

4. There is some evidence that colleagues of Professor Scott may have influenced the survey results. Professor Scott acknowledged at her deposition that either Mr. Hoffman or Ms. Celini had been in the room when interviews took place. While it is not improper for these two colleagues of Professor Scott to visit the field for training purposes, it is important that such individuals not be present while interviews are being conducted in order to avoid inadvertent influencing of respondents' answers. That is the reasoning behind the "double-blind" requirement that, on page 6 of her report, Professor Scott claims to have been implemented.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2005 WL 2414391                                                                                    Page 5
2005 WL 2414391 (N.D.Cal.)

After stating, "The survey was conducted on a double-blind basis...", Professor
Scott goes on to define double-blind as a survey, "...designed to ensure that
neither the interviewer nor the interviewees knew the purpose or sponsor of the
survey or knew that the survey was in any way connected to this litigation." The
reasons for a double-blind environment can easily be compromised with inadvertent
behavior on the part of a knowledgeable staff member sitting in on interviews.

 5. Professor Scott's discovery production has not been timely and is still
incomplete. Despite numerous and complete requests, Professor Scott only within the
last two weeks produced questionnaire documentation and the necessary information
to decipher those computer records. And those questionnaire records do not include
the original files or a key to enable the order of product presentation to be
determined. Such information may be an important factor in evaluating the
interviewing procedure.

 Then, suddenly, and without notice, an "Amended Expert Report...", dated February
11, 2005, appeared that "...updates and corrects certain figures and results..." It
contained revised tabulations that resulted from adding some interviews and
eliminating interviews that were disqualified for one reason or another.

 6. Professor Scott used open-ended probes that were clearly leading. To understand
this criticism, it is necessary to know that Professor Scott considered a
respondent to be confused if he indicated that the Indigo Red jeans he saw on the
computer screen were manufactured, licensed or associated with Levi's and that the
design on the pocket caused the respondent to reach that opinion. However,
Professor Scott unduly encouraged such a response not only by presenting an image
of the jeans that showed only the back of the jeans, where the pocket was, but also
by asking a leading probe of those who did not give her the type of answer she was
looking for. Instruction 9 for the interviewers states, "If the participant ...does
not respond with a feature or specific detail, please probe once by asking, 'Is
there any specific feature that makes you say that?' "Having been focused on that
part of the garment that features the pocket, respondents wanting to be helpful and
correct would find a pocket design answer an attractive response.

 Professor Scott's analysis of her data was improper and her conclusions were
incorrect. While all of the problems already enumerated regarding Professor Scott's
survey render her data useless, it is interesting to note that even if her results
are taken at face value, a proper interpretation of her results shows that there is
no substantial likelihood of confusion between the Indigo Red jeans and Levi's.

 Professor Scott states in her Amended Report's "Summary of Research Findings"
that, "My analysis indicted that 54 (22.3%) of the 242 participants who saw the
Indigo Red jean incorrectly identified it as an LS&CO. product, thus demonstrating
the degree of association between the stitching and the 'LEVI's(R)' brand." It is
not surprising that a substantial number of respondents would guess or mistake
almost any unbranded jeans as Levi's. Such was the case in Professor Scott's survey
with the other three brands shown to respondents. Levi's was named as the brand
manufactured, licensed or associated with Wrangler by 16% of respondents, with Ecko
by 14% of respondents, and with Azzure by 16% of respondents. If one uses an
average of these brand responses (16%+14%+16% divided by 3= 15.3%) as a type of
control for guessing, the net level for Indigo Red becomes +7% (22.3% minus 15.3%),

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2005 WL 2414391
2005 WL 2414391 (N.D.Cal.)

hardly a level that could be called substantial. In my own likelihood of confusion tests that I conduct for both plaintiffs and defendants, I characterize any difference under 10% as not being indicative of substantial confusion. And my understanding is that many attorneys and Courts look to higher levels of likelihood of confusion before they consider them actionable. Professor Scott's reliance on statistical significance in this case is misguided in that, if one conducts enough interviews, even a 1% difference can be statistically significant. The size of the difference also needs to be taken into consideration.

In a similarly incorrect manner, Professor Scott uses a 58% Levi's product recognition level to conclude "...that 'LEVI's(R)' Arcuate pocket stitching design is a well known trademark that consumers use to identify 'LEVI's(R)' jeans." Minimally, Professor Scott would have to subtract the 15% of false claiming level observed for the other three jeans products shown. In addition, there were other visual cues that the jeans were Levi's. If Professor Scott wished to isolate the effect of the arcuate stitching to the recognition of Levi's jeans, she would have to conduct a test where the test group saw the Levi's with the arcuate design and a control group saw an identical product, but without the arcuate design on the pocket. To my knowledge, no such test was conducted.

Summary

The survey conducted by Professor Scott presents no objective or reliable survey information for the Court to use in addressing the issue of the likelihood of confusion of indigo Red jeans with Levi's jeans or on the issue of whether or not the arcuate design is being diluted by the Indigo Red jeans pocket stitching design.

Professor Scott's survey suffers from many design, implementation, and analytical faults:

1. There were several problems with the universe she selected. First of all, it was the wrong universe in that it contained no women, and the price points for jeans purchase were incorrect. Moreover, the age quotas she used were not based on the universe she intended to represent.

2. It appears that less than 10% of the interviews used in Professor Scott's report were validated and the results of those validations are unknown. Furthermore, I have not been provided any information about what validation questions were asked.

3. Professor Scott's use of computer images of the jeans was unduly limiting and encouraged a disproportionate degree of attention to the pocket design.

4. There is some evidence that the presence of colleagues of Professor Scott during the conduct of some of the interviews may have influenced the survey results.

5. Professor Scott's discovery production has not been timely and is still incomplete. No information has been provided that shows the order in which the products were shown to respondents, and an Amended Report, dated February 11, 2005,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2005 WL 2414391                                                                                    Page 7
2005 WL 2414391 (N.D.Cal.)

appeared without adequate explanation of how that Report differed from the original one.

6. Professor Scott used open-ended probes that were clearly leading. She unduly encouraged a "pocket stitching" response by not only showing an image of the jeans that concentrated on the back of the jeans, where the pocket was, but also asking a leading probe of those who did not give her the type of answer she was looking for.

7. Professor Scott's analysis of her data was improper and her conclusions were incorrect. Despite their many problems, even if Professor Scott's results are taken at face value, a proper interpretation of those results shows that there is no substantial likelihood of confusion between the Indigo Red jeans and Levi's jeans.

If one uses an average of the other three incorrect "Levi's" brand responses as a type of control for guessing, the net level for Indigo Red becomes +7%, hardly a level that could be called substantial. Professor Scott's reliance on statistical significance in this case is misguided in that, if one conducts enough interviews, even a 1% difference can be statistically significant. The size of the difference also needs to be taken into consideration.

In a similarly incorrect manner in discussing dilution, Professor Scott uses a 58% Levi's product recognition level to conclude "...that 'LEVI's(R)' Arcuate pocket stitching design is a well known trademark that consumers use to identify 'LEVI's(R)' jeans." Minimally, Professor Scott would have to subtract the 15% false claiming level observed for the other three jean products shown. Even then, it is not clear if only the arcuate design on the pocket caused consumers to recognize the jeans as Levi's.

In conclusion, based on all these design, implementation and analytical problems, I would strongly advise the Court to disregard Professor Scott's survey in its entirety.

If I receive the information mentioned above, that Professor Scott has not yet produced, I may have additional criticisms to bring to the Court's attention.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.