IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| POLAROID CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-738 (SLR) |
| | ) | |
| HEWLETT-PACKARD COMPANY, | ) | **REDACTED –** |
| | ) | **PUBLIC VERSION** |
| Defendant. | ) | |

**POLAROID'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT HEWLETT-PACKARD'S MOTION TO PRECLUDE THE REPORT AND TESTIMONY OF POLAROID'S SURVEY EXPERT WALTER MCCULLOUGH**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, Delaware 19801
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com
  *Attorneys for Plaintiff Polaroid Corporation*

OF COUNSEL:

Russell E. Levine, P.C.
G. Courtney Holohan
Michelle W. Skinner
David W. Higer
Maria A. Meginnes
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000

Original Filing Date: June 12, 2008

Redacted Filing Date: June 26, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

NATURE AND STAGE OF PROCEEDINGS ............................................................. 1

SUMMARY OF ARGUMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 2

ARGUMENT .................................................................................................................. 5

    A.    Mr. McCullough's Opinions Are Relevant — Or "Fit" In This Case. .................... 5

    B.    Mr. McCullough's Methodology Was Reliable ................................................... 8

        1.    The Survey Questions Are Not Biased And Misleading. ........................... 8

            (a)    Mr. McCullough Did Not Suggest An Answer By Focusing Only On The Adaptive Lighting Feature. ......................................... 8

            (b)    The Definition of The Adaptive Lighting Feature Provided By Mr. McCullough Did Not Suggest That It Was Valuable. ...................................................................................... 10

            (c)    The Questions In The Surveys Did Not Suggest A Higher Value. .......................................................................................... 12

        2.    Mr. McCullough's Surveys Did Not Cause Respondents To Guess ......... 15

            (a)    Mr. McCullough Used A Proper Set of Respondents. ................... 15

            (b)    Mr. McCullough Asked Respondents A Logical Question To Determine The Value Consumers Place On The Adaptive Lighting Feature. .......................................................... 16

            (c)    A Filter Question Would Not Have Made Sense Here. ................. 16

            (d)    Respondents Were Not Forced To Answer. ................................. 17

            (e)    Outlandish Responses To The Surveys Were Not Included In The Results. .......................................................................... 17

    C.    Mr. McCullough Is A Qualified Survey Expert ................................................. 18

CONCLUSION ............................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*American Home Products Corp. v. Johnson & Johnson,*
    654 F. Supp. 568 (S.D.N.Y. 1987).................................................................. 14

*Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc.,*
    288 F.Supp.2d 105 (D.N.H. 2003)................................................................... 2

*C.A. May Marine Supply Co. v. Brunswick Corp.,*
    649 F.2d 1049 (5th Cir. 1981) ........................................................................ 7

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993)..................................................................................... 4, 5

*Elcock v. Kmart Corp.,*
    233 F.3d 734 (3d. Cir. 2000)........................................................................... 5

*Georgia-Pacific Corp. v. United States Plywood Corp.,*
    318 F.Supp. 1116 (D.C.N.Y. 1970) ................................................................ 6

*In re Paoli Railroad Yard PCB Litigation,*
    35 F.3d 717 (3d Cir. 1994).............................................................................. 5

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.,*
    315 F. Supp. 2d 589 (D. Del. 2004).......................................................... 5, 18

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,*
    19 F.3d 125 (3d Cir. 1994)............................................................................ 14

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.,*
    No. 06 CIV 550, 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ................... 4, 18

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 150 (1999)...................................................................................... 19

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,*
    502 F.3d 504 (6th Cir. 2007) ..................................................................... 4, 19

*Oddi v. Ford Motor Co.,*
    234 F.3d 136 (3d Cir. 2000)............................................................................ 5

*Paco Sport, Ltd. v. Paco Rabanne Parfums,*
    86 F.Supp.2d 305 (S.D.N.Y. 2000)................................................................. 2

*Smith v. Wal-Mart Stores, Inc.,*
    537 F.Supp.2d 1302 ( N.D. Ga. 2008) ......................................................................... 4, 19

*Starter Corp. v. Converse Inc.,*
    170 F.3d 286 (2d Cir. 1999) .................................................................................. 7

*Tivo, Inc. v. Echostar Comm. Corp.,*
    Case No. 2:04-CV-1-DF, 2006 WL 5127620 (E.D. Tex. Jan. 26, 2006) ......................... 6

*Weight Watchers Int'l, Inc. v. Stouffer Corp.,*
    744 F.Supp. 1259 (S.D.N.Y. 1990) ............................................................................. 4, 19

*Westchester Media Co. v. PRL USA Holdings, Inc.,*
    103 F.Supp.2d 935 (S.D. Tex. 1999) ............................................................................. 2

*Whirlpool Properties, Inc. v. LG Electronics U.S.A., Inc.,*
    No. 1:03 CV 414, 2006 WL 62846 (W.D. Mich. Jan. 10, 2006) ..................................... 19

*Winner Intern. Royalty Corp. v. Wang,*
    202 F.3d 1340 (Fed. Cir. 2000) .................................................................................. 7

## Other Authorities

*Reference Manual on Scientific Evidence* at 229 (2d ed. 2000) .................................................. 6

Webster's II New College Dictionary 370, 819 (1999 ed.) .......................................................... 13

## NATURE AND STAGE OF PROCEEDINGS

On May 23, 2008, Hewlett Packard (HP) filed *Defendant Hewlett-Packard's Memorandum In Support Of Motion To Preclude The Report And Testimony of Polaroid's Survey Expert Walter McCullough*. (D.I. 165). This is Polaroid's answering brief in opposition to that motion.

## SUMMARY OF ARGUMENT

HP asserts that the opinions of Mr. Walter McCullough are not relevant or reliable. Specifically, HP argues that Mr. McCullough's printer surveys (the "Surveys") are not relevant because they allegedly do not support the analysis submitted by Polaroid's damages expert, Dr. Allyn D. Strickland. D.I. 165 at 3, 9-10. Dr. Strickland, however, relied on the Surveys in connection with his analysis of *Georgia-Pacific* factor no. 8. HP also argues that the Surveys are not relevant because Dr. Strickland only mentions the Surveys once in his report. *Id.* at 3. Frequency of citation, however, is not, nor has it ever been, a test for relevancy.

HP also argues that the Surveys fail to comply with generally accepted survey standards because they allegedly were biased and asked respondents to guess. *Id.* at 1. However, none of the survey questions suggested a particular response, therefore, the Surveys were not biased. And, the survey questions asked respondents to estimate the value of the infringing feature — not to guess — based on the information provided and the assessments and needs of the respondents. McCullough Dep. at 135:12-136:24, 169:4-170:2, attached hereto as Exhibit 1. There is no reason to believe that the respondents could not do so intelligently. *Id.* at 169:4-170:2. Furthermore, the Surveys followed the guidelines of the Reference Guide on Survey Research. *Id.* at 124:19-159:17. The fact that HP disagrees with the Survey results and that it may have asked different survey questions is not a basis to preclude Mr. McCullough's opinions

under the standards of *Daubert*.  At most, HP raises issues that can and should be addressed during the cross examination of Mr. McCullough at trial.

## STATEMENT OF FACTS

Mr. Walter McCullough is a survey expert who has conducted thousands of surveys in the 40 years he has worked in the survey research field.  *Id.* at 57:18-20; 27:12-28:9; 29:13-24; 94:10-24; McCullough Dec. at ¶6, attached hereto as Exhibit 2.  Some of those surveys have sought to determine the value consumers place on a particular product, as he was asked to do in this matter. Ex. 1, McCullough Dep. at 94:2-9; Ex. 2, McCullough Dec. at ¶6.  Hundreds of the surveys Mr. McCullough has conducted have been for litigation purposes, and courts have regularly accepted his opinions.  Ex. 1, McCullough Dep. at 57:21-23; Ex. 2, McCullough Dec. at ¶6.  *See, e.g. Westchester Media Co. v. PRL USA Holdings, Inc.*, 103 F.Supp.2d 935, 968 (S.D. Tex. 1999) ("Because of the many concerns raised by Dr. Cogan's survey procedure, this court credits instead the findings in Mr. McCullough's survey evidence, which shows a confusion rate of 31%."); *Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc.*, 288 F.Supp.2d 105, 127 (D.N.H. 2003) (where court found that "McCullough's study constitutes undisputed circumstantial proof of actual confusion"); *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 323 (S.D.N.Y. 2000) ("In contrast to the Weiss survey, the McCullough survey's universe does not suffer from the flaws described above and is consistent with the established requirements.")  Although there are some courts that have opted to not rely upon his opinions, Mr. McCullough does not believe that he has ever been disqualified nor that his surveys or opinions were ever stricken.  Ex. 1, McCullough Dep. at 68:12-21.

Mr. McCullough was retained to determine the extent to which consumers valued the Adaptive Lighting feature — the feature which is at issue in this lawsuit.  Ex. 1, McCullough Dep. at 6:4-7:11, 11:3-11:8, 87:5-10; 88:6-25, 89:12-15; D.I. 166 at Ex. A (McCullough Report)

at 3.  Initially, Mr. McCullough was asked to survey an HP camera, the Photosmart C6180 All-in-One printer, and the Officejet 5610 All-in-One printer, which are examples of HP products that have the Adaptive Lighting feature.  Ex. 1, McCullough Dep. at 6:23-7:11, 11:3-11:8, 42:21-43:13.  But subsequently, Polaroid opted to not go forward with the camera survey.  *Id.* at 14:14-19, 22:11-23:14.  Polaroid did not ask for or receive the camera questionnaire responses prior to the submission of Mr. McCullough's report.  *Id.* at 21:9-25.

Mr. McCullough conducted the initial phase of the survey of the Photosmart C6180 printer and the HP camera in January 2008.  *Id.* at 45:22-47:7, D.I. 166 at Ex. A (McCullough Report) at Ex. B at 3; *see also* Ex. 1, McCullough Dep. at 14:25-15:5.  Although the surveys of those products were conducted simultaneously, they were completely separate surveys and not part of the same survey as HP suggests.  Ex. 1, McCullough Dep. at 16:4-13; 17:25-18:18; Ex. 2 McCullough Dec. at ¶5; D.I. 165 at 5 n. 3.  Mr. McCullough did not have the camera survey "in [] mind" as he went forward with the two printer surveys.  Ex. 1, McCullough Dep. at 16:4-13.  Mr. McCullough did not go to the mall to conduct or witness the survey taking place.  *Id.* at 114:2-7.  Nor were the results for the camera survey "in mind" (or even a "conscious awareness") as Mr. McCullough wrote the report on the printer surveys because the results of the camera survey had nothing to do with the printer surveys.  *Id.* at 17:9-18:18.  Mr. McCullough did not compare the results of the camera survey with the results of the printer surveys.  *Id.* at 44:3-13.

The results of the Surveys showed that consumers believed, on the average, that the Adaptive Lighting feature was worth approximately $50.00 per printer in the HP Photosmart C6180 printer and about $20.00 in the HP Officejet 5610 printer.  D.I. 166 at Ex. A (McCullough Report) at 8.

HP submitted a rebuttal report and its own survey from Dr. Jacob Jacoby. *See* D.I. 166 at Ex. B (Jacoby Rebuttal); Jacoby Report, excerpts attached hereto as Exhibit 3. Dr. Jacoby defined his survey as a behavioral study and stated that this was the first time he had ever looked at the behavior of individuals to determine the information to which they pay attention. Jacoby Dep. at 7:25-9:4, excerpts attached hereto as Exhibit 4.

Although Dr. Jacoby's opinions have been praised by some courts, other courts have criticized his opinions. *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06 CIV. 550, 2007 WL 2258688, at * 12 (S.D.N.Y. Aug. 6, 2007) (finding that Rule 403 was clearly warranted because "[t]he live testimony of Kargo's highly seasoned and impressively credentialed consumer confusion expert, regarding the results of the deeply flawed Jacoby Survey, would prove to be 'both powerful and quite misleading'"); *Smith v. Wal-Mart Stores, Inc.,*537 F.Supp.2d 1302, 1334 ( N.D. Ga. 2008) ("Jacoby surveyed an overbroad universe, failed to adequately replicate the shopping experience and asked leading questions. He also surveyed a non-random sample that in any case was too small to allow the results to be projected upon the general market. Thus, the Court finds that the Jacoby survey is so flawed that it does not establish a genuine issue of material fact with regard to actual confusion, much less prove actual confusion."); *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1272 (S.D.N.Y. 1990) (finding that Dr. Jacoby failed to identify the proper universe); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518 (6th Cir. 2007) (finding that Dr. Jacoby had identified an overbroad universe and declining to follow his opinions).

## ARGUMENT

The Supreme Court has "assign[ed] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp.2d 589, 600 (D. Del. 2004). The Third Circuit has interpreted Rule 702 to include "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Id.* at 600 (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d. Cir. 2000)). An expert's opinion is considered to be reliable if it is based on valid scientific knowledge. *Daubert*, 509 U.S. at 589–90. There needs to be a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92. "This standard, nevertheless, is not intended to be a high one or to be applied in a manner that requires the plaintiffs 'to prove their case twice — they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of the expert are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable.'" *Izumi Prods. Co.*, 315 F.Supp.2d at 601 (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (citing *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994)).

As the survey experts in this case agreed, the Reference Guide on Survey Research, which is a chapter from the *Reference Manual on Scientific Evidence*, provided by the Federal Judicial Center, is a basic guideline for putting together surveys. *Reference Manual on Scientific Evidence* at 229 (2d ed. 2000); *see also* Ex. 1, McCullough Dep. 124:19-125:15; D.I. 166 Ex. B (Jacoby Rebuttal Report) at 3-4; *see also* D.I. 166 at Ex. G.

### A.    MR. McCULLOUGH'S OPINIONS ARE RELEVANT — OR "FIT" IN THIS CASE.

HP says that the Surveys are not relevant in this case because they do not support Polaroid's damages theory. D.I. 165 at § 2(A). ███████████████████

5

████████████████████████████████    Strickland's Report at ¶ 118, attached hereto

as Exhibit 5.  And certainly, survey results of the infringing feature are relevant to at least factor

no. 8 of the *Georgia Pacific* factors: "[t]he established profitability of the product made under

the patent; its commercial success; and its current popularity."  *Georgia-Pacific Corp. v. United

States Plywood Corp.,* 318 F.Supp. 1116, 1120 (D.C.N.Y. 1970).  Respondents were asked to

place a value on the Adaptive Lighting feature as consumers, and the results of the Surveys

provide information about the popularity of the feature and its commercial success.[1]  D.I. 166 at

Ex. A (McCullough Report) at Ex. A (Main Questionnaire); *see also Tivo, Inc. v. Echostar

Comm. Corp.,* Case No. 2:04-CV-1-DF, 2006 WL 5127620, at *3-4 (E.D. Tex. Jan. 26, 2006)

(denying Echostar's motion to preclude Tivo's survey expert and accepting Tivo's argument that

courts are allowed "a fair amount of temporal leeway in their analysis of the hypothetical

negotiation" where Tivo used the survey results in connection with *Georgia-Pacific* factors nos.

6, 8, 10, 11, 14, and 15).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[1] ████████████████████████████████████    (Ex. 5, Dr.

Strickland's Report at pages 59-63), ██████████████████

████████████████████████    *Id.* at ¶¶ 138, 143. ████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

█████████████████████████████████████████████████████[2]  By no means does

this make Mr. McCullough's survey results irrelevant or unreliable.

Tellingly, the results of HP's own survey expert, Dr. Jacoby, were not even *reviewed* by

HP's damages expert.  *See* Wallace Report at 1-2 and App. C, excerpts attached hereto as Exhibit

6.  This indicates that surveys geared towards showing how consumers perceive the Adaptive

Lighting feature are independently relevant even if not cited by and relied upon by a party's

damages expert.  *See e.g., Winner Intern. Royalty Corp. v. Wang,* 202 F.3d 1340, 1350-51 (Fed.

Cir. 2000) (in analyzing commercial success of the patented feature, the district court did not err

in finding that a survey showed the nexus between the patented features and the reasons

consumers bought the products).

The cases HP cites in support of the theory that the McCullough Surveys are not relevant

are not even patent infringement cases, and the courts excluded the surveys at issue there based

on serious flaws.  *Starter Corp. v. Converse Inc.,* 170 F.3d 286, 296-97 (2d Cir. 1999)

(trademark case where Starter's survey evidence was excluded because it was found to be "little

more than a memory test, testing the ability of the participants to remember the names of the

shoes they had just been shown and gave no indication of whether there was a likelihood of

confusion in the marketplace"); *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d

1049, 1052 (5th Cir. 1981) (wrongful dealership termination case where court excluded a

─────────────────────────

[2] ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████    *See* Ex. 5, Strickland Report *generally*.  Dr. Strickland applied the
*Georgia-Pacific* factors in arriving at his opinion.  His damages figures were not "derived
from speculative assumptions," and notably, Dr. Strickland's Report is not the subject of this
motion or of any other motion to preclude raised by HP.

████████████████████████████████████

customer survey because "customer opinion on the merits of the termination was irrelevant" and would not be useful to calculate lost future profits as May Marine contended).

**B.    MR. MCCULLOUGH'S METHODOLOGY WAS RELIABLE**

HP also asserts that the methodology employed by Mr. McCullough in this case was not reliable.  D.I. 165 at Argument §§ 2(B) and 2(C).

1.    The Survey Questions Are Not Biased And Misleading.

HP asserts that the Surveys were biased and misleading.  *Id.* at § 2(B).  Specifically, HP claims that Mr. McCullough's Surveys were not objective because 1) consumers were only asked to value the Adaptive Lighting feature, 2) the description of the Adaptive Lighting feature was "laudatory," and 3) the manner in which Mr. McCullough asked respondents to provide a dollar amount for the feature was allegedly misleading.  *Id.*

Surveys must be objective.  Mr. McCullough maintained objectivity through his survey questions.  Mr. McCullough ensured objectivity by using stimulus information that is available from HP's own website, asking non-leading questions, and relying on answers from respondents that were mainly volunteered.  Ex. 1, McCullough Dep. at 128:2-23.  The survey questions were not leading because they did not suggest a particular answer, and therefore, the respondents were able to answer based on their own beliefs.  *Id.* at 128:24-129:12.

(a)    Mr. McCullough Did Not Suggest An Answer By Focusing Only On The Adaptive Lighting Feature.

First, HP complains that even though Mr. McCullough handed out the HP fact sheet for the surveyed printer showing many attributes, he did not ask the consumers to place any value on any attribute other than the Adaptive Lighting feature.  D.I. 165 at 11-12.  HP asserts that the focus on this one feature communicated to respondents that they should view this particular feature as valuable.  *Id.* at 12.  But as HP admits, Mr. McCullough did inform consumers through

the fact sheet that the printers have many attributes. *Id.* at 11; Ex. 1, McCullough Dep. at 111:17-24. Respondents did not know that Mr. McCullough would only ask about Adaptive Lighting — that is, respondents did not know at the time that they were asked to value the Adaptive Lighting feature that they would not be asked to do the same for other features of the printer. Therefore, there is no suggestion in the survey questions that Adaptive Lighting has great value. Specifically, respondents were first told:

> I'd like you to look at this description of a color ink jet printer and review the information as if you were considering whether or not to buy it. After you have reviewed the product description, I will ask you a few questions. If you don't know the answer to any of my questions, please don't hesitate to say that.

D.I. 166 at Ex. A (McCullough Report) at Ex. A (Main Questionnaire) at 1. Respondents were then handed the fact sheet and allowed time to review the facts before more questions were asked. *Id.* The respondents were provided a description of the Adaptive Lighting feature and then asked if this printer "contained all of the features of the printer whose description I just showed you, but it did **not** have the Adaptive Lighting Technology" would that printer cost less or the same. *Id.* (emphasis in original). The fact sheets made it clear that the printer had other attributes, and the respondents were free to decide on their own whether the printer would cost the same or less without the Adaptive Lighting feature (or to say they did not know). *Id.* There was no indication to the respondents that they would not be asked similar questions about other features. Ex. 2, McCullough Dec. ¶10. Therefore, the survey questions did not suggest any specific answers from the respondents. *Id.* Asking about the remaining attributes was unnecessary because they are not at issue in this case. *Id.* Furthermore, it would be overwhelming and unreasonable to ask a consumer to place a value on each of the twenty or so attributes (or some portion thereof), and doing so is meaningless since the objective of the survey was to determine the consumers' perceived value of the patented feature — not to figure out the

9

value of each feature. *Id.;* Ex. 1, McCullough Dep. at 107:19-108:7; 166 at Ex. A (McCullough

Report) at Ex. C.

> (b)    The Definition of The Adaptive Lighting Feature Provided By Mr.
> McCullough Did Not Suggest That It Was Valuable.

Second, HP complains that the description of the Adaptive Lighting feature Mr.

McCullough provided misled respondents into thinking this feature was valuable. D.I. 165 at 12-

13. The description Mr. McCullough provided was:

> This particular color ink jet contains a feature called "Adaptive
> Lighting Technology." Adaptive Lighting Technology is a
> breakthrough technology that enables printers to produce photos
> that look more like what people see with their own eyes. It
> accomplishes this by balancing relationships between bright and
> dark areas in a photo, preserving gentle contrasts by smoothing out
> harsh contrasts.

D.I. 166 at Ex. A (McCullough Report) at 6. HP claims that Mr. McCullough crafted this

definition through "different websites" and used words (such as "breakthrough technology,"

"enables," "what people see with their own eyes," "accomplishes," "preserving gentle contrasts

by smoothing out harsh contrasts") that made the feature appear valuable. D.I. 165 at 12-13. HP

further complains that Mr. McCullough should have let respondents know that this feature has

"limited use." *Id.* at 12.

HP's website offers numerous definitions of Adaptive Lighting: *See e.g.* POL 7522306;

POL        7539353;        POL        7522307-13; P      L      7539345-352;

http://h10025.www1.hp.com/ewfrf/wc/genericDocument?docname=c01066451&cc=us&dlc=en

&lc=en&jumpid=reg_R1002_USEN; http://h41257.www4.hp.com/cda/hpec/display/main/hpec_

content.jsp?zn=hho&cp=2-705-706-712%5E19166_4022_19_ Attached hereto as Group Exhibit

7. The fact sheets for the two different printers do not contain a definition for Adaptive Lighting.

D.I. 166 at Ex. A (McCullough Report) at Ex. C. All of the definitions generally show that

Adaptive Lighting is an image enhancing feature to fix lighting in pictures. *Id.*

Mr. McCullough developed the definition he used from different pages of *HP's* own website and not from random places on the Internet as HP's motion suggests. Ex. 1, McCullough Dep. at 147:16-150:25; Ex. 2, McCullough Dec. at ¶8; D.I. 165 at 12-13. The main portion of the definition comes from a page on HP's website that incorporates most of the very words HP complains about and deems suggestive:

> HP Adaptive Lighting Technology is a **breakthrough technology** that permits digital cameras to produce photos that look more like **what we see with our own eyes**. It balances brightness relationships between bright and dark areas in a photo, **preserving gentle contrasts** but compressing harsh contrasts.

Ex. 7, POL 7522306 (emphases added). Another page from HP's website shows the exact wording Mr. McCullough used for the last phrase of the description: "**preserving gentle contrasts by smoothing out harsh contrasts**." *Id.* at POL 7539353 (emphasis added).

Mr. McCullough only made a few adjustments beyond these two pages. First, he replaced "permits digital cameras" with the phrase "enables printers" because the Surveys focused on printers and not cameras. "Enable" means "to make possible" and "permit" means "to afford possibility" or "allow." WEBSTER'S II NEW COLLEGE DICTIONARY 370, 819 (1999 ed.). While "enable" and "permit" do not mean the exact same thing, they are arguably similar terms — one no more suggestive than the other. Second, Mr. McCullough slightly changed the words of the second sentence to read, "It accomplishes this by balancing relationships," rather than HP's words, "It balances relationships," which inherently would mean that the balancing is "accomplished" in this manner. Again, there is nothing suggestive or complimentary about this minor change. The only other change made was from "we" to "people." Therefore, Mr. McCullough either used HP's own words or made slight neutral adjustments. The definition Mr. McCullough used did not suggest any value. The goal was to articulate a generalized description

11

since this infringing feature is available in a significant number of both cameras and printers. Ex. 2, McCullough Dec. ¶8.  There would be no benefit to limiting the definition to one used for the specific printers that were surveyed since the infringing feature is in many different HP cameras and printers.  *Id.*  Mr. McCullough wanted to use a "constructive, cohesive" definition that "consumers would understand."  *See* Ex. 1, McCullough Dep. at 150:10-25.

HP further complains that the definition Mr. McCullough used did not show that the Adaptive Lighting feature has "limited use."  D.I. 165 at 12.  But on HP's website, it says only that there are a "few types" of scenes for which Adaptive Lighting "may" not be desirable:  when one wants a dramatic contrast such as a silhouette, and low contrast scenes such as "delicate outlines of objects in a fog bank."  Ex. 7, POL 7522309.  HP claims that the infringing feature is "usually" turned off in "many" models (D.I. 165 at 2), but that suggests this feature is *sometimes* turned on in those models, and that there are other models embodying the infringing feature where the feature is indeed turned on.  In any event, even if the feature is turned off, the feature can certainly be turned on.  Whether the product comes with the feature turned on or off and the few instances where purchasers may not want to use this feature do not suggest that the feature has "limited use" as HP claims.[3]

(c)     The Questions In The Surveys Did Not Suggest A Higher Value.

Next, HP complains that the survey questions misled respondents to place a higher value on the Adaptive Lighting feature first, because respondents were not asked to value the feature

---

[3]     Interestingly, HP cites Dr. Jacoby's Rebuttal Report to also claim that "when this feature is turned on, it evaluates an image to determine whether to apply the accused algorithm and in a minority of instances will apply the algorithm." D.I. 165 at 2 citing Jacoby Rebuttal Report at 8.  Certainly Dr. Jacoby does not hold himself out to be an expert in algorithms, and there is no evidence, in Dr. Jacoby's Rebuttal Report or elsewhere in this case, that actually quantifies how often the accused algorithm is used.

keeping the other features in mind (*i.e.* respondents had no frame of reference), and second, because the respondents who answered that they did not know the value of the feature were provided with a card that showed a series of ranges of prices from which to select.  D.I. 165 at 13-14.

Again, as mentioned above, it would have been overwhelming, and unnecessary, to ask respondents about the value of the other features.  Ex. 1, McCullough Dep. at 107:19-108:7; Ex. 2, McCullough Dec. at ¶10.  Notably, Mr. McCullough did not hide the fact that the printers had other attributes; as HP admits, he provided respondents with fact sheets about the printers which listed the other attributes.  *Id.* at 111:17-24.

Respondents who said they did not know how much less the printer would be without the Adaptive Lighting feature were provided with a card showing various price ranges for them to select from.  D.I. 166 Ex. A (McCullough Report) at Ex. A (Main Questionnaire) at M2.  HP believes that the potential choices were misleading because the scale communicated a high value.  D.I. 165 at 14.  First, as shown above, the first question of the survey made it clear that the respondent could answer "don't know" at any time.  D.I. 166 Ex. A (McCullough Report) at Ex. A (Main Questionnaire) at M1; Ex. 1, McCullough Dep. at 145:24-146:15.  Next, there is no evidence to support HP's inference that the Adaptive Lighting feature only cost a few cents.  In fact, during discovery, Polaroid sought cost figures from HP but HP refused to produce that information.  *See e.g.* Polaroid's First Set of Document Requests at No. 6; 10/22/07 Holohan Ltr. to Coburn; 10/30/07 Coburn Ltr. to Holohan, attached hereto as Group Exhibit 8.  In any event, Mr. McCullough was not trying to measure the actual cost of the Adaptive Lighting feature.  Ex. 1, McCullough Dep. at 140:18-141:3; Ex. 2, McCullough Dec. ¶¶4, 7, 10,13.

Furthermore, it was appropriate for Mr. McCullough to offer a closed-ended choice once a respondent was unable to decide how much less the printer would be without the Adaptive Lighting feature.  Ex. 2, McCullough Dec. at ¶11.  Every experienced survey researcher knows that some respondents are reluctant to answer an open-ended question and would prefer a list of choices.  *Id.* at ¶11; Ex. 1, McCullough Dep. at 138:8-139:8.  Moreover, the range provided by Mr. McCullough, if anything, suggested numbers too low since the median for the Photosmart C6180 was $50.00 and $20.00 for the Officejet 5610 printer, and the highest range respondents could choose from for either printer was "$20.00 or more."  D.I. 166 at Ex. A (McCullough Report) at Ex. C; Ex. 1, McCullough Dep. at 139:9-140:17; McCullough Dec. ¶11.

This is not an instance where only a closed-set of responses were provided and the choices did not provide a full range of options.  *See American Home Products Corp. v. Johnson & Johnson,* 654 F. Supp. 568, 581-82 (S.D.N.Y. 1987) (where the court found the survey unreliable where the "list of choices was incomplete, inexplicably omitting to include, as one of its options, the literal meaning of the advertisement!" and "the list of choices were seriously slanted in another way: among the four positive choices, the latter two were so obviously false that they could almost as well have been omitted").  Respondents in this case were only asked the closed-ended question     with a full range of potential options     if they decided the printer cost less without the Adaptive Lighting feature, but they did not know what value to place on it.  Ex. 1, McCullough Dep. at 138:8-139:8; Ex. 2, McCullough Dec. at ¶ 11.  Moreover, even if Mr. McCullough, instead, did not include any answers to his closed-ended questions, it would have very little impact on the results.  Specifically, the survey results would show that the medians of $50.00 and $20.00 would not change at all, and the means would actually increase to $55.96 and $24.89.  Ex. __, McCullough Dec. ¶12; *see Johnson & Johnson-Merck Consumer Pharm. Co. v.*

*Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134-35 (3d Cir. 1994) (where court affirmed refusal to consider survey questions that were leading but agreed to credit the answers to the non-leading questions).

      2.    <u>Mr. McCullough's Surveys Did Not Cause Respondents To Guess.</u>

HP also accuses Mr. McCullough's Surveys of directing respondents to make guesses. Specifically, HP claims that 1) Mr. McCullough did not properly choose respondents based on their skill in valuing printer features; 2) Mr. McCullough did not ask a logical question to determine how consumers value the Adaptive Lighting feature; 3) Mr. McCullough failed to use a filter question asking potential respondents if they felt qualified to make such estimates; 4) Mr. McCullough's Surveys forced respondents to answer after they said they did not know the value of the printer without the Adaptive Lighting feature; and 5) because the Surveys called for guessing, Mr. McCullough's Surveys "led to preposterous results."  D.I. 165 at 16-18.

Mr. McCullough did not ask respondents to guess.  The survey questions asked respondents to estimate based on their own assessment of the value of the feature to them — not to guess — in the context of the information provided and their own experience and needs.  Ex. 1, McCullough Dep. at 135:12-136:24, 169:4-170:2.  There is no reason to believe that respondents could not do so intelligently.  *Id.*

      (a)    Mr. McCullough Used A Proper Set of Respondents.

HP criticizes Mr. McCullough for failing to seek out skilled respondents to value the Adaptive Lighting feature.  D.I. 165 at 15-16.  But this was not intended to be a survey among experts, nor a survey "of randomly selected retail shoppers."  D.I. 165 at 16; Ex. 2, McCullough Dec. at ¶7.  Mr. McCullough's respondents were people who had purchased a color inkjet printer in the past year or who thought they might buy one in the next year.  D.I. 166 at Ex. A (McCullough Report) at Ex. A (screener questionnaire) at S2; Ex. 1, McCullough Dep. at 130:4-

10; Ex. 2, McCullough Dec. ¶7.  These respondents were selected from a representative pool of consumers who mirrored the gender and age makeup reflective of the population as determined by the US Census Bureau.  Ex. 1, McCullough Dep. at 118:13-119:21; Ex. 2, McCullough Dec. at ¶7; D.I. 166 at Ex. A (McCullough Report) at 5.  Notably, Dr. Jacoby used the exact same universe in his survey.  Ex. 3, Dr. Jacoby Report at 7.

Because the Surveys were focused on consumer perception of the value of the feature and not on estimating manufacturing or wholesale cost, there was no reason to have greater skills or knowledge as a respondent.  Ex. 2, McCullough Dec.¶ 7.

> (b)   Mr. McCullough Asked Respondents A Logical Question To Determine The Value Consumers Place On The Adaptive Lighting Feature.

HP says that Mr. McCullough should have framed the operative question as "How much are you willing to pay for such a feature" instead of the question asked:  "About how much less do you think the model without the Adaptive Lighting feature would cost?"  D.I. 165 at 16.  As Mr. McCullough explained in his deposition, because there already exists a printer (or printers) with the Adaptive Lighting feature, it only makes sense to introduce the product with the feature and to ask then how much the unit would cost without it.  Ex. 1, McCullough Dep. at 98:15-99:18.  Because the question Mr. McCullough did ask was reasonable and logical, it does not matter that HP's expert would have chosen to ask different questions.

> (c)   A Filter Question Would Not Have Made Sense Here.

HP claims Mr. McCullough should have at least used a filter question to weed out any respondents who did not feel qualified or capable to place a value on the Adaptive Lighting feature.  D.I. 165 at 16.  Again, respondents were permitted to say "Don't Know" to any question in the Surveys.  D.I. 166 at Ex. A (McCullough Report) at Ex. A (Main Questionnaire) at M1.  Given that choice, a filter question was not needed here, particularly because the Surveys were

16

attempting to measure consumer perceived value and not actual cost.  Ex. 1, McCullough Dep. at 107:19-108:7, 135:2-11, 137:5-24; Ex. 2, McCullough Dec. ¶7.

> (d)     Respondents Were Not Forced To Answer.

HP contends that by asking respondents     who said they did not know how much less the printer would be without the Adaptive Lighting feature     to pick from a range of prices, Mr. McCullough encouraged guessing.  D.I. 165 at 16-17.  Again, even once the respondents were given pricing options, they could still say they did not know the answers to any question in the survey.  D.I. 166 at Ex. A (McCullough Report) at Ex. A (Main Questionnaire) at M1; Ex. 2, McCullough Dec. ¶11.  And even if Mr. McCullough, instead, did not include any of the answers where a pricing range was selected, it would have very little impact on the results.  Specifically, the survey results would show that the medians of $50.00 and $20.00 would not change at all, and the means would actually increase to $55.96 and $24.89.  Ex. 2, McCullough Dec. ¶12.

> (e)     Outlandish Responses To The Surveys Were Not Included In The Results.

HP points out that some of the responses in the Surveys were unreasonable.  D.I. 165 at 17-18.  In virtually all surveys, there are some respondents who either do not understand the task at hand or who provide unreasonable answers for some unknown reason.  Ex. 2, McCullough Dec. ¶14.  Survey experts, such as Mr. McCullough, take this fact into account by excluding the outlandish responses from the calculation of the means and median values.  *Id.*; *see e.g.* Ex. 1, McCullough Dep. at 100:23-103:22.  For instance, in the Officejet 5610 printer survey, two respondents said the Adaptive Lighting feature was worth $200 even though the price of the printer was only $99.99.  D.I. 166 at Ex. A (McCullough Report) at Ex. E (second to last page of Officejet 5610 verbatim response chart).  Naturally, Mr. McCullough excluded those results from his calculations, as he did with other unreasonable responses.  *Id.* (last page of Photosmart C6180 verbatim response chart and last two pages of Officejet 5610 verbatim response chart

where it is indicated which responses are not included in the mean/median); Ex. 2 McCullough

Dec. ¶ 14; *see also* Ex. 1, McCullough Dep. at 100:23-103:22.   And to further minimize the

influence of some particularly high values, Mr. McCullough calculated the median value (*i.e.* the

middle most value) together with the mean.  Ex. 2, McCullough Dec. ¶14.  Some survey experts

may have chosen to exclude more or less responses, but regardless, this would not alter the

underlying fact that consumers believe that Adaptive Lighting has significant value.  *Id*.[4]

## C.      MR. MCCULLOUGH IS A QUALIFIED SURVEY EXPERT.

While HP does not specifically claim that Mr. McCullough is unqualified, it nevertheless

focuses on times in which Mr. McCullough's opinions were not used by a court, points to the

fact that Mr. McCullough has not written an academic paper or taught at a university,[5] and

(wrongly) notes that Mr. McCullough has never done a consumer perception survey before.  D.I.

165 at 3-6.   At the same time, HP touts its own survey expert, Dr. Jacoby, as "a nationally

recognized expert on consumer research."   D.I. 165 at 6.   This puffery is unnecessary and

misleading.

As noted above, Mr. McCullough has 40 years of experience in surveys.   Ex. 1,

McCullough Dep. at 57:18-20; 27:12-28:9; 29:13-24; 94:10-24; Ex. 2, McCullough Dec. at ¶6.

His company, Ipsos Mendehlson Inc. (formerly Monroe Mendehlson Research Inc.), is a member

---

[4]   HP points out that one respondent stated that he was "taking a stab in the dark."  D.I. 165 at
      17 n. 4.  As Mr. McCullough stated during his deposition, such responses do not mean that
      respondents are actually guessing or arriving at their answer arbitrarily.  Rather, this is just
      the way people sometimes speak.  Ex. 1, McCullough Dep. at 169:18-170:23.

[5]   As stated in *Izumi*, the specialized knowledge required by Rule 702 is interpreted liberally to
      include practical experience, academic training, and credentials.  *Izumi Prods. Co.*, 315
      F.Supp.2d at 600.  A proffered expert need only have skills greater than the average layman.
      *Id.*

of CASRO (Council of American Survey Research Organizations) and CMOR (Council for Marketing and Opinion Research), trade associations for the marketing research business, and he is personally a member of the American Marketing Association, American Statistical Association, and the American Association of Public Opinion Research (APOR).  Ex. 1, McCullough Dep. at 64:8-65:20; Ex. 2, McCullough Dec. at ¶3.

It is important to note that courts have not always praised HP's expert Dr. Jacoby and his work.  For instance, in his deposition, Dr. Jacoby noted three instances where the court did not agree with his opinions, and there are a number of courts that declined to follow his opinions. Ex. 4, Jacoby Dep. at 9:8-13:22; *see e.g. Kargo Global, Inc.* 2007 WL 2258688, at * 12 (where the court stated that Rule 403 was clearly warranted in this case stating "[t]he live testimony of Kargo's highly seasoned and impressively credentialed consumer confusion expert, regarding the results of the deeply flawed Jacoby Survey, would prove to be 'both powerful and quite misleading'"); *Smith,* 537 F.Supp.2d at 1334 ("Jacoby surveyed an overbroad universe, failed to adequately replicate the shopping experience and asked leading questions.  He also surveyed a non-random sample that in any case was too small to allow the results to be projected upon the general market.  Thus, the Court finds that the Jacoby survey is so flawed that it does not establish a genuine issue of material fact with regard to actual confusion, much less prove actual confusion."); *Weight Watchers Int'l, Inc.*, 744 F.Supp. at 1272 (where court found that Dr. Jacoby failed to identify the proper universe); *Leelanau Wine Cellars, Ltd.,* 502 F.3d at 518 (where the court found that Dr. Jacoby had identified an overbroad universe and declined to follow his opinions).

Nonetheless, given the experience of both Dr. Jacoby and Mr. McCullough, "the fact that their work has been criticized in some cases and lauded in others is not surprising.  Criticisms or

praise regarding surveys in other cases is not a basis for exclusion. The court's gatekeeping inquiry must be "tied to the facts of a particular case." *Whirlpool Properties, Inc. v. LG Electronics U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at * 3 (W.D. Mich. Jan. 10, 2006) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 150, 152 (1999)).

## <u>CONCLUSION</u>

Mr. McCullough's Surveys satisfy *Daubert*. His surveys are relevant here, and his methodology was not biased nor did it require guessing. HP's complaints, at most, go to the weight to afford Mr. McCullough's opinions at trial and can be handled through cross-examination. HP's motion should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney*
_____

OF COUNSEL:

Russell E. Levine, P.C.
G. Courtney Holohan
Michelle W. Skinner
David W. Higer
Maria A. Meginnes
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000

June 12, 2008
2367607

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, Delaware  19801
(302) 658-9200
jheaney@mnat.com
  *Attorneys for Plaintiff, Polaroid*
  *Corporation*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on June 26, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

William J. Marsden, Jr.
FISH & RICHARDSON P.C.

I also certify that copies were caused to be served on June 26, 2008 upon the following in the manner indicated:

### BY E-MAIL

William J. Marsden, Jr.
FISH & RICHARDSON P.C.
919 N. Market Street, Suite 1100
Wilmington, DE 19801

Matthew Bernstein
John E. Giust
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC
5355 Mira Sorrento Place
Suite 600
San Diego, CA 92121-3039

Bradley Coburn
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701

Daniel Winston
CHOATE HALL & STEWARD, LLP
Two International Place
Boston, MA 02110

/s/ Julia Heaney
_____
Julia Heaney (#3052)

# Exhibit 1

Walter McCullough

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

POLAROID CORPORATION,

       Plaintiff,

      vs.          No. 6-738 (SLR)

HEWLETT-PACKARD COMPANY,

       Defendant.
------------------------)

VIDEOTAPED DEPOSITION OF

WALTER J. McCULLOUGH

New York, New York

Tuesday, May 6, 2008

Reported by:
SHAUNA STOLTZ-LAURIE
CSR NO. 810490
JOB NO. 202738

83ac5977-95b5-4f5c-a692-2bf61c1c055e

# Walter McCullough

Page 2

```
 1
 2
 3
 4
 5              May 1, 2008
 6              9:08 a.m.
 7
 8       Videotaped deposition of WALTER J.
 9   McCULLOUGH, held at the offices of
10   Kirkland & Ellis LLP, 153 East 53rd
11   Street, New York, New York, pursuant to
12   notice, before Shauna Stoltz-Laurie, a
13   Notary Public of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4   Kirkland & Ellis LLP
 5   Attorneys for Plaintiff
 6        200 East Randolph Drive
 7        Chicago, Illinois 60601
 8   BY:  COLBY ANNE KINGSBURY, ESQ.
 9
10   CHOATE HALL & STEWART LLP
11   Attorneys for Defendant
12        Two International Place
13        Boston, Massachusetts 02110
14   BY:  ROBERT M. BUCHANAN, JR., ESQ.
15
16   ALSO PRESENT:
17        LEE BOWRY, Videographer
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2        THE VIDEOGRAPHER:  This is tape
 3   number one of the videotaped deposition
 4   of Walter J. McCullough in the matter of
 5   Polaroid Corporation versus
 6   Hewlett-Packard Company, in the United
 7   States District Court for the District
 8   of Delaware, CA number 6-738 (SLR).
 9   This deposition is being held at
10   Kirkland & Ellis LLP, 153 East 53rd
11   Street, New York, New York on May 6,
12   2008.  The time on the video screen is
13   9:09 a.m.
14        My name is Lee Bowry, I am the
15   legal videographer with Shari Moss &
16   Associates.  The court reporter is
17   Shauna Stoltz-Laurie.
18        Will counsel please introduce
19   themselves for the record.
20        MR. BUCHANAN:  Good morning.  My
21   name is Robert Buchanan from Choate Hall
22   & Stewart.  I represent Hewlett-Packard
23   Company, and I'll be conducting the
24   deposition.
25        MS. KINGSBURY:  Good morning.  My
```

Page 5

```
 1        McCullough
 2   name is Colby Anne Kingsbury.  I'm from
 3   Kirkland & Ellis, and I represent
 4   Polaroid, and I'm here on behalf of Mr.
 5   McCullough as well.
 6        THE VIDEOGRAPHER:  Will the court
 7   reporter please swear in the witness.
 8   W A L T E R   J.   M c C U L L O U G H ,
 9   called as a witness, having been duly
10   sworn by a Notary Public, was examined
11   and testified as follows:
12   EXAMINATION BY
13   MR. BUCHANAN:
14   Q.  Good morning, Mr. McCullough.
15   A.  Good morning, Mr. Buchanan.
16   Q.  We met earlier.
17        Would you spell your last name in
18   full, please?
19   A.  Yes.  M-c capital C-u-l-l-o-u-g-h.
20   Q.  And have you been retained on
21   behalf of Polaroid in this case?
22   A.  Yes, I have.
23   Q.  And have you been retained by the
24   firm of Kirkland & Ellis on behalf of
25   Polaroid?
```

2  (Pages 2 to 5)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 6

```
1            McCullough
2      A.  That's correct.
3      Q.  And when were you retained?
4      A.  I think the initial contact was
5  sometime in October of '07.
6      Q.  Who contacted you in October?
7      A.  Courtney Holohan was my initial
8  contact person.
9      Q.  Courtney Holohan from the Kirkland
10  & Ellis firm?
11      A.  That's correct.
12      Q.  And in that first contact were you
13  engaged to do something?
14      A.  I was -- well, we had some initial
15  discussions.  I'm not sure exactly when the
16  approval came, but there were initial
17  discussions about what the case was about and
18  about what they wanted me to do.
19      Q.  So in that first contact in October
20  was there discussion of a potential
21  engagement?
22      A.  Yes.
23      Q.  And as you understood it at that
24  time, what were you potentially engaged to
25  do?
```

Page 7

```
1            McCullough
2      A.  I was -- there was a feature called
3  adaptive lighting technology that Polaroid
4  had maintained had a patent that was
5  infringed by Hewlett-Packard, and this was a
6  feature that was involved in both cameras and
7  printers, and initially my assignment was to
8  survey the relevant consumers and find out
9  the extent to which that feature had a value
10  in both cameras and printers that were put
11  out by Hewlett-Packard.
12      Q.  And what you've just told me about,
13  was all of that discussed in your initial
14  contact with Ms. Holohan in October?
15      A.  I can't remember the exact
16  conversation -- it was too far back -- but
17  within a series of conversations, that was
18  what was made known to me.
19      Q.  And in -- the series of
20  conversations ran through October and on into
21  when?
22      A.  Probably on until -- in different
23  degrees until I started doing the study,
24  which I believe was in January.
25      Q.  All right.  Did there come a time
```

Page 8

```
1            McCullough
2  when you had the word yes, go ahead with the
3  engagement?
4      A.  I'm sure there was, but I don't
5  recall when that was.
6      Q.  Do you recall whether that was
7  before New Year's, so it was during '07, or
8  after New Years, so it was in '08?
9      A.  It was probably '07, but I don't
10  recall specifically.
11      Q.  Do you remember whether it was
12  Courtney Holohan who called to tell you that
13  the word was yes, or was it somebody else?
14      A.  I think it was her.
15      Q.  Had you heard of adaptive lighting
16  before you had the initial contact in this
17  case?
18      A.  Not -- not by that time, no.
19      Q.  Had you heard of the feature that
20  you later learned was called adaptive
21  lighting?
22      A.  I was not aware of that specific
23  feature, no.
24      Q.  All right.  And were you -- the
25  information that you just told me about in
```

Page 9

```
1            McCullough
2  your first series of phone calls, did all of
3  that information come to you orally, or did
4  some of it come in the form of documents or
5  other things?
6      A.  It was orally, is I recall.
7      Q.  And did you speak with anyone else
8  besides Courtney Holohan?
9      A.  Initially that's the only person I
10  spoke to.  I think she went on trial at some
11  point in time, and she then had a Maria
12  Meginnes talk to me from time to time, but
13  that was much later than the initial
14  conversations.
15          MR. BUCHANAN:  Okay.  Let me ask
16  if we can mark as [McCullough]
17  Exhibit 1.
18          ([McCullough] Exhibit 1, Monroe
19  Mendelsohn Research, Inc. 2/1/08 invoice
20  to Kirkland & Ellis, marked for
21  identification, as of this date.)
22      Q.  Is this a copy of an invoice from
23  your firm to Courtney Holohan at Kirkland &
24  Ellis?
25      A.  Yes.
```

3  (Pages 6 to 9)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 10

1        McCullough
2      Q.  Do you recognize this to be your
3  firm's invoice?
4      A.  This was my firm's invoice, yes.
5      Q.  And is it the -- to your
6  recollection, is this the first invoice for
7  your engagement in this case?
8      A.  I believe so.
9      Q.  Does this accurately reflect the
10  initial engagement that you had?
11      A.  I believe so, yes.
12      Q.  I see that it's dated February 1.
13  At that time the survey work had begun; is
14  that correct?
15      A.  According to the bill here, the
16  initial phase of the interviewing had been
17  completed.
18      Q.  I see that the title of this
19  project is "Adaptive Lighting Technology
20  Consumer Value Survey."
21        What does consumer value survey
22  mean?
23      A.  It was just a term that I put on --
24  I made up the title for this -- to indicate
25  the type of information I was trying to

Page 11

1        McCullough
2  obtain.
3      Q.  And what type of information were
4  you trying to obtain?
5      A.  The extent to which consumers
6  valued this feature when it was part of
7  either a camera in one case or a printer in
8  another case.
9      Q.  And did you go forward with
10  interviews --
11        MR. BUCHANAN:   Strike that.
12      Q.  What do you mean by initial phase
13  of interviewing?
14      A.  My standard practice, when I do
15  work in this litigation context, is to
16  strongly recommend that approximately half
17  the interviews are done; then we look at the
18  top line results of that, and if those
19  results are going to be helpful to the
20  client, then we'll continue and do the rest
21  of the interview; if it's not, we will stop
22  at that point in time and not spend any more
23  money on the project.
24      Q.  Now, I've seen your report -- and
25  we'll ask to mark that a little bit later --

Page 12

1        McCullough
2  about interviews conducted in various
3  shopping malls.
4        When you say "conduct the first
5  phase of interviewing," does that refer to
6  that same type of interviewing in the
7  shopping malls?
8      A.  Yes.  It's basically -- what I try
9  to do, when time permits, is set up basically
10  two replicates that represent half of the
11  survey being done as the initial phase and
12  the other half being done as the completion
13  phase, so then they're done identically.
14      Q.  The initial phase that -- did you
15  conduct an initial phase here in this
16  engagement?
17      A.  Yes.
18      Q.  And is that reflected in the report
19  that you provided to us later?
20      A.  I don't break it out separately,
21  because I don't consider it really to be a
22  separate study.  It's really just part of the
23  total study.
24      Q.  So that I'm clear, the interviews
25  that were conducted in the initial phase,

Page 13

1        McCullough
2  those are reflected in the report that you've
3  prepared for us?
4      A.  Oh, absolutely, yeah.
5        Those would be -- like roughly the
6  first half of the interviews are the initial
7  phase, and then the rest of the interviews
8  are done as the remainder phase.  The total
9  represents all the interviews that are in my
10  report.
11      Q.  We'll look at the report later, but
12  as I recall, there were some interviews in
13  January and then some more in February.  Are
14  those the two phases?
15      A.  There was actually -- there was a
16  two-phase setup of the initial printer and a
17  camera also, and that was done probably --
18  looking at this, probably in January.  That
19  study was then completed, but then there was
20  an additional printer survey that was done
21  later, which I believe must have been in
22  February.  So the -- half of the study was
23  done in -- in early January, the rest was
24  done either in late January, February -- I
25  don't recall; I have to look at my report --

4  (Pages 10 to 13)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 14

```
1           McCullough
2  but then a second study was done on a second
3  printer.  That was done I think probably
4  February.
5      Q.  Did you do some interviews
6  involving cameras?
7      A.  I did.
8      Q.  I don't recall reading about
9  cameras in your report.
10     A.  I was called by the client at one
11 point, and said that the cameras were no
12 longer going to be an issue from -- from my
13 -- in my situation.
14     Q.  Had you collected a --
15 questionnaire responses pertaining to the
16 cameras?
17     A.  I did have interviews on cameras,
18 just like I did on printers.  Counsel had
19 told me that the cameras were out.
20     MS. KINGSBURY:  I'm going to just
21     object -- excuse me -- at this point for
22     attorney work product.
23     MR. BUCHANAN:  Let me explore that
24     -- the scope of your objection.
25     Q.  So at the same time that you
```

Page 15

```
1           McCullough
2  conducted an initial phase of interviewing
3  about printers, you also conducted an initial
4  phase of interviewing about cameras?
5      A.  That's correct.
6      Q.  And so people directed by you went
7  out to shopping malls and asked questions
8  about the cameras as well as printers?
9      MS. KINGSBURY:  I want to object
10     about any questioning on -- this
11     camera survey, based on the agreement
12     that we have on -- that's in the case,
13     that shows that only documents -- or
14     only things that were relied upon in Mr.
15     McCullough's opinions is something
16     that's subject to deposition and to
17     production.  So I'm not going to allow
18     any questions on -- on the cameras
19     surveyed.
20     MR. BUCHANAN:  Well, I'm going to
21     first test some scope questions, Colby,
22     and then I'll come back and respond to
23     your objection.
24     Q.  Is it the case that you saw or
25 heard preliminary results from interviews
```

Page 16

```
1           McCullough
2  with consumers pertaining to cameras?
3      A.  Yes.
4      Q.  Did you have those in your mind as
5  you went ahead with further interviews later
6  about printers?
7      A.  No.
8          The two are completely separate.  I
9  did -- one survey was about cameras, one
10 survey was about printers, and then the
11 follow-up survey was about printers.  The
12 initial survey, cameras and printers, are two
13 different surveys.
14     Q.  So the survey that I have a report
15 about, does that survey include both the
16 questions from the initial round of printer
17 questions and the later round of printer
18 questions?
19     A.  Yes.  The report you have is based
20 on both the initial survey on the printer, I
21 guess the C6180, and also the second printer,
22 which is five something, if I remember.  Yes,
23 that -- that report shows both of the results
24 from both of those surveys.
25     Q.  So both, the same or substantially
```

Page 17

```
1           McCullough
2  the same questions were asked to the
3  consumers about the C6180 printer and later
4  the other printer.
5      A.  Identical question, yes.
6      Q.  And so the report that you wrote
7  covers both sets.
8      A.  That's correct.
9      Q.  When you were writing the report
10 did you have in your mind the preliminary
11 results that you had heard from the interview
12 of the camera people?
13     A.  No.  That had nothing to do with my
14 report on the printers.
15     Q.  You didn't have it in your mind at
16 all?
17     A.  That's correct.
18     Q.  So it's your testimony that you did
19 not -- well, let me ask you.  Did you
20 consider, have conscious awareness of, the
21 preliminary results that you had heard about
22 cameras as you wrote your report about
23 printers?
24     A.  No.
25     Q.  So it's your testimony that you
```

5 (Pages 14 to 17)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 18

1           McCullough
2   were able to put that out of your mind
3   entirely when you wrote your report about
4   printers.
5       A.  Yes.
6           It's completely unrelated, in terms
7   of my point of view.
8       Q.  And what do you mean, they are
9   unrelated?
10      A.  They're two completely different
11  surveys on two different products, and when I
12  was working on the printer report I was
13  thinking in terms of the results of the two
14  printer surveys I did; I was not thinking at
15  all about the camera survey, because that was
16  -- from my point of view, I was told that
17  this was taken off -- off the table, so to
18  speak.
19      Q.  Did you yourself design the
20  questions that were asked as a printer
21  survey?
22      A.  Yes.
23      Q.  Did you yourself design the
24  questions that were asked in the camera
25  survey?

Page 19

1           McCullough
2       A.  Yes.
3       Q.  Did you -- when did you work on the
4   design of questions for the printer survey,
5   which began in late January '08?
6       A.  Sometime in January.  I can't
7   recall exact dates.
8       Q.  And was it also in January that you
9   worked on designing the questions that were
10  asked this camera survey?
11      A.  That's correct.
12      Q.  Did you work on both of those on
13  the same days in January?
14      A.  It could have been.
15      Q.  Were they -- were the initial
16  interviews conducted in the same shopping
17  malls?
18      A.  Yes, they were.
19      Q.  Were the initial shopping --
20  interviews conducted by the same interviewing
21  -- interviewers in the same shopping malls?
22      A.  Some may have been and some may
23  have been different interviewers, depending
24  on the mall situation.
25      Q.  Did the interviewers, when they

Page 20

1           McCullough
2   sought people to ask questions about the
3   printers, also seek people to ask -- answer
4   questions about the cameras?
5       A.  Let me think about that.
6           I think they were separate
7   screeners.  But it goes back a ways, so I'm
8   not positive.  I think they were separately
9   done.  But it was an along time ago, and I
10  forgot the detail of it.
11      Q.  Well, were there sent to you any
12  documents that reflect responses that people
13  indicative about cameras?
14      A.  You mean -- you mean the
15  interviews?
16      Q.  Yes.
17      A.  Yes.
18      Q.  And so -- now, about printers, I've
19  received from counsel about what in my --
20  what fills about one full box of cartons of
21  questionnaire responses --
22      A.  Right.
23      Q.  -- containing the printer survey.
24      A.  Right.
25      Q.  Are you familiar with those?

Page 21

1           McCullough
2       A.  Yes.
3       Q.  And those came to your firm
4   initially?
5       A.  The original ones did, yes.
6       Q.  And then you then provided those to
7   counsel.
8       A.  Correct.
9       Q.  Did you similarly receive
10  questionnaire responses pertaining to
11  responses about the cameras?
12      A.  From the field people that were
13  getting -- yes, I did.
14      Q.  So does your firm have those in
15  your possession?
16      A.  Yes, we do.
17      Q.  And have you provided those to
18  counsel?
19      A.  They did not ask for them.
20      Q.  So you still have them?
21      A.  I still have them in my office.
22      Q.  How many discussions did you have
23  with counsel about the preliminary results of
24  the camera questions?
25      A.  I think probably one.

6  (Pages 18 to 21)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

| Page 22 | Page 24 |
|---|---|

Page 22

1          McCullough
2    Q.  Did you yourself have those
3 discussions?
4    A.  Yes.
5    Q.  And who did you speak with?
6    A.  Courtney Holohan I believe.
7    Q.  And was this in January '08?
8    A.  It's hard to remember dates on
9 these things.  It's either January, February
10 that she spoke to me about it.
11    Q.  Was it all in one phone call that
12 you spoke about preliminary results and she
13 said no, don't go forward with that?
14    A.  No.  I think --  let me correct
15 something, because maybe I gave you the wrong
16 impression.  I believe we actually finished
17 the interviews on the cameras.  We did the
18 preliminary results.  The results were
19 acceptable to the client to proceed with
20 that, and I think we finished the interviews
21 up on that, and then I got a call from
22 Courtney saying that the cameras are out of
23 the case or they're out of the -- you know,
24 they're off the table; you don't need to
25 report anything on cameras.  But we had

Page 24

1          McCullough
2 in forming his opinions, and I think
3 these are included.  We'll need to take
4 that up in the appropriate time at in
5 the appropriate way, but that's my
6 position.
7       MS. KINGSBURY:  Okay.  Well, just
8 in response to that, the documents that
9 were not used that were relevant to the
10 camera survey are not anything that are
11 part of the survey that was -- the
12 report that was produced.  You have all
13 the documents that he relied on in the
14 opinions that he has set forth in this
15 case.
16       MR. BUCHANAN:  I understood it to
17 be or I think I understand it to be your
18 position that all the documents that are
19 relating to the questions asked about
20 printers have been provided to us, and
21 my comment is as this expert develops
22 his opinions in the case, necessarily he
23 also considers what he has learned about
24 his own survey about cameras, survey
25 questions that he developed at the same

Page 23

1          McCullough
2 finished the interviews on that, I believe.
3    Q.  Do you have any further
4 understanding of why cameras were, to repeat
5 your phrase, off the table?
6       MS. KINGSBURY:  I'll object as to
7 attorney work product.
8       You can only answer to the extent
9 that there was anything you considered
10 in forming your opinions.
11    A.  I -- I -- I was not given any
12 information about why.  I was surprised about
13 it, but that's -- we were told they're off
14 the table.
15 REQ    MR. BUCHANAN:  Okay.  Let me state
16    for the record that it would seem to me
17    that a survey expert who designs  a
18    survey, continues forward with a further
19    round of the survey, then writes a
20    report about it, in doing so is
21    necessarily considering the information
22    that he learned in the initial phase of
23    his interviewing, so it's our position
24    on behalf of HP that we are entitled to
25    all of the documents that he considered

Page 25

1          McCullough
2 time on the same case for the same
3 reason.  And so we will reserve our
4 right to seek to compel the production
5 of those documents, and if we prevail in
6 that, then we'll also reserve the right
7 for a further deposition on that
8 subject.
9       MS. KINGSBURY:  Okay.  And
10 obviously we object, but we'll get into
11 that more, if you prefer, off the
12 record.
13       MR. BUCHANAN:   Yeah, that was my
14 objective, was to --
15       MS. KINGSBURY:  Okay.
16       MR. BUCHANAN:  -- at the moment set
17 out our positions so that there's no
18 misunderstandings, and then move
19 forward.
20    Q.  Let me return your -- direct your
21 attention back to Exhibit 1 again.  The -- I
22 see there was -- it's stated here, estimated
23 billing of 144,000 broken out between an
24 amount for a printer and an amount for
25 camera.  Could you explain that estimate to

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 26

McCullough
1
2   me, and tell me how you arrived at it?
3      A.   Well, the estimate's based upon
4   determining what all costs are going to be on
5   the project, and then adding up all the costs
6   on the project, and then coming up with a
7   number that I give the client ahead of time
8   so they know what this project's going to
9   cost them.
10      Q.   And how did you split it out
11   between printer 80,000 and camera 64,000?
12      A.   The reason why the camera would be
13   somewhat lower would probably be due to the
14   fact that I must have assumed a lower
15   incidence level.
16      Q.   What do you mean by lower incidence
17   level?
18      A.   I knew you'd ask that question.
19         (Laughter.)
20      A.   The best way to explain it is if
21   you were to take a cross-section of a hundred
22   people and asked them questions that qualify
23   them to answer the interview, how many of
24   them would -- would qualify.  So let's say if
25   it's ten out of the hundred, you have a 10

Page 27

McCullough
1
2   percent incidence level.  So if the incidence
3   level of people who would qualify for the
4   camera interview, it must have been a lower
5   incidence level -- I'm sorry.  It was the
6   opposite impression.  The printer must have
7   been a lower incidence level than the camera,
8   because the printer estimate was higher.  The
9   lower the incidence, the higher the cost of
10   the project, because it's hard to find people
11   who meet that qualification.
12      Q.   What does incidence level mean as
13   applied to your particular survey, sending
14   out to ask people about printers in the
15   shopping malls?
16      A.   Well, what it means is how -- we
17   have to do an estimate of what the incidence
18   level is likely to be in order to put an
19   estimate together, and basically I look for
20   data to try to do that.  I usually ask my
21   client.  They sometimes give me a little
22   information on it.  I frequently have to
23   guess at it, based on my 40 years of
24   experience working in the business; that the
25   clients often don't know the incidence level.

Page 28

McCullough
1
2   But it's an important fact in the field,
3   because you have to get a cost estimate in
4   terms of doing the project, and therefore you
5   have to realize how many people do I have to
6   approach to find enough people to satisfy the
7   survey requirements.  The lower the
8   incidence, the harder it is to get somebody
9   who qualifies, and the more expensive it is.
10      Q.   So what incidence means as applies
11   to --
12      A.   (Coughing) Excuse me.
13      Q.   Do you have enough water?
14      A.   I'm good.  It's just allergies this
15   time of this year.  Sorry.
16      Q.   So what "incidence" means as
17   applied to your particular survey is the
18   interviewers have to go out and talk to about
19   how many people in the shopping mall in order
20   to get somebody who's qualified.
21      A.   Generally speaking, that's correct.
22      Q.   Does the incident -- does that cost
23   estimate also take into account whether
24   people are willing to talk, so you might have
25   somebody who is qualified but doesn't want to

Page 29

McCullough
1
2   spend the time on it?  Is that included in
3   this estimate as well?
4      A.   Yes.  I -- I -- I factor that into
5   the incidence level, and the field factors
6   that into the pricing of the surveys.
7      Q.   So your estimates reflect that you
8   thought it would be -- it would take more
9   initial approaches to get the right number of
10   people to answer questions about printers as
11   compared to cameras.
12      A.   Correct.
13      Q.   Why did you think so?
14      A.   It was either -- getting back, it
15   was either information that I obtained from
16   -- from somewhere.  Sometimes I go on the
17   Internet and I look for levels of printer
18   sales or -- or camera sales, or sometimes
19   I'll find studies even about how many people
20   buy these things, and I look for various
21   sources  frequently on the Internet, and then
22   I try to use my -- my 40 years of intuition
23   and come up with a number, and scarily
24   enough, I'm usually pretty close.
25      Q.   So just in case -- let me ask that

8 (Pages 26 to 29)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 30

1           McCullough
2  we mark [McCullough] Exhibit 2, and I'll ask
3  if this document reflects what you've just
4  been talking about.
5           ([McCullough] Exhibit 2, printout
6      from Internet on 2005 printer sales,
7      marked for identification, as of this
8      date.)
9      (Discussion off the record.)
10     A.  Excuse me.  (Reading) Yeah, my --
11  my -- "Assume 10 % incidence," that's my
12  handwriting there, and this is part of the
13  information that I happen to get that made me
14  somehow come up with a 10 percent incidence
15  level for the -- this was for the printers.
16     Q.  So this is your handwriting here,
17  "Assume 10 % incidence"?
18     A.  Yes.
19     Q.  And does this refer to the printers
20  that you were asking about in your survey?
21     A.  That's correct.
22     Q.  And did you print out this
23  particular page of information, or have
24  somebody print it out for you?
25     A.  I think I printed it out from my

Page 31

1           McCullough
2  computer.
3      Q.  And how did you get to 10 percent?
4      A.  Well, that's good question.
5          I probably took some of the
6  information from here, and I probably also
7  took some other information which I may have
8  gotten off the Internet, which I didn't print
9  out, that led me to believe it could be
10  around 10 percent.  It's hard to reconstruct
11  now, because I put a lot of pieces of
12  information together, and then to that I add
13  my likely guesstimate, which is the best I
14  can do.
15     Q.  Now, does 10 percent mean that of
16  the people walking around in the shopping
17  malls, 10 percent of those people would
18  qualify?
19     A.  Pretty much.  10 percent of a
20  cross-section of adults, in my estimation,
21  would either have indicated they bought a
22  color printer in the past year or might
23  consider buying one in the next -- next 12
24  months.
25     Q.  And that's the criteria for

Page 32

1           McCullough
2  qualifying?
3      A.  That was the criteria in my survey.
4  I'm paraphrasing a little bit, but that's
5  pretty much the qualification.
6      Q.  And so your estimate was that of
7  the people walking around in the shopping
8  mall could be approached, 10 percent would
9  meet those criteria.
10     A.  Generally speaking, yes.
11     Q.  Did it turn out that way; do you
12  know?
13     A.  I believe it was close to this.
14  And the reason I say that is if it's not
15  close to that, then my field director would
16  tell me that the field wants more money to do
17  a study, if it's much below that, or we're
18  going to get some money back on the study.
19  And I don't -- I didn't hear either of those
20  things.  So it's within several -- it's
21  usually within five points of that or less.
22  When I get no playback, it usually gives
23  (sic).
24     Q.  Did you make an estimate of
25  incidence for the cameras as well?

Page 33

1           McCullough
2      A.  Yes, I'm sure I did.
3      Q.  Do you remember what it was?
4      A.  No, but based on the camera price
5  being lower, it must have been a little bit
6  higher than this.
7      Q.  Do you remember why you thought it
8  would be a higher incidence for cameras?
9      A.  I -- I probably, you know, did the
10  same process for cameras, you know, went on
11  the Internet, tried to gather information
12  about that, and from whatever information I
13  gathered and a large degree of my own
14  intuition, I came up with a number somewhat
15  higher.
16     Q.  And did you -- have you kept back
17  at your office the information that you
18  gathered with respect to cameras?
19     A.  The questionnaires?  Yes.
20     Q.  No, I meant the --
21     A.  Oh.
22     Q.  -- whatever information you
23  gathered in forming an estimate of the
24  incidence.
25     A.  I may or may not have a page

9 (Pages 30 to 33)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 34

          McCullough
1
2  similar to this.  Sometimes I do and
3  sometimes I don't.  The only (unintelligible)
4  -- to have it printed out, providing it
5  wasn't printed out.
6      Q.  Speaking of which, beyond
7  Exhibit 2, do you have any other information
8  that you used in making your estimate about
9  incidence for printers?
10     A.  Nothing that I -- nothing that I
11 gathered.  I did go on the Internet to look
12 at things, but I didn't print anything out.
13        MR. BUCHANAN:  Let me ask to mark
14     this next one as Exhibit 3.
15        ([McCullough] Exhibit 3, Monroe
16     Mendelsohn Research, Inc. 2/1/08 invoice
17     to Polaroid Corporation, marked for
18     identification, as of this date.)
19        THE WITNESS:  Thank you.
20     Q.  Do you recognize what's been marked
21 as Exhibit 3?
22     A.  Yes.  It appears to be a  -- it
23 appears that the first invoice was directed
24 to Courtney Holohan, and as I recall, Maria
25 Meginnes called me again and said send it

Page 35

          McCullough
1
2  directly to this gentleman at Polaroid.  But
3  I think it's the same invoice.  You see the
4  same invoice number?  It's just the same
5  invoice that's redirected to the person at
6  Polaroid who evidently is the person who must
7  have paid the bill.
8      Q.  As best you can tell, is it exactly
9  the same exact for except for that?
10     A.  Yes.  Yes, it's the same invoice
11 number.
12        And I do recall that she asked me
13 to redirect the bill to somebody at some
14 point in time.
15     Q.  Did she say anything else about
16 why?
17     A.  If I wanted to get paid, that was
18 who to send it to.
19        (Laughing) That's enough of a why.
20     Q.  And do you recall when?
21     A.  No, I don't, but it was a while
22 after, because probably what happened is I
23 probably -- we didn't get paid within a
24 certain amount of time, and my controller
25 probably came to me and said we haven't been

Page 36

          McCullough
1
2  paid for a while, and, you know, I inquired
3  with this people -- that's what usually
4  happens -- and they said, oh, well, if you
5  send it to this gentleman, he'll take care of
6  it.
7      Q.  You say "that's what usually
8  happens."  Do you recall that happening in
9  this case?
10     A.  I recall -- no, I don't recall
11 specifically that happening, but that's the
12 likeliest scenario when these things happen.
13     Q.  What's the name of your controller?
14     A.  Alex Cepeda.
15     Q.  How do you spell the last name?
16     A.  C-e-p-e-d-a.
17     Q.  And is he a he?
18     A.  That's a he, Alex.
19     Q.  Is he an employee of your firm?
20     A.  Yes, he is,
21     Q.  Now, could I direct your attention
22 to the line that says "Description of
23 Billing," ends at 72,000.  Underneath that
24 there's some smudge marks.  Do you know what
25 those are?

Page 37

          McCullough
1
2      A.  I think the printer must have --
3  the copy must have just left a mark.
4      Q.  Do you recall anything being
5  written on this?
6      A.  No, there's nothing on it.
7        This is just the printer smudge.
8  Yeah.
9      Q.  And let me ask the same question.
10 Down at the bottom of the page, underneath
11 the line that says "Terms:  Payment Due
12 Within," do you know if there was something
13 written there?
14     A.  No, I would expect the rollers were
15 dirty on whoever printed this.
16     Q.  So you're not aware of any
17 additional writing.
18     A.  No.  I'm relatively confident there
19 wasn't any.
20        MR. BUCHANAN:  Let me ask that we
21     mark Exhibit 4.
22        ([McCullough] Exhibit 4, Monroe
23     Mendelsohn Research, Inc. 3/7/08 invoice
24     to Polaroid Corporation, marked for
25     identification, as of this date.)

10  (Pages 34 to 37)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 38

McCullough
1          McCullough
2     Q.  Do you recognize Exhibit 4?
3     A.  Yes.  It's my -- my invoice.
4     Q.  Now, this one is not the same as
5  the ones we've seen before dated February 1.
6     A.  That's correct.
7     Q.  Is this the second invoice for your
8  project?
9     A.  This is I believe the second
10  invoice, yes.
11     Q.  So the first invoice estimated a
12  hundred forty four thousand, and this one
13  likewise estimated a total of a hundred forty
14  four thousand?
15     A.  Correct.
16     Q.  The first invoice called for a
17  payment of 72,000?
18     A.  Yes.
19     Q.  And this one calls for an
20  additional payment of 72,000, bringing it up
21  to a total of one forty four?
22     A.  That's correct.
23     Q.  So this invoice calls or covers the
24  initial phase of both the printer survey and
25  the camera survey?

Page 39

1          McCullough
2     A.  No.  It covers the total cost of
3  the first two surveys, because it says
4  "Amount due upon delivery of final report."
5     Q.  And these are called, up at the
6  top, "Initial Two Surveys."  What does
7  "initial" mean in this context?
8     A.  There was a third survey, which is
9  the second printer survey that was done.
10     Q.  We'll get to that in a moment.
11         Did you have any discussion with --
12  oh.
13         MR. BUCHANANA:  Strike that.
14     Q.  Did you ever have any discussion
15  directly with Polaroid during the course of
16  your project?
17     A.  No.
18     Q.  And do you know if your controller
19  had any discussion directly with Polaroid?
20     A.  Not that I'm aware of.  I don't
21  think so.
22     Q.  In connection with these two
23  invoices that we've seen so far, did you have
24  any further conversation with Kirkland &
25  Ellis other than what you've told me?

Page 40

McCullough
1          McCullough
2     A.  In terms of invoices?
3     Q.  Yes.
4     A.  Just that -- just the likely
5  conversation was -- I'm trying to -- I'm
6  trying to -- assuming this happened is that
7  when the bill initially wasn't paid in the
8  30-day period, and Maria Meginnes had me
9  redirect it.  Except for that conversation,
10  I'm not aware of any other conversations.
11     Q.  When did you start writing your
12  report?
13     A.  I can't remember, but probably just
14  shortly before I delivered it, which is -- if
15  you look at the report, there's a signed date
16  here.  It was probably a couple days before
17  that.
18     Q.  Did you start writing it at the
19  time that the results began to be reported to
20  you?
21     A.  No.  I wrote the report once the
22  results were complete.
23     Q.  How did it --
24         MR. BUCHANAN:  Strike that.
25         Let me ask that we mark the next

Page 41

1          McCullough
2  exhibit.
3         ([McCullough] Exhibit 5, Monroe
4  Mendelsohn Research, Inc. 3/7/08 invoice
5  to Polaroid Corporation, marked for
6  identification, as of this date.)
7     Q.  Have we have put in front of you as
8  Exhibit 5 Invoice No. 5431?
9     A.  Yes.
10     Q.  And this is also dated March 7,
11  2008?
12     A.  Okay.
13     Q.  And this is for the additional
14  printer survey?
15     A.  Yes.
16     Q.  How did it come about that you were
17  asked to do an additional printer survey?
18     A.  Ms. Holohan called me up and said
19  that I could -- asked me if I could do an
20  additional printer survey with a printer that
21  was a less expensive product, and I said yes,
22  of course.
23     Q.  So now, to try to clarify some of
24  these things, let me ask to mark a copy of
25  your report.

11 (Pages 38 to 41)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 42

```
1          McCullough
2      ([McCullough] Exhibit 6, Walter
3   McCullough March 2008 expert report,
4   marked for identification, as of this
5   date.)
6      MS. KINGSBURY:  This is 6; is that
7   right?
8      THE WITNESS:  Yes.
9      MR. BUCHANAN:  Yes.
10     Q.  Do you recognize as Exhibit 6 a
11  copy of your report?
12     A.  Yes, I do.
13     Q.  Is this the report that you've been
14  referring to?
15     A.  That's correct.
16     Q.  And your signature appears at the
17  end of the report section about eight pages
18  in?
19     A.  That's correct.  That's correct,
20  yes.
21     Q.  And when I turn to Exhibit C I see
22  that one printer you asked about was the
23  Photosmart C6180 listed with a price of
24  $299.99; is that right?
25     A.  Let me find it.  (Perusing
```

Page 43

```
1          McCullough
2   document).
3      Q.  You just passed it I think.
4      A.  Yes.  Yes, that was the first one I
5   tested.
6      Q.  And so the initial survey was about
7   this printer?
8      A.  That's correct.
9      Q.  And then if you turn to the next
10  page, the next page shows the HP Officejet
11  5610 with a price after rebate of $99.99.  Is
12  that the second printer that you tested?
13     A.  That's correct.
14     Q.  So that was tested in the
15  additional survey that we've referred to on
16  the Exhibit 5 invoice?
17     A.  That's correct.
18     Q.  Your initial round of surveys
19  tested an HP Photosmart C6180 and also at the
20  same time you were conducting a test on the
21  cameras; is that right?
22     A.  One particular camera.
23     MS. KINGSBURY:  (Sneezing.)
24     THE WITNESS:  Bless you.
25     MR. BUCHANAN:  Bless you.
```

Page 44

```
1          McCullough
2      MS. KINGSBURY:  Thank you.
3      Q.  When you spoke with Ms. Holohan
4   about the results, did you make any
5   comparison between the results for the
6   Photosmart printer and the results for the
7   camera?
8      A.  No.
9      Q.  Did you yourself compare the
10  results for the Photosmart printer and the
11  results for the camera?
12     A.  No.  I did them in two separate
13  surveys.
14     Q.  Did the survey for the camera have
15  a similar design to the survey for the
16  Photosmart printer?
17     A.  Yes.
18     Q.  Was the survey for the camera
19  designed to be carried out in the malls in a
20  manner similar to the survey for the
21  Photosmart printer?
22     A.  Yes, it was.
23     Q.  Now, when we go on to the survey
24  for the Officejet 5610, the less expensive
25  printer, was that designed to be carried out
```

Page 45

```
1          McCullough
2   in a similar manner to the survey for the
3   Photosmart C6180, the more expensive printer?
4      A.  Yes.
5      Q.  And were the questions for the less
6   expensive printer designed to be similar to
7   the questions for the more expensive printer?
8      A.  They were virtually identical.
9      Q.  Did you compare -- in your report,
10  did you compare the results for the
11  Photosmart C6180 and the results for the
12  Officejet 5610?
13     A.  I didn't really compare the
14  results.  I reported them independently.
15     Q.  But you reported both of those
16  results in the report that you have in front
17  of you as Exhibit 6.
18     A.  Right.
19     They're both in the same report,
20  but I really didn't draw a comparison between
21  the two of them.
22     Q.  When you were conducting the
23  initial printer survey on the Officejet 5610
24  did your interviewers also at that time ask
25  people questions about the Photosmart C6180?
```

12  (Pages 42 to 45)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 46

1           McCullough
2       A.  No.  It was completely separate, at
3   a later point in time.
4       Q.  So first you did the questions
5   about the C6180 and later you did questions
6   about the 5610.
7       A.  Correct.
8       Q.  Is that stated in your report?
9       A.  Well, it's -- I'm not sure it's in
10  the actual dates.  Let me go back.  (Perusing
11  document)  Well, the field dates are in the --
12  the Supervisor Instructions or the Interview
13  Instructions (inaudible) by the supervisors.
14      Q.  I think you might need to enunciate
15  a little bit more --
16      A.  I'm sorry.
17      Q.  -- for the court reporter.
18      A.  I'm sorry.
19          Let me take a look at the
20  Supervisor Instructions, which are in
21  Exhibit D (ph.) --
22          THE COURT REPORTER:  D as in dog,
23  sir?
24          (Discussion off the record.)
25      A.  -- B as in bravo.  It talks about

Page 47

1           McCullough
2   the field dates January -- this is on the
3   initial printer study -- between January 24th
4   and January 27th was the initial phase of
5   that.
6       Q.  Are you reading from --
7       A.  From page three.
8       Q.  -- Exhibit B, at page numbered
9   three?
10      A.  Yeah, where it says "4450P" at the
11  top.
12      Q.  What does 4450P stand for?
13      A.  Our job number 4450 is just a
14  number that we assign sequentially for jobs,
15  and the P means printer.
16      Q.  And so did the same job number 4450
17  apply for all of the work that you've
18  described so far today?
19      A.  4450 represents the work -- the
20  survey for the first printer.  4462
21  represents -- which is another job number, is
22  the work done for the second printer.
23      Q.  So now I see that on the first
24  invoice dated February 1 we have a reference
25  to "MMR Project No. 4450."

Page 48

1           McCullough
2       A.  Right.
3       Q.  And that -- that is the job number
4   for the Adaptive Lighting Technology Consumer
5   Value Survey which had a printer component
6   and a camera component; is that correct?
7       A.  Correct.
8       Q.  And then the invoice dated March 7
9   for the additional printer survey has a new
10  job number, MMR Project No. 4462; is that
11  right?
12      A.  That's correct.
13      Q.  So your report has described the
14  printer results from job number 4450 and has
15  described the printer results from job number
16  4462; is that right?
17      A.  Correct.
18      Q.  And then is there -- so now if I
19  continue in Exhibit B, I see further
20  Supervisor Instructions with the heading at
21  the top "MMR #4462"?
22      A.  Yes.
23      Q.  And that refers to the additional
24  printer survey?
25      A.  That's correct.

Page 49

1           McCullough
2       Q.  And page three tells me that the
3   dates of that are from February 14th to
4   February 18, 2008?
5       A.  Yes.
6           Now, that is the -- we -- that's
7   the dates of the initial phase of
8   interviewing.  What traditionally is done in
9   my work is usually one weekend we do the
10  initial phase, then we look at the results,
11  and if we continue on the study, the balance
12  is done the following weekend.  So the dates
13  that are here for 4450, which is the initial
14  printer, are -- is January 24th through 27th,
15  that would represent the initial phase.  The
16  following weekend would be the remainder
17  phase.  For the second printer survey the
18  initial phase would be done February 14th
19  through February 18th, and then the following
20  weekend would be the remainder phase for the
21  remaining printer survey.
22      Q.  So now let me go back to the
23  January phase so I make sure I understand
24  this.
25      A.  Sure.

13  (Pages 46 to 49)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 50

McCullough

1           McCullough
2       Q.   An initial phase of interviews was
3    done January 24th through January 28th.
4       A.   27th, actually.
5       Q.   I'm sorry.
6           And those interviews were done both
7    on the Photosmart C6180 and on the camera?
8       A.   Correct.
9       Q.   Was there, for that job 4450, a
10   subsequent round of interviews the following
11   weekend?
12      A.   Yes.
13      Q.   And did those interviews proceed
14   both for the Photosmart printer and for the
15   cameras?
16      A.   Yes.
17      Q.   And were results reported to you
18   for both weekends in January or, I'm sorry,
19   both sets of dates in January, both for the
20   Photosmart printer and for the cameras?
21      A.   Well, the -- the January was the
22   first phase, and that would have gone into
23   February, because we ran out of days in the
24   month.
25      Q.   Thank you for that.

Page 51

1           McCullough
2       A.   (Laughing).
3       Q.   Thank you for that correction.
4           But --
5       A.   Yeah --
6       Q.   -- so --
7       A.   -- the following weekend after that
8    would have been the second remainder phase,
9    and that would have completed the interviews
10   both for the initial printer survey and the
11   initial camera survey.
12      Q.   And you've seen the results from
13   all of those.
14      A.   I've seen the results from the --
15   I've seen the questionnaires from all of
16   them.  I don't know if we even tabulated the
17   final results for the camera or not, since
18   I'm not sure when they came out of the
19   picture, so I may not have tabulated the
20   results for those.
21      Q.   Was there a third round of
22   interviews for the Photosmart C6180?
23      A.   No.  No.
24      Q.   Was there a third round of
25   interviews for the cameras?

Page 52

1           McCullough
2       A.   No.
3       Q.   Why was there a first one round and
4    then a second round?
5       A.   Yeah, I was trying to explain it
6    before, but I guess I didn't do a good job of
7    it.
8           In all my surveys I do for
9    litigation purposes, I try to -- I break them
10   into two pieces, mostly from a monetary point
11   of view, where roughly half the interviews
12   are done, and if it's a mall, they're usually
13   done over a long weekend, and then I'm able
14   to look at the results by the middle of that
15   week after I get them back from the field and
16   give the clients some directions as to what
17   the results are likely to show just by my
18   just looking at the questionnaires.  If the
19   results are helpful to the client, then they
20   continue or we continue and do the second
21   phase.  If not, we don't spend a lot of money
22   doing something they can't use.  And I do
23   that in all cases where I have the time to do
24   it.
25      Q.   Did you -- after you saw the first

Page 53

1           McCullough
2    round of results from the January 18 -- from
3    the first round in January --
4       A.   Okay.
5       Q.   -- did you have such a conversation
6    with the law firm, where you reported what
7    you were seeing so far?
8       A.   Yes.
9       Q.   What were you seeing at that point?
10      A.   I was reporting on the types of
11   levels that I was getting to the open-ended
12   question particularly, and giving them an --
13   an idea of what the results were.
14      Q.   And do you recall what they were,
15   what you had seen at that time?
16      A.   I don't recall what they were, but
17   they were such that the client told me to
18   continue.
19      Q.   So continued at that point for the
20   Photosmart printer and also continued at that
21   point for the cameras?
22      A.   Yes.
23      Q.   Was it one camera that was tested,
24   or more than one?
25      A.   It was just one camera.

14  (Pages 50 to 53)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 54

McCullough

1
2     Q.  Do you remember the name of the
3  camera?
4     A.  No.  I can barely remember these
5  names.  I don't remember the name, no.
6     Q.  It was an HP camera, I take it?
7     A.  Yes, it was an HP camera.
8        MR. BUCHANAN:  Let me ask to mark
9     the next exhibit.
10       ([McCullough] Exhibit 7, invoice to
11    Polaroid, marked for identification, as
12    of this date.)
13    Q.  Do you recognize Exhibit 7 as a
14 further invoice from your firm to Polaroid
15 with a copy to Kirkland & Ellis?
16    A.  Yes.
17    Q.  And this one covers both job
18 numbers 4450 and 4462?
19    A.  Yes.
20    Q.  And is this the most recent invoice
21 that you have submitted to date?
22    A.  Yes.
23    Q.  I assume there will be another
24 invoice after the deposition, but this is as
25 you've gotten so far?

Page 55

McCullough

1
2     A.  Correct.
3     Q.  What is the work reflected in this
4  invoice?
5     A.  I don't know the exact nature of
6  it, but obviously I spent some time with
7  counsel after -- after the report is
8  completed I bill for my time at $600 an hour
9  and other time appropriately.  It probably --
10 some of this probably is related to the
11 production.  That's probably what it is,
12 thinking back on it, production and
13 conversation with counsel, because I have
14 clerical staff here, and they are probably,
15 just you know, making copies of the
16 questionnaire, and then I see there's
17 photocopies and shipping down there.  So this
18 is basically the cost that relates to
19 production but possibly some conversations I
20 had with counsel about some issues.
21    Q.  And do you recall who, which
22 counsel you spoke with?
23    A.  It's probably Maria Meginnes,
24 because I think Courtney Holohan was still in
25 trial at this time.  So I think it was her,

Page 56

McCullough

1
2  but I'm not sure.  I don't remember the
3  details of the conversations.
4     Q.  And there's a reflection for time
5  of senior project staff.  Who was that?
6     A.  Probably at that point it was
7  Jackie Cummings, who is -- used to be the
8  person that was my project director working
9  on projects with me on these types of
10 projects.
11    Q.  And I see that the "Re" line of
12 this invoice is "Printer and camera surveys."
13 Was the work that is reflected in this
14 invoice involve both printers and cameras?
15    A.  Where do you see "printers and
16 cameras"?
17    Q.  Underneath the address --
18    A.  Oh.
19    Q.  -- above the line.
20    A.  Now, the reason for that is the
21 carry-over from the last bill, which is -- I
22 used the last invoice as a model, and just
23 never changed it.  It could have been just
24 printer surveys.  I just carried over the --
25 the title from the previous invoices.  I

Page 57

McCullough

1
2  probably should have just said printer
3  surveys, because at that time camera survey
4  was not an issue.
5     Q.  So is it your testimony that the
6  work reflected on the March 31 invoice
7  involves only printers and not cameras?
8     A.  No.
9        MR. BUCHANAN:  So I suggest we take
10    a break.  It's been about an hour.
11       THE VIDEOGRAPHER:  Going off the
12    record.  The time is 10:01 a.m.  This is
13    the end of tape one.
14       (Recess taken.)
15       THE VIDEOGRAPHER:  We are back on
16    the record.  The time is 10:23 a.m.
17    This is the beginning of tape two.
18    Q.  Mr. McCullough, how many surveys
19 roughly have you done in your career?
20    A.  Thousands.
21    Q.  And how many for litigation have
22 you done roughly?
23    A.  Hundreds.
24    Q.  How many times have you testified
25 in court?

15 (Pages 54 to 57)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 58

McCullough
1
2      A.  I'd be really guessing at this, but
3  probably 30, 40 times maybe?
4      Q.   And how many depositions would you
5  guess?
6      A.   Maybe twice that number.
7      Q.   Your report tells us, does it, the
8  instances where you have provided testimony
9  during the last four years?
10     A.   That's correct.
11     Q.   And that's at the very end of your
12  report?
13     A.   That's correct.
14     Q.   Do you know how it came about that
15  Kirkland & Ellis contacted you?
16         Had you worked with them before?
17     A.   I'd worked with a Mr. Paul Garcia
18  previously, and that may be how they found
19  out about it.
20     Q.   Who is Paul Garcia?
21     A.   He's an attorney from Kirkland &
22  Ellis.
23     Q.   Which city?
24     A.   Chicago.
25     Q.   How did you get into the business

Page 59

McCullough
1
2  of doing surveys?
3      A.   About 20, 20, 25 years ago an
4  attorney asked me if I would critique a
5  survey that was done by another expert, and I
6  agreed to do that, and the judge relied upon
7  my decision and mentioned me several times or
8  relied upon my testimony, and relied upon
9  that in his decision, and he said "Ed
10  McCullough said," and he went on and
11  mentioned something Ed McCullough said, and
12  all of a sudden the phone started ringing.
13     Q.   What was the name of that case?
14     A.   It was a case that involved Advil
15  and -- and Motrin I believe.
16     Q.   And what court was it in?
17     A.   Southern District of New York.
18     Q.   How long ago?
19     A.   Oh, 20 to 25 years ago.
20         I think I was -- the law firm I was
21  working with at that point was (inaudible) --
22         (Noise interruption.)
23     A.   -- from Washington --
24         THE COURT REPORTER:  I couldn't
25  hear you.

Page 60

McCullough
1
2         THE WITNESS:  Arnold & Porter, I'm
3  sorry.
4      A.   -- Arnold & Porter from Washington,
5  law firm, and it had something to do -- I
6  think it was a false advertising case.
7      Q.   Was there a reported decision in
8  that case; do you know?
9      A.   Yes.  That's how the lawyers
10  started calling me, I think, from the
11  decision.
12     Q.   And was there a Court of Appeals
13  decision in that case; do you know?
14     A.   I don't know.
15     Q.   You went to -- you had an
16  undergraduate degree, yes?
17     A.   Yes.
18     Q.   And where and when?
19     A.   1963, Lafayette College, in
20  psychology.
21     Q.   And any further degrees after that?
22     A.   Yes.  I have an MBA with a market
23  research specialization from Baruch that I
24  obtained I think it was '77 or something like
25  that.

Page 61

McCullough
1
2      Q.   Any further degrees?
3      A.   No.
4      Q.   Have you done teaching in an
5  academic setting?
6      A.   Not on a regular basis, no.
7      Q.   On an occasional basis?
8      A.   I have occasionally gone to a law
9  school class for -- to talk to the students
10  on a just a one-time basis here and there.
11     Q.   Have you written articles in
12  academic journals?
13     A.   No.
14     Q.   Your report, on the very last page
15  lists three papers that you've provided, that
16  you've given --
17         MR. BUCHANAN:  Strike that.
18     Q.   Are these the papers -- is this a
19  full listing of the papers that you've
20  authored over the last ten years?
21     A.   That's correct.
22     Q.   And those were about ways to
23  increase survey response rates in mail
24  surveys?
25     A.   That's correct.

16  (Pages 58 to 61)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 62

1        McCullough
2      Q.  So those are about surveys
3   conducted through the mail?
4      A.  Yes.
5      Q.  Hard copy, snail mail?
6      A.  Yeah, as they call it.  Yes, snail
7   mail.
8      Q.  By the way, what counts as a
9   response rate in a mail survey?
10       Do you literally compare how many
11  were mailed out versus how many were mailed
12  back?
13     A.  It depends exactly what you're
14  doing.  It's -- theoretically it's how many
15  completions you get based on how many people
16  who would have qualified for the interview.
17     Q.  And how do you know how many would
18  have qualified?
19     A.  You have to -- it's -- it depends.
20  It varies from situation to situation.  I'd
21  have to try to figure it out based on how
22  many people that return, let's say, a
23  questionnaire were qualified versus how many
24  weren't, and you extrapolate that to the full
25  population, assuming the rates would stay the

Page 63

1        McCullough
2   same.
3        For instance, we do a very
4   substantial affluent survey, and we target
5   people who are supposed to have a hundred
6   thousand plus incomes, and we know how many
7   we get back from people.  We don't tell them
8   that they can only respond if (inaudible) --
9       THE COURT REPORTER:  I couldn't
10  understand you.
11     A.  (Continuing) We ask their income,
12  but therefore the -- we look at what
13  percentage we get back actually turn out to
14  be a hundred thousand plus, and then we
15  quickly -- we make the projection or the
16  assumption that that would have been the case
17  in the general -- in the people who didn't
18  respond, so --
19      THE COURT REPORTER:  "Who didn't
20  respond"?
21      THE WITNESS:  Who didn't respond.
22  I'll try to be clearer.  I'm sorry.
23     Q.  What's the purpose of the affluent
24  study?
25     A.  Well, the affluent study had many

Page 64

1        McCullough
2   purposes, but the main purpose is it's an
3   audience measurement survey for -- primarily
4   for magazines and also for cable stations.
5   It's used as a tool for advertising agencies
6   and for -- for media companies to determine
7   audience levels.
8      Q.  Have you ever heard of an
9   organization called CASRO?
10     A.  Sure.
11     Q.  What is it?
12     A.  The CASRO we call it.  That's the
13  initials,  yes.
14     Q.  And what is that organization?
15     A.  It's a trade association of people
16  in the marketing research business.
17     Q.  Are you a member of that?
18     A.  Yes, we are.
19     Q.  When you say "we," what do you
20  mean, we?
21     A.  The company.  It's a company
22  membership.  It's not individual membership.
23     Q.  Are you a member of any other
24  professional associations?
25     A.  Yes.  American Marketing

Page 65

1        McCullough
2   Association, American Statistical
3   Association, the American Association of
4   Public Opinion Research, a company called
5   APOR.  The company's a member of The
6   Advertising Research Foundation.  There's
7   another organization that's in the field
8   called -- C-M-O-R; we call it CMOR, and
9   that's another organization that's somewhat
10  similar to CASRO in terms of -- of research
11  quality issues and response rates.
12     Q.  What is the name of your company?
13     A.  It's interesting you ask that.
14       Up until the 17th of April the
15  company was Monroe Mendelsohn Research.  On
16  April 17th I sold my firm to a company called
17  IPSOS, I-P-S-O-S, so our new name either is
18  or will be IPSOS Mendelsohn.  They're in the
19  process of going through the name change
20  situation right now.
21     Q.  You were the -- before April 17 you
22  were the president of Monroe Mendelsohn
23  Research, Inc.?
24     A.  President, CEO and owner.
25     Q.  How did you come to be the

17 (Pages 62 to 65)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 66

1          McCullough
2    president, CEO and owner of a company with
3    the name Monroe Mendelsohn --
4        A.   Good question.
5        Q.   -- Research, Inc.?
6        A.   A gentleman named Monroe
7    Mendelsohn, first name Monroe, second name
8    Mendelsohn, hired me in 1968 to work for him
9    as a project director, and after taking
10   various promotions in the company I then
11   bought the firm from him in 1978.  I became
12   President in '77 under his ownership, and
13   then bought the firm then in 1978, so I've
14   owned the company for the last 30 years.
15       Q.   What is IPSOS?
16       A.   IPSOS is a large international
17   research organization that's headquartered in
18   Paris, listed on the Paris stock exchange.
19   It's a large company owning a lot of
20   different research companies.
21       Q.   How did it come about that you sold
22   your company to IPSOS on April 17th?
23       A.   Well, it's a long story, but to
24   make the short part of the story is a
25   gentleman who knew of the type of work we did

Page 67

1          McCullough
2    and knew of our reputation, and he's been
3    quoting me for about seven years now, and
4    there were several other firms that were
5    interested in buying the firm, but they --
6    this company, seemed to have the most need
7    for a company with our type of expertise and
8    background and type of products, so after
9    discussions with both him and the so-called
10   runner-up, I determined that this
11   company was probably the best company to sell
12   the company to.
13       Q.   What was the runner up?
14       A.   A company called Kantar.
15       Q.   How do you spell that?
16       A.   K-a-n-t-a-r.  They're a division of
17   WPP, which is a humongous international firm
18   as well.
19       Q.   And effective April 17 what is your
20   position at -- I forget the name.
21       A.   IPSOS Mendelsohn.  Right.
22            I'm still President and CEO.
23       Q.   And you're continuing to be active
24   in the case -- or in the company?
25       A.   Yes.

Page 68

1          McCullough
2        Q.   In the course of your discussions
3    with IPSOS, did you ever happen to mention
4    this particular case?
5        A.   No.
6        Q.   Have there -- in the various times
7    when you have submitted a report in a case
8    have there been times when your testimony has
9    been challenged?
10       A.   Oh, I think my testimony is always
11   challenged.
12       Q.   And have there been times when the
13   court has determined that your report should
14   be stricken, or that you should be
15   disqualified from testifying?
16       A.   I don't recall any case where it's
17   been stricken or disqualified.  There are
18   cases where the court has not relied upon my
19   decisions, or my report rather, but I don't
20   think I've ever been stricken or
21   disqualified.
22       Q.   What cases come to mind where the
23   court expressed that it did not rely on your
24   testimony?
25       A.   There was a case, a pet food case,

Page 69

1          McCullough
2    that was years ago, which I actually think --
3    I think Dr. Jacoby was on the other side of
4    that case and critiqued my survey, and the
5    court did not rely upon my survey in that
6    case.
7        Q.   Is that the case in Kansas?
8        A.   Yes.
9        Q.   Something like Hills Foods?
10       A.   That's correct.  That's the one.
11            Well, there was another survey that
12   was done in the -- this was interesting.  I
13   was working -- Dr. Jacoby was testifying in a
14   case which was Steak -- Steak 'N Bake?  Steak
15   'N Shake I guess it was -- a Steak 'N Shake
16   case out in the Midwest also, where Dr.
17   Jacoby was actually the lead researcher, and
18   I had done some additional interviewing in a
19   different venue sort of following up on what
20   he had done, and I think the court rejected
21   our -- both my survey, which he was the
22   actual architect of the survey.  I was just
23   the provider of interviews, but I think they
24   didn't rely upon that either.
25            There was another case, a

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 70

1           McCullough
2    pharmaceutical case, regarding ophthalmic
3    products in Jersey where -- a dilution case
4    where the court did not rely upon my
5    testimony in that case to make their
6    decision.
7           There probably was some others, but
8    that's all that comes to mind at this point.
9       Q.   Before you were contacted for this
10   case had you ever heard of adaptive lighting?
11      A.   You'd asked me that before.  I said
12   no.
13      Q.   Do you yourself use a digital
14   camera?
15      A.   I do.
16      Q.   Do you do any -- do you use any
17   editing features?
18      A.   On the camera itself?
19      Q.   Yes.
20      A.   No.
21      Q.   Do you do any photo editing
22   features --
23           MR. BUCHANAN:  Strike that.
24      Q.   Do you sometimes print with a
25   printer?

Page 71

1           McCullough
2       A.   Yes, I do.
3       Q.   And do you sometimes print photos
4    with a printer?
5       A.   Yes, I do.
6       Q.   Have you had occasion to use photo
7    editing features of a printer?
8       A.   Not of a printer.  I've done some
9    photo editing on the computer.
10      Q.   What have you done using what tool?
11      A.   What's it called?  Corel is the
12   name of the program, I believe, and it's
13   Corel -- some kind of photo name, et cetera,
14   but Corel is the company.
15           And I will occasionally do some
16   editing of a photo before I print it.
17      Q.   Do you have an understanding of
18   what the adaptive lighting technology does?
19      A.   Just what I read in this case.
20           MR. BUCHANAN:  Okay.  Let me ask
21   that we mark the next exhibit.
22           ([McCullough] Exhibit 8, website
23   printouts contained in Mr. McCullough's
24   project folder, marked for
25   identification, as of this date.)

Page 72

1           McCullough
2       Q.   Do you recognize Exhibit 8?
3       A.   Yes.
4       Q.   What is Exhibit 8?
5       A.   These are some pages from the
6    websites that I had printed out that were in
7    my folder, that I produced to you because
8    they were in my folder.
9       Q.   And when you say "in my folder,"
10   did you have a folder for this particular
11   project?
12      A.   Yes.
13      Q.   Did you have a single -- do you
14   have a single folder for this case?
15      A.   I have a folder for the project,
16   which is I guess the case.
17      Q.   Do you -- do you have a title on
18   your folder?
19           What do you call it?
20      A.   I don't know exactly what's on it.
21   It's got a job on it is the main thing.  It
22   has some type of description.  It may have
23   "Kirkland & Ellis" written on it.
24      Q.   I'll just call it the project
25   folder for this case.

Page 73

1           McCullough
2       A.   Yeah.  It's my project folder.
3       Q.   When did you print out these
4    materials?  Before designing your survey?
5       A.   Well, there's a date on the bottom,
6    so I must have done it December 20th.
7       Q.   And what did you go -- did you
8    yourself go and look for these materials?
9       A.   These materials I actually looked
10   for.  I also had one of my techie people do
11   some searching at one point in time for
12   cameras and printer material, which basically
13   resulted in finding those, the actual sheets
14   that I used in my survey.
15      Q.   When your sheets (sic), are you
16   referring to the --
17      A.   Exhibit C.
18      Q.   -- two fax sheets we looking at
19   earlier, one with the hundred ninety nine
20   dollar printer and the other with the
21   99-dollar printer?
22      A.   Yes.  To be specific, the ones that
23   are in Exhibit C.
24           So yeah, I had him go through and
25   look for -- actually, he did both looking for

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 74

McCullough

1        McCullough
2   adaptive lighting technology definitions at
3   one point, and also he looked for whether
4   from a list of -- cameras at one point and
5   from a separate list of printers which ones
6   were still being sold, because we had a
7   larger list that we were working from, and
8   some of them were discontinued.
9        Q.  What was the larger list that you
10  were working from?
11       Where did you get that list?
12       A.  I think Ms. Holohan gave it to me.
13       Q.  And to your understanding, what was
14  that list?
15       A.  I think it was a list of all the
16  printers, specifically I think a list of the
17  printers that were involved in this case.  I
18  think it was.  I'm not a hundred percent
19  sure.  I think it was.
20       Q.  Do you remember, what was the form
21  of the list?
22       Was this an interrogatory answer or
23  was it --
24       A.  Just a --
25       Q.  -- a document?

Page 75

1        McCullough
2        A.  It was just a -- a -- a listing of
3   all these different models.  I didn't -- I
4   didn't have any writing on it, except it was
5   a list of a bunch of printers and in the
6   camera case it was a bunch of cameras.
7        Q.  And do you have that list in your
8   folder now?
9        A.  Anything I have I produced to you,
10  for the printers.  For the camera one, I
11  probably -- I probably have that list at some
12  point in a folder, in a camera folder.
13       Q.  Do you have one folder for printers
14  and another printers for cameras, or do you
15  have a single folder?
16       A.  Actually, I moved over -- I had one
17  folder at one point, but then when the
18  printer -- when the cameras came out of the
19  case I kind of moved all of my printer stuff
20  into the new folder.  So it's -- the new job
21  name came of 4462, so I had pretty much moved
22  all the -- all the printer stuff from 4462
23  just to keep it separate from the camera
24  stuff, which was in the old folder.
25       Q.  So you now have two folders related

Page 76

1        McCullough
2   to your work in this case.
3        A.  Right.
4        Q.  So let me ask you -- let me direct
5   your attention back to Exhibit number 8, and
6   let me ask you to turn to the -- one, two --
7   fifth page of this, with the Bates number at
8   the bottom 7539349.
9        A.  Okay.
10       Q.  Do you see the statement "HP
11  adaptive lighting is built into the camera.
12  All you need to do is turn it on"?
13       A.  I do see that.
14       Q.  Do you have an understanding, where
15  does one find adaptive lighting technology in
16  HP products?
17       A.  I'm not sure I understand your
18  question.
19       Q.  What is your understanding of what
20  is adaptive lighting, and -- and where is it?
21       A.  Well, it's a software feature
22  that's implicit, that's in the camera or --
23  or in the -- in the printer.
24       Q.  Do you have any further
25  understanding about it?

Page 77

1        McCullough
2        A.  No.
3        Q.  Do you have any understanding about
4   how often is it used?
5        A.  I would not know that.
6        Q.  Do you have any understanding of
7   the --
8        MR. BUCHANAN:  Strike that.
9        Q.  Was there anything in particular
10  about this Exhibit 8 that was of significance
11  to you as you were preparing your work?
12       A.  I don't recall exactly how these
13  particular pages entered into it.  I think
14  it's just I printed out a bunch of these at
15  one point in time, and I stuck them in my
16  folder, and therefore I produced them.  I
17  don't think they have any specific
18  significance.
19       MR. BUCHANAN:  Can we mark the next
20  exhibit?
21       ([McCullough] Exhibit 9, printouts
22  from Internet, marked for
23  identification, as of this date.)
24       THE WITNESS:  Thank you.
25       Q.  Do you recognize Exhibit 9?

20  (Pages 74 to 77)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 78

```
1           McCullough
2       THE VIDEOGRAPHER:  Mr. Buchanan
3   (indicating)?
4       MR. BUCHANAN:  (Donning mic).
5       A.  I'm not sure why these are
6   separated from the others, but these look
7   like two more pieces of papers that I guess,
8   since they have the same date on it, I must
9   have had them in my folder as well but are
10  separated from these others.  I don't know
11  why they're separated.
12      Q.  Do you remember anything of
13  particular significance in this one that --
14  that you considered in doing your work?
15      A.  I don't recall anything specific
16  about this particular one, no.
17      Q.  Have you yourself ever used the red
18  eye function of photo editing?
19      A.  I've used it in my Corel computer
20  corrections.  That's the only time I
21  personally have used it.
22      Q.  Have you done -- in your own use of
23  the Corel function, is there any other
24  editing that you've done besides red eye?
25      A.  I've done cropping of the photo.  I
```

Page 79

```
1           McCullough
2   may have done some enlargements at times.
3   It's possible.
4       Q.  Does your Corel product have a tool
5   that allows you to enhance contrast or lighting?
6       A.  Yeah.
7           I've also done that.  I've made --
8   I've changed contrast and brightness on some
9   pictures occasionally.
10      Q.  Do you understand whether the Corel
11  product has a feature comparable to the
12  adaptive lighting, as you understand it?
13      A.  I don't understand enough about the
14  software to be able to say it's the same
15  technology.
16      Q.  From the user point of view, does
17  your Corel photo tool have a function that
18  allows you to do what you understand a user
19  can do with adaptive lighting?
20      A.  My assumption would be -- again,
21  just acting as a layperson now, is that the
22  function I use on Corel is much more user
23  oriented, and my assumption is that the
24  other, the feature of the adaptive lighting,
25  is much more automatic in terms of the --
```

Page 80

```
1           McCullough
2   both the cameras and printers that have
3   adaptive technology in them.
4       Q.  What do you mean, that the Corel
5   tool is more user oriented?
6       A.  Well, I have to actually physically
7   make the decisions as to how much I want to
8   lighten, how much I want to contrast, how
9   much I want to -- what I want to do with the
10  red eye, how much I want to crop.  It's very
11  -- it's very oriented to me making all the
12  decisions.  There's no automatic -- automatic
13  process.  I have to decide on everything.
14      Q.  Do you have an understanding as to
15  whether the adaptive lighting feature of the
16  HP products operates automatically?
17      A.  That's my assumption.
18      Q.  So can I ask you to look at
19  Exhibit 8 again?  Can you look to that same
20  page we were looking at, Bates number
21  7539349?
22      A.  Okay.
23      Q.  Do you see it says "HP adaptive
24  lighting is built into the camera.  All you
25  need to do is turn it on"?
```

Page 81

```
1           McCullough
2       A.  Okay.
3       Q.  Do you have an understanding
4   whether adaptive lighting runs automatically
5   or whether the user has to turn it on?
6       A.  Well, based on this, obviously it
7   seems you have to turn it on, but I would
8   guess also once you turn it on, you can leave
9   it on.
10      Q.  And do you have an understanding
11  when -- as to when adaptive lighting is
12  provided in the HP printers, whether it's
13  automatic or whether the customer has to turn
14  it on?
15      A.  I don't know.
16      MR. BUCHANAN:  Can we mark this one
17  next, please?
18      ([McCullough] Exhibit 10, printout
19  from Internet, marked for
20  identification, as of this date.)
21      Q.  Is Exhibit 10 another page from
22  your folder?
23      A.  Yes.
24      Q.  Do you believe that you or someone
25  in your office printed this out as well?
```

21 (Pages 78 to 81)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

Walter McCullough

Page 82

McCullough

1          McCullough
2      A.  Yes.
3      Q.  The camera glossary here says
4  "Adaptive lighting technology, an HP Real
5  Life technology that automatically," so and
6  so.  Do you have an understanding what is the
7  relationship between the title Real Life
8  technology and the title adaptive lighting
9  technology?
10     A.  No.
11         MR. BUCHANAN:  Can we mark the next
12     one, please?
13         ([McCullough] Exhibit 11, printout
14     from Internet, marked for
15     identification, as of this date.)
16         THE WITNESS:  Thank you.
17     Q.  Is Exhibit 11 also a page from your
18  folder?
19     A.  If you're producing it to me and I
20  produced it to you, it must be, but I don't
21  -- just looking at it, I can't recall, but it
22  probably is.
23     Q.  But there's a Bates number POL,
24  which indicates to me that it was produced
25  (speaking simultaneously) --

Page 83

1          McCullough
2      A.  I'm not -- I'm not doubting it.  I
3  just don't recall it.
4      Q.  This description here appears to
5  refer to cameras.  First paragraph, second
6  line, "some HP cameras," second paragraph
7  (inaudible) --
8          (Discussion off the record.)
9      Q.  -- "Select HP R series digital
10  cameras."  Would you agree with me that this
11  page describes cameras, not printers?
12     A.  It does reference printers in the
13  second paragraph, yes.
14         (Reading) Yes.  I'd say yes.
15         MR. BUCHANAN:  One more, please.
16         ([McCullough] Exhibit 12, HP
17     website printout from Mr. McCullough
18     project folder, marked for
19     identification, as of this date.)
20     Q.  Is this also a page from your
21  folder printed out on December 20th, 2007?
22         MS. KINGSBURY:  I just want to say
23     there are two pages to this exhibit.
24     A.  Since it has a date on it with my
25  Bates number, obviously this is one I must

Page 84

1          McCullough
2  have produced to you.
3      Q.  Now, I see some handwriting on the
4  bottom left, and I don't know who wrote it
5  there.  It looks like it says "see
6  attachment."  Is that your handwriting?
7      A.  No.  I would assume that's the
8  person -- my tech person, who must have
9  printed this out.
10     Q.  And on that assumption, what do you
11  understand is the attachment referred to?
12     A.  It might just be this second page
13  that's there?
14         MR. BUCHANAN:  Let me mark one
15     more.
16         ([McCullough] Exhibit 13, printout
17     from HP website, marked for
18     identification, as of this date.)
19     Q.  I don't know whether Exhibit 13 is
20  from your folder or not.
21         Do you recognize Exhibit 13?
22     A.  (Perusing document) There's so many
23  things on adaptive lighting technology, I
24  don't -- it very well could be from my
25  folder, but I don't -- I don't -- I don't

Page 85

1          McCullough
2  recognize it per se, but it could be.
3      Q.  Do you see the first question,
4  "What is HP Adaptive Lighting Technology"?
5      A.  Yes.
6      Q.  And do you see the first sentence,
7  "HP adaptive-lighting-technology is a
8  breakthrough technology that permits digital
9  cameras," and so forth?
10     A.  Um-hm.
11     Q.  Have you seen that phrase,
12  "breakthrough technology," in any of the
13  other materials we've looked as so far this
14  morning?
15     A.  I can't say I have, but I really
16  haven't seen the materials you showed me
17  previously.
18     Q.  Do you recall seeing that word
19  breakthrough or the phrase breakthrough
20  technology in any of the other materials that
21  you looked at in the course of designing your
22  survey?
23     A.  I may very well have, but I don't
24  remember this at this point, sitting here.
25     Q.  Let me ask you to turn to the

22  (Pages 82 to 85)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 86

1         McCullough
2  second page, and do you see the question,
3  second question down, "Did HP invent this
4  technology"?
5      A.  Okay.
6      Q.  Let me direct your attention to the
7  second paragraph there.  "The first digital
8  HP Adaptive Lighting Technology algorithm was
9  described in a 1983 patent issued to Polaroid
10 Corporation," open quote, "RETINEX," close
11 quote.  "This patent has since expired."
12        Do you have an understanding as to
13 what is the technology basis of the adaptive
14 lighting feature that you were testing in
15 your survey?
16     A.  No.
17     Q.  Do you have any understanding one
18 way or another about what RETINEX is?
19     A.  I do not.
20     Q.  Do you have any understanding one
21 way or another about the particular patent
22 that is asserted by Polaroid in this case?
23     A.  I do not.
24     Q.  Do you have any other understanding
25 about what's the technology or technologies

Page 87

1         McCullough
2  contained in the adaptive lighting products
3  of HP?
4      A.  I do not.
5      Q.  What was the question that you set
6  out to address in the initial design of your
7  surveys in this case?
8      A.  The -- the value that consumers
9  would -- would put on the adaptive lighting
10 technology features.
11     Q.  And who -- who did -- who designed
12 this specific question that you -- that you
13 asked?
14     A.  I did.
15     Q.  And what is the specific question
16 that you sought to address?
17     A.  If I'm going to be specific, I
18 should probably read it.
19     Q.  Please.
20     A.  I'll go to my Exhibit 6.  In
21 Exhibit A -- I'm going to the main
22 questionnaire.
23        Well, there's a preamble to this.
24 You want me to read the preamble, or just the
25 actual question?

Page 88

1         McCullough
2      Q.  Well, actually, I -- I'm not sure.
3         Let me try to be more clear in my
4  question?
5      A.  Okay.
6      Q.  What is the precise statement of
7  objective that you were trying to accomplish
8  in your survey?
9         What's the analytic question that
10 you were seeking to address?
11        Is it stated in the report section
12 of your report?
13     A.  Well, it's part of the conclusions.
14     Q.  Please show me where.
15     A.  Here.  (Perusing document) Well,
16 actually, probably it's -- it's better stated
17 in the background section, that --
18     Q.  What page, please?
19     A.  Page four.  I'm sorry.
20        "Monroe Mendelsohn Research, MMR,
21 was asked by attorneys at Kirkland & Ellis,
22 counsel to Polaroid, to design and conduct
23 research to determine consumers's perceived
24 value of Hewlett-Packard Adaptive Lighting
25 Technology feature, used in printers."

Page 89

1         McCullough
2      Q.  And who put that question?  Did you
3  put the question, or did Kirkland & Ellis put
4  the question?
5      A.  "Put the question"?  I'm not sure
6  that word meaning, put --
7      Q.  Who -- were you asked by Kirkland &
8  Ellis to determine what is stated here?
9      A.  I was asked by them to -- yes.
10 That's what I'm -- that's what I'm stating
11 here; they asked me to determine that.
12     Q.  And what do you mean by "consumers'
13 perceived value of the feature"?
14     A.  How much they think that is worth
15 in terms of the price to them.
16     Q.  And what do you mean by "the
17 feature used in printers"?
18     A.  Well, that's just -- just -- just
19 determining -- that's just explaining the
20 fact that it's -- it's a feature that is used
21 in printers, and that's the mechanism on
22 which I am doing the interview.
23     Q.  Is it -- in order to determine
24 perceived value, is it of interest to
25 determine how often consumers who have the

23  (Pages 86 to 89)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

## Walter McCullough

Page 90

| | McCullough |
|---|---|
| 1 | McCullough |
| 2 | printers use that feature? |
| 3 | A.  I don't think that's a necessary |
| 4 | component.  That's an additional piece of |
| 5 | information. |
| 6 | Q.  Is it -- in determining consumers' |
| 7 | perceived value of the feature, is it of |
| 8 | interest to try and project how often they |
| 9 | think they will use it? |
| 10 | A.  Again, that's something that they |
| 11 | would take into consideration potentially |
| 12 | when they're giving answers to the questions. |
| 13 | That's not something that I would seek to |
| 14 | find out separately. |
| 15 | Q.  Are you aware of any sorts of |
| 16 | information of how often owners of HP |
| 17 | printers actually do use this feature? |
| 18 | A.  I'm not. |
| 19 | Q.  Are you aware of any -- |
| 20 | MR. BUCHANAN:  Strike that. |
| 21 | Q.  Did you consider conducting a |
| 22 | survey of people who actually owned them? |
| 23 | A.  No. |
| 24 | Q.  Are you aware of any information on |
| 25 | as to whether those who own the printers and |

Page 91

1      McCullough
2  use this feature are caused to print photos
3  more often than they would have absent the
4  feature?
5      A.  I'm not aware of that either way.
6      Q.  And are you aware of any source of
7  information on that subject?
8      A.  No, I'm not.
9      Q.  If we asked you to think about it,
10 can you design a survey to study that
11 question?
12     A.  The question of -- once again?
13 Would you repeat it?
14     Q.  Can we read it back, and see how
15 well did I frame the question.
16     A.  Good test.
17     (Discussion off the record.)
18     (Record read, as follows:
19     "Question:  Are you aware of any
20     information on as to whether those who
21     own the printers and use this feature
22     are caused to print photos more often
23     than they would have absent the
24     feature?")
25     A.  No.  I can design surveys to just

Page 92

1      McCullough
2  about do anything, so I could design a survey
3  to try to elicit that information, but it
4  would depend upon a number of factors, you
5  know, in terms of whether people are using
6  the feature actually even know they're using
7  the feature, in terms of whether they
8  understand if they had to reprint the
9  product, reprint it, at least (inaudible)
10 printing for one reason versus another.
11 There would be a lot of issues involved, but
12 I can design surveys to test for virtually
13 anything.
14     Q.  In the -- do you have any current
15 plans to do any further surveys related to
16 this case?
17     A.  No, I do not.
18     Q.  And are there any others besides --
19 that you've done in this case besides the
20 printers and cameras that you've told us
21 about?
22     A.  No.  There are no others.
23     Q.  Before you set off on those surveys
24 did you do before -- in advance any pre-tests
25 or focus groups or any other preliminary

Page 93

1      McCullough
2  work?
3      A.  No, I did not.
4      Q.  How did you go about --
5      MR. BUCHANAN:  Strike that.
6      Q.  Of the -- of the past surveys that
7  you've done either in business settings or in
8  litigation, are there any of the past ones
9  that are particularly similar to the one that
10 you did here?
11     A.  As I sit here I can't think of any.
12 No.
13     Q.  Is this -- is the design of this
14 survey particularly different from ones that
15 you have done in the past?
16     A.  By definition of "last," last
17 answer, yes.  Most of the surveys I work on
18 in a litigation context are either trademark
19 surveys or false advertising surveys, so this
20 kind of survey is somewhat different than
21 what I usually do.  So yes, it is different.
22     Q.  And is this the first time that
23 you've done a perceived value survey for
24 litigation purposes?
25     A.  Probably is, yes.

24  (Pages 90 to 93)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 94

1         McCullough
2     Q.  Have you done perceived value
3  surveys in a non-litigation setting?
4     A.  I've done surveys over the years
5  that relates to respondents' perception of
6  costs, and I've done some experimentation in
7  that area many years ago.  Nothing specific
8  comes to mind, but I've worked in that area
9  in years back, on commercial work.
10    Q.  How did you -- given the survey
11 objective that you showed me on page four,
12 how did you go about designing the questions
13 that you would ask and the way that you would
14 ask them?
15    A.  Based on doing this type of design
16 work for close to 40 years, close to 40 years
17 now and more specifically in the last 35
18 years which I've been doing this, when you
19 have an issue that comes up you basically --
20 the question framed just comes to mind just
21 based on your experience level.  So I knew
22 what the issue was, and therefore I just
23 developed the question I thought addressed
24 the issue.
25    Q.  And so is there questions stated on

Page 95

1         McCullough
2  -- when you say "the question," where should
3  I look to see the question?  Page six?
4     A.  Well, if you go to page -- well, if
5  you go to Exhibit A, the main
6  questionnaire, there's actually a series of
7  questions there, with a preamble to it, and
8  -- are you at that?  It's at page M1, if you
9  want to look at the first survey.  The other
10 survey, the 4462, is virtually the same, so
11 either one of these would suffice.  It's the
12 preamble plus questions one, two and three.
13    Q.  By the way, to help me orient, M1,
14 does the M there refer to main questionnaire?
15    A.  Yes, main questionnaire page one.
16    Q.  And on the earlier thing, S1, does
17 that refer to S for screener?
18    A.  That's correct.
19    Q.  And some of these say "green" and
20 some of say "blue."  Why is that?
21    A.  That's probably the rotation scheme
22 for question one.  There was two versions of
23 question one in terms of the order in which
24 they were read, and one color was for "price
25 would be the same" and -- when it was first,

Page 96

1         McCullough
2  and the other would be for if it would cost
3  less.
4     Q.  And in the upper right-hand corner
5  of page M1 there's a Figure 4-1.  What does
6  that refer to?
7     A.  Yours says four one.  Mine says
8  four two.
9         That's the rotation punch.  That
10 would coordinate with the color.
11    Q.  Okay.  So question one on page M1
12 is the main question of the survey?
13    A.  Well, I wouldn't say the main
14 question.  This is the first question.  It
15 needs to be taken as a whole.
16    Q.  Okay.  Tell me what you were
17 seeking to accomplish by this question.
18    A.  I think it's pretty self-evident.
19        I was explaining to people -- first
20 they saw the description of the printer,
21 which they were able to look at and read and
22 keep in front of them if -- during the
23 interview.  And then I asked them the
24 question that's right here.  I can read it,
25 but I don't think it's necessary to read the

Page 97

1         McCullough
2  question, unless you do.  And then after
3  reading the question I wanted to find out if
4  they thought that the printer model did not
5  have the adaptive lighting technology feature
6  that I just described above in the previous
7  paragraph, if they thought the price would be
8  the same as the model with the adaptive
9  lighting technology feature or would cost
10 less than the model with the adaptive
11 lighting feature.
12    Q.  Did you consider asking people what
13 they would be willing to pay for a printer
14 with this feature?
15    A.  You can -- not in that form.  I
16 think you can back into that from this
17 (inaudible) a more appropriate way of asking
18 the question.
19    Q.  Why do you think so?
20    A.  Just my experience.
21    Q.  Did you give active consideration
22 to asking people "How much would you be
23 willing to pay for this feature"?
24    A.  I don't know if I thought of it at
25 the time.

25 (Pages 94 to 97)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 98

1          McCullough
2          I'm not sure if that's the right
3    way to go, though.
4       Q.  Any -- anything further to say on
5    why you think that is not the right way to
6    go?
7       A.  I just think this is a more direct
8    way of getting that information.
9       Q.  Have you seen surveys in a business
10   setting or litigation setting where people
11   are asked what would you be willing to pay
12   for something?
13      A.  I'm sure I've seen those over the
14   years, yes.
15      Q.  Would you think that would be a
16   less direct way to ask the question here?
17      A.  Well, in this context we're talking
18   about showing them a product and explaining
19   the fact that it has a certain feature to it,
20   and that's the existing product as it
21   currently stands, so the more logical
22   question to ask them is if -- if this feature
23   were taken away from this, how much less do
24   you think it would cost.  If we're starting
25   with the actual product with the feature in

Page 99

1          McCullough
2    it, and then we're saying, "Well, if you had
3    -- if you had a product that didn't have this
4    feature, how much less would it cost" is the
5    more logical extension for me, from working
6    from a product that already has a feature.
7    So that's different than the hypothetical
8    that you're raising, in terms of other
9    issues.  I think this is a much more direct,
10   natural way to ask people a question.
11      Q.  Did you consider asking people how
12   much would you pay to get a printer with the
13   feature, how much would you pay would you pay
14   to get a printer without the feature?
15      A.  No, I don't think -- again, I did
16   what I did here.  Again, what's here is done,
17   and this is what I thought would be the
18   better way of getting at that.
19      Q.  And I may have asked you this
20   before, but when did you write your report;
21   in a small number of days before its date, is
22   that correct?
23      A.  That's -- that's -- that's correct.
24      Q.  So page eight tells me it's dated
25   March 5th?

Page 100

1          McCullough
2       A.  March 5th, and, you know, several
3    days before that I probably started writing
4    the report.  Again, I don't remember the
5    exact dates on these things.  That's the way
6    I normally do things.  So it was probably
7    several days before the actual report was
8    signed.
9       Q.  So let me ask you to look at the
10   Verbatims section, section E.
11      A.  Okay.
12      Q.  And I'll ask you to start at the
13   back.
14      A.  Okay.
15      Q.  So let me -- let me look at the
16   second to last page.  These are Verbatims
17   about the HP Office Jet 5610.  Do I have that
18   right?
19      A.  Yes, you do.
20      Q.  And this is the printer that's a
21   price, after rebate, 99.99.
22      A.  Correct.
23      Q.  In the bottom half of the page you
24   have some that say "Following response not in
25   mean/median.  Q2 equals questionable

Page 101

1          McCullough
2    response."  Let me see if I understand this.
3    Questionnaire -- as I understand it,
4    questionnaire 175, the person said it would
5    cost less, and a hundred fifty dollars less.
6       A.  Right.
7       Q.  And you wrote that was a
8    questionable response, not to be included.
9    Yes?
10      A.  That's correct.
11      Q.  Okay.  Why is that a questionable
12   response, not to be included?
13      A.  Well, if the whole thing cost a
14   hundred dollars roughly, obviously a hundred
15   fifty dollars less would be minus $50, so
16   they're not going to pay you -- they're not
17   going to pay you to take the printer away.
18      Q.  And similarly, to pick one,
19   questionnaire a hundred twelve said costs
20   less, a hundred dollars less, and that, too,
21   would be questionable, because then you would
22   be getting the printer for negative one
23   penny?
24      A.  Right.
25      Q.  And similarly, questionnaire 468

26  (Pages 98 to 101)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 102

1          McCullough
2   said it would cost less, $90 less, and you
3   believe that that also was a questionable
4   response, because then the printer would only
5   be $10?
6       A.  Yes.
7       Q.  Now, let's turn to the previous
8   page.  Questionnaire 314, the person said
9   cost less, $80 less, which would make the
10  printer cost $19.99.  Why did you keep that
11  one in?
12      A.  That was actually a judgment call.
13  At some point I have to cut off as to what I
14  thought was completely unreasonable and
15  things that are possible.  It's possible that
16  some of these people also -- you know, it
17  could have been excluded.  It's really a
18  judgment call on my point, where I cut off.
19      Q.  And how about, oh, let's pick
20  questionnaire 381, costs less, $50 less.  Why
21  keep in $50, half the price of the printer?
22          Is that again a judgment call?
23      A.  Well, I think when you get to that
24  area it's not -- you know, it's not -- it's
25  not unreasonable that a person could think

Page 103

1          McCullough
2   that.  If they think that this technology is
3   particularly important, that it's a very
4   important function for them, that's not
5   unreasonable.  When you get up to being above
6   $80 it's, from my point of view, very
7   unreasonable, and maybe even at 79 or $80 or
8   $75, maybe some those aren't too reasonable
9   either.
10         At some point you just have a make
11  a judgment as to, even though respondents are
12  answering the questionnaire, and it should be
13  a very clear question to them, you have to
14  make a judgment as to where you cut off and
15  say anything above this is not reasonable.
16  And it wouldn't have made any real
17  significant difference if I take -- took some
18  of those from -- that were in the 80- or
19  79-dollar area and I put them in the back and
20  try to do the numbers.  It's not going to
21  change the numbers very much.  So it's a
22  judgment call.
23      Q.  Now, suppose you had asked people
24  about the perceived value of the red eye
25  removal and the perceived value of adaptive

Page 104

1          McCullough
2   lighting.  If they had said $50 less for a
3   printer without red eye removal and $50 less
4   for a printer without adaptive lighting,
5   would that be a reasonable response or an
6   unreasonable response?
7       A.  I didn't ask that question, so I
8   mean I don't know what the answer would have
9   been, and I can't speculate as to what
10  respondents would have said.  I didn't ask
11  those two questions.  I only asked one
12  question.
13      Q.  So my question is not to speculate
14  about what they say, but let's suppose a
15  particular questionnaire came back with the
16  answers that I've described.
17      A.  Well, it couldn't happen that way,
18  because we didn't ask about red eye removal.
19      Q.  Suppose you did.
20          You could design a survey to ask
21  about red eye removal, yes?
22      A.  I could.
23      Q.  And you could design a survey that
24  would ask about both red eye removal and
25  adaptive lighting.

Page 105

1          McCullough
2       A.  I could.
3       Q.  And if you did that, wouldn't it be
4   reasonable to expect that a customer would
5   give some dollars related to red eye removal
6   and some dollars related to adaptive
7   lighting?
8       A.  It's possible that they could do
9   that, and I don't know what answers they
10  would give me.
11      Q.  And suppose that they -- that one
12  particular person gave you the answer that
13  I've outlined in my hypothetical question.
14      A.  Right.
15      Q.  And the hypothetical question
16  involves a person who responded that lacking
17  red eye removal, it would cost less, $50 les,
18  and lacking adaptive lighting, it would cost
19  less, $50 less.
20      A.  Um-hm?
21      Q.  Would that be a reasonable response
22  or an unreasonable response?
23      A.  No, I would take that out as being
24  unreasonable.
25      Q.  Because the total would be a

27 (Pages 102 to 105)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 106

```
1              McCullough
2  hundred dollars, and that would be the whole
3  price.
4       A.  Correct.
5       Q.  And let's look, if we -- just
6  looking at the fact sheet on the 5610, you'll
7  agree with me, won't you, that the printer
8  has a number of features?  It has --
9           Can we take a look at that?
10      A.  Sure.
11          That's number C?  Okay.
12      Q.  The first bullet says that it
13  "prints in copies up to 20 pages per minute
14  in black and up to 13 per minute in color."
15      A.  Okay.
16      Q.  So that's one feature of the
17  printer that might be of interest to some
18  people, yes?
19      A.  Well, I think by definition, every
20  printer has a speed, so I'm not sure if
21  that's an extra feature.  That looks like
22  it's just a mechanical description of the
23  printer printing.
24      Q.  The next one says that it copy --
25  "automatically copies and scans faxes."
```

Page 107

```
1              McCullough
2  That's a feature that might be of interest to
3  some people, yes?
4       A.  Yes, but it also is implicit in an
5  All-In-One.  That's what an All-In-One means.
6           (Discussion off the record.)
7       Q.  So to some people it might be
8  particularly of interest that this is an
9  All-In-One as opposed to a stand-alone
10  printer or a stand-alone copier or a
11  stand-alone fax machine.
12      A.  Right.
13          And that's in the title of the
14  printer.
15      Q.  Yes.
16          So there are a variety of features
17  that you could ask about in a survey, yes?
18      A.  Yes.
19      Q.  And if you did ask about, let's
20  say, ten features, would it be reasonable to
21  expect that people would have assigned some
22  dollar number to each of the ten?
23      A.  I'm not sure that the ten might be
24  somewhat overwhelming to people in terms of
25  trying to come up with their -- the value it
```

Page 108

```
1              McCullough
2  is to them, but even, you know, assuming that
3  you could do that, and it would be a
4  reasonable task, which I'm not sure it would
5  be, it's possible that the people could
6  decide values for $50, and I don't know what
7  the value would be, though.
8       Q.  Given all the features that this
9  printer has as outlined on the fact sheet,
10  isn't it unreasonable on its face to assert
11  that the adaptive lighting feature in
12  particular accounts for $50 of the hundred
13  dollars of value of the printer?
14      A.  It's in the eyes of beholder.
15  That's what the consumer actually told me
16  they thought it was worth.
17      Q.  In your judgment, that's not
18  unreasonable on its face.
19      A.  Not unreasonable on its face, no.
20      Q.  If you --
21          MR. BUCHANAN:  Strike that.
22      Q.  From your own experience in using
23  devices of this kind, do you find that
24  unreasonable, $50 out of the hundred for that
25  one feature?
```

Page 109

```
1              McCullough
2       A.  I really don't have -- it's -- it's
3  -- I can't approach this anymore as a
4  consumer, because I've gotten too involved in
5  it, so I really can't answer that.
6       Q.  Let me ask you to turn back to the
7  main section of the report, and let me ask to
8  look at page eight.
9       A.  Okay.
10      Q.  If I understand this correctly, for
11  the people who were asked about the
12  Photosmart C6180 printer --
13          MR. BUCHANAN:  Strike that.
14      Q.  The -- the left column reports to
15  me findings of the people who were asked
16  about that printer, yes?
17      A.  The C6180, correct.
18      Q.  And that had a price of one penny
19  less than $300.
20      A.  That's correct.
21      Q.  And if I look down at the bottom,
22  the median dollar amount answer from the
23  respondents as you calculated was $50.
24      A.  That's correct.
25      Q.  And then on the right reports the
```

28 (Pages 106 to 109)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 110

1      McCullough
2  answers about the Officejet 5610, which had a
3  price, after rebate, of one penny less than a
4  hundred dollars; is that right?
5      A.  That's correct.
6      Q.  And the median that's reported to
7  you was $20.
8      A.  That's correct.
9      Q.  Why would I pay $50 for a feature
10 in one printer if I could get it for $20 in
11 another printer?
12     A.  Well, of course, you have to
13 recognize that these are completely different
14 respondents that are reacting to completely
15 different stimuli, and it's apparent from the
16 results is that people are looking at this
17 feature as being a certain value relative to
18 the total price, and that's why I put down
19 the bottom on the next line that the percent
20 of price turns out to be about the same in
21 each case, 17 or 18 percent, which tends to
22 suggest that respondents are saying, well,
23 this is a feature that's worth, on average,
24 17, 18 percent of the price of the printer.
25     Q.  So as you would -- based on your

Page 111

1      McCullough
2  experience, as you would understand what's
3  driving these results, the main driver is
4  people view the value of the feature in the
5  context of the price of the printer as a
6  whole?
7      A.  Yes.
8      Q.  So when the price of the printer is
9  reduced, then they perceive the value of that
10 feature as reduced.
11     A.  Well, yes, except the price of the
12 printer's not reduced; it's a different
13 printer.  When you have a different printer
14 at a lower price, it's going to result in a
15 lower expectation of what the -- how much
16 less it would cost.
17     Q.  And you showed me the -- so one
18 group of people were shown the fact sheet for
19 the 300-dollar printer --
20     A.  Yes.
21     Q.  -- and the other group of people
22 were shown the fact sheet for the 100-dollar
23 printer; is that right?
24     A.  Yes.
25     Q.  And then the question number one

Page 112

1      McCullough
2  that we saw on the main survey questionnaire,
3  that question was the same for both groups,
4  correct?
5      A.  Yes.
6      Q.  So they were both told the same
7  thing about the adaptive lighting feature.
8      A.  That's right.
9      Q.  As you had a chance to think about
10 the results of your survey applying to your
11 experience, is there any other driver that
12 you would identify as a main component of
13 driving these results?
14     A.  Driver -- other driver as -- which
15 one are you referring to?
16     Q.  You told me that one of the main
17 drivers is view this feature in the context
18 of the overall price for the printer.
19     A.  Right.
20     Q.  Any other major driver?
21     A.  My -- my assumption in looking at
22 the results is people are making a judgment
23 as to what value this feature has to them,
24 and they are putting it in proportion to the
25 price of the total printer.

Page 113

1      McCullough
2      Q.  Do you believe that the people who
3  were respondents had any experience in
4  themselves setting prices for products?
5      A.  Setting prices?
6      Q.  Yes.
7      A.  No.
8      Q.  By the way, did you use a
9  subcontractor firm to set up the actual
10 interviewers?
11     A.  All of the interviewing that's done
12 in malls is actually done by subcontract.
13     Q.  Did you have a single subcontractor
14 or multiple --
15     A.  No --
16     Q.  -- for the various malls?
17     A.  -- multiple subcontractors.
18     Q.  And are their names stated
19 somewhere?
20     A.  I don't know.
21     Q.  Do you remember their names?
22     A.  No, because I don't deal with them
23 directly; my field director does.
24     Q.  Who is your field director?
25     A.  Tom Jasorka, J-a-s-o-r-k-a.

29 (Pages 110 to 113)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 114

1         McCullough
2     Q.  And have you yourself been to the
3  particular malls where these things were
4  done?
5     A.  I didn't go there during this
6  interviewing process because I would not
7  normally do that.
8         But there's one mall we use --
9  let's see.  Is Trumble being used here?  Go
10 back and look.  (Perusing document) I happen
11 to live not that far from Trumble Mall, so I
12 may have been there, but -- yes, Trumble
13 Connecticut was used as a mall.  So I've been
14 to the Trumble mall.  I have not been to -- I
15 don't know, maybe 15 years ago I may have
16 gone to the mall in Atlanta, but I haven't
17 recently been there.  The Trumble mall I've
18 been to as a consumer but not in the context
19 of doing these interviews.
20    Q.  So let me ask you a question about
21 page 6 of your report, and the section
22 entitled "Interview"?
23    A.  Okay.
24    Q.  It says "After completing the
25 screening process respondents were taken to a

Page 115

1         McCullough
2  private room" --
3     A.  Yes.
4     Q.  -- "in the interviewing facility."
5     A.  Yes.
6     Q.  In the mall that you've been to,
7  the one in Connecticut, is there a private
8  room?
9     A.  In all of the malls that we use,
10 that we used in this study, there's an
11 interviewing area that is a -- room or an
12 office, actually, that is attached to the
13 mall, usually out of the main part of the
14 mall, and in that, depending on which
15 facility it is, individual cubicles or
16 individual private rooms, depending on the
17 facility, where these interviews are
18 conducted.  They're always done in an area
19 which is private and where interviewers can't
20 hear -- respondents can't here the interviews
21 being done in other parts of the office.
22    Q.  Let me ask you to turn to
23 Exhibit B --
24    A.  Okay.
25    Q.  -- the page that's page numbered

Page 116

1         McCullough
2  two?
3     A.  There's a lot of page twos there.
4     Q.  After Exhibit B there's a page with
5  no number, and next says "Page 2."
6     A.  Okay.
7     Q.  At the bottom, under "Method of
8  Interviewing" --
9     A.  Okay.
10    Q.  -- it says "All respondents are to
11 be screened in the main mall.  All qualified
12 respondents are to be taken to a separate
13 area off the main mall."  What does "separate
14 area" refer to here?
15    A.  That's a generic description that's
16 used that is kind of boilerplate.  The
17 "separate area" turns out, though, to be --
18 it's not a cordoned off area, it's not a
19 screened-off area on the main mall, it's
20 actually in the offices of the interviewing
21 service that's there.  These are permanent,
22 established mall interviewing services that
23 do this on a full-time basis.  It is not a --
24 it's not like setting up a partition or
25 something like that.

Page 117

1         McCullough
2     Q.  And tell me, what do you mean, it's
3  a permanent facility?
4     A.  These are full-time businesses,
5  very substantial businesses that do
6  interviewing on a regular basis by
7  subcontract, for many, many research firms in
8  the United States, and they have permanent
9  facilities there.  They have a permanent
10 office that's in the mall.  Just like
11 somebody has a store, they have an office.
12 Usually it's down a back corridor which
13 doesn't have retail, you know, facings,
14 because it's not worth as much from a space
15 point of view.  And in that office -- they
16 vary somewhat, but they have either
17 individual offices or individual cubicles for
18 interviewing, and they're set up just for the
19 purpose of doing interviews.
20    Q.  And there's one of those in each of
21 the malls that were the venues for your
22 study?
23    A.  Yes, that's correct.
24    Q.  So the people who were in those
25 malls, people who frequent those malls may

30 (Pages 114 to 117)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

| Page 118 |
| --- |

McCullough

1
2   have seen these interviewers going around
3   from time to time.
4       A.  It's possible, sure.
5       Q.  Is there -- are some types of
6   people more likely to be willing to be
7   intercepted and participate in a mall
8   interview, and other people less likely to be
9   willing to be intercepted and participate in
10  that?
11      A.  The answer to that question
12  obviously is yes.
13      Q.  And tell me a little bit about what
14  kind of people are more likely and what kind
15  of people are less likely.
16      A.  Well, obviously people that are in
17  a hurry or have a screaming kid on their hand
18  is not going to be too happy to sit down for
19  an interview.  So, you know, what we do is to
20  try to offset the potential for maybe more
21  females than males being interviewed, as we
22  screen people in proportion to their age and
23  sex into six categories that represent the
24  distribution of people in those six
25  categories in the U.S. population, in the

| Page 119 |
| --- |

McCullough

1
2   U.S. Census reports, and from that base of
3   people that we establish in each of these six
4   categories, we then draw our interviews from
5   them.  So that because of the fact that you
6   can -- for instance, you get -- if you just
7   went in and did willy-nilly, you'd get more
8   women than men, but our quotas are -- our
9   screening quotas are set up in a such a way
10  that we get roughly -- in terms of answering
11  the screening question, we get the same
12  number of men and women, because that's what
13  the population statistics indicate.  You may
14  also get people of different age groups if
15  you didn't do a special screening like we
16  did.  So we screen people into these special
17  age groups, so we avoid the problem that
18  you're alluding to here in terms of certain
19  people being -- having more of a proclivity
20  to be available in the mall or interested in
21  doing the interview.
22      Q.  You said if you went in
23  willy-nilly, you would get more women than
24  men.  Why is that?
25      A.  Because more women go to malls than

| Page 120 |
| --- |

McCullough

1
2   men do.
3       Q.  Have you calculated for yourself
4   what is the response rate for your survey?
5       A.  In all intercept study, we can't
6   calculate response rate.
7       Q.  And why is that?
8       A.  Because there's a certain selection
9   process.  When interviewers are walking up to
10  somebody, you don't really know if they're
11  qualified, not qualified, or if they can even
12  see the interviewer, or if they're walking
13  away.  You can't really quantify that, so you
14  can't really -- you can't really see how many
15  people would have been approached.  There's
16  just no way to do it.
17      Q.  How about for telephone surveys?
18  Can one calculate the response rate for
19  telephone survey?
20      A.  Yes.
21      Q.  And how does one do that?
22      A.  Well, we try to figure out what
23  percentage of people you completed the
24  interview with based on what percentage of
25  people are likely or qualified or likely to

| Page 121 |
| --- |

McCullough

1
2   qualify.
3       Q.  So in the denominator you include
4   people who participate in the initial
5   telephone interview?
6       A.  In the denominator -- well, in the
7   numerator you'd have the number of interviews
8   that you completed.  The denominator, you
9   have number of people who met your screening
10  criteria, and potentially you would
11  extrapolate that to those you didn't reach,
12  and therefore would have -- would have --
13  would have met your screening criteria if you
14  had reached them.
15      Q.  If you're conducting a telephone
16  survey, what do you do if people just don't
17  answer the phone?
18          Do they go into the denominator?
19      A.  They don't go into any part of the
20  calculation.
21      Q.  Let's do another break.
22      A.  Sure.
23          THE VIDEOGRAPHER:  Going off the
24  record.  Time is 11:30 a.m.  This is the
25  end of tape two.

31 (Pages 118 to 121)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 122

1      McCullough
2      (Recess taken.)
3      THE VIDEOGRAPHER:  We are back on
4  the record.  The time is 11:49 a.m.
5  This is the beginning of tape three.
6      ([McCullough] Exhibit 14, Mr.
7  McCullough expert report in Levi Strauss
8  case, marked for identification, as of
9  this date.)
10     Q.  I've handed you what's been marked
11  as Exhibit 14.  Is this a report that you
12  submitted in a case involving Levi Strauss?
13     A.  (Reading) Well, it appears to be,
14  although I have no recollection of this case.
15     Q.  You have no recollection of
16  submitting a report in a case involving Levi
17  Strauss?
18     A.  A couple of cases I've been
19  involved with where they've been on the --
20  they've been on the other side.
21     Q.  So let me --
22     A.  I don't remember this particular --
23     Q.  To --
24     A.  -- case.
25     Q.  -- walk through this for a moment,

Page 123

1      McCullough
2  let me ask you to turn to page two.
3      A.  Okay.
4      Q.  Under the heading "Information
5  Provided For Evaluation" it says you reviewed
6  a report of the Professor Scott December '04,
7  and reviewed a transcript of the deposition
8  of Professor Scott February --
9      A.  Um-hm.
10     Q.  -- '05.  Do you remember that?
11     A.  No.  (Laughing).
12     Q.  Have you from time to time been
13  retained to critique surveys done by other
14  people?
15     A.  Yes, I have.
16     Q.  Do you recall ever being retained
17  to critique a report by Professor Scott?
18     A.  You're refreshing my memory, but I
19  don't recall it.  Honestly don't remember it.
20     Q.  Are you familiar with Professor
21  Scott?
22     A.  Not as we sit here, I'm not.
23     Q.  Okay.  I -- I happen to be familiar
24  with a Professor Carol Scott.  If I mention
25  the first name Carol, does that ring a bell?

Page 124

1      McCullough
2      A.  No.
3      Q.  Okay.  Are you able to -- having
4  taken a look at this for a moment, have you
5  been able to determine that this is not a
6  report by you?
7      A.  Well, I have to assume that since
8  the beginning talks about -- well, it has my
9  name and it says I've done research for 30
10  years or so.  (Reading).
11     Q.  Look --
12     A.  It looks like it's a description of
13  me, but I just don't remember the actual
14  project.
15     Q.  Okay.  But reading the first page,
16  your name and title and the qualifications
17  stated, those look like you, yes?
18     A.  Yes, they do.
19     Q.  Have you -- let's like at page two.
20  Have you from time to time in the course of
21  your work referred to the "Reference Guide on
22  Survey Research" chapter of the Reference
23  Manual on Scientific Evidence from the
24  Federal Judicial Center, by Sheri Diamond?
25     A.  Yes, I have.

Page 125

1      McCullough
2      Q.  Are you familiar with that work?
3      A.  Yes, I am.
4      Q.  And do you regard that as an
5  appropriate reference tool?
6      A.  It's an appropriate reference tool,
7  yes.
8      Q.  Is that an authoritative statement
9  on standards for research surveys?
10     A.  As a basic guideline, yes.  Most of
11  what she says in there I would agree with.
12  Certain things I may not agree with.  But as
13  a basic tool, particularly for people that
14  were not familiar with surveys, it's a good
15  starting point.
16     Q.  Do you recall something in
17  particular in her work that you don't agree
18  with?
19     A.  I recall that there was some things
20  -- well, I haven't read her recently, besides
21  this, several times over the years, but there
22  were a couple of things that I felt that she
23  was not really necessarily on target with.  I
24  don't remember what they are now, though.
25     Q.  All right.  I think you

32  (Pages 122 to 125)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

<table>
<tr><td>

Page 126

McCullough
1
2    acknowledged that from time to time you have
3    been engaged to critique work by other survey
4    experts.  In doing that, have you cited to
5    the Federal Judicial Center "Reference Guide
6    on Survey Research" chapter?
7        A.  Yes.  I've sometimes used her
8    outline as a guideline.
9        Q.  And would you agree that it's
10   appropriate to apply those same guidelines to
11   your own work?
12       A.  Yes.
13       Q.  So let me run through some of these
14   questions.
15           The first question listed here on
16   Exhibit 14 is "Was the survey designed to
17   address relevant questions?"  Do you regard
18   that as an appropriate question?
19       A.  Yes.
20       Q.  What was the question that your
21   survey was designed to address, and -- and --
22   and do you have an understanding one way or
23   the other as to whether it was -- that
24   question was relevant?
25       A.  Well, the question that the survey

</td><td>

Page 128

McCullough
1
2    Exhibit 14.  Question two -- let me give a
3    copy to the court reporter just in case --
4    "Was participation in the design and
5    administration and interpretation of the
6    survey appropriately controlled to ensure the
7    objectivity of the survey?"  Is that an
8    appropriate question to apply?
9        A.  In general concept, yes.
10       Q.  In what way was your survey
11   designed so as to ensure objectivity?
12       A.  The -- the questions that -- the
13   method of showing respondents the stimulus
14   was an objective way of doing it, because
15   this is a piece that is available from the
16   websites, so the -- the stimulus information
17   was appropriate.  The questions -- the
18   questions I asked were a fair question.  They
19   were not leading questions.  And the answers
20   for the most part we relied upon were
21   answers that were volunteered by respondents.
22   So I think it's a good, straightforward, fair
23   questionnaire.
24       Q.  When you ask about the perceived
25   value of the one feature, adaptive lighting,

</td></tr>
<tr><td>

Page 127

McCullough
1
2    addressed, as I indicated before, is -- is
3    the value that consumers would put on the
4    adaptive lighting technology.
5        Q.  And do you have an understanding or
6    opinion as to whether that question is
7    relevant in the context of this litigation?
8        A.  I'm told by counsel it's relevant.
9        Q.  Do you yourself have an opinion or
10   an understanding on the subject?
11       A.  Inasmuch as I don't know about the
12   rest of the case, it's hard for me to answer
13   that.
14       Q.  Do I take it, then, that -- is it a
15   correct statement, then, that based on the
16   information that you have currently, you
17   don't have an opinion as to whether it's
18   relevant?
19       A.  I don't have a personal opinion on
20   whether it's relevant.  I was refer -- I was
21   responding to the attorneys' request.  I
22   don't know about the rest of the case, so I
23   don't know how relevant my piece is to the
24   rest of the case.
25       Q.  Let's look at number two stated in

</td><td>

Page 129

McCullough
1
2    and you don't ask about the perceived value
3    of other features, isn't that leading,
4    inherently?
5        A.  No.
6        Q.  Why not?
7        A.  Leading is a term that's basically
8    used to -- to -- to define a situation where
9    your question suggests an answer, and the
10   question doesn't suggest an answer in this
11   case.  The respondent is able to answer based
12   on their own beliefs.
13       Q.  Let's look at number three.
14   Question three reads "Are the experts who
15   designed, conducted or analyzed the survey
16   appropriately skilled and experienced?"
17   That's appropriate to ask, yes?
18       A.  Yes, it is.
19       Q.  Number four, "Are the experts who
20   will testify about others appropriately
21   skilled and experienced?", that, too, is
22   appropriate to ask, yes?
23       A.  I believe so.
24       Q.  Number five, "Was an appropriate
25   universe or population identified?", that's

</td></tr>
</table>

33  (Pages 126 to 129)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 130

1         McCullough
2  appropriate to ask, yes?
3      A.  Yes, it is.
4      Q.  How did you identify the universe
5  or population for your question?
6      A.  Well, it was based upon, as you
7  probably know, people who had bought a color
8  printer in the past year or thought they
9  might buy one in the next year, so that's by
10 definition a relevant universe.
11     Q.  Point six on Exhibit 14, "Did the
12 sampling frame approximate the population?",
13 is that an appropriate question?
14     A.  Yes, it is.
15     Q.  What does "sampling frame" mean?
16     A.  Sampling frame is really the way in
17 which you obtain your respondents to meet the
18 population definition.
19         And the way I did that was, as we
20 described before, I described before, was to
21 talk to men and women who met the
22 qualification, involved after I had gone
23 through a screening of age and sex to make
24 sure that there is a good distribution of
25 people asking the screening questions that

Page 131

1         McCullough
2  come from six different age/sex groupings.
3      Q.  Question seven on Exhibit 14 reads
4  "How was the sample selected to approximate
5  the relevant characteristics of the
6  population?"  That's an appropriate standard
7  to ask?
8      A.  Yes.
9      Q.  And do you have anything further to
10 add on what you just told me?
11     A.  I think I pretty much answered that
12 along with six.
13     Q.  Question eight on Exhibit 14 reads
14 "Was the level of non-response sufficient to
15 raise questions about the representativeness
16 of the sample?  If so, what is the evidence
17 that non-response did not bias the results of
18 the survey?"  Is that an appropriate question
19 to ask?
20     A.  It is an appropriate question to
21 ask.
22         And, as we indicated before, when
23 you do mall surveys, you really don't have a
24 way of calculating non-response rate, but it
25 is a -- it is an interviewing technique that

Page 132

1         McCullough
2  is widely used in the marketing research and
3  media research field, and one that the courts
4  have rarely excepted.
5      Q.  Is it -- do you have an opinion
6  here that in your particular survey,
7  non-response -- level of non-response did not
8  bias the results?
9      A.  I have no reason to suspect
10 non-response in any way biases the results.
11     Q.  And do you have reason to believe
12 that non-response did not bias the results?
13     A.  I'd actually say -- since I don't
14 know what the non-response rate was, I'd have
15 to say that based on the procedures we use,
16 that I don't think that non-response -- there
17 is no reason to think that non-response is an
18 issue here.
19     Q.  Is there a phenomenon in mall
20 intercept surveys that the people who are
21 friendly by nature are more likely to be
22 willing to stop and participate than people
23 who are less friendly by nature?
24     A.  I think that's true of all
25 interviewing, not just in malls.

Page 133

1         McCullough
2      Q.  And is there a phenomenon in malls
3  or everywhere that those people are more
4  likely to wish to please the interviewer than
5  people who decline to participate?
6      A.  There is a phenomenon that has been
7  described in the literature in certain
8  situations that people try to please the
9  interviewer.
10         You try to avoid that situation by
11 not asking questions where you have obvious
12 answers, like leading questions.
13     Q.  Number nine on Exhibit 14 reads
14 "What procedures were used to reduce the
15 likelihood of a biased sample?"  That's an
16 appropriate question to ask, yes?
17     A.  Yes.  I think --
18     Q.  And what procedures of that nature
19 were used in your survey?
20     A.  I was -- I think I described that
21 to a large degree when I talked about six and
22 seven.  The screening process to make sure
23 that I started out with a representative
24 sample of men and women in those age groups
25 is a method that's used to reduce the

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 134

1         McCullough
2  likelihood of biased sample.
3      Q.  Question ten on Exhibit 14 reads
4  "What precautions were taken to ensure that
5  only qualified respondents were included in
6  the survey?"  That's an appropriate question
7  to ask in a survey, yes?
8      A.  Yes.
9         And basically we asked our
10 screening questions the way we've done it,
11 and then we also validate the question in a
12 vacuum.
13     Q.  Point 11 on the next page of
14 Exhibit 14 reads "Were questions on the
15 survey framed to be clear, precise and
16 unbiased? "  That is appropriate to ask of a
17 survey, yes?
18     A.  Yes.
19     Q.  And do you believe you met that
20 standard here?
21     A.  Absolutely.
22     Q.  Anything further to say on that
23 beyond what you've already told me?
24     A.  I don't think so.
25     Q.  Question 12 on Exhibit 14 asks

Page 135

1         McCullough
2  "Were filter questions provided to reduce
3  guessing?"  Is that appropriate to ask of a
4  survey?
5      A.  In the right circumstance, yes.
6      Q.  Should that -- does that
7  circumstance apply to your survey in this
8  case?
9      A.  There's no situation here where I
10 think a filter question as normally described
11 would be appropriate.
12     Q.  In this case, when you asked people
13 how much less would the printer cost without
14 the adaptive lighting feature, weren't they
15 guessing?
16     A.  No.  They were estimating --
17     Q.  What's the difference?
18     A.   -- what they thought --
19        Well, guessing is really just
20 picking a number out of the air or picking --
21 usually picking among choices that might be
22 provided.
23        We asked people if they thought it
24 should be the same price or a lower price,
25 and if they said it would cost less, then we

Page 136

1         McCullough
2  asked them, well, how much less do you think
3  that would be.  They're giving you an
4  estimate of what they think based upon the
5  information they've seen and based upon their
6  own needs and their own assessment of what
7  this -- what the feature's worth.  That's not
8  -- that's not guessing.  That's -- that's --
9  that's responding to the questions.
10     Q.  Where these are people who don't
11 have previous experience setting the price
12 for a product as a printer, why isn't it
13 guessing when you asked them how much less it
14 would cost without this feature?
15     A.  Well, they're not setting a price,
16 actually.  What they're doing is they're
17 giving an estimate of what the -- of what the
18 feature's worth to them by answering the
19 question of how much less would it cost if it
20 didn't have it.  They're not setting the
21 price in any way.  They're giving you their
22 estimate of how much less they think it would
23 cost, based on their own assessment of the
24 value as to them.
25     Q.  Why didn't you ask them what would

Page 137

1         McCullough
2  it be worth to them?
3      A.  Well, I did ask them that, but I
4  asked them in a better way.
5      Q.  What are instances where you
6  believe as a survey expert that filter
7  questions should -- should be provided?  Can
8  you give me an example?
9      A.  Well, let's say you're going to ask
10 people what comes to mind is an advertising
11 situation, and you show people a print ad,
12 and let's say you're interested in a certain
13 topic in the print ad.  You might ask people
14 when you looked at that print ad, do you
15 recall seeing anything about the topic, and
16 if they say yes, then you can ask them the
17 further questions about the topic.  If they
18 say no, then you skip them out, rather than
19 going right into the questions without asking
20 that filter.  That's what comes to mind.
21 There are a number of the cases.  And most
22 filters are like yes/no type questions.  And
23 there's probably many examples, but that's
24 the one that comes to mind.
25     Q.  Question 13 on this exhibit reads

35 (Pages 134 to 137)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 138

1          McCullough
2    "Did the survey use open-ended or
3    closed-ended questions?  How was the choice
4    in each instance justified?"  That's an
5    appropriate question to ask an examining
6    survey, correct?
7        A.  That's correct.
8        Q.  Which was yours, open-ended or
9    closed-ended, and how was the choice made?
10       A.  Well, in terms of the -- the price
11   questions, the first question was open-ended.
12   The follow-up question, people said that it
13   was less but they didn't know how much less,
14   was closed-ended.  I think that combination
15   of questions here is a -- is a legitimate way
16   of going about it, because some people are
17   reluctant to give a specific number when you
18   ask them how much less, but they're able to
19   put it within certain boundaries.
20          Not too dissimilar when you ask
21   people what's their income, and many people,
22   in that case, they don't necessarily want to
23   answer the question, or maybe they don't even
24   know, but then when you asked them, well, is
25   it between 25,000 and 50,000, they can say

Page 139

1          McCullough
2    yes to that question, but maybe, if they're
3    not the breadwinner, they don't even actually
4    know the income, but they know it's in the
5    range.  So it's appropriate to follow up with
6    that kind of question, a closed-ended
7    question like that after you've made the
8    attempt to get the open-ended response.
9        Q.  So let's look at the closed-end
10   portion of yours, which is in your report at
11   Exhibit A, and I think it's at page M2.
12       A.  Okay.
13       Q.  Question three, is this what you
14   referred to as the closed-end portion of your
15   question?
16       A.  Yes, it is.
17       Q.  So you offer as choices "less than
18   a dollar" is choice A, and B is a higher
19   number, and so forth, C, D and E.
20          Why didn't you offer "less than
21   five cents" as one of the choices?
22       A.  I just picked numbers that I
23   thought were relatively conservative and
24   represented a decent range of numbers.  It
25   was somewhat arbitrary, judgmental on my

Page 140

1          McCullough
2    part.
3          And, as it turns out, if I had done
4    the open-ended responses, I should have
5    actually used much higher levels.
6        Q.  Why do you say that?
7        A.  Well, because the median turned out
8    in one study to be like $20, and the median
9    in the other study came out to be $50, so
10   that these choices which I did a priori
11   turned out to be much too low.  Usually you'd
12   want to -- you'd want to get the range where
13   you're kind of -- in the middle range is
14   around the median, so I probably should have
15   levels that were, you know, 20 to 25, 25 to
16   50, that kind of -- or 25-30, something like
17   that.
18       Q.  Do you have any understanding what
19   it actually does cost HP to include that
20   adaptive lighting feature in the printer
21   where that's included?
22       A.  I think that's almost irrelevant to
23   this, because what it cost them has nothing
24   to do with what the value is to the consumer.
25   We're not asking what it cost HP.  We're

Page 141

1          McCullough
2    asking him what price they expect if you --
3    if you -- if you pay for it.
4        Q.  When you designed the survey did
5    you have the understanding that the cost to
6    HP to include the adaptive lighting feature
7    is likely a small number of pennies or
8    substantially less than a penny per printer?
9        A.  I have no idea (indicating) --
10          THE COURT REPORTER:  "I have no
11   idea" --
12       A.  -- what it was costing.
13          (Discussion off the record.)
14       Q.  Let's go back to Exhibit 14.
15       A.  Sure.
16       Q.  Question 14 reads "If probes were
17   used to clarify ambiguous or incomplete
18   answers, what steps were taken to ensure that
19   the probes were not leading and were
20   administered in a consistent fashion?"  In
21   some studies, is that an appropriate question
22   to ask?
23       A.  In some studies it is.
24          It's not appropriate -- it's not
25   really applicable here.

36 (Pages 138 to 141)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 142

1        McCullough
2     Q.  You didn't use probes in your
3  survey.
4     A.  No.
5     Q.  Or at least interviewers were
6  instructed not to probe by asking anything
7  beyond what was written in the --
8     A.  That's correct.
9     Q.  -- questionnaire.
10    A.  That's correct.
11    Q.  Item 15 reads "What approach was
12 used to avoid or measure potential order or
13 context effects?"  Is that appropriate as a
14 question to ask about a survey?
15    A.  Yes, it is.
16    Q.  And let's look at that same
17 closed-ended portion of the question that we
18 were just looking at.
19        MS. KINGSBURY:  The M2, Exhibit A?
20        MR. BUCHANAN:  Yes.
21        THE WITNESS:  (Perusing document)
22 Okay.  There we go.
23        (Witness and counsel confer off the
24 record.)
25    A.  Okay.

Page 143

1        McCullough
2     Q.  So for the people who were --
3        By the way, this came in the form
4  of -- people who said "cost less, but don't
5  know how much" were handed a card --
6     A.  Yes.
7     Q.  -- is that right?
8        And this item three here reproduces
9  what was on the card?
10    A.  That's correct.
11    Q.  And the card was in this order, A,
12 B, C, D, E?
13    A.  That's correct.
14    Q.  So the order begins with one dollar
15 and goes up to $20 or more?
16    A.  Yes.
17    Q.  Why not have half the cards rotated
18 the other way, and begin with $20 or more and
19 go down to less than one?
20    A.  I think that would be very unusual
21 and maybe even confusing to people.  I think
22 most people are used to thinking of things in
23 terms of ascending order, and therefore we
24 didn't want to confuse the respondents.
25    Q.  Did you give some thought to that

Page 144

1        McCullough
2  question when you were designing this?
3     A.  I may have given tangential
4  thought, but I would have automatically said
5  this is not one to rotate.
6     Q.  So as best you -- you can remember,
7  you didn't actively think about it, but you
8  nearly automatically put it --
9     A.  Well --
10    Q.  -- in ascending order; is that
11 correct?
12        MS. KINGSBURY:  Objection.
13     Mischaracterizes his testimony.
14    A.  Yes, I may have thought about it,
15 and the reason I say that is I did rotate, as
16 you probably know, question one, where there
17 I think it might have some difference.  So I
18 rotated the choice in question one from, you
19 know, "would cost less" first half the time,
20 and "would be the same cost" the other half
21 the time.
22        So rotation is always, when you
23 (inaudible) a question -- I mean any good
24 researcher, experienced researcher, is always
25 thinking, when they write a question, should

Page 145

1        McCullough
2  it be rotated.  I probably actually
3  considered it, but it's like one of those
4  split-second decisions you make based on
5  looking at the question:  This question, both
6  in retrospect and what -- I see no reason why
7  to rotate it at this point, I still do not
8  rotate it after you pointed that out.
9     Q.  So let's look at question one that
10 you pointed me to.
11    A.  Okay.
12    Q.  The first choice was -- as printed
13 here, choice one was "would cost less."
14 Choice two was "price would be the same."
15    A.  Right.
16    Q.  And you rotated the order of those
17 two.
18    A.  Yes.
19    Q.  Choice three was "don't know."  Why
20 isn't that included in the rotating also?
21    A.  Well, you don't ask the person a
22 "don't know" question.  The "don't know" is
23 something that's volunteered.
24    Q.  So you didn't -- so they weren't
25 given that "don't know" as an option here.

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 146

```
1          McCullough
2      A.  Well, not here they weren't, but in
3  the paragraph, the preamble up above asks --
4  the sentence says "If you don't know the
5  answer to any of my questions, please don't
6  hesitate to say that."  So we give them a
7  global instruction, so any point during the
8  interview they want to say they don't know,
9  they feel free to say that.
10         But here, these two options that
11 they were given were the ones that in the --
12 that are written into the question, which is
13 "would cost less" or "price would be the
14 same," half the time in that order, half the
15 time in the reverse order.
16     Q.  And why did -- did you think of
17 also giving them as an option "would cost
18 more"?
19     A.  Well, I thought of it for a second,
20 and dismissed it as being silly, because it
21 really just doesn't make any sense.
22     Q.  By the way, reading the portion of
23 question one here that appears right before
24 those choices, might it be the case that some
25 respondents may wonder whether the feature
```

Page 147

```
1          McCullough
2  that does not have this -- excuse me, the
3  printer that does not have adaptive lighting
4  may have something else in addition beyond
5  the printer that you showed them?
6      A.  No, I can't guess what's in
7  somebody else's mind, but I don't see any
8  reason why they would think that.  I don't
9  know why they would think something like
10 that.
11     Q.  Did you give any thought to that as
12 you were designing question one?
13     A.  No.
14         I don't think it's a reasonable
15 thing for people to think about.
16     Q.  Back up to the main part of
17 question one, the part that begins "This
18 particular color Inkjet printer contains a
19 feature called adaptive lighting technology"
20 -- let me just read the rest of it so that
21 we'll have a clear record.  "Adaptive
22 lighting technology is a break-through
23 technology that enables printers to produce
24 photos that look more like what people see
25 with their own eyes.  It accomplishes this by
```

Page 148

```
1          McCullough
2  balancing relationships between bright and
3  dark areas in a photo, preserving gentle
4  contrasts by smoothing out harsh contrasts."
5  Where did you get that language from?
6      A.  I believe it was kind of a
7  compilation of things I got from the
8  different sites that I visited, and I put
9  together what I thought was a good
10 description based upon various descriptions,
11 mostly from HP website.  It's not one -- it's
12 not one place I got it all from.  It was kind
13 of a composite of what I got from the various
14 sites.
15     Q.  And the various sites that you went
16 to, the various things that are now in your
17 folder are the things we went through earlier
18 in the deposition?
19     A.  Well, that's probably some of it,
20 but there's a lot of other stuff that I
21 didn't print out that I went to.  I did a lot
22 of searching around the HP website.  There
23 was a lot of stuff there.
24     Q.  Do you believe that you drew on
25 wording from somewhere else on the HP website
```

Page 149

```
1          McCullough
2  that you did not print out and keep?
3      A.  There probably were components of
4  it that I didn't print out and keep, because
5  I was visiting a lot of websites, a lot of
6  parts of the website at different points in
7  time, and it's very likely there that are
8  parts I didn't keep.
9      Q.  Let me ask you a more specific
10 question.  I'm sure that -- I understand that
11 in the course of your work, generally you
12 looked at many Web pages.
13     A.  Right.
14     Q.  As you were preparing the wording
15 for question one in particular, to the extent
16 that you drew on wording on the HP website,
17 did you print that out so that you would have
18 a record of it, or do you believe that
19 question one wording itself rests on portions
20 that you didn't keep?
21     A.  The latter.
22     Q.  What makes you think so?
23     A.  Because I don't -- I don't recall
24 taking just one definition from someplace and
25 not modifying it.  A number of the
```

38 (Pages 146 to 149)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 150

McCullough

1        McCullough
2    definitions were somewhat slightly different
3    one from the other, and I tried to make
4    something that was cohesive, so I think, as I
5    recall back months ago, putting together this
6    definition based on seeing a lot of different
7    definitions that HP had for adaptive
8    lighting.  It didn't just come from one
9    specific source.
10        Q.  And so this morning, earlier we
11   looked at I think eight different places from
12   the HP website.  You think that you based
13   question one wording, in addition, on other
14   portions of the HP website that you did not
15   print out and keep?
16        A.  My recollections are that I -- I
17   didn't use any one wording, and therefore
18   what I printed out was not necessarily what I
19   depended on.  I don't recall exactly how I
20   got that.  I know I looked at a lot of
21   different definitions, and I didn't print out
22   everything, and I put this together based
23   upon what I thought was a constructive,
24   cohesive understanding of this that consumers
25   would understand.

Page 151

1        McCullough
2        Q.  Okay, let's go back to Exhibit 14.
3    Question 16 reads "If the survey was designed
4    to test a causal proposition, did that survey
5    include an appropriate control group or
6    question?"  For some surveys is that an
7    appropriate question to ask?
8        A.  Yes.
9        Q.  Does it apply to your survey?
10       A.  No.
11       Q.  Because your survey was not testing
12   a causal proposition.
13       A.  Right.
14       Q.  All right.  Question 17 asks "What
15   limitations are associated with the mode of
16   data collection used in the survey?"  Is that
17   an appropriate question to ask at the survey?
18       A.  For some surveys it would be, yes.
19       Q.  Are there any limitations
20   associated with the mode of data collection
21   that you used?
22       A.  Not related to this survey, that I
23   can think of.
24       Q.  Question 18 on Exhibit 14 asks
25   "Were the interviewers appropriately selected

Page 152

1        McCullough
2    and trained?"  Is that appropriate to ask of
3    a survey?
4        A.  Yes.
5        Q.  Do you believe that was met in
6    yours?
7        A.  Yes.
8        Q.  Have you worked with those same
9    subcontractor firms in the past?
10       A.  Yes, we have.
11       Q.  And have you had occasion to review
12   the work that they do in selecting and
13   training the interviewers?
14       A.  I personally don't.  My field
15   director controls that.  But we use malls
16   that we've had previous experience with and
17   do good work for us, and that's how we
18   selected these.
19       Q.  By the way, are the interviewers
20   themselves employees of the subcontractors,
21   or are they people who were recruited ad hoc
22   to do a particular job?
23       A.  The former.
24       Q.  Question 19 on Exhibit 14 reads
25   "What did the interviewers know about the

Page 153

1        McCullough
2    survey and its sponsorship?"  Is that
3    appropriate to ask of the survey?
4        A.  Yes.
5        Q.  And what is the answer for yours?
6        A.  They didn't know anything about any
7    sponsorship or any details of the survey or
8    what the results should be or might be.  They
9    just had the questionnaire in front of them.
10       Q.  Who -- does your field director
11   tell the subcontractors about the survey and
12   its sponsorship?
13            Do the management of these
14   companies know it?
15       A.  Absolutely not, no.
16            He doesn't even know it.
17       Q.  Oh.
18       A.  My field director doesn't even know
19   it.
20       Q.  So tell me about that.  How does
21   that work?
22       A.  I tell -- I tell the field director
23   what interviews I want to do and who I want
24   to interview, I prepare the questionnaire,
25   you know, with my project directors assisting

39 (Pages 150 to 153)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 154

McCullough
1       McCullough
2   me, and he gets it administered.  He calls
3   the field services and says:  "I have a so
4   and so interview.  It's ten minutes, the
5   incidence is 10 percent, and it will going to
6   be ready on -- we'll send it to you on
7   Thursday."  So he doesn't really know the
8   details of what's going on.
9       Q.  So the project directors work with
10  you on designing this survey, but the field
11  director administers it not working with you
12  on what it's about.
13      A.  Yeah.  He's an implementer.  He's
14  not a party to the design.
15      Q.  Question 40 on Exhibit 14 reads
16  "What procedures were used to ensure and
17  determine that the survey was administered to
18  minimize error and bias?"  Is that an
19  appropriate question to ask of a survey?
20      A.  Yes.
21      Q.  Do you believe you've met that
22  standard here?
23      A.  Yes.
24      Q.  Anything further to add beyond what
25  we've discussed already?

Page 156

McCullough
1       McCullough
2   our firm.  My field director then checks it
3   in to know how many interviews were done and
4   make sure people were qualified.  And then
5   one of our coding staff or clerical staff
6   will type the answers into the program.  And
7   then somebody else, different person, checks
8   that to be sure it's entered correctly.  And
9   then -- and then I have access to it.
10      Q.  Question 22 on Exhibit 14 reads
11  "What was done to ensure that the grouped
12  data were classified" consistency --
13  "consistently and accurately?"  Is that
14  appropriate question to ask of a survey?
15      A.  In some surveys, but we really
16  don't have any group data here.
17      Q.  What does "group data" mean in this
18  context?
19      A.  I think what they're talking about
20  is your subgroups.  You're talking about
21  analytical subgroups.  I think that's what
22  she's talking about there.
23      Q.  So, for example, if you had split
24  out people in one of your six age and sex
25  classifications --

Page 155

McCullough
1       McCullough
2       A.  No, I don't think so.
3       Q.  Question 21 on Exhibit 14 reads
4   "What was done to ensure that the data were
5   recorded accurately?"  Is that appropriate to
6   ask?
7       A.  Yes.
8       Q.  And what was done here?
9       A.  The data was entered and it was
10  checked.  Somebody proofread all the answers.
11      Q.  So the procedure was the
12  interviewer subcontractor firms mailed the
13  questionnaires back to your firm?
14      A.  Yes.  The interviewers saw (ph.)
15  the questionnaire.  The supervisor then sent
16  (inaudible)--
17      THE COURT REPORTER:  I can't hear
18      you.  I'm sorry.
19      A.  (Continuing) The interviewers fill
20  out the questionnaire.
21      THE COURT REPORTER:  "Saw?"
22      THE WITNESS:  Fill out the
23      questionnaires.
24      A.  (Continuing) They -- the
25  supervisors then send the interviews back to

Page 157

McCullough
1       McCullough
2       A.  Yeah, if you want to go with men
3   versus women or young versus old, et cetera,
4   I believe that's what she's referring to.
5       MS. KINGSBURY:  I just want to
6       remind my witness and counsel to be
7       careful about talking over each other.
8       THE WITNESS:  Okay.
9       I wouldn't do that!
10      (Laughter.)
11      THE WITNESS:  Not purposely at
12      least.
13      MS. KINGSBURY:  No.
14      Q.  Question 23 on Exhibit 14 reads
15  "When was the information about the survey
16  methodology and results disclosed?"  Is that
17  an appropriate as a question to ask of a
18  survey?
19      A.  Yeah, I guess so, even though it's
20  pretty obvious.  When you issue a report,
21  that one is disclosed -- disclosed.
22      Q.  Does this question mean anything
23  further to you beyond that?
24      A.  That's all it means to me.
25      Q.  Question 24 on Exhibit 14 reads

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 158

McCullough

1        McCullough
2    "Does the survey report include complete and
3    detailed information on all relevant
4    characteristics?"  Is that appropriate to
5    ask?
6        A.  Yes.
7        Q.  And in your report did you conclude
8    -- excuse me.  Did your report include
9    complete information on all relevant
10   characteristics?
11       A.  Yes, it does.
12       Q.  And the final question, 25, on
13   Exhibit 14 reads "In surveys of individuals,
14   what measures were taken to protect the
15   identities of individual respondents?"  Is
16   that appropriate to ask of a survey?
17       A.  Yes, it is.
18       Q.  What's the reason for that?
19       A.  It's to help ensure that
20   respondents are willing to answer questions
21   and answer them without any concern about how
22   their answers might be used.  There's no
23   sales follow-up.  Make sure they're candid.
24   And therefore they -- there's an implicit
25   guarantee of confidentiality.

Page 159

1        McCullough
2        As a matter of fact, there's even
3    an explicit guarantee of confidentiality to
4    keep their respondent pool available to us in
5    the long term.  Technically a natural
6    resource, so to speak.
7        Q.  And was that done here?
8        A.  Yes.
9        Q.  In the course of a survey like
10   this, do you alert the people that they may
11   get a phone call afterwards to validate?
12       A.  Sometimes we do and sometimes we
13   don't, and I'm not sure if we did it here or
14   not.  I don't think we did it here.
15       I don't consider that to be, you
16   know, important.  It's just arbitrary.  Sort
17   of some do, some don't.
18       Q.  But you did a validation exercise
19   here.
20       A.  Yes, we did.
21       Q.  You called back to ask people
22   whether they had participated in a survey.
23       A.  And other questions beyond that,
24   yes.
25       Q.  What's the purpose of validating?

Page 160

McCullough

1        McCullough
2        A.  To double-check the fact the
3    interview was actually conducted and, in our
4    case, to try to also be sure that the
5    qualifications were met in the survey.
6        Q.  In your particular survey, what
7    organization did the validating phone calls?
8        A.  It's an independent organization
9    called Park Research located in New Jersey.
10       Q.  P-a-r-k?
11       A.  P-a-r-k.
12       Q.  Is its name stated somewhere in
13   this report?
14       A.  I don't think so, no.
15       Q.  The -- if you look at Exhibit D to
16   your report --
17       A.  Yes.
18       Q.  -- the validation questionnaire has
19   the name of your organization but not the
20   name of the Park organization.  Why is that?
21       A.  Well, we're the ones who generated
22   the questions, so that we generate the
23   questions, and then we don't necessarily have
24   to send it to any one organization.
25       We happen to use Park Research a

Page 161

1        McCullough
2    lot because they do work for us, but this way
3    we can send it to anybody we want.
4        Q.  And where in your report is the
5    results of the validation exercise stated?
6        A.  It's stated in the report.
7    (Perusing document) Let's see.  The main
8    body, on page six of the report, the middle
9    of the paragraph at top:  "Several attempts
10   were made to contact each respondent.
11   Attempts were curtailed when more than half,"
12   in paren, "60 percent," close paren, "were
13   each invalidated," and then it goes on to say
14   a little bit more.
15       Q.  And is there a table somewhere, or
16   do you have a report given to you which
17   states the results of the validation in more
18   detail than that?
19       A.  I think you would have had that
20   produced to you.  It's multiple pages that
21   basically say yes or no to each of the
22   questions for each respondent, and you should
23   have a copy of that.  I think I produced
24   that.
25       Q.  Now that we've spent some time on

41 (Pages 158 to 161)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

Walter McCullough

Page 162

McCullough
1
2    Exhibit 14, the document which says it's a
3    report by you, do you now recognize it as a
4    report by you?
5        A.  From what we've just read, all
6    we've actually do (sic) is read basically
7    Sheri Diamond's questions outlined, so I
8    really -- that didn't refresh my memory any
9    more, because her questions have nothing to
10   do with this specific thing.
11       I don't -- I don't dispute the fact
12   that I did this.  It seems pretty obvious I
13   did.  I just don't recall it.
14       Q.  I would be content to break for
15   lunch now if you like.
16       A.  Sure.
17       MS. KINGSBURY:  Is that all right?
18       THE WITNESS:  Sounds good.
19       MR. BUCHANAN:  Off the record.
20       THE VIDEOGRAPHER:  Going off the
21   record.  The time is it 12:30 p.m.  This
22   is the end of tape three.
23       (Luncheon recess taken.)
24
25

Page 163

McCullough
1
2    A F T E R N O O N   S E S S I O N
3        THE VIDEOGRAPHER:  We are back on
4    the record.  The time is 1:25 p.m.  This
5    is the beginning of tape four.
6    W A L T E R   J.   M c C U L L O U G H ,
7        resumed and testified further as follows:
8    CONTINUED EXAMINATION
9    BY MR. BUCHANAN:
10       Q.  Welcome back, Mr. McCullough.
11       A.  Thank you.
12       Q.  Have you had a chance to see the
13   rebuttal report of Dr. Jacoby in this case?
14       A.  Yes, I have.
15       MR. BUCHANAN:  So let me ask to
16   mark that.
17       ([McCullough] Exhibit 16, rebuttal
18   expert report of Jacob Jacoby, Ph.D.,
19   marked for identification, as of this
20   date.)
21       Q.  Exhibit 16 is a copy of
22   Dr. Jacoby's rebuttal report, and that's the
23   one you've seen?
24       A.  Yes, that's correct.
25       Q.  In light of the comments in his

Page 164

McCullough
1
2    report --
3        MR. BUCHANAN:  Well, strike that.
4        Q.  Is there anything in his report
5    that you do agree with?
6        A.  (Laughing) Well, he -- he makes
7    reference to certain -- to the Sheri Diamond
8    chapter, et cetera.  I'm not going to
9    disagree with his references to that.
10       If you're talking about
11   specifically his criticisms about me?  I
12   don't think there's anything that I would
13   agree with, no.
14       Q.  Having had a chance to read his
15   report and think about it, if you were going
16   back to do your survey over again, would you
17   do anything differently?
18       A.  Nothing that I can think of right
19   now, no.
20       Q.  One of his -- his first critique
21   was on page four, paragraph eight, that you
22   asked about costs rather than asking about
23   what we would -- people would pay for a
24   printer.  And I asked you about that earlier.
25   Do you have anything to add on that subject

Page 165

McCullough
1
2    other than what you already told me this
3    morning?
4        A.  His criticism of me was actually
5    quite curious, because I don't see how he
6    took that away from the question.  He seems
7    to be implying here that I was asking about
8    manufacturer cost, but if you read the
9    question, I think anybody who reads the full
10   question would realize what we're talking
11   about is the cost to the consumer.  And in
12   the same sentence, the word price is used.
13   There's no reference whatsoever or I can't
14   even imagine how anybody would even think
15   that I'm trying to ask these consumers what
16   the manufacturer cost would be, but he seems
17   to allude to that in his criticism.
18       MR. BUCHANAN:  Let's pause for a
19   moment, because a new chair is coming
20   in.
21       THE VIDEOGRAPHER:  Going off the
22   record.  The time is 1:27 p.m.
23       (Discussion off the record.)
24       THE VIDEOGRAPHER:  We are back on
25   the record.  The time is 1:28 p.m.

42  (Pages 162 to 165)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 166

1        McCullough
2     Q.  And having read the comments that
3  Dr. Jacoby wrote about this, if you were now
4  going to go back and ask your question again,
5  would you ask it exactly the same or would
6  you change anything?
7     A.  I'd ask it the same way.  I think
8  it's a very clear question.
9     Q.  The next major point Dr. Jacoby
10  makes, on page five, is -- I'll paraphrase --
11  that the printers have numerous features, and
12  by asking about one of them, you drew
13  attention to that one at the expense of the
14  others. ; isn't that correct?
15     A.  I drew attention to one is correct.
16  I'm not sure I would agree with the idea of
17  your last part of your question.  There was
18  one that we were typically concerned about.
19  I wasn't really concerned about the other
20  features or if some of those were to be
21  removed, how much less the product would cost
22  if those were removed, so I didn't ask about
23  those, because they weren't an issue of
24  concern.
25     Q.  The -- this particular page of Dr.

Page 167

1        McCullough
2  Jacoby's report, in paragraph ten, points out
3  features.  It lists a number of them.  I see
4  -- one, two, three, four, five, six, seven,
5  eight -- nine features there.  If you ran a
6  survey similar to yours with essentially the
7  same question but asking about these other
8  features instead, do you expect that you
9  would get back numbers similar to the numbers
10  you got?
11     A.  I don't know, because that's
12  speculative.
13        But I don't think that kind of a
14  survey would be very reasonable.  If you're
15  asking people here's a machine, and if it
16  didn't have this, how much less would it
17  cost, and then if it didn't have this, how
18  much less would it cost, and if it didn't
19  have this, it seems it's a very awkward
20  survey vehicle.
21     Q.  And my -- my question wasn't clear.
22     A.  Okay.
23     Q.  I can tell by your answer, that it
24  didn't come out the way I intended it.
25        Suppose you ran a survey just like

Page 168

1        McCullough
2  yours, but instead of asking about the
3  adaptive lighting feature you asked about the
4  feature that says "Aproa color faxing," and
5  you ask people how much less would the device
6  cost if it lacked that feature.  Would you
7  expect to get numbers similar to the ones you
8  got when you asked about adaptive lighting?
9     A.  By asking about that specific
10  feature?
11     Q.  Right.
12     A.  I have no idea.  I didn't do that.
13     Q.  And if you asked about built-in
14  wireless networking, would you expect to get
15  numbers similar to yours, or different?
16     A.  The same answer.  I didn't do it,
17  so I don't know.
18     Q.  If you asked about any ten
19  features, isn't it likely that you would get
20  numbers that in total would exceed the price
21  of the printer?
22     A.  I have no idea if that would be the
23  case or not.
24     Q.  The --
25        THE VIDEOGRAPHER:  I'm getting

Page 169

1        McCullough
2  interference from somebody's BlackBerry.
3        (Discussion off the record.)
4     Q.  Dr. Jacoby, on page nine says that
5  your survey, as constructed, called for
6  people to make guesses, and you told me this
7  morning that you thought these were
8  estimates, not guesses.  Do you have anything
9  further to say on that subject?
10     A.  I'd just reiterate, when you ask
11  people a question as I asked them, there is
12  no reason to suspect they're guessing.
13  You've given them information, and there is
14  no reason why they can't reply intelligently
15  as to -- as to what their answer would be.
16  It's an estimate on their part, but it's not
17  a guess.
18     Q.  Were there any of the verbatim
19  responses that sounded like guesses when you
20  read them?
21     A.  I think there were one or two
22  people who used the word "I guess it would
23  be" so and so, as a matter of speaking
24  parlance, but that doesn't -- that doesn't
25  mean they were guesses.  It's just the way

43  (Pages 166 to 169)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 170

1           McCullough
2  that people speak sometimes.
3      Q.  So let's look at, for example --
4  I'm going to ask you to direct your attention
5  to your report, section E, second page of
6  data after tab -- after E.
7      A.  Okay.
8      Q.  Let me direct your attention to
9  questionnaire number 410, near the bottom.
10  Question one, "cost less," question two,
11  "taking a stab at the dark, but $15 comes to
12  mind," does that sound like a guess?
13          THE COURT REPORTER:  I didn't
14      understand you.
15          (Discussion off the record.)
16      A.  I think it's one person expressing
17  their opinion, and they're saying the way
18  that makes it sound more like a guess, but,
19  you know, they're not just -- they're not
20  just coming up with a number arbitrarily,
21  they're coming up with some kind of estimate,
22  even though the way they did it makes it
23  sound like some kind of guess.
24      Q.  And let me ask you to turn a couple
25  more pages to there's an answer for

Page 171

1           McCullough
2  questionnaire number 490, question one,
3  "costs less," question two, "between 15 or
4  100 bucks."  Do you see that one?
5      A.  What happened to the page?  Because
6  they're not in any order.
7          Can you tell me which page that is?
8      Q.  If you look in the column on the
9  next to the far right.
10      A.  How many pages in from the
11  beginning?
12          That might be easier --
13      Q.  Sure.
14      A.  -- because the pages aren't
15  numbered.
16      Q.  One, two, three, four, five --
17  sixth.
18      A.  And you said respondent 490?
19      Q.  490.  The number in the next to the
20  right-hand column is 75.
21      A.  Oh.
22      Q.  In fact, there is a cumulative
23  percentage you can look at, 75.93583.
24      A.  Ah.  75, is that (inaudible) --
25      Q.  So the verbatim response was --

Page 172

1           McCullough
2      A.  Sure.
3      Q.  -- "between 50 or a hundred bucks."
4      A.  No, what was the percentage?
5  Because that's a good way.  That's the way to
6  identify people.
7          You said a number on the right-hand
8  column?
9      Q.  Yes, 75.9358.
10      A.  Okay.  Now I got it.
11      Q.  So is that person guessing?
12      A.  No.  They're estimating between 50
13  and a hundred dollars.
14      Q.  And why did you put down for the --
15  am I correct in understanding from the next
16  to last column that the number you included
17  in your calculation of mean or median for
18  that person was 75?
19      A.  Correct.
20      Q.  Why 75?
21      A.  Because that's the midpoint between
22  50 and a hundred.
23      Q.  And when this person said between a
24  hundred -- "between 50 or 100," would 51
25  equally fall between 50 and a hundred?

Page 173

1           McCullough
2      A.  Well, the answer to that question
3  is, obviously, yes, because if you wanted
4  more than 50 but the answer -- I interpret
5  the answer is meaning they're giving me a
6  range, and I have to come up with one number
7  in the range, so I think it's the midpoint.
8      Q.  And let me ask you one more
9  question on these verbatims.  It's a
10  methodology question.  If you turn to the end
11  of this section on C6180, the last page of
12  C6180.
13      A.  (Perusing document) Okay.
14      Q.  Am I correct in understanding that
15  these are respondents at the top there, "DK,"
16  answered don't know?
17      A.  I'm not -- you said the last page?
18      Q.  The last page of C6180.
19      A.  Oh, I'm on the wrong page.  Okay.
20          (Perusing documents)
21      Q.  So at the top there's a
22  questionnaire I.D. number 307.
23      A.  Oh, yeah.  These are people that
24  said they don't know.
25      Q.  And am I right that you did not

44  (Pages 170 to 173)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

Walter McCullough

Page 174

McCullough

1          McCullough
2   include these in the calculation of the mean
3   or median?
4          "NA" in that column means not
5   applicable?
6      A.   Right.
7      Q.   And similarly, at the bottom
8   there's one questionable response as
9   identified in your report, 192, costs less,
10  two fifty.  "NA" means that you did not
11  include that in the calculation; is that
12  right?
13     A.   That's also correct.
14     Q.   Okay.
15     Q.   Mr. McCullough, have you also had a
16  chance to look at the report prepared by
17  Professor Jacoby on the survey that he
18  conducted?
19     A.   Yes, I have.
20         MR. BUCHANAN:  So let me ask that
21  we mark this.
22         ([McCullough] Exhibit 17, survey
23  report of Jacob Jacoby, Ph.D., marked
24  for identification, as of this date.)
25     Q.   Is this a copy of the report that

Page 175

1          McCullough
2   you've seen?
3          MS. KINGSBURY:  Sorry, Bob.  Do you
4   have a copy for me, too?
5          MR. BUCHANAN:  Oh, I'm sorry.
6          MS. KINGSBURY:  That's okay.
7          MR. BUCHANAN:  (Handing.)
8          MS. KINGSBURY:  Thank you.
9      A.   This appears to be the report, yes.
10     Q.   And have you been asked to form any
11  opinions about Dr. Jacoby's survey?
12     A.   Yes.
13     Q.   And what have you been asked?
14     A.   I've been asked to -- to be
15  prepared to critique his survey at trial.
16     Q.   Ah.
17         And have you done your work to
18  prepare for that?
19     A.   I've -- I've reviewed his report.
20  I've expressed my concerns or issues or
21  critique to counsel, but that's the extent to
22  which I have done that.
23     Q.   And to be clear, you've not
24  provided a report in writing stating your
25  opinions about the Jacoby survey.

Page 176

McCullough

1          McCullough
2      A.   No.  I had asked, when I had seen
3   it, if I -- if they wanted me to prepare a
4   rebuttal report, and they told me that the
5   deadline has passed for that.
6      Q.   Have you --
7          THE COURT REPORTER:  "They" what?
8          THE WITNESS:  That the deadline has
9   passed for that.
10     Q.   Would you tell me, please, what
11  opinions have you formed thus far about the
12  Jacoby survey?
13     A.   Well, there are lots of opinions.
14  Let me try to kind of organize it somewhat.
15         First of all, I -- I -- I
16  questioned his objectives in the fact that,
17  as I understand it, he was trying to, you
18  know, determine the information acquisition
19  and importance of various features,
20  particularly the adaptive lighting technology
21  feature, and the reason I question the
22  objective is it doesn't really go to the
23  value that that feature has to consumers, so
24  I think it's really very restrictive and
25  maybe not particularly helpful in terms of --

Page 177

1          McCullough
2   of this -- this situation or this case.
3          If I also take a look at the design
4   of the survey, the basic scope of the survey,
5   I don't think it's very a objective approach
6   to even the issue he was trying to report on.
7          It -- it seems like the -- the
8   design of the test was such that almost on a
9   priority basis one could reach the opinion
10  that it's unlikely that adaptive lighting
11  could possibly come up with a high level of
12  -- of acquisition, as he calls it, or
13  importance because of the design itself.
14         More specifically, he makes the
15  assumption that if somebody doesn't access
16  one of the features, that by definition, to
17  him, that that's not an important feature,
18  and I think that's really very improper,
19  incorrect.  And I think that his -- his data
20  actually I think indicates that as well.  For
21  example, around I think only 75 percent of
22  the people, or something like that, accessed
23  the manufacturer.  Using his logic, that
24  would mean that about 25 percent of the
25  people think that the manufacturer of the

45 (Pages 174 to 177)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

| Page 178 | Page 180 |
|---|---|

**Page 178**

1        McCullough
2   printer that they are being simulated to
3   purchase is not important. It's hard to
4   believe that 25 percent of the people would
5   not think the manufacturer is important.
6        There were similar levels,
7   something like on price. The price of the
8   equipment, I think only like 72 percent of
9   the people accessed that button in the
10  computer program, which is saying that about
11  28 percent of the people then, by his
12  definition, would say the price of the
13  printer is not an important item.
14       Red eye removal is one which is
15  really extreme, in that I think it's only
16  twenty -- you know, 24, 26 percent of the
17  people that say it's important. That means
18  that like 72, 74 percent of the people, by
19  his definition, would say that red eye is not
20  an important feature. And there are a number
21  of others that I could have cited. Those are
22  the ones I happen to recall. So this whole
23  concept, this whole theory of him saying that
24  if the total design -- in saying that if a
25  person doesn't access that button or access

**Page 179**

1        McCullough
2   that information, that therefore it's not
3   important is just -- is just -- it's silly.
4   It's just wrong.
5        The other thing in the design is he
6   relies on this Internet simulation situation,
7   and his rationale for doing that is he asked
8   some questions about people, whether they
9   have looked on the Internet for information
10  about products, but the products could be
11  anything: They could be looking to buy
12  batteries. They could be looking to buy CDs,
13  et cetera. There's no -- there's no
14  qualification that the people would be
15  looking to buy printers on line. And -- and
16  the following of using that process, I think
17  there's some common sense following to it in
18  the fact that it's highly unlikely that
19  people buying a relatively expensive piece of
20  equipment compared to most consumer type
21  products would not look at more than one
22  source of information. For instance, there's
23  consumer reports. There is the stores you go
24  into. There are friends and colleagues.
25  There are technical people in your company.

**Page 180**

1        McCullough
2   None of these resources were anything that he
3   took into consideration.
4        He's making the assumption that he
5   can get a simulation done on the computer
6   based on this computer simulation he set up
7   which doesn't make real sense. Some evidence
8   to that is -- again, from his own report, is
9   I believe it was 74 percent of the people in
10  his sample who bought a computer in the past
11  year bought it in a retail store, which
12  suggests that obviously there was some
13  involvement in the retail store, maybe a lot
14  of involvement.
15       In one of the footnotes on one of
16  his pages of his report he indicates that he
17  kicked a hundred ninety six people out of the
18  survey who were potential respondents,
19  because they didn't have Internet access. A
20  hundred ninety six people is actually more
21  people he kicked out that are actually in his
22  whole survey. In another part of the
23  information, again from his own survey, among
24  people who had bought a printer in the past
25  year, I think around -- maybe around half of

**Page 181**

1        McCullough
2   them or a little bit less than half of them
3   said that they did not use the Internet to
4   gather information about the printer before
5   they bought it.
6        So when you put these all together,
7   you realize that the stimulation (sic) on
8   the Internet is very unrealistic, and his own
9   data shows it's unrealistic. So that's some
10  of the basic design issues that we get into.
11       When we get into the actual
12  interview itself, let's talk about the
13  universe, kind of -- I'm kind of using as a
14  framework sort of like Sheri Diamond might
15  use, in terms of how to evaluate these
16  surveys. We talked about the universe. I
17  think the universe is appropriate, and
18  obviously I'm saying that because he used the
19  same universe as I did.
20       In terms of how he went about
21  getting it, the process of getting to the
22  sample, et cetera, was among the worst I've
23  seen maybe ever. The telephone method of
24  recruiting people conceptually is fine, but I
25  think it was 210,710 numbers that he dialed

46  (Pages 178 to 181)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 182

McCullough

1 or that were dialed in his behalf to try to
2 reach a hundred and ninety people that he
3 eventually put in his survey. There's
4 something wrong with that. There's something
5 wrong with the sample that he used. There's
6 something wrong with the techniques that he
7 used. There's no way that anybody should --
8 who does a proper survey should have to use
9 that many phone numbers to try to get a
10 hundred ninety people to qualify,
11 particularly since the incidence was not
12 infinitesimal. The incidence probably was
13 somewhere not too far away from my 10 percent
14 level.
15        The process of doing the interview,
16 the telephone interview, was also very
17 inappropriate. There is no -- there was no
18 procedure to contact a specific individual
19 and household. He just talked to or his
20 interviewers talked to anybody who answered
21 the phone. Proper telephone technique would
22 indicate you have to use some kind of control
23 to be sure that you get some kind of
24 representative sample of people, at least
25

Page 183

McCullough

1 when you initially talk to them before you
2 actually then try to find somebody who's
3 qualified.
4        So there's no issue -- no control
5 on the sex of the individual. There's no
6 control on the age of the individual.
7 There's no control on anything in terms of
8 dialing that number. And part of the
9 evidence of this improper procedure is I
10 think in 64 percent of his surveys is
11 females. Now, it's hard to believe that 64
12 of the people who buy printers or are likely
13 to buy printers are female to start with.
14 Just intuitively that doesn't make sense.
15 But if you look at the mechanics of what he
16 did, I can understand how he got there, and
17 what that is is that there's a proclivity, a
18 well-known proclivity, of women to be more
19 likely to answer the phone than men. And
20 since he didn't have any procedure set up in
21 terms of the telephone interview situation,
22 he probably got a very disproportionate level
23 of women who he was talking to initially
24 because they were the ones who are most
25

Page 184

McCullough

1 likely home and most likely answering the
2 phone. Even if there are men and women both
3 being home at the same time, there's a known
4 phenomenon that woman are more likely to pick
5 up the phone than the man.
6        There is also no record of when the
7 phone calls were made, and that may be part
8 of problem. If a lot of dialing was done
9 during the daytime, well, then you have an
10 additional probability of getting more women
11 than men, because more women were home. Even
12 though a number of them work, there's still a
13 number of them that are home. I don't have a
14 record of when they were called, but maybe
15 that's some explanation as to why so many
16 phone numbers had to be called to result in
17 the number of people surveyed.
18        So the sampling was really quite
19 bad, among the worst I've seen in terms of
20 the telephone selection procedure.
21        In terms of the actual interview
22 situation, the -- the interview was -- on the
23 Internet situation was really I think quite
24 -- quite poor. The more -- the more items
25

Page 185

McCullough

1 you put into this procedure that he did,
2 obviously the fewer -- the fewer things
3 people are going to click on. As a matter of
4 fact, Dr. Jacoby indicated -- this in his
5 deposition -- that the more -- the more items
6 that you put into something, the more likely
7 there are other people clicking on -- on
8 fewer of them, percentagewise at least.
9        As a matter of fact, I think he
10 said at one point, you know: I really could
11 have been really bad, and put in a hundred of
12 them, and then, you know, where would you
13 guys have been? So I only put in 28. But
14 yet he cites a scholarly piece of research
15 that says that many people access, I think he
16 said, between nine and twelve in this piece
17 of research. So if people normally access
18 nine to twelve items -- I assume that that
19 scholarly piece that he cites is correct --
20 then that means by definition, a lot of
21 people aren't going to access the 28 items or
22 many of the 28 items.
23        The length of the interview was
24 also of great concern to me. He in both of
25

47 (Pages 182 to 185)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

| Page 186 |
|---|

```
 1          McCullough
 2   initial screening and also again the
 3   information appears on the screen, the
 4   respondents said (sic) that the interview
 5   will take about ten minutes to be
 6   administered.  Dr. Jacoby I believe in his
 7   deposition had said it would be around ten
 8   minutes.  So I'm looking eight to nine, some
 9   would be ten to  twelve, whatever, but from
10   what I see from the tables, which are
11   Appendix I and Appendix J tables, if I -- if
12   I'm remembering the numbers correct, it looks
13   like the interview on average took around 39
14   minutes.  Some of the data is not completely
15   clear there, but that's the best I could -- I
16   could -- I could do.  And as he indicated in
17   his deposition, I think, when the interview
18   gets particularly long, particularly beyond
19   the expectation period that you created for
20   people, people pay -- tend to pay less
21   attention to it, and are less concerned.  So
22   as the interview is -- if the interview -- if
23   I'm correct, and the interview was as long as
24   I think I'm understanding from his report,
25   then a lot of people would be expecting it to
```

| Page 187 |
|---|

```
 1          McCullough
 2   be ten minutes, and it turns out to be 39
 3   minutes, once it gets beyond a certain point,
 4   they're not going to be paying real attention
 5   to it.
 6          Which may also explain one of the
 7   reasons that he went for the 10- dollar to a
 8   20-dollar to a 50-dollar incentive, part of
 9   which he attributes to the fact that it had
10   to be done in a short period of time but part
11   of which also may be due to the fact that
12   people were not completely on task, because
13   they realized that they were told something
14   that wasn't true.
15          But then people -- then you have
16   the question of, well, what about the people
17   who -- who actually tried to go through the
18   interview, once they got beyond the
19   expectation time limit of what you told them
20   a couple of times, are they going to go
21   through the process with any degree of
22   diligence once they've already gotten to the
23   10-, 15-minute period, and the interview is
24   still not even close to being over.  So
25   there's a real issue there as well.
```

| Page 188 |
|---|

```
 1          McCullough
 2          He also acknowledges at one point
 3   in time that he realized that there are some
 4   people weren't paying attention, and he
 5   retabulated the data to take out people who
 6   accessed zero, one or two features.  And he
 7   -- he -- I think he took 38 people or
 8   something like that out.  He had a base of
 9   one fifty two I think it was, in that area,
10   on that -- on that base.  But the reduction
11   of people who were zero, one or two is really
12   kind of arbitrary on his part.  I think he
13   said he didn't go beyond two, because it
14   might have affected some people who picked
15   adaptive lighting as one of the features.
16   But what that's -- what his -- what he
17   indicated by doing this retabulation was the
18   fact that he acknowledged and realized that a
19   number of people weren't paying attention to
20   the interview, but did he go far enough, and
21   did he take enough people out.
22          And then if he realized these
23   people weren't paying attention, and he
24   reduced it, and he ran a whole set of
25   retabulations that completely mirrored that
```

| Page 189 |
|---|

```
 1          McCullough
 2   retabulation on this reduced base of one
 3   fifty two, then my question would be why
 4   wouldn't he then report the one fifty two and
 5   not the one ninety two, because basically what
 6   he's saying is those people didn't honestly
 7   -- didn't honestly complete the interview,
 8   based upon his own interpretation, even
 9   though he may be -- he may be cutting off at
10   an arbitrary point.  He should at least, I
11   think, said, okay, well, I'm going to  take
12   those people out, I'm not going to count
13   them, because they really didn't pay
14   attention.  Obviously people may click on
15   anything.
16          The other thing about the 28
17   different items there is that a number of
18   them were items that were not features really
19   but they really were descriptions or
20   indicators of the brand.  For instance,
21   "Manufacturer" was one thing you had to click
22   on to see who manufactured the product.
23   "Model" was number.  "Picture" was another.
24   I think "Dimensions" might have been another
25   one.  There was a number of things up top,
```

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 190

McCullough
1        McCullough
2    before you got to the real features, that
3    instead of just being presented as well,
4    here's the so-and-so printer that's made by
5    so-and-so, and this is the model number, and
6    now I want you to click on "Features." They
7    had to go through the task of going through
8    each one of these items before they got to
9    anything what I would call really features,
10   as opposed to just descriptives of what they
11   were talking about.  So the task was made
12   very onerous on people because of that.  And
13   I think they had like seven or eight of them
14   that came before any of the features that
15   were there.
16       He then goes on later on in the
17   questionnaire or in the interviews in the
18   simulation interview and, as I indicated
19   before, he only asked people who clicked on
20   one of these features whether it was
21   important or not, and that's an assumption
22   that doesn't make any sense at all.  As I
23   indicated before, I mean does that mean that
24   any 25 percent of the people won't be able to
25   make the machine (sic)?

Page 191

1        McCullough
2        THE COURT REPORTER:  I don't
3        understand what you just said.  Could
4        you speak a little more clearer?
5        A.  (Continuing) Does that mean that 25
6    percent of the people do not make the
7    machine?  Does that mean that -- don't care
8    who makes the machine, I'm sorry.  Does that
9    mean that 72 percent of the people don't
10   think the red eye reduction is important?  Et
11   cetera.  I mentioned this earlier before, but
12   it's kind of sequentially looking at the
13   questionnaire in terms of the design issues.
14       So I don't think that -- in sort of
15   summarization, I think the study was off
16   target.  The design, I thought, was really
17   very inappropriate.  I think his own -- his
18   own findings I think showed to be
19   inappropriate.  I think he made a lot of
20   assumptions which were incorrect, and I think
21   the -- the whole thing was set up in such a
22   way that it was looking for a predetermined
23   conclusion.
24       Q.  So let me go back and ask you about
25   some of these things in particular.

Page 192

1        McCullough
2        You began by saying that you had a
3    criticism of the objective as stated of the
4    Jacoby survey.  Let's look on page two of his
5    report?
6        A.  Yes.
7        Q.  What's wrong with the objectives as
8    stated on page two of Exhibit 17?
9        A.  (Reading) Well, it doesn't go to
10   the value of the -- of the feature, and I
11   thought that was what was appropriate for the
12   situation, not just to find out if people
13   normally go to acquire information, even
14   though he didn't do that appropriately, but
15   forgetting how he did it versus the -- the --
16   the objective, I think -- I thought the
17   objective was more to try to put a value on
18   -- on this adaptive lighting technology from
19   a consumer point of view, and this doesn't do
20   it.
21       Q.  In your survey you identify the
22   objective that you were aiming at, and in his
23   Jacoby identifies the objective that he's
24   aiming at.  Based on what do you say that the
25   objectives stated by Jacoby are not

Page 193

1        McCullough
2    appropriate?
3        A.  Well, I thought part of the issue
4    in this case was to determine -- I thought --
5    as the lawyers described it to me, I thought
6    the objective that I had was the one that was
7    important to the damages issue in the case.
8        Q.  So that objective that you had
9    comes from your discussions, but is there --
10   as a matter of survey expertise or
11   methodology, is there something a priori
12   wrong about the objectives that Jacoby
13   described?
14       A.  No.  It -- it -- no.  No.  If you
15   think that these objectives fit into some
16   part of the case that you're trying to
17   present, then no, there's nothing that in
18   itself would say these objectives are wrong,
19   even though I think he achieved the
20   objectives, but that's a different story.
21       Q.  You said a second (sic), as I heard
22   it, that you believe that the design of the
23   Jacoby survey would a priori be expected to
24   lead to a result that adaptive lighting had a
25   low level of importance, or I think your

49 (Pages 190 to 193)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 194

McCullough
1
2  words were unlikely that adaptive lighting
3  could have a high level of importance.  Why
4  do you say that with respect to adaptive
5  lighting as compared to any of the other
6  items that people could click?
7      A.  Well, some of the other items were
8  also -- were also low, but adaptive lighting
9  was one that didn't have any definition put
10  to it, and some people who were looking at it
11  might have thought it being something very
12  technical instead of something that just made
13  sense just based on the name.  That's one --
14  one set of respondents.
15      Another set of respondents may have
16  understood what it was -- I don't know how
17  many people do or not -- in which case there
18  is no need for them to click on it.  But if
19  then they don't click on it because they
20  don't think there's a need to click on it or
21  conversely they don't click on it because
22  they don't understand I think a technical
23  thing, they don't need to look at, none of
24  those people are asked the importance
25  question.  So he's made the assumption that

Page 195

McCullough
1
2  if they didn't click on it, I'm not going to
3  ask them about how important it is, even
4  though there are two possible explanations of
5  why somebody would not be clicking on it.
6  And why wouldn't he ask the importance
7  question?  It's all of them.
8      Q.  But let me ask about red eye
9  removal as a point of comparison.
10      Do you think there's something
11  about the design of the Jacoby survey that
12  a priori would lead you to expect that people
13  would rank red eye removal relatively more
14  important and adaptive lighting relatively
15  less important?
16      A.  I can't speak to any one specific
17  item because I don't know, but the concept
18  basically is if you give them 28 items to
19  click on, if you tell them the interview's
20  going to be ten minutes, and it turns out to
21  be a lot longer than that, and a number of
22  the items that are up front are the ones that
23  are descriptive and not really attributes,
24  and you don't ask the importance question to
25  the people who don't click on the item, then

Page 196

McCullough
1
2  the importance level, by definition, has to
3  be much lower than it would have been if you
4  had asked everybody about the importance.
5      Q.  But is there -- let me sharpen my
6  question.  Is there something specific about
7  the treatment of adaptive lighting in this
8  survey as compared to the other things that
9  leads you to expect that adaptive lighting
10  would not be given a high level of importance
11  as compared to other things?
12      A.  Well, it may be less likely to be
13  clicked on because it's not -- it's not --
14  it's not obvious what it is from just looking
15  at the name, whereas red eye removal is
16  pretty amaze -- pretty obvious.  "Requires a
17  computer" is pretty obvious.  "Has a photo
18  tray" would be pretty obvious.  "Has external
19  color image displays."  A lot of these are
20  self-descriptive, but "adaptive lighting" is
21  not descriptive.  So he could have presented
22  a definition for it that would have been
23  understood by people, and therefore maybe
24  people would have been (inaudible) on how
25  important it was to them.

Page 197

McCullough
1
2      Q.  Did you yourself go through the
3  experience of taking this survey?
4      A.  Yes, I did.
5      Q.  So you looked at the description of
6  adaptive lighting, as well as the other
7  descriptions?
8      A.  I didn't look at all of them.  I
9  went through it just to go through the
10  process to see what -- I didn't -- I didn't
11  have the time to go through the whole
12  interview.
13      Q.  And so you noticed that you could
14  click on "Adaptive Lighting" --
15      Did you click on "Adaptive
16  Lighting"?
17      A.  I don't remember.  Sorry.
18      Q.  And are you aware that if you do
19  click on "Adaptive Lighting," the screen
20  gives you a description of what adaptive
21  lighting is?
22      A.  But you have to click on it first,
23  right?
24      Q.  Do you have any quarrel -- do you
25  have any criticism of the description of

50 (Pages 194 to 197)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 198

1           McCullough
2  adaptive lighting as given?
3      A.  No.  No.
4      Q.  All right, you mentioned that
5  "Requires a computer" you said would be
6  somewhat self-explanatory.
7      A.  Right.
8      Q.  Doesn't that mean that people would
9  be less likely to click on it?
10     A.  At least they know what it is.
11 There's two groups of people there.  They're
12 less likely to click on it in some, and
13 there's some that maybe even say, well, I
14 want to see if the question's yes or no.
15         Because I think there's a question
16 mark there.  Right?
17     Q.  And if there weren't a question
18 mark, and if it just said "Requires a
19 computer," wouldn't that then be a
20 declaratory statement --
21     A.  Right.
22     Q.  -- with nothing further (speaking
23 simultaneously) --
24     A.  (Speaking simultaneously) -- a
25 question mark --

Page 199

1           McCullough
2      THE COURT REPORTER:  I'm sorry.
3      THE WITNESS:  I'm sorry.
4      I'll take your admonishment.
5      (Laughter.)
6      A.  (Continuing)  Yes, if there were no
7  question mark there, it would be more a
8  descriptive statement, which I'm not even
9  sure it would be even necessarily be in there
10 then, because it's just a -- it's not a --
11 not something necessarily you have to -- you
12 have to say possibly.
13     Q.  Did you -- do you recall looking at
14 the item that read "Requires a computer,"
15 question mark?
16     A.  I'm sorry, I can't remember any
17 specific thing.  I went through the
18 questionnaire I think twice, but it -- I was
19 going through it not necessarily remembering
20 everything I did.  I didn't take a record of
21 what I did.  I don't remember.
22     Q.  And is it your understanding that
23 the printer being tested here has some
24 functions that it can perform without being
25 connected to the computer?

Page 200

1           McCullough
2      A.  I didn't pay attention to that
3  detail.  I'm sorry.
4      Q.  Without regard to --
5      MR. BUCHANAN:  Strike that.
6      Q.  So it would be your view that the
7  survey design doesn't give you a basis for a
8  particular number that represents the
9  importance of any one item, such as
10 identifying -- such as adaptive lighting.
11     A.  Correct.
12     Q.  Now, how about the range of numbers
13 from one to another?  Do you think the survey
14 is fairly designed to ascertain that the
15 manufacturer's name is relatively more
16 important and adaptive lighting is relatively
17 less important?
18     A.  Not necessarily.  There's a lot of
19 biases that go into each of these.
20 "Manufacturer's name" was in the front, in
21 the beginning of the listing, and by
22 definition, if you click on it, which I think
23 75 percent roughly I think clicked on that,
24 by definition, you're asking the importance
25 question.  If you then click on the adaptive

Page 201

1           McCullough
2  lighting, you won't ask the importance
3  question, even though you probably should
4  have done.
5      Q.  You will recall that the -- that
6  there's an initial screen where you can --
7  where the respondent can -- is presented
8  three -- a category of "General Information,"
9  a category of "Features" and a category of
10 "Technical Specifications."
11     A.  I do.
12     Q.  Are you saying that there's a
13 primacy effect as to how those three
14 categories were presented on that screen?
15     A.  Well, I think there would be an
16 inclination to start at the top and maybe
17 work your way down, which is not unusual.
18     Q.  What do you mean by start at the
19 top?
20     A.  "Manufacturer," the first item.
21     Q.  But in order to -- so the first
22 screen presents categories of General
23 Information or Features or Technical
24 Specifications.  Are you with me on that?
25     A.  Yes.

51 (Pages 198 to 201)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 202

1           McCullough
2       Q.  And then if you click on General
3   Information --
4       A.  Um-hm?
5       Q.  -- then underneath that you get
6   subcategories which include Manufacturer's
7   Name --
8       A.  Right, um-hm.
9       Q.  -- Model Name --
10      A.  Right.
11      Q.  -- Functions, Suggested Retail
12  Price, Picture of Unit, Dimensions and
13  Warranty Information.
14      A.  So that's by somebody who's not --
15  probably would be -- many people would be
16  likely to do that first, to find out what
17  brand they're talking about, what model
18  they're talking about.  And again, now
19  they're into the interview, and they've spent
20  a certain amount of time already, and they're
21  expecting to only spend ten minutes.
22      Q.  So it's your opinion that people
23  are more likely to begin by clicking on
24  General Information and less likely to begin
25  by clicking on Features.

Page 203

1           McCullough
2       A.  I think that there's an inclination
3   that a lot of people do that.  I can't --
4   that can be -- that can be tested.  I can't
5   test it, because I don't have the ability to
6   test that.  I don't have data in that format.
7   But I would think that's likely.
8       Q.  Now, you mentioned that in your
9   view, the treatment of Red Eye Removal was
10  particularly extreme.  Why do you say that?
11      A.  No, the point I was making was that
12  I think 72 percent of the people did not
13  click on it, which meant that 72 percent of
14  the people were not asked the importance
15  question about red eye removal.  The reason I
16  say extreme is the number was real high.  72
17  percent of the people not clicking on it
18  means 72 percent of the people were excluded
19  from being asked the importance question, and
20  therefore, by Dr. Jacoby's method, an
21  assumption was made that that's not important
22  to them.
23      Q.  And did you have a basis for
24  asserting that red eye removal is important
25  to a higher percentage of people than shown

Page 204

1           McCullough
2   in the Jacoby survey?
3       A.  I can't really attest to what the
4   numbers on -- from -- I think his survey has
5   an awful lot of problems.  I can't really
6   (inaudible) any of the numbers in the survey,
7   so --
8           THE COURT REPORTER:  "I can't"
9       what?
10      A.  -- believe any of the numbers in
11  the survey, based on the criticism I made.
12  But I would think it would be an important
13  feature in a lot of people.
14      Q.  On what basis do you think it would
15  be an important feature to a lot of people?
16      A.  Just my own layperson knowledge of
17  people, you know, looking at photos, and
18  talking to people, I would think that's an
19  important feature.
20      Q.  All right.  You said that the cons
21  -- are you critiquing the concept of
22  presenting people with a simulated Internet
23  experience of clicking on information?
24      A.  Yes.  That's -- that's the proper
25  -- that's the proper method, based upon what

Page 205

1           McCullough
2   he's trying to do.
3       Q.  All right.  And one of the
4   critiques that I heard you state was that
5   likely in the actual world people would go to
6   more than one source of information.  Why is
7   that a basis to critique an Internet
8   simulation of the type that Mr. -- Dr. Jacoby
9   did?
10      A.  Well, he's not allowing -- he's not
11  allowing for that possibility.  He's assuming
12  that all the information that people get, it
13  could be compressed within this simulation
14  that he's created.
15      Q.  But why does that -- any survey is
16  inherently sampling some aspect of the real
17  world at large that goes on broader, longer
18  or deeper.
19          Why is that particular phenomenon a
20  critique of this type of simulation?
21      A.  Well, I mean I could -- the
22  simulation seems to be not replicating a
23  process that is -- is the common experience.
24  And what you try to do in a simulation is you
25  try to represent some degree of what's likely

52 (Pages 202 to 205)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 206

McCullough
1
2  to happen in the real world.
3        When a hundred and ninety six
4  people that you've identified as being
5  eligible for your survey can't do the survey
6  because they don't have Internet capability
7  or availability, that says something about
8  whether Internet is a reasonable thing for --
9  a reasonable method of simulation.  When 74
10  percent of the people who have bought a
11  printer in the past year indicate that they
12  bought at the retail store, that's indicating
13  that retail stores are particularly important
14  in the purchase of these equipment.  When 50
15  percent or -- or 45, 50 percent of the people
16  who -- in your own study who purchased a
17  printer in the past year say that they did
18  not go on line to get information about
19  printers before they bought the printer,
20  that's another thing saying that the Internet
21  may not be the right vehicle to do the
22  simulation.
23        And the simulation, you set it up
24  in such a way that there's so many -- so many
25  choices to make in such a limited amount of

Page 207

McCullough
1
2  time that if you don't click on a certain one
3  of these items, you're -- you're -- you're
4  cut out of the availability of expressing
5  your importance of the item, which is just
6  wrong.
7        Q.  Do you believe your survey was a
8  closer simulation of real world conditions?
9        A.  I wasn't really trying to do a
10  purchasing simulation study.  What I was
11  basically trying to do is ask people to look
12  at a product and in the context of if they
13  were thinking about this product -- thinking
14  about buying this product, but I wasn't
15  trying to simulate the full process, as he
16  was trying to do, and I wasn't excluding
17  people, and I wasn't giving them an over --
18  an overly ambitious task.  It was a very
19  different type of an interview.
20        Q.  Have you ever done any simulation
21  studies in your own work, whether in business
22  settings or litigation settings?
23        A.  Nothing of this type exactly that
24  he did, I don't think.  I can't recall any.
25        Q.  Have you done anything that's

Page 208

McCullough
1
2  simulation studies?
3        A.  I mean the studies I do -- I mean
4  even the study I did is to some extent a
5  simulation.  I'm just saying it wasn't the
6  some type of simulation he tried to do.
7        I can't recall any others there
8  that I've done.  I probably have, but it --
9  I've done so many studies over so many years,
10  and it's just not coming to me.
11        Q.  Are you familiar with any academic
12  literature on on-line survey simulations?
13        A.  No.
14        Q.  You've mentioned that a hundred
15  ninety six people didn't participate in the
16  Jacoby survey because they didn't have
17  Internet availability.  Now, to begin with,
18  something very simple:  It's certainly true
19  that people could not have done the Internet
20  on-line simulation if they didn't have
21  Internet availability, right?
22        A.  Exactly.
23        Q.  So it's not surprising that those
24  hundred ninety six didn't participate.
25        A.  It's not surprising that they

Page 209

McCullough
1
2  couldn't have participated, by definition.
3        Q.  Now, is there any reason to think
4  that the people who did participate formed a
5  sub-sample that was biased in some
6  characteristic as compared to those who
7  didn't participate?
8        A.  There's no way to really know that
9  except the fact that some people don't have
10  Internet capability and there are more of
11  them that are actual respondents in the study
12  suggest that they could be.  There could be
13  big differences in each group.
14        Q.  What differences could there be
15  that would be relevant to the objective of
16  the Jacoby survey?
17        A.  I guess it's hard to know where to
18  start, because there's so many issues and
19  problems here.  When you have a universe
20  which is what he would describe -- and we
21  both described that in a similar fashion --
22  you try to have a sample that replicates the
23  universe as the best you can, but then when
24  you start taking out large groups of people
25  out of that universe -- or out of that

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 210

```
1          McCullough
2  sample, rather, you then distort the
3  universe.  What kinds of problems that
4  causes, who knows, but it -- it -- it
5  distorts the -- it distorts the sample.  It
6  distorts your representation of that sample
7  representing the universe.  And there's a
8  large group of people that he took out of
9  that sample, that were part of the universe.
10      So who knows what kind of bias is
11 removed here?  You don't know, because we
12 don't know what these other people, how they
13 would have answered the questions if they
14 could have been asked the questions in a
15 non-on-line manner.
16     Q.  Based on your experience in working
17 with at least hundreds of surveys, do you
18 have a belief that the sample that ultimately
19 answered the Jacoby survey was
20 non-representative in a way that's relevant
21 to the objectives?
22     A.  It probably is, yes.  I would say
23 yes.
24     Q.  And what is it?
25     A.  Well, it's the fact that it was
```

Page 211

```
1          McCullough
2  such a major exclusionary -- certain large
3  number of people excluded from the sample.  I
4  can't tell you exactly how the answers would
5  have differed, because obviously they weren't
6  interviewed, but when you have a sample where
7  you exclude a large number of people and many
8  or more people than you actually have in your
9  own survey, there's a likely bias that
10 develops.
11     Q.  And so -- I'll ask the question
12 again -- based on your experience in surveys,
13 do you have a belief as to what
14 characteristics of those who did answer is
15 non-representative in a way that's relevant?
16     A.  I -- I can't -- I can't answer the
17 question with any specifics in mind, because
18 I don't know what answers you people (sic)
19 would have given if they had been
20 administered a -- a similar study that wasn't
21 done on-line.
22     Q.  One thing that you mentioned was
23 that -- you said 64 percent of the
24 respondents were female.
25     A.  Yes.
```

Page 212

```
1          McCullough
2      Q.  In your own survey, did you find a
3  difference in responses between females and
4  males?
5      A.  I didn't analyze that.
6      Q.  Do you have -- have you checked to
7  see whether there was a substantive
8  difference in the responses to the Jacoby
9  survey as between females and males?
10     A.  No, I have not done -- I have not
11 done that.
12      I think I -- I probably can do
13 that, because I do have some raw data, but I
14 must point out the raw data doesn't --
15 doesn't given me a hundred ninety
16 respondents.  For some reason, the data that
17 I was given, it looks like 249 respondents,
18 so I haven't been able to retab anything,
19 because I don't have the right base.  There's
20 something wrong with the data file he gave
21 me.  So I can't go back and do any tabs until
22 I get that straightened out.  I mean I can't
23 straighten it out.  You'd have to straighten
24 it out for me.
25     Q.  Did you -- do you have any -- based
```

Page 213

```
1          McCullough
2  on your experience, do you have any reason to
3  believe that females have different answers
4  as compared to males in a way that's relevant
5  to the objectives of this study?
6      A.  I mean nobody can answer that
7  question, because we don't really know what
8  the answers would be.
9       And why mention the female
10 difference?  It's just something that was in
11 his tables that was obvious.  That's not to
12 say there aren't age issues also, because he
13 didn't -- in the screening technique that was
14 used for the telephone interview, there were
15 no controls based upon getting people in
16 terms of the right age groups or -- the
17 right gender groups, so that could be all
18 messed up as well.
19     Q.  And are you able to identify any
20 specific way in which you believe that age
21 might lead to a non--- excuse me,
22 non-representative sample in a way that's
23 relevant to the objectives of the study?
24     A.  These are the things that you
25 really can't prove one way or the other, and
```

54 (Pages 210 to 213)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 214

```
 1         McCullough
 2  that's why one has to follow good research
 3  technique, and if you don't follow good
 4  research technique, you have all of these
 5  pondering questions that you can't prove that
 6  -- that -- that certain parts are not
 7  representative for the most part, but you
 8  just know that if you don't do good sampling
 9  procedures and you don't do appropriate
10  interviewing situations, that the sample that
11  you're likely to wind up one is one that is
12  not representative.  You can't necessarily
13  identify how it is not representative.  But
14  that's the whole reason for following good
15  interviewing procedures, is that so you don't
16  have to worry or ask that question.
17      Q.  I think you said that there was,
18  you said, no record of when the phone calls
19  were made.
20          Have you seen the -- the file of
21  raw data that we provided?
22      A.  I have seen the raw data.
23          And maybe -- you're right, maybe
24  there is some time frame on that, but I don't
25  know -- those are the only interviews
```

Page 215

```
 1         McCullough
 2  that are completed, those are not -- not all
 3  the attempts, so I have a partial record.  I
 4  probably could -- if I could get the hundred
 5  ninety parsed out of that two forty nine
 6  whatever that the file I've got have, I could
 7  then see how many people were interviewed
 8  during certain times of the day.  I wouldn't
 9  know about the rest of the situation, in
10  terms of the people who weren't contacted.
11          I was trying to explain the
12  possibility of why -- why it took 210,710
13  phone calls to get respondents, because
14  that's out of sight.  I've never seen
15  anything so huge like that in terms of
16  database.
17      Q.  And did you see Dr. Jacoby's
18  deposition testimony on that subject?
19      A.  He kind of passed the buck to the
20  people who were doing the -- doing the
21  interviewing.  He kind of divorced himself
22  from -- he said those are left up to the
23  experts, I think, in TNS, whoever did the
24  interviewing.
25      Q.  And did you see there were some
```

Page 216

```
 1         McCullough
 2  number of thousand where the telephone was
 3  disconnected, and some number of thousand
 4  where the phone wasn't answered, and so forth
 5  and so on?
 6      A.  Well, if you look at Appendix G,
 7  which I think this is in, I think those are
 8  the ones that are subtracted out of that
 9  number.  Well, there are certain components
10  that I saw, but why those numbers get so
11  high, it's hard to know.
12          I don't know if I have G in here.
13  Can we be sure?
14      Q.  If you start at the back, I think
15  you'll see there's K and then J and then I
16  and then H and then --
17      A.  Appendix G.
18      Q.  -- a vertical columns that says --
19      A.  Oh, it's on the back of the page.
20  That's front and back.
21          MS. KINGSBURY:  And I want to
22      point out that this exhibit only
23      includes the hard copies of the
24      appendices, it does not include
25      electronic versions, which include
```

Page 217

```
 1         McCullough
 2  Appendix C, Appendix I and Appendix J.
 3  Therefore --
 4          MR. BUCHANAN:  Sure thing.  And --
 5      and let's clarify that.
 6      Q.  You have seen, Mr. McCullough, the
 7  CD that's Appendix C, and it has on it a
 8  sample --
 9      A.  Yes.
10      Q.  -- of this survey?
11      A.  Yes.
12          And that's the one I told you that
13  was imprecise?
14      Q.  No, I'm asking you something
15  different.
16      A.  Oh.
17      Q.  Appendix C was a CD where when you
18  loaded it up you can click through the survey
19  yourself (speaking simultaneously) --
20      A.  That one?  I did that.  Yes, I did
21  use that.
22      Q.  So you did get that.
23      A.  Yes, I did.  Thank you.
24      Q.  And another CD had Appendix I and
25  Appendix J, if I'm recalling the letters
```

55 (Pages 214 to 217)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 218

1          McCullough
2   correctly, which were some tables.
3        A.  I've -- I've -- I've looked through
4   I and J to see the tables.  Yes, I'm aware of
5   those.
6        Q.  And finally, to complete further, a
7   couple -- I've forgotten -- one week, two
8   weeks ago I -- we provided a CD which
9   provided raw data --
10       A.  That's the one I told you --
11       Q.  -- (speaking simultaneously) also.
12       A.  That's the one I told you --
13          THE COURT REPORTER:  I'm sorry.
14   Counsel and the witness --
15          (Discussion off the record.)
16          (Record read as follows:
17          "Question:  And finally, to
18   complete further, a couple -- I've
19   forgotten -- one week, two weeks ago we
20   provided a CD which provided raw
21   data" --
22       Q.  -- and you have seen that as well.
23       A.  I have seen that, and that's the
24   one I'm mentioning to you has I think 249
25   respondents on it, not one ninety, and I

Page 219

1          McCullough
2   don't know what the discrepancy is all about.
3        Q.  And counsel's correct, we don't
4   have those CDs here today, but you've seen
5   them.
6        A.  I have seen the ones that you
7   mentioned, yes.
8          MS. KINGSBURY:  One further
9   clarification is I should have said it's
10   only part of Appendix C that's not
11   attached here, because there is -- there
12   are some hard copy documents in
13   Appendix C, but the rest of it is the
14   simulation, the actual electronic
15   survey.
16          THE WITNESS:  Okay.
17       Q.  So now let's go back to Appendix G,
18   which is on the reverse side of the page it
19   says G, and you say up at the top it says
20   "complete counts 676"?
21       A.  Yes, I do.
22       Q.  All right.  Is it your
23   understanding that that's the number of
24   people who did go ahead and undertake a --
25   the -- the online survey?

Page 220

1          McCullough
2        A.  No, I don't think so.  Those are
3   the people who theoretically, by definition,
4   would have qualified for it.  They didn't all
5   go on and do the survey, because the survey
6   is only a hundred ninety.  So some of them
7   didn't.
8          But there are other categories here
9   which I'm not really sure what's in them.
10   Like, for instance, the "Soft Refusal," I
11   don't know what that means exactly in this
12   context.  Does that mean people who qualified
13   or didn't want to interview?  Does that mean
14   that they weren't -- they weren't going to --
15   they weren't going to cooperate with the
16   screener?  It's just not clear what that
17   means.
18          It just was astounding to me -- and
19   I've done a large number of telephone
20   interviews over the years -- that there were
21   215,000 numbers, many of whom weren't called,
22   210,710 numbers who were called that resulted
23   in so few interviews.  There's a lot going on
24   here that I don't think is clear just from --
25   from -- from this one little chart, and --

Page 221

1          McCullough
2   I'm sorry.
3        Q.  You mentioned that the Soft Refusal
4   category, you said you don't understand what
5   that means.  Are there any other categories
6   stated here that you don't understand what
7   they are?
8        A.  Well, probably there are.  I mean
9   let me just look through them.
10          I presume this is a final
11   disposition report as opposed to a cumulative
12   one, so I start with that premise.  For
13   instance, by -- what I mean by that if they
14   got a busy signal when they called the first
15   time but the second time they got a complete,
16   that that number would have come out of Busy
17   Signal and would have gone into Complete, so
18   I'm making that kind of assumption, that this
19   is a final disposition report, even though it
20   doesn't say that.
21          The Telephone Answering Device
22   being 33,600, I understand what that is, but
23   was the calling done at different times of
24   the day, on different days, the callbacks?  I
25   don't know about that, because I don't think

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 222

1        McCullough
2    Dr. Jacoby knew that either.  He kind of said
3    he left it up to the people at TNS to decide.
4    Good telephone procedure usually has you
5    making three to four telephone calls to any
6    one household at different times of the day
7    on different days.  Whether that was followed
8    or not, I don't know, but there seem to be a
9    large number of -- of attempts here that
10   didn't result in anything successful, so it
11   raises a very big question in a researcher's
12   mind about how this was actually done,
13   because it's -- it's an astounding number of
14   calls for a hundred ninety interviews with an
15   incidence level that's somewhere around 10
16   percent.  It just doesn't compute.
17       Q.  You mentioned that the money
18   incentive provided was increased from $10 to
19   $20 to $50.  Do you have any basis for -- do
20   you believe that that, in some way that's
21   relevant, biased the sample?
22       A.  No, I wouldn't complain about that.
23           Biasing the sample, I think I was
24   using it as a possible explanation of -- of
25   the fact that the interview was a lot longer

Page 223

1        McCullough
2    than -- than -- than advertised, and perhaps
3    that was a reason why or one of the reasons
4    why it had to be increased from 10 to 20 to
5    50, because, you know, it was more than a
6    ten-minute interview, and people weren't
7    going to -- weren't going to do it if the
8    interview wasn't as long as they think it
9    was, for ten bucks.
10       Q.  And do you believe that that in
11   turn led the results to be unreliable?
12       A.  Not by itself, no.  I wouldn't
13   criticize that.
14       Q.  And in case my question wasn't
15   clear, if you're right in inferring that
16   people were led to believe the time would be
17   ten minutes, and it turned out to be an
18   average of 39, do you believe that that in
19   turn led to results that are unreliable?
20       A.  It may have to some extent caused
21   people to pay less attention to the
22   interview, and click on fewer things just to
23   get done with the interview if they feel they
24   were taken advantage of.
25       Q.  We've talked about the Jacoby

Page 224

1        McCullough
2    survey for a while now.  Have you formed any
3    other opinions about it beyond the ones that
4    you've told me?
5        A.  I can't think of any.  I think I
6    told you the main ones I can think about.
7    (Inaudible) off the top of my head.
8           THE COURT REPORTER:  What was that
9    last?
10       A.  (Continuing) I'm doing it off the
11   top of my red head.
12          THE WITNESS:  My voice is getting
13   raspy.  I'm sorry.
14          MR. BUCHANAN:  Counsel, I propose
15   another break.
16          MS. KINGSBURY:  Okay.
17          THE VIDEOGRAPHER:  Going off the
18   record.  The time is 2:30 p.m.  This is
19   the end of tape four.
20          (Recess taken.)
21          THE VIDEOGRAPHER:  We are back on
22   the record.  The time is 2:56 p.m.  This
23   is the beginning of tape five.
24       Q.  Mr. McCullough, based on the work
25   that you have done in the case, have you

Page 225

1        McCullough
2    formed an opinion on what customers would be
3    willing to pay to get the use of the adaptive
4    lighting feature?
5        A.  I can -- not exactly in those
6    terms.  Actually, it's the -- I determined is
7    what they think the value of it is, which is
8    slightly different.
9        Q.  And first of all I'll ask you what
10   did you determine, what dollar number?
11       A.  Well, as a round -- as a round
12   number I would use the numbers that came from
13   the median, which is around $20 I think for
14   the less expensive machine, and then about
15   $50 for the more expensive printer.
16       Q.  And now I'll ask you what's the
17   difference, as you used the terms on the one
18   hand, the perceived value of the feature and,
19   on the other hand,  in my words, what
20   customers would be willing to pay far the
21   feature?
22       A.  Well, they could be the same, but
23   the way I was asking the question was it was
24   what they think the value of that is, and I'm
25   not even sure that these people would

57 (Pages 222 to 225)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

Walter McCullough

Page 226

McCullough
1     McCullough
2  necessarily actually buy this -- you know,
3  that printer.
4      Q.  So then what does perceived value
5  mean in that context?
6      A.  Is what they think that feature is
7  worth if they were to buy that piece of
8  equipment.
9      Q.  So value is what it would be worth
10 if they were going to buy the printer, which
11 is different from the assertion that actually
12 these people would in fact buy the printer.
13 Is that the point?
14     A.  That's right.
15     Q.  And is -- how about if it's some
16 other printers that's not the 300-dollar
17 model and not the hundred-dollar model; have
18 you formed an opinion as to what the
19 perceived value of the adaptive lighting
20 feature would be in some other printer?
21     A.  I think a rule of thumb would be
22 probably taking 17 percent of the price of
23 the equipment, and assessing that as the
24 value, since that seems to be the level it
25 came out for two printers at two different

Page 227

1     McCullough
2  printers.
3      Q.  And have you formed an opinion as
4  to what would be the value, the perceived
5  value of customers of -- how -- of software,
6  of the opinion to buy stand-alone software
7  that contains an adaptive lighting feature?
8      A.  I have no opinion on that.
9      Q.  And how about have you formed an
10 opinion on what would be the value to
11 customers of receiving, or not -- not buying
12 specifically, but by any method obtaining
13 stand-alone software that has an inactive
14 lighting feature?
15     A.  My study doesn't give any
16 information about stand-alone software.
17     Q.  Have you formed any opinion as to
18 how often people who have the Hewlett-Packard
19 printers use the adaptive lighting feature?
20     A.  No.
21     Q.  Do the results of your survey and,
22 for that matter, the Jacoby survey give any
23 basis to draw a conclusion as to that
24 question?
25     A.  No.

Page 228

1     McCullough
2      Q.  Have you formed any opinion as to
3  whether people who have an HP printer are
4  likely to print more photos as a result of
5  having the adaptive lighting feature?
6      A.  I don't know that either way.
7      Q.  And so I take it the results of
8  your survey and, for that matter, the results
9  of the Jacoby survey do not provide a basis
10 to draw a conclusion on that question.
11     A.  That's correct.
12     Q.  Have you drawn -- formed any
13 opinion as to whether HP derives a benefit
14 from having the adaptive lighting feature
15 provided to people who own HP printers?
16     A.  I think just on the basis of the
17 fact that it has a perceived value of some --
18 of some amount, that would basically say yes,
19 it does provide a benefit.
20     Q.  And have you formed any opinion as
21 to what's the -- how to quantify that benefit
22 to Hewlett-Packard?
23     A.  Nothing precisely, no.  Just what I
24 volunteered in my report.
25     Q.  Nothing further on that subject.

Page 229

1     McCullough
2      A.  That's correct.
3      Q.  And so I take it the results of
4  your survey don't provide a basis to state
5  anything further to quantify that dollar
6  benefit.
7      A.  That's right.
8      Q.  And I -- and likewise, the Jacoby
9  survey that you've seen doesn't provide a
10 basis to quantify that benefit?
11     A.  That's also correct.
12     Q.  Your survey actually was conducted
13 in early 2008.  Do you have any opinion as to
14 what perceived value was in 2002?
15     A.  I can't really know that, since I
16 didn't do the survey then.
17     Q.  Do you have any opinion as to what
18 HP as of 2002 should have or did believe was
19 the perceived value on the adaptive lighting
20 feature?
21     A.  I have no information about that at
22 all.
23     Q.  Have you formed any opinion as to
24 what your survey results tell us about a
25 negotiation between HP and Polaroid if there

58  (Pages 226 to 229)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 230

1          McCullough
2   had been one in 2002?
3       A.   No.
4       Q.   And the Jacoby survey, for that
5   matter, did those results, in your opinion,
6   tell us anything about the probabilities of a
7   negotiation between Hewlett-Packard and
8   Polaroid if there had been one in 2002?
9       A.   No.
10      Q.   Have you ever -- we've talked about
11  testimony that you've given on surveys.
12           Have you ever in any case given
13  testimony about quantifying damages?
14      A.   No.
15      Q.   Have you ever -- and to be
16  specific, have you ever given testimony about
17  what would be a reasonable royalty in a case
18  seeking damages for patent infringement?
19      A.   No.
20      Q.   And you don't have any opinion on
21  what the reasonable royalty would be in this
22  case?
23      A.   That's correct, I do not.
24      Q.   And just to say something that I
25  think is obvious, you obviously have not

Page 231

1          McCullough
2   formed opinions on the subject of whether
3   Hewlett-Packard infringed or whether the
4   patent was valid, or subjects of that
5   technical nature.
6       A.   That's correct.
7       Q.   Have you ever asked -- in any case
8   have you ever been asked to design a survey
9   that goes to the question of how the patent
10  owner and the alleged infringer would
11  negotiate royalties as between them?
12      A.   No.
13      Q.   Now, have I now heard all of the
14  opinions that you formed to date in this
15  case?
16      A.   All the ones that I can recall at
17  this point in time.  I would at some point
18  like to have the opportunity to have a
19  corrected file of the respondents so that I
20  can possibly -- I'm not sure I will do
21  anything with, it but at least in case I'm
22  asking to do something, to look at the one
23  ninety respondents, that I would have a file
24  for that, and not the file that I have, which
25  has 249 on it, and I may reach some opinions

Page 232

1          McCullough
2   that counsel would ask for me later on, but I
3   can't anticipate that.
4       Q.   Do you have a -- I heard you
5   explain that the raw data file that we
6   provided to you, you said had two fifty in
7   it.  Do you have any other reason for
8   suggesting that that's not a correct file?
9       A.   No.  I just know -- I know there
10  are a hundred ninety respondents, and that's
11  I think two forty nine.  You said two fifty;
12  I think it's two forty nine.  But I have no
13  other reason to suspect it's wrong.
14           But like you raised some issues
15  before about do I know there's a difference
16  between men and women, et cetera, and if
17  counsel asked me at some point to investigate
18  that, I'd rather have, you know, the complete
19  file, the accurate file, as opposed to one I
20  don't.  They may not.
21      Q.   (Speaking simultaneously).
22      A.   That's one reason.
23      Q.   Pardon me.
24      A.   Sure.
25      Q.   The nature of my question is -- I

Page 233

1          McCullough
2   understood what you were pointing to as what
3   you would perceive as an anomaly in the
4   number --
5       A.   Yeah.
6       Q.   -- but do you have any reason to
7   think that what we provided to you is not the
8   correct file?
9       A.   I do not have any reason to suspect
10  that.
11      Q.   As we are sitting here today, do
12  you have any plans to undertake any other
13  investigation in the case besides the things
14  that you've told me so far?
15      A.   Nothing, unless counsel brings up
16  some things they want me to look into that
17  I've not been told about yet.
18      Q.   So nothing yet.
19      A.   Nothing at this point, no.
20           MR. BUCHANAN:  Counsel, I'm going
21  to conclude my questioning for today.
22  As I said earlier in the morning, it
23  will be HP's position that the data on
24  the camera survey should have been
25  included in Mr. McCullough's report and

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 234

```
1         McCullough
2    provided since, and I understood your
3    position, so it will be our position
4    that those things should be provided,
5    and the deposition reopened thereafter.
6    But we'll take that up in the
7    appropriate fashion at some other time.
8         MS. KINGSBURY: Okay. I have a
9    couple of follow-up questions, if I may.
10   EXAMINATION BY
11   MS. KINGSBURY: :
12       Q. Mr. McCullough, one of the things
13   you've talked about with Mr. Buchanan was
14   about the respondents that you did not
15   include in your report because, for instance,
16   they had said that the feature was -- that
17   the printer without the feature --
18       MS. KINGSBURY: Strike that.
19       Q. Mr. Buchanan had asked you earlier
20   why you disqualified certain respondents. In
21   particular there were some respondents that
22   seemed to think that the value of the printer
23   once the feature had been removed was
24   somewhere between ten and twenty dollars, a
25   very small amount. If instead you had
```

Page 235

```
1         McCullough
2    excluded anyone who thought the feature cost
3    $50 or more, what impact, if any, would that
4    have had on the results?
5        A. Without going back, I can't be
6    precise about that, but I think it would have
7    a minimal effect on it, maybe no effect on
8    the median and probably a minimal effect on
9    the mean, but no substantive effect I can
10   think of. But it's easily calculated.
11       Q. Why do you believe that it would
12   have a minimal impact on the results by
13   removing that group of respondents?
14       A. Well, there aren't that many people
15   in that group, and there's a large sample
16   size, so reducing, taking out ten or fifteen
17   people out of the -- out of the calculation
18   is probably not going to have that much of an
19   effect on a base of around 400 and some-odd.
20       (Discussion off the record.)
21       Q. And just to clarify, when we're
22   talking about the $50 or more, we're talking
23   about the more expensive printer --
24       A. Yes.
25       Q. -- is that right?
```

Page 236

```
1         McCullough
2        A. Right.
3        Q. Another thing Mr. Buchanan asked
4    you was why you didn't pose the question of
5    your survey as what is the value to you as a
6    respondent, and in response it's my
7    understanding that you said that you did pose
8    that question but in a better way. Can you
9    explain that?
10       A. I think an easier way for a
11   consumer at least to come up with that type
12   of information is to start with a base of
13   saying here's a printer that has a feature,
14   and this is what the feature is, and this is
15   what it does, et cetera, and then to ask them
16   if I were to remove -- if I had a printer
17   that did not have this feature, how much less
18   do you think that that would -- that would --
19   that would cost; how much of a price do you
20   think that would be. I think that's an
21   easier way for people to relate to that
22   issue, rather than just abstractly saying
23   what's the value of that feature to you.
24       Q. Another question Mr. Buchanan asked
25   you is why in your survey, when respondents
```

Page 237

```
1         McCullough
2    were asked about if the feature were removed,
3    you would provide --
4        MS. KINGSBURY: Strike that.
5        Q. In the question that you asked in
6    your survey concerning what would happen if
7    the adaptive lighting feature was removed,
8    you provided two potential responses. One
9    was it would cost the same or it would cost
10   less. Mr. Buchanan asked you why you did not
11   also add the response would it cost more, and
12   in response you said that was silly. Can you
13   explain that.
14       A. Well, when you -- when you deal
15   with respondents, and you're trying to get
16   them to take a test seriously, you don't want
17   to give them a response category that seems
18   to be one which doesn't make any sense. It
19   causes them to feel like maybe it's -- you
20   know, you're not very serious about what
21   you're doing. So you try to avoid things.
22   You know, if you have -- if you have a
23   printer with a feature, and you say if I'm
24   going to remove that, it's almost illogical
25   to say it would cost more. And that's why I
```

60 (Pages 234 to 237)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 238

McCullough

1        McCullough
2   didn't have it in there, so not to -- not to
3   make it sound silly.
4       Q.  I'm looking at [McCullough]
5   Exhibit 6, which is your report, and
6   specifically I'm looking at Exhibit E, and
7   this is -- I'm looking at the last page of
8   the data on the C6 180 printer, which is a
9   page that Mr. Buchanan had had you look at
10  before.
11      A.  Okay.
12      Q.  Specifically the second column has
13  "DK," and you had identified for him that the
14  DK stood for don't know.
15      A.  That's right.
16      Q.  And I think he had asked you if
17  those people had in fact not been included as
18  respondents in your analysis.  Is that right?
19      A.  They're not in the mean or median,
20  correct.
21      Q.  Okay.  So they've not been factored
22  into your median.
23      A.  Right.  They're in the study, but
24  they're not in the -- they're not in the mean
25  or median.

Page 239

1        McCullough
2       Q.  Okay.  And I just wanted to ask as
3   well, there's below, in the second column
4   after the "DK" that starts with "Costs less,"
5   and then in the next column it says "Don't
6   know," and then again "Don't know," and then
7   the next column which is identified as value
8   used in mean or median, "NA"?
9       A.  Right.
10      Q.  And I want to make sure I
11  understand what that represents.
12      A.  All right you.
13      Q.  Maybe you should just explain that
14  to me.
15      A.  Yeah.  These are seven respondents
16  that in question one said that they thought
17  it would cost less, but when we asked them in
18  the open-ended basis in question two how much
19  less, they said they didn't know, and then
20  again when we offered them the opportunity to
21  pick from one of the closed-end options, they
22  still said they didn't know.  So these people
23  are also excluded from the mean and the
24  median.
25      Q.  Okay.  And so -- so I understand,

Page 240

McCullough

1        McCullough
2   if people said it cost less and then said
3   they didn't know how much less, they still
4   didn't have the option to say, when asked
5   with the -- when provided with the card that
6   showed the ranges, they could still say don't
7   know.
8       A.  Oh, absolutely.
9       Q.  Okay.  And if they did say don't
10  know, then their response was not calculated
11  into the median.
12      A.  That's correct.
13      Q.  Okay.  Mr. Buchanan also asked you
14  why you didn't -- or asked you if you
15  analyzed whether men or women or different
16  ages in your survey (sic).  Specifically, to
17  be a little more clear, he had asked you if
18  you had looked at how many more -- or how
19  women responded as compared to men, or
20  different age groups responded, and you had
21  responded no, is my understanding.  Why
22  didn't you analyze that information?
23      A.  Well, there was no particular
24  reason to do that.  There's a lot of groups I
25  could have looked at.  I could have looked at

Page 241

1        McCullough
2   different age groups.  I could have looked at
3   different genders.  But if there is no reason
4   to do that, then I would normally not do
5   that.  It's an opportunity I would have if I
6   wanted to do it, but I just don't see any
7   reason why I would do that.
8       Q.  Did you attempt in your survey to
9   address the potential of getting more females
10  than males?
11      A.  Well, I actually -- by the
12  screening process, which I talked about
13  earlier, what that -- that screening process
14  where you -- you get people to answer the
15  screening questions in proportion to their
16  existence in the population in those six
17  groups, by setting up a screening criteria
18  like that, then the people who fall into your
19  study based on the qualifications fall in in
20  the proper proportion in terms of age and
21  sex.  It's a technique I developed years ago,
22  which I think other people have copied since
23  then.
24      MS. KINGSBURY:  Okay.  I have no
25      further questions.

61 (Pages 238 to 241)

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

| Page 242 |
|---|
| 1         McCullough |
| 2         MR. BUCHANAN:  I want to ask a |
| 3    clarification about the clarification. |
| 4         (Laughter.) |
| 5    BY MR. BUCHANAN: |
| 6         Q.  On your report, Exhibit 6, counsel |
| 7    asked you about Exhibit E and about responses |
| 8    over $50. |
| 9         A.  Right. |
| 10        Q.  Can you look at Exhibit E, and I'm |
| 11   going to look at the fourth page of data on |
| 12   Exhibit E. |
| 13        A.  (Perusing document) Fourth page. |
| 14   Let me see.  One, two, three, four. |
| 15        Q.  So this should be the page for the |
| 16   HP Photosmart C6 180. |
| 17        A.  Right. |
| 18        Q.  And that's the price of a penny |
| 19   less than $300. |
| 20        A.  Right. |
| 21        Q.  So that's the more expensive of the |
| 22   two printers. |
| 23        A.  Right. |
| 24        Q.  And do you see on this page is |
| 25   where we begin with the numbers $50? |

| Page 243 |
|---|
| 1         McCullough |
| 2         A.  Yes. |
| 3         Q.  Okay.  So there's three pages |
| 4    before this one with numbers less than $50. |
| 5         A.  Right. |
| 6         Q.  And then after this one there's a |
| 7    page five with numbers of $50, yes? |
| 8         A.  Okay. |
| 9         Q.  And a page six with numbers of $50 |
| 10   going up to a hundred, yes? |
| 11        A.  Right. |
| 12        Q.  And page seven of numbers of a |
| 13   hundred dollars, yes? |
| 14        A.  Okay. |
| 15        Q.  And a page eight with numbers of a |
| 16   hundred and higher. |
| 17        A.  Okay. |
| 18        Q.  So for this more expensive printer, |
| 19   if you were to take out the numbers $50 or |
| 20   higher, that -- that would indeed change the |
| 21   mean or the median, yes? |
| 22        A.  In this one it would, yes. |
| 23        Q.  And so when you said it wouldn't, |
| 24   you were talking about the less expensive |
| 25   printer. |

| Page 244 |
|---|
| 1         McCullough |
| 2         A.  Correct. |
| 3         Q.  So let's look at the less expensive |
| 4    printer.  This is the -- let's begin with the |
| 5    Officejet 5610 with a price, after rebate, of |
| 6    a penny less than a hundred dollars.  So on |
| 7    the first page we have numbers of zero, Yes? |
| 8         A.  Okay. |
| 9         Q.  And the second page numbers of zero |
| 10   running up to $10. |
| 11        A.  Right. |
| 12        Q.  On the next page, third page, |
| 13   numbers 10 to 15, yes? |
| 14        A.  Right. |
| 15        Q.  Fourth page numbers 15 to 20, yes? |
| 16        A.  Right. |
| 17        Q.  Fifth page, numbers 20 to 25. |
| 18        A.  Right. |
| 19        Q.  Sixth page, numbers 25 to 40. |
| 20        A.  Right. |
| 21        Q.  Seventh page, numbers 40 to 75. |
| 22        And if we begin with 50, I'll just |
| 23   count up how many there are here.  I'll count |
| 24   silently.  I got a 39 on that page that had |
| 25   $50 or more.  Does that sound right? |

| Page 245 |
|---|
| 1         McCullough |
| 2         A.  Right. |
| 3         Was the question $50 or more or |
| 4    more than $50?  Just to be clear. |
| 5         Q.  Well, I'll ask about $50 or more. |
| 6         A.  Okay. |
| 7         If you took those out, is that what |
| 8    you're asking about? |
| 9         Q.  Yes. |
| 10        A.  It would probably have -- again, as |
| 11   I said, it would probably not have a dramatic |
| 12   effect on the median.  It might affect the |
| 13   mean more, because it's easily calculatable. |
| 14   I mean I just can't do it sitting here.  But |
| 15   it's not going to effect the mean -- it's not |
| 16   going to affect the median very much, and it |
| 17   might affect the mean a little bit, but it's |
| 18   still going to be a value that's going to be |
| 19   close to 20 bucks probably.  But again, you |
| 20   know, it needs to be calculated. |
| 21        MR. BUCHANAN:  Okay.  I have |
| 22   nothing further, Colby, at this time, |
| 23   subject to what I said before. |
| 24        MS. KINGSBURY:  I have no further |
| 25   questions. |

62  (Pages 242 to 245)

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

Walter McCullough

Page 246

1         McCullough
2         THE VIDEOGRAPHER:  Going off the
3  record.  The time is 3:19 p.m.  This is
4  the end of tape five and concludes this
5  deposition.
6  _____
7         WALTER J. McCULLOUGH
8
9  Subscribed and sworn to before me
10 this ___ day of _____, 2008.
11
12 _____
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 247

1
2         C E R T I F I C A T E
3  STATE OF NEW YORK    )
4                 : ss.
5  COUNTY OF NEW YORK   )
6
7         I, SHAUNA STOLTZ-LAURIE, a Notary
8  Public within and for the State of New
9  York, do hereby certify:
10        That WALTER J. McCULLOUGH, the
11 witness whose deposition is hereinbefore
12 set forth, was duly sworn by me and that
13 such deposition is a true record of the
14 testimony given by the witness.
15        I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I
18 am in no way interested in the outcome
19 of this matter.
20        IN WITNESS WHEREOF, I have hereunto
21 set my hand this 9th day of May, 2008.
22
23
24 _____
25        SHAUNA STOLTZ-LAURIE

Page 248

1
2  ------------------ I N D E X ---------------
3  WITNESS        EXAMINATION BY       PAGE
4  WALTER McCULLOUGH  MR. BUCHANAN      5, 242
5           MS. KINGSBURY       234
6  ------------ INFORMATION REQUESTS-----------
7  REQUESTS:
8  23  Materials on cameras
9  ------------------- EXHIBITS----------------
10 [McCULLOUGH]                FOR ID.
11 [McCullough] Exhibit 1, Monroe Mendelsohn
12 Research, Inc. 2/1/08 invoice to Kirkland &
13 Ellis......................................9
14 [McCullough] Exhibit 2, printout from
15 Internet on 2005 printer sales.............30
16 [McCullough] Exhibit 3, Monroe Mendelsohn
17 Research, Inc. 2/1/08 invoice to Polaroid
18 Corporation...............................34
19 [McCullough] Exhibit 4, Monroe Mendelsohn
20 Research, Inc. 3/7/08 invoice to Polaroid
21 Corporation...............................37
22 [McCullough] Exhibit 5, Monroe Mendelsohn
23 Research, Inc. 3/7/08 invoice to Polaroid
24 Corporation...............................41
25

Page 249

1
2  [McCullough] Exhibit 6, Walter McCullough
3  March 2008 expert report...................42
4  [McCullough] Exhibit 7, Monroe Mendelsohn
5  Research, Inc. invoice to Polaroid.........54
6  [McCullough] Exhibit 8, website printouts
7  contained in Mr. McCullough's project
8  folder.....................................71
9  [McCullough] Exhibit 9, printouts from
10 Internet...................................77
11 [McCullough] Exhibit 10, printout from
12 Internet...................................81
13 [McCullough] Exhibit 11, printout from
14 Internet...................................82
15 [McCullough] Exhibit 12, HP website printout
16 from Mr. McCullough project folder.........83
17 [McCullough] Exhibit 13, printout from HP
18 website....................................84
19 [McCullough] Exhibit 14, Mr. McCullough
20 expert report in Levi Strauss case........122
21 [McCullough] Exhibit 16, rebuttal expert
22 report of Jacob Jacoby, Ph.D..............163
23 [McCullough] Exhibit 17, survey report of
24 Jacob Jacoby, Ph.D.......................174
25

                    63  (Pages 246 to 249)

Walter McCullough

Page 250

```
1
2          *** ERRATA SHEET ***
           ESQUIRE DEPOSITION SERVICES
3
   NAME OF CASE:  POLAROID v HP
4  DATE OF DEPOSITION:  MAY 6, 2008
   NAME OF WITNESS:  WALTER J. McCULLOUGH
5
   Reason codes:
6     1.  To clarify the record.
      2.  To conform to the facts.
7     3.  To correct transcription errors.
8  Page _____ Line _____ Reason _____
   From _____ to
9  _____
   Page _____ Line _____ Reason _____
10 From _____ to
   _____
11 Page _____ Line _____ Reason _____
   From _____ to
12 _____
   Page _____ Line _____ Reason _____
13 From _____ to
   _____
14 Page _____ Line _____ Reason _____
   From _____ to
15 _____
   Page _____ Line _____ Reason _____
16 From _____ to
   _____
17 Page _____ Line _____ Reason _____
   From _____ to
18 _____
   Page _____ Line _____ Reason _____
19 From _____ to
   _____
20 Page _____ Line _____ Reason _____
   From _____ to
21 _____
   Page _____ Line _____ Reason _____
22 From _____ to
   _____
23
24
   _____
25        WALTER J. McCULLOUGH
```

ESQUIRE DEPOSITION SERVICES, LLC
1-800-944-9454

83ac5977-95b5-4f5c-a692-2bf61c1c055e

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| POLAROID CORPORATION | ) | C.A. No. 06-738 (SLR) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HEWLETT-PACKARD COMPANY | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DECLARATION OF WALTER MCCULLOUGH</u>

I, Walter McCullough, declare as follows:

1)    I am eighteen (18) years of age, I have never been convicted of a felony or crime of moral turpitude, and I am fully competent to make this declaration.

2)    Based on my position with Ipsos Mendelsohn, I have personal knowledge of the facts stated herein.

3)    I am the Chairman and CEO of Ipsos Mendelsohn Inc. (formerly Monroe Mendelsohn Research Inc.), a custom marketing, media and opinion research company located at 841 Broadway, New York, New York 10003-4704.  Ipsos Mendelsohn is a member of the Council of American Survey Research Organizations (CASRO) and Council for Marketing and Opinion Research (CMOR), which are trade associations for the marketing research business, and I am personally a member of the American Marketing Association, American Statistical Association, and the American Association of Public Opinion Research (AAPOR).

4)    I was retained by Kirkland & Ellis LLP, attorneys for Polaroid Corporation, to conduct a survey to design and conduct research to determine consumers' perceived value of

Hewlett-Packard's Adaptive Lighting Technology feature, which is used in printers and cameras. I conducted and presented a report on the survey results of the Photosmart C6180 printer, and the Officejet 5610 printers (the "Surveys"), and was deposed regarding that assignment.

5)     Although I was originally asked to also conduct a survey on an HP camera, I was told by Polaroid's counsel to discontinue that survey. I have confirmed that the camera survey was conducted entirely separate from the printer surveys. While both camera and printer interviews were conducted in three of the eight interviewing locations, in those three locations the interviews were conducted as separate surveys among different respondents.

6)     While it is true that this was the first time I had ever conducted a consumer valuation survey for litigation purposes, I have conducted thousands of surveys in the 40 years I have worked in the survey research field and many of them have related to the value consumers place on products. I have also conducted hundreds of surveys for litigation purposes. My opinions have been regularly accepted by the courts.

7)     Based on my experience, I decided that respondents for these Surveys should be people who had purchased a color inkjet printer in the past year or who thought they might buy one in the next year. Respondents were selected from a representative pool of consumers who mirrored the gender and age makeup reflective of the population as determined by the US Census Bureau. Because the Surveys were focused on consumers' perception of the value of the feature and not on estimating manufacturing or wholesale cost, there was no reason to have greater skills or knowledge as a respondent. I did not seek out skilled respondents for the Surveys because the objective was not intended to survey experts. Nor were the respondents just random-selected retail shoppers.

2

8)     I developed the definition of Adaptive Lighting that I used in the Surveys from different pages of HP's own website and not from random places on the Internet.  In putting together the definition, I used HP's own words or made neutral slight adjustments.  The bulk of the definition was taken from a webpage discussing cameras since I was originally asked to also do a camera survey.  The goal was to put together a generalized description of Adaptive Lighting since this feature is available in a significant number of both cameras and printers.  There would have been no benefit to limiting the definition to one used for the specific printers that were surveyed since the infringing feature is in many different HP printers and cameras.  I wanted to use a constructive cohesive definition that consumers would understand.

9)     Respondents were provided with a fact sheet showing the attributes of the particular surveyed printer.  As part of the survey, respondents were told to consider a printer without the Adaptive Lighting feature, and then they were provided a full range of possible responses as to whether such a printer would cost less or the same without the Adaptive Lighting feature.  When respondents were asked to value the printer without the Adaptive Lighting feature, there was no indication made to the respondents that the printers would not continue to have the other attributes listed on the fact sheet.

10)    There was never an indication during the Surveys that respondents would not be asked similar questions about other features.  Therefore, the survey questions did not suggest any specific answers from the respondents.  But asking about the value of the remaining attributes in the printer was unnecessary because those attributes are not at issue in this case.  Furthermore, it would be overwhelming and unreasonable to ask a consumer to put a value on each of the twenty or so attributes (or some portion thereof), and doing so would have been meaningless since the

3

objective of the survey was to determine the consumers' perceived value of the Adaptive Lighting feature — not to figure out the value of each feature.

11)     Respondents who stated that the printer would cost less without the Adaptive Lighting feature were asked to value the printer without the Adaptive Lighting feature. Those who answered "I do not know" were provided a card with a closed-set of price ranges from which to select. It was entirely appropriate to offer closed-ended choices once a respondent was unable to decide how much less the printer would be without the Adaptive Lighting feature. Every experienced survey researcher knows that some respondents are reluctant to answer an open-ended question and would prefer a list of choices. Moreover, the ranges I provided, if anything, suggested numbers too low since the median for the Photosmart C6180 was $50.00, the median for the Officejet 5610 printer was $20.00, and the highest range respondents could choose for either printer was from only "$20.00 or more." Respondents were also told at the very beginning of the survey that they could always say they did not know the answer to any of the survey questions asked.

12)     If I had not included the information from the closed-ended responses in my calculations, it would have had very little impact on the overall survey results. Specifically, without the data from the closed-ended questions, the survey results would show that the medians of $50.00 and $20.00 would not change at all, and the means would actually increase to $55.96 and $24.89.

13)     I do not believe it was necessary to use a filter question to weed out any respondents who did not feel qualified or capable to place a value on the Adaptive Lighting feature. Respondents were told they could always say they did not know the answer to a survey question at the beginning of the survey. Furthermore, the Surveys were attempting to measure

4

consumers' perceived value and not actual cost, so no particular qualifications were necessary to answer the survey questions.

14)     In virtually all surveys, there are some respondents who either do not understand the task at hand or who provide unreasonable answers for some unknown reason.   Survey experts, such as me, take this fact into account by excluding outlandish responses from the calculation of the means and median values.  For instance, in the Officejet 5610 printer survey, two respondents said the Adaptive Lighting feature was worth $200 even though the price of the printer was only $99.99.  I decided that those responses were unreasonable, and I excluded those results from his calculations.  And to further minimize the influence of some particularly high values, I also calculated the median value (*i.e.* the middle most value) together with the mean. Some survey experts may have chosen to exclude more or less responses, but regardless, this would not alter the underlying fact that consumers believe that Adaptive Lighting has significant value.

5

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 11th day of June 2008.


_____

Walter McCullough

# Exhibit 3

# TO WHAT EXTENT DO CONSUMERS CONSIDER THE "ADAPTIVE LIGHTING" FEATURE WHEN EVALUATING AND MAKING PURCHASE DECISIONS REGARDING HEWLETT-PACKARD COLOR PRINTERS?©

Prepared for:

**Choate, Hall & Stewart, LLP**

and

**Fish & Richardson, P.C.**

Prepared by:

**JACOB JACOBY, PH.D.**
**JACOB JACOBY RESEARCH, INC.**

**April 2008**

## BACKGROUND AND OBJECTIVES

**Background:**

Hewlett-Packard Company (hereinafter referred to as "HP") is a company organized under the laws of Delaware, with its principal place of business in Palo Alto, California.   HP is a leading manufacturer of computers and printers.  Along with containing many other features, some of its color printers contain a feature referred to as Adaptive Lighting.  It is my understanding that frequently this feature is not turned on and not used.  Where it is turned on and used, this feature automatically adjusts high contrast photos to reveal the detail that would otherwise be lost in the shadows or in areas of very bright light.

Polaroid is a Delaware corporation, with its principal place of business in Waltham, MA.  Polaroid has sued HP for alleged infringement of U.S. Patent No. 4,829,381.  As I am informed, HP's "Adaptive Lighting" feature, where it includes a particular algorithm in Local Area Content Enhancement (LACE), is accused of infringing this patent.

My academic vita is provided in Appendix A.  Also provided therein is a list of my publications of the last 10 years, a list of my courtroom and deposition testimony for the last four years, and a statement of the cost of this investigation.

---

© Jacob Jacoby (2008)

**Objectives**:

Counsel for HP asked me to design and conduct research to determine the extent to which consumers rely on the Adaptive Lighting feature when evaluating and making purchasing decisions of HP color printers.  This investigation addresses two key questions:  (1) When gathering information prior to purchasing an HP color All-in-One or color printer, to what extent do consumers acquire information regarding the Adaptive Lighting feature?  (2) For those who do acquire information regarding the Adaptive Lighting feature, how important do they feel this information is to their purchase decision relative to the other information they acquired?  As described more fully below, this report describes the design, implementation and findings of that investigation.

2

6.      The data were analyzed in accordance with accepted statistical principles;

7.      The process was conducted so as to insure objectivity.

How the seven *Manual for Complex Litigation* factors were applied in the current investigation are discussed below.

My qualifications as a consumer researcher (an element of Factor #4) are set forth in Appendix A, entitled "Qualifications of Jacob Jacoby, Ph.D." Additional information may be obtained from JacobyResearch.com. Information regarding the principal subcontractor, Phi Power Communications, may be obtained from PhiPower.com.

As will be seen from this detailed report, the importance of objectivity (Factor #7) was observed throughout the design, implementation and interpretation of all aspects of the investigation.

## FACTOR #1:  *THE UNIVERSE (OR POPULATION)*

To be useful (and, in the case of litigation surveys, to be considered probative), the study needs to focus on "the proper respondents," namely, those whose state of mind is relevant.  For purposes of the present study, the universe was defined as individuals, aged 18 and above, who said they had bought a color All-in-One printer or other color printer in the past 12 months, or said they might do so in the coming 12 months.

## FACTOR #2:  *THE SAMPLING PLAN*

Color All-in-One printers and other color printers are designed to operate in connection with computers and the vast majority of individuals who have

7

# CERTIFICATION

Pursuant to 28 U.S.C. Paragraph 1746, I declare that, to the best of my knowledge and belief, the foregoing is true and correct.

Executed on: _April 17, 2008_

Jacob Jacoby, Ph.D.

38

# Exhibit 4

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

POLAROID CORPORATION,

              Plaintiff,

          vs.                  No. 6-738 (SLR)

HEWLETT-PACKARD COMPANY,

              Defendant.
-----------------------)

VIDEOTAPED DEPOSITION OF

JACOB JACOBY, Ph.D.

New York, New York

Thursday, May 1, 2008

Reported by:
SHAUNA STOLTZ-LAURIE
CSR NO. 810490
JOB NO. 202736

b10faeb5-b242-4406-bfb4-27b8b70ac3a9

JACOB JACOBY, Ph.D.,  MAY 1, 2008

Jacoby

1  is ambiguous, would you also try to let me

2  know that?

3       A.   Certainly.

4       Q.   If there's a question that I ask

5  that requires more information before you

6  answer, will you try to tell me what

7  information you need so that you can answer

8  the question?

9       A.   Yes.

10       Q.   Is there any reason that you are

11  unable today to give full and complete

12  testimony?

13       A.   None that I know of.

14       Q.   And will you do your best today to

15  provide me with full and compete answers to

16  my questions?

17       A.   Certainly.

18       Q.   Dr. Jacoby, I understand that you

19  presented several reports in this matter, and

20  I just want to ask, generally speaking, is

21  the survey that you prepared considered to be

22  a consumer perception survey?

23       A.   Not really.

24       Q.   What is a consumer perception

b10faeb5-b242-4406-bfb4-27b8b70ac3a9

JACOB JACOBY, Ph.D.,  MAY 1, 2008

Page 8

1                    Jacoby

2    survey?

3         A.    It depends on the person who's

4    defining it that way.  Perception is how you

5    perceive the outside world, how -- what you

6    interpret from the outside world.  It's the

7    incoming sensation combined with what's in

8    your mind to interpret that incoming

9    sensation.  Some people have used "consumer

10   perception" more broadly to include other

11   things in as well.

12             In contrast, the study that I did

13   first and foremost is a behavioral study.  It

14   looks at what information people pay

15   attention to.

16        Q.    How many times have you been asked

17   -- excuse me.  How many times have you been

18   retained as an expert witness to provide --

19   to provide a behavior --

20             I'm sorry, what was it again?

21        A.    A behavioral study.

22             Is that your question?

23        Q.    Let me ask you again.  How many

24   times have you been retained as an expert

25   witness to provide a behavioral study?

b10faeb5-b242-4406-bfb4-27b8b70ac3a9

JACOB JACOBY, Ph.D.,  MAY 1, 2008

Page 9

1                    Jacoby

2        A.   I believe this may be the first

3   time that I've looked at the behavior of

4   individuals in acquiring information.

5        Q.   To your knowledge, Dr. Jacoby, has

6   a court ever refused to qualify you as an

7   expert?

8        A.   None.

9        Q.   To your knowledge, has a court ever

10  declined to rely upon your testimony or your

11  evidence?

12       A.   Yes.

13       Q.   Can you tell me which of those

14  cases you remember?

15       A.   Yes.  One was actually in your

16  circuit, the Seventh Circuit.  It was a court

17  -- a case in the Eastern District.  It was

18  the National Football League Properties, Inc.

19  and Green Bay Packers versus Prostyle,

20  P-r-o-s-t-y-l-e, one word, and Sherry Tanner

21  I believe was her last name, T-a-n-n-e-r.

22       Q.   And you're saying Sherry Tanner was

23  also a defendant in that case?

24       A.   Yes.

25       Q.   Do you know what happened in that

b10faeb5-b242-4406-bfb4-27b8b70ac3a9

JACOB JACOBY, Ph.D.,  MAY 1, 2008

Page 10

1                    Jacoby

2    case, as to why your testimony was

3    disqualified?

4         A.   Yes, I do know why.  Opposing

5    counsel lodged -- lodged five criticisms.

6    The court rejected four, excepted one, which

7    was contrary to what other most other courts

8    had accepted, and said based on that, we're

9    not going to accept the study.

10        Q.   Do you remember what that criticism

11   was --

12        A.   Sure.

13        Q.   -- that the court excepted?

14        A.   The court -- in fact, I can send

15   you to an article which covers the whole

16   thing in great detail in the 2006 Cardoso law

17   journal.  It was on measuring sponsorship

18   confusion.  The court said that the question

19   I asked respondents was "Do you think" --

20   essentially it was this:  "Do you think party

21   B needed permission from party A or from

22   anyone to get -- to come out with this

23   product," and the court said I should have

24   asked "Did party B get permission," and had I

25   asked that question, it would have been a

b10faeb5-b242-4406-bfb4-27b8b70ac3a9

JACOB JACOBY, Ph.D.,  MAY 1, 2008

Page 11

1                      Jacoby

2    violation of Daubert, because no lay consumer

3    knows whether or not Party B did or did not

4    get permission, and any answer to that would

5    be a guess, yet the court -- that was the

6    court's opinion.

7              MR. BUCHANAN:  I noticed a ground

8         rule problem right at the beginning of

9         that question.  I happened to notice

10        that as counsel was asking her question

11        you began your answer before she was

12        finished, so if you'll forgive me, let

13        me just remind everybody to talk one at

14        a time so that we can have a record.

15             THE WITNESS:  Will do.  Thank you

16        for noticing that.

17             MS. KINGSBURY:  Thanks, Bob.

18        Q.   Do you recall any other cases where

19   the court declined to rely upon your

20   testimony or evidence in a case?

21        A.    Yeah.  Recent case, Louis Vitton

22   versus Dooney & Bourke, and Kargo, K-a-r-g-o,

23   versus Advance.

24        Q.   Can you tell me why your testimony

25   was disqualified Louis Vitton versus Dooney &

b10faeb5-b242-4406-bfb4-27b8b70ac3a9

JACOB JACOBY, Ph.D., MAY 1, 2008

Page 12

1                    Jacoby

2    Bourke?

3         A.    Yeah.  The court -- the -- the --

4    there was -- there was a mistake in the

5    survey.  It was supposed to test four Louis

6    Vitton handbags.  As it turned out only two

7    handbags were tested.  I was provided by my

8    subcontractor with the aggregate data.

9    Didn't realize this until at the deposition.

10   The court basically said, you know, that was

11   a mistake; you were supposed to test four.

12   It didn't matter that all four, each and

13   every one of them, had the same design, and

14   it was the design at issue, not the shape of

15   the handbags or anything like that, and I was

16   chastised for submitting a report that didn't

17   correspond to what was done.  Of course at

18   the time I submitted it I thought that was

19   what was done.

20              And the courts also used the same

21   criticism that the Prostyle court had looked

22   at, and again, completely opposite to what 30

23   or more courts, including Judge Posner in

24   appeal on the 7th Circuit, had ruled.  So,

25   you know, when the courts resolve the issue,

b10faeb5-b242-4406-bfb4-27b8b70ac3a9

JACOB JACOBY, Ph.D.,  MAY 1, 2008

Page 13

1                    Jacoby

2    witnesses such as myself won't be at the

3    mercy of a court that wanted to go one way,

4    contrary to the way in which most other

5    courts have gone.

6         Q.   Can you tell me what happened on

7    the Kargo versus Advance case?

8         A.   Yes.  Over there the court had

9    essentially two criticisms of the survey I

10   did.  One was that it wasn't close enough to

11   the real world, the scenario tested, and the

12   court is correct, was correct, very correct.

13   What we did is the best we could with the

14   stimuli we had under the circumstances, and

15   the court said it wasn't good enough.

16             The second essential criticism was

17   we used closed end questions, which is

18   something that I don't agree with.

19        Q.   Do you recall any other cases in

20   which your testimony was disqualified?

21        A.   As I sit here now none occur to me,

22   no.

23        Q.   I'd like to talk to you a little

24   bit about surveys generally.

25        A.   Um-hm.

JACOB JACOBY, Ph.D., MAY 1, 2008

*222449*

```
 1              Jacoby
 2         MR. BUCHANAN:  I have no further
 3    questions.
 4         MS. KINGSBURY:  Thank you again.
 5         THE WITNESS:  Thank you both.
 6         THE VIDEOGRAPHER:  The time is
 7    2:48 p.m.  This marks the end of the
 8    videotaped deposition of Mr. Jacoby.
 9
10                   JACOB JACOBY, Ph.D.
11
12   Subscribed and sworn to before me
13   this 12th day of May    , 2008.
14
15
16
17            SHERYL D. LIMPERT
          Notary Public , State of New York
18              No.01LI5072374.
           Qualified in New York County
           Commission Expires Jan.27,2011
19
20
21
22
23
24
25
```

# Exhibit 5

REDACTED

# Exhibit 6

REDACTED

# Exhibit 7

# HP Photosmart 945 digital camera
## Technology Backgrounder | HP Adaptive Lighting Technology





## What is HP Adaptive Lighting Technology?

HP Adaptive Lighting Technology is a breakthrough technology that permits digital cameras to produce photos that look more like what we see with our own eyes. It balances brightness relationships between bright and dark areas in a photo, preserving gentle contrasts but compressing harsh contrasts. In doing so, some local areas in a photo are lightened and other areas are left alone.

Professional photographers sometimes do this by hand in the silver halide darkroom by "burning and dodging." Image scientists call this "adaptive scene re-lighting", or digitally adjusting the various sources of light that illuminate a scene.

This exclusive HP Adaptive Lighting Technology is included in PS945 camera's digital flash feature and can be switched "low", "high" and "off" based on user and reviewer needs. By default, this feature is turned off.

Because some dark areas of a scene can become lighter, this feature is called "Digital Flash" in PS945 camera menus. The exclusive HP technology (patents pending) is called "HP Adaptive Lighting Technology".

## Do other cameras do anything like this?

No, the PS945 is the world's first camera to do this.

## Has anything like this been done before?

Digital silver-halide photofinishing machines produced by Kodak and Fuji contain proprietary technologies that yield some of the benefits of HP Adaptive Lighting Technology. However, these algorithms have not been incorporated into digital cameras sold by either company.

There are several PC software applications that claim to do similar things. However, once a photo has been processed and compressed into a JPEG file, much of the picture information needed to effectively do processing has been lost. This is one reason why HP Adaptive Lighting Technology and similar technologies work best when performed inside a digital camera.



HP adaptive lighting Technology Tour
http://www.hp.com/united-states/consumer/digital_photography/tours/adaptive_lighting/index_fl.html?jumpid=reg_R1002_USEN


Camera Glossary
**Adaptive lighting technology –** An HP Real Life technology that automatically balances highlights and shadows in high-contrast photos to bring details (such as faces) out of shadows while preserving detail in brightly lit areas.

**Adaptive lighting bracketing –** An HP Real Life technology that creates three versions of a photograph: one with adaptive lighting turned off, one with adaptive lighting on low, and one with adaptive lighting on high.

**Printer Glossary**
**Adaptive Lighting** - Image enhancement to enhance detail in shadow areas or areas that are too light
or overexposed.


Easy product comparison chart: HP Photosmart All-in-Ones
http://www.hp.com/united-states/consumer/digital_photography/comp_chart/all_in_ones.html?jumpid=reg_R1002_USEN

Adaptive lighting technology balances relationships between bright and dark areas in a photo, preserving gentle contrasts by smoothing out harsh contrasts.



No
adaptive
lighting

With
adaptive
lighting

POL 7539353

### How does this relate to Preferred Photographic Reproduction?

Inside the PS945 camera, HP Adaptive Lighting Technology processing is carefully coordinated with Preferred Photographic Reproduction so that PPR operates in an optimal fashion.

### Did HP invent this technology?

HP researchers skilled in image and color science found new ways to dramatically improve a widely known algorithm and have filed numerous patent applications to protect these discoveries.

The first digital HP Adaptive Lighting Technology algorithm was described in a 1983 patent issued to Polaroid Corporation ("RETINEX"). This patent has since expired. The algorithm described in this patent did not work very well, but it did serve as the starting point for HP's improvements.

### What types of photos benefit the most from HP Adaptive Lighting Technology processing?

Photos of scenes that have a lot of contrast benefit the most. These include outdoor scenes in a mixture of sun and shade, cloudy days when there is a lot of "glare" from the sky, and indoor flash photography.

It is especially difficult to get pleasing photos with flash photography, because light from the camera's flash brightly shines on subjects close to the camera, but dimly lights subjects far from the camera. Professional photographers call this problem "inverse-square light falloff."

HP Adaptive Lighting Technology processing balances much of these brightness differences to produce more natural and pleasing photos.

A good time to use HP Adaptive Lighting Technology on the low setting is when taking photos at a gathering of family or friends and you want to get pleasing photos without paying much attention to the act of taking photos. The algorithm improves photos taken under many difficult lighting conditions and results in more photos that are worth keeping and sharing.

### Show me!

Here is one of the first before and after comparisons made with HP Adaptive Lighting Technology processing in an HP digital camera. The photographs were taken on a dark, cloudy day. With HP Adaptive Lighting Technology processing, large dark areas such as the statue appear brighter.

Figure 1.1

Without HP Adaptive Lighting Technology



With HP Adaptive Lighting Technology



Contrast Mask



The Contrast Mask photo shows the "burning and dodging" map calculated by the algorithm.

The bright areas in the mask will be lightened the most. Dark areas will be left alone.

POL 7522307

2

Figure 1.2



In other words, HP Adaptive Lighting Technology calculates a mask which it combines with the original to form the final image.

In the next pair of photos we see how HP Adaptive Lighting Technology balances the light with flash photography.

Figure 1.3



In the photo without HP Adaptive Lighting Technology, the mannequin close to the camera flash is brighter than the one farther away. This happens because the light from a camera flash dims according to the square of the distance to the subject; a subject twice as far away receives only one quarter as much light.

In the photo with HP Adaptive Lighting Technology, the two mannequins appear more natural and are much more similar in brightness.

A very difficult photographic situation is photography in a mixture of sun and shade. In the following pair of photographs we see how HP Adaptive Lighting Technology is able to balance light between sun and shade. Imagine how useful this would be at a family picnic.

Figure 1.4



POL 7522308

## What is the difference between the high and low settings?

For most types of scenes the low setting would be preferred. In this setting, the algorithm balances lighting on a scene with a conservative touch that is unlikely to make photos look worse.

The high setting is most useful under conditions of extreme backlighting, or when you want a dramatic effect.

## Will all photos look dramatically different?

HP's HP Adaptive Lighting Technology adjusts the strength of processing for each individual scene. Sometimes the effect will be very mild.

## When should I not use HP Adaptive Lighting Technology?

There are a few types of scenes for which HP Adaptive Lighting Technology may not be desirable. These include times when you want dramatic contrasts in a photo, such as a silhouette. Low contrast scenes, such as delicate outlines of objects in a fog bank, do not benefit.

When making 8x10 or larger prints, some parts of a photo may appear to have more noise. With digital photography, dark parts of the scene will contain more noise than light areas. Because HP Adaptive Lighting Technology lightens some of these dark areas, you may notice more noise in these parts of the picture.

## Reviewers need to know that…

HP Adaptive Lighting Technology processing extends the time needed by the camera to save a photo to the Secure Digital memory card. For this reason, HP Adaptive Lighting Technology is not turned on as a default. Turn off Digital Flash before timing camera performance.

Turn off Digital Flash when measuring color accuracy, contrast or signal/noise. When printing HP Adaptive Lighting Technology photos on an HP inkjet printer, turn off the printer's Digital Photography enhancements.

Avoid setting the camera to high sharpness and high contrast as both of these make noise more visible. High contrast also works against HP Adaptive Lighting Technology processing.

© Copyright 2003 Hewlett-Packard Development Company, L.P. The information contained herein is subject to change without notice and is provided "as is" without warranty of any kind. The warranties for HP products and services are set forth in the express warranty statements accompanying such products and services. Nothing herein should be construed as constituting an additional warranty. HP shall not be liable for technical                                                                           or                                                                           editorial                                                                           errors or omissions contained herein.

06/2003

POL 7522309

# HP Digital Cameras

*- Technology Backgrounder -*

## HP Adaptive Lighting Technology – HP Real Life technologies ™





hp

### What is HP Adaptive Lighting Technology?

HP Adaptive Lighting technology is a breakthrough technology that permits HP digital cameras to produce photos that look more like what we see with our own eyes. The human visual system, our eyes and brains working together, have a marvelous ability to deal with very high contrast scenes without loosing information in either shadows or bright areas. The photographic process, either digital or film based, is much more limited in this regard. Photographers have long used techniques such as fill flash, fill lighting and darkroom techniques such as dodging and burning to address this challenge. HP's Adaptive Lighting technology uses advanced digital image processing to achieve the same effect, automatically and in the camera. HP Adaptive Lighting technology balances brightness relationships between bright and dark areas in a photo, preserving gentle contrasts but compressing harsh contrasts. In doing so, some local areas in a photo are lightened while other areas are left alone.  Image scientists call this process "adaptive scene re-lighting", but only HP does this in camera.

HP Adaptive Lighting technology is included in newer Photosmart digital cameras and can be set to "low", "high" and "off" based on the photographer's desires. By default, this feature is turned off, however the camera can be set to power on with any of the three levels as the default. The current level is indicated by a symbol on the LCD display or in the Electronic View Finder (EVF) if equipped.

### Do other cameras do anything like this?

The HP Photosmart 945 was the world's first and only camera to do this. HP Adaptive Lighting technology is now included in the HP Photosmart R707 digital camera.

POL 7522310



Robert G. Gann, Ph.D
Imaging System Architect

## Show me!

Here is one of the first before and after comparisons made with HP Adaptive Lighting technology processing in an HP digital camera. The photographs were taken on a dark, cloudy day. With HP Adaptive Lighting technology processing, large dark areas such as the statue appear brighter.



The Contrast Mask photo shows the "burning and dodging" map calculated by the algorithm.

The bright areas in the mask will be lightened the most. Dark areas will be left alone.

*Figure 1.0: With and without HP Adaptive Lighting technology*



*Figure 2.0: HP Adaptive Lighting Technology contrast mask*

In other words, HP Adaptive Lighting technology calculates a mask which it combines with the original to form the final image.

## Has anything like this been done before?

The concept of scene re-lighting is not new. However, application of these advanced techniques is quite limited. Some digital silver-halide photofinishing machines contain proprietary technologies that yield some of the benefits of HP Adaptive Lighting technology. However, these algorithms have not been incorporated into digital cameras.

In addition, there are PC software applications that claim to do similar things. In the case of these software applications, the process must be manually applied by the user after the photograph is downloaded to a computer. However, once a photo has been processed and compressed into a JPEG file, much of the critical picture information needed to effectively do processing has been lost. In addition, HP Adaptive Lighting technology utilizes camera 'state' as well as specifies camera information to optimally process the image. This information is simply not available to a software package processing a stored image file.

The images on the next page show a photograph taken using an HP 945 camera with Adaptive Lighting off and then with Adaptive Lighting set to "high." The bottom image is the "Adaptive Lighting Off" image post processed by a software application intended to perform adaptive scene relighting. While the software processed image is certainly lighter, notice how the color and character of the sky has changed dramatically.  The HP Adaptive Lighting technology image shows none of this undesirable effect. These photos illustrate a very difficult photographic situation is photography in a mixture of sun and shade. In the following pair of photographs we see how HP Adaptive Lighting technology is able to balance light between sun and shade. Imagine how useful this would be at a family picnic.

Fundamentally, the ability to perform digital adaptive scene re-lighting based upon just the stored image file will be limited by the amount of information available to the image processing routines.

POL 7522311

## Can't I just do this in an image editing package using tools like histograms, gamma curves and so on?

Not really. Tonal manipulation tools can be extremely useful and powerful tools. However, they operate globally over the entire image whereas HP Adaptive Lighting technology operates based upon an image dependent mask. A sophisticated user may be able to achieve some of the benefit of HP Adaptive Lighting technology in image editing packages by carefully making selections or masks then applying tonal correction using those masks. In addition, burning and dodging tools can selectively lighten or darken specific areas of an image much like the film photographer does in a darkroom.

However, while these techniques are possible, they are very difficult, time consuming and beyond the ability of most users. HP Adaptive Lighting technology operates automatically, in the camera, with no user interaction required (other than turning it on!)

## Example images showing HP Adaptive Lighting technology as well as a competitive software package:

  

| *Figure 3.0: HP Adaptive Lighting Technology – off* | *Figure 3.1: HP Adaptive Lighting Technology – high*<br><br>*Note the dramatic improvement in details on the church – yet the sky and clouds are virtually unchanged.*<br><br>*Note: this is not a processed version of the above photo – rather an independent photograph taken with the camera after turning ADAPTIVE LIGHTING TECHNOLOGY on.* | *Figure 3.2: Original ADAPTIVE LIGHTING TECHNOLOGY off image (above) post processed using a high quality software package.*<br><br>*While the church has been lightened, (maybe too much), the sky has also significantly changed in color and character.* |

## Did HP invent this technology?

Yes and no. HP researchers skilled in image and color science found new ways to dramatically improve a widely known algorithm and have filed numerous patent applications to protect these discoveries.

The first digital scene re-lighting algorithm was described in a 1983 patent issued to Polaroid Corporation (RETINEX for "RETINA + cortEX"). This patent has since expired. The algorithm described in this patent did not work very well and was extremely compute intensive, but it did serve as the starting point for HP's improvements.

## What types of photos benefit the most from HP Adaptive Lighting technology processing?

Photos of scenes that have a lot of contrast benefit the most. These include outdoor scenes in a mixture of sun and shade, cloudy days when there is a lot of "glare" from the sky, and indoor flash photography.

A good time to use HP Adaptive Lighting technology on the low setting is when taking photos at a gathering of family or friends and you want to get pleasing photos without paying much attention to the act of taking photos. The algorithm improves photos taken under many difficult lighting conditions and results in more photos that are worth keeping and sharing.

It is especially difficult to get pleasing photos with flash photography, because light from the camera's flash brightly shines on subjects close to the camera, but dimly lights subjects far from the camera. Professional photographers call this problem "inverse-square light falloff." HP Adaptive Lighting technology processing balances much of these brightness differences to produce more natural and pleasing photos. The images on the next page illustrate the advantage of Adaptive Lighting technology in a flash scene where the background is better revealed. Another very common problem flash scene is a flash photograph of people where some of the people are close to the camera and others are farther away. In this case, the

people close to the camera tend to be over exposed and those further away are dimly lit. Adaptive Lighting will help to balance the illumination and create a better photograph of both close and far subjects.

*Note, HP Adaptive Lighting technology does not replace the flash – it simply works to make flash photography better.*

**Examples of flash photograph combined with HP Adaptive Lighting technology:**

  

| | | |
|---|---|---|
| *Figure 4.0: Indoor photo taken with strobe on, HP Adaptive Lighting technology off.* | *Figure 4.1: Same conditions as above, but with HP Adaptive Lighting technology set to the high setting.*<br><br>*Notice how this photograph is much more like what a person would see in this environment.* | *Figure 4.2: Same conditions as above. Photograph taken with a competitive, high end, digital still camera - strobe on.* |

**What is the difference between the high and low settings?**

For most types of scenes the low setting would be preferred. In this setting, the algorithm balances lighting on a scene with a conservative touch that is unlikely to make photos look worse.

The high setting is most useful under conditions of extreme backlighting, or when you want a dramatic effect.

**Will all photos look dramatically different?**

HP's Adaptive Lighting technology adjusts the strength of processing for each individual scene. Sometimes the effect will be very mild, particularly in scenes where extremes of contrast do not exist.

**When should I not use HP Adaptive Lighting Technology?**

There are a few types of scenes for which HP Adaptive Lighting technology may not be desirable. These include times when you want dramatic contrasts in a photo, such as a silhouette. Low contrast scenes, such as delicate outlines of objects in a fog bank, do not benefit.

When making 8x10 or larger prints, some parts of a photo may appear to have more noise. With digital photography, dark parts of the scene will contain more noise than light areas. Because HP Adaptive Lighting technology lightens some of these dark areas, you may notice more noise in these parts of the picture. In general, the improvement in overall photo quality using Adaptive Lighting technology will offset slight increase in noise.

**Reviewers need to know that...**

HP Adaptive Lighting technology processing extends the time needed by the camera to save a photo to the Secure Digital memory card. For this reason, HP Adaptive Lighting technology is not turned on as a default. Turn off Adaptive Lighting before timing camera performance.

Turn off Adaptive Lighting when measuring color accuracy, contrast or signal/noise. When printing HP Adaptive Lighting technology photos on an HP inkjet printer, consider turning off the printer's Digital Photography enhancements.

Avoid setting the camera to high sharpness and high contrast as both of these make noise more visible. High contrast also works against HP Adaptive Lighting technology processing.

© Copyright 2004 Hewlett-Packard Development Company, L.P. The information contained herein is subject to change without notice and is provided "as is" without warranty of any kind. The warranties for HP products and services are set forth in the express warranty statements accompanying such products and services. Nothing herein should be construed as constituting an additional warranty. HP shall not be liable for technical or editorial errors or omissions contained herein.

POL 7522313



United States-English

| » HP Home | » Products & Services | » Support & Drivers | » Solutions | » How to Buy |

» Contact HP

Search: ▢ >>

◉ Home & Home Office  ○ All of HP United States

HP Digital Photography



# HP adaptive lighting Technology Tour

» **Home & Home Office**

📇 **My Cart**
0 items in My Cart

» Digital Photography
  » Buying guides
  » Take better photos
  » Print better photos
  » Edit & restore photos
  » Organize & archive photos
  » Share photos & get creative
  » Photo scanning tips

» Everyday Printing
» Everyday Computing
» Digital Entertainment
» Activity Center
» Free online classes

**Browse & Buy**
» Home & Home Office Store
» Rebate Center

**Product Support**
» Support & troubleshooting
» Software & drivers
» HP Total Care
» Register your product

## HP adaptive lighting Technology Tour
### Introduction

Exclusive HP adaptive lighting and adaptive lighting bracketing technology balances the contrast in an image and allows you to produce photos that look more like what you see with your own eyes.

» Next



| » Introduction | » How It Works | » Availability |

» Check out our cameras

Average rating: 3.8 (8 votes)  ★★★★☆

Rate it:
☆☆☆☆☆
☆

Comment on it
Read all comments

Share/tag this page
Send to a friend

» Text version



Join the conversation

» Visit the HP Digital Photography Blog



Creative ideas
» Get digital photo tips and projects via email



📄 Printable version

Privacy statement        Using this site means you accept its terms        Feedback to Home & Home Office

© 2007 Hewlett-Packard Development Company, L.P.



United States-English

| » HP Home | » Products & Services | » Support & Drivers | » Solutions | » How to Buy |

» Contact HP

Search: [              ] ⏩

⦿ Home & Home Office ○ All of HP United States

HP Digital Photography



HP adaptive lighting Technology Tour

**» Home & Home Office**

🛒 **My Cart**
0 items in My Cart

» Digital Photography
 » Buying guides
 » Take better photos
 » Print better photos
 » Edit & restore photos
 » Organize & archive
   photos
 » Share photos & get
   creative
 » Photo scanning tips

» Everyday Printing
» Everyday Computing
» Digital Entertainment
» Activity Center
» Free online classes

**Browse & Buy**
» Home & Home Office
  Store
» Rebate Center

**Product Support**
» Support &
  troubleshooting
» Software & drivers
» HP Total Care
» Register your product



**HP adaptive lighting Technology Tour**
How It Works  -  Main

HP adaptive lighting technology can be used indoors, outdoors, and with the flash. Indoors, in situations where there is uneven lighting, it can balance brightness, preserving gentle contrasts and compressing harsh contrasts.

« Previous   » Next

| » Introduction | » How It Works | » Availability |

» Check out our cameras

Average rating: 3.8 (8 votes)
★★★★☆

Rate it:
☆☆☆☆
☆

Comment on it
Read all comments

🔖 Share/tag this page
Send to a friend

» Text version



Join the conversation
» Visit the HP Digital
Photography Blog



Creative ideas
» Get digital
photo tips
and projects
via email

🖨 **Printable version**

Privacy statement          Using this site means you accept its terms          Feedback to Home & Home Office

© 2007 Hewlett-Packard Development Company, L.P.

POL 7539346



United States-English

| » HP Home | » Products & Services | » Support & Drivers | » Solutions | » How to Buy |

» Contact HP

Search: [_____] [»]

◉ Home & Home Office   ○ All of HP United States

HP Digital Photography



# HP adaptive lighting Technology Tour

**» Home & Home Office**

 **My Cart**
0 items in My Cart

» Digital Photography
» Buying guides
» Take better photos
» Print better photos
» Edit & restore photos
» Organize & archive photos
» Share photos & get creative
» Photo scanning tips

» Everyday Printing
» Everyday Computing
» Digital Entertainment
» Activity Center
» Free online classes

**Browse & Buy**
» Home & Home Office Store
» Rebate Center

**Product Support**
» Support & troubleshooting
» Software & drivers
» HP Total Care
» Register your product



**HP adaptive lighting Technology Tour**
How It Works  -  Adaptive lighting for outdoor shots

For outdoor scenes with a mixture of sun and shade, or on cloudy days when there is a lot of contrast, HP adaptive lighting technology is able to produce the right contrast.

« Previous   » Next

| » Introduction | » How It Works | » Availability |

» Check out our cameras

Average rating: 3.8 (8 votes)   Rate it:     Comment on it        Share/tag this page
★★★★☆        ☆☆☆☆☆    Read all comments     Send to a friend
                         ☆

» Text version



Join the conversation
» Visit the HP Digital Photography Blog



Creative ideas
» Get digital photo tips and projects via email

 **Printable version**

Privacy statement        Using this site means you accept its terms    Feedback to Home & Home Office
© 2007 Hewlett-Packard Development Company, L.P.

POL 7539347



United States-English

| » HP Home | » Products & Services | » Support & Drivers | » Solutions | » How to Buy |

» Contact HP

Search: [            ] [»]

○ Home & Home Office  ○ All of HP United States

HP Digital Photography



# HP adaptive lighting Technology Tour

» **Home & Home Office**

🛒 **My Cart**
0 items in My Cart

» Digital Photography
  » Buying guides
  » Take better photos
  » Print better photos
  » Edit & restore photos
  » Organize & archive
    photos
  » Share photos & get
    creative
  » Photo scanning tips

» Everyday Printing
» Everyday Computing
» Digital Entertainment
» Activity Center
» Free online classes

**Browse & Buy**
» Home & Home Office
  Store
» Rebate Center

**Product Support**
» Support &
  troubleshooting
» Software & drivers
» HP Total Care
» Register your product



**HP adaptive lighting Technology Tour**
How It Works - Adaptive lighting for flash photos

You can also improve your flash photography with HP adaptive lighting. Your entire scene will appear more natural with a more even level of brightness in subjects close to the lens and further away.

« Previous    » Next

» Introduction    » How It Works    » Availability

» Check out our cameras

Average rating: 3.8 (8 votes)
★★★★☆

Rate it:
☆☆☆☆☆
☆

Comment on it
Read all comments

📰 Share/tag this page
Send to a friend

» Text version



Join the conversation
» Visit the HP Digital
  Photography Blog



Creative ideas
» Get digital
photo tips
and projects
via email

📄 Printable version

Privacy statement        Using this site means you accept its terms        Feedback to Home & Home Office

© 2007 Hewlett-Packard Development Company, L.P.

POL 7539348

United States-English



| » HP Home | » Products & Services | » Support & Drivers | » Solutions | » How to Buy |

» Contact HP

Search: [              ]  ⊳⊳

⊙ Home & Home Office  ○ All of HP United States

HP Digital Photography



# HP adaptive lighting Technology Tour

» Home & Home Office

**My Cart**
0 items in My Cart

» Digital Photography
 » Buying guides
 » Take better photos
 » Print better photos
 » Edit & restore photos
 » Organize & archive
   photos
 » Share photos & get
   creative
 » Photo scanning tips

» Everyday Printing
» Everyday Computing
» Digital Entertainment
» Activity Center
» Free online classes

**Browse & Buy**
» Home & Home Office
  Store
» Rebate Center

**Product Support**
» Support &
  troubleshooting
» Software & drivers
» HP Total Care
» Register your product



Join the conversation
» Visit the HP Digital
  Photography Blog



Creative ideas
» Get digital
photo tips
and projects
via email

## HP adaptive lighting Technology Tour
How It Works - How to use this feature

HP adaptive lighting is built into the camera; all you need to do is turn it on. Select adaptive lighting from the Capture Menu. Choose the adaptive lighting setting that best meets your needs and then select OK.



« Previous    » Next

| » Introduction | » How It Works | » Availability |

» Check out our cameras

Average rating: 3.8 (8 votes)
★★★★☆

Rate it:
☆☆☆☆
☆

Comment on it
Read all comments

Share/tag this page
Send to a friend

» Text version

Printable version

Privacy statement    Using this site means you accept its terms    Feedback to Home & Home Office
© 2007 Hewlett-Packard Development Company, L.P.

POL 7539349



United States-English

| » HP Home | » Products & Services | » Support & Drivers | » Solutions | » How to Buy |

» Contact HP

Search: [                ] >>

( Home & Home Office    C All of HP United States

HP Digital Photography



# HP adaptive lighting Technology Tour

» **Home & Home Office**


**My Cart**
0 items in My Cart

» Digital Photography
 » Buying guides
 » Take better photos
 » Print better photos
 » Edit & restore photos
 » Organize & archive photos
 » Share photos & get creative
 » Photo scanning tips

» Everyday Printing
» Everyday Computing
» Digital Entertainment
» Activity Center
» Free online classes

**Browse & Buy**
» Home & Home Office Store
» Rebate Center

**Product Support**
» Support & troubleshooting
» Software & drivers
» HP Total Care
» Register your product

## HP adaptive lighting Technology Tour
### How It Works - Adaptive lighting bracketing

New R-Series HP digital cameras include adaptive lighting bracketing. When you turn it on and take a picture, adaptive lighting bracketing automatically creates three separate images; normal, adaptive lighting low, and adaptive lighting high.



« Previous    » Next

| » Introduction | » How It Works | » Availability |

» Check out our cameras

Average rating: 3.8 (8 votes)    Rate it:    Comment on it        Share/tag this page
★★★★☆                      ☆☆☆☆☆   Read all comments    Send to a friend
                                 ☆

» Text version


Join the conversation
» Visit the HP Digital Photography Blog


Creative ideas
» Get digital photo tips and projects via email


**Printable version**

Privacy statement    Using this site means you accept its terms    Feedback to Home & Home Office
© 2007 Hewlett-Packard Development Company, L.P.

POL 7539350



United States-English

| » HP Home | » Products & Services | » Support & Drivers | » Solutions | » How to Buy |

» Contact HP

Search: [_____]  [»]

◉ Home & Home Office  ○ All of HP United States

HP Digital Photography



# HP adaptive lighting Technology Tour

» **Home & Home Office**


**My Cart**
0 items in My Cart

» Digital Photography
  » Buying guides
  » Take better photos
  » Print better photos
  » Edit & restore photos
  » Organize & archive photos
  » Share photos & get creative
  » Photo scanning tips

» Everyday Printing
» Everyday Computing
» Digital Entertainment
» Activity Center
» Free online classes

**Browse & Buy**
» Home & Home Office Store
» Rebate Center

**Product Support**
» Support & troubleshooting
» Software & drivers
» HP Total Care
» Register your product

**HP adaptive lighting Technology Tour**
How It Works  -  Save the best image

These are three versions of the same photo. The camera always saves three images. You can save the best version or save all three.



« Previous    » Next

| » Introduction | » How It Works | » Availability |

» Check out our cameras

Average rating: 3.8 (8 votes)
★★★★☆

Rate it:
☆☆☆☆☆

Comment on it
Read all comments

Share/tag this page
Send to a friend

» Text version


Join the conversation
» Visit the HP Digital Photography Blog


Creative ideas
» Get digital photo tips and projects via email

**Printable version**

Privacy statement    Using this site means you accept its terms    Feedback to Home & Home Office
© 2007 Hewlett-Packard Development Company, L.P.



United States-English

» HP Home    » Products & Services    » Support & Drivers    » Solutions    » How to Buy

» Contact HP

Search: [ ]  >>

⦿ Home & Home Office    ○ All of HP United States



HP Digital Photography

## HP adaptive lighting Technology Tour

» **Home & Home Office**


**My Cart**
0 items in My Cart

» Digital Photography
  » Buying guides
  » Take better photos
  » Print better photos
  » Edit & restore photos
  » Organize & archive photos
  » Share photos & get creative
  » Photo scanning tips

» Everyday Printing
» Everyday Computing
» Digital Entertainment
» Activity Center
» Free online classes

**Browse & Buy**
» Home & Home Office Store
» Rebate Center

**Product Support**
» Support & troubleshooting
» Software & drivers
» HP Total Care
» Register your product



**HP adaptive lighting Technology Tour**
Availability

HP adaptive lighting bracketing is available on the following sold HP Photosmart digital cameras: M737, R837, R847, R927, R937 and R967.

« Previous

» Introduction    » How It Works    » Availability

» Check out our cameras

Average rating: 3.8 (8 votes)
★★★★☆

Rate it:
☆☆☆☆☆
☆

Comment on it
Read all comments

Share/tag this page
Send to a friend

» Text version


**Join the conversation**
» Visit the HP Digital Photography Blog


**Creative ideas**
» Get digital photo tips and projects via email

**Printable version**

Privacy statement     Using this site means you accept its terms     Feedback to Home & Home Office

© 2007 Hewlett-Packard Development Company, L.P.

POL 7539352



» Return to original page

# HP Photosmart A520 Series Printer - Adjusting the Brightness, Contrast, and Exposure of an Image Using HP Photosmart Essentia Software

## Introduction

Use either the Adaptive Lighting or the Photo Fix feature to adjust the image. Adaptive Lighting improves the dark areas in an image without affecting the bright areas. You can also adjust the brightness, contrast, and exposure of an image using the Adaptive Lighting feature. Photo Fix adjusts the image automatically.

## Adjusting the image

### Adjusting the image using Adaptive lighting

1. Double-click the Photosmart Essential Software icon on the Desktop.

2. Click **Skip** on the **Welcome** screen.

3. Click **View Library** .

4. In the left panel, select the folder where your photos are stored.

5. In the **Selection tray** , double-click the image you want to edit. The image appears in the work area.

6. Click **Color and Light Tools** in the left panel to view the options.

7. Click **Adaptive Lighting** .

8. Wait for the computer to adjust the image and view the results. To remove the changes, click the **Undo Adaptive Lighting** button.

   A copy of the original is stored as a digital negative in the computer for safe keeping.

### Adjusting the image using Photo Fix

1. Double-click the Photosmart Essential Software icon on the Desktop.

2. Click **Skip** on the **Welcome** screen.

3. Click **View Library** .

4. In the left panel, select the folder where your photos are stored.

5. In the **Selection tray** , double-click the image you want to edit. The image appears in the work area.

6. Click **Photo Fix** in the top left panel.

7.  Wait for the computer to adjust the image and view the results. To remove the changes, click the **Undo Photo Fix** button.

    A copy of the original is stored as a digital negative in the computer for safe keeping.

## Quick find your product

Enter a product number
(e.g. Deskjet 990cse, Pavilion 7955)

How do I find my product number?

» Return to original page

Privacy statement                    Using this site means you agree to its terms                    Feedback to Webmaste
© 2008 Hewlett-Packard Development Company, L.P.

Case 4:06-cv-00738-SLR    Document 249-4    Filed 06/26/2008    Page 10 of 43

South Africa

| » HP.co.za | » Products & Services | » Support & Drivers | » Solutions | » How to B |

» Contact HP

Search:

⦿ **Home & Home Office**   ○ All of HP

Digital Photography > Latest & Greatest > Real Life Technologies™

## Real Life technologies™ in HP Photosmart printer All-in-Ones

» **Home & Home Office**

» How to Buy
» Buy Online
» Offers

» Browse Products
» Help me choose a printer

» Get Support
» Drivers & Downloads

» Digital Photography
  » Smart HP combinations
  » Latest & Greatest
    » Lightscribe
    » Vivera
    » **Real Life Technologies™**
  » Free downloads & fun
  » Discover more



**HP Care Pack**
» Great success needs great support

**Please rate this page**

bad [ ][ ][ ][ ] good


HP Real Life technologies. Innovation, control and creativity at your fingertips.

HP Smart Printing Features are designed to ensure you get the very most from your HP printer or HP All-in-One, helping you to achieve great results every time. HP-pioneered features benefit every stage of the printing process, from start to finish, and the intelligence that's built into HP printers or HP All-in-Ones puts real creativity at your fingertips.

» HP automatic red-eye removal
» HP Adaptive Lighting technology

### HP automatic red-eye removal

Never see red-eyes on your photos again with your HP printer or your HP All-in-One. Remove red-eyes with HP automatic redeye removal. This unique, easy-to-use and highly effective feature automatically recognises red eyes on your photos produced by a flash.


**Before**


**After**

» Back to top

### HP Adaptive Lighting technology


Get the light, right. This ground-breaking technology automatically adjusts high contrast photos to reveal the detail that would otherwise be lost in the

Recommended I


HP Pho A516 C Photo F


HP Pho A717 C Photo F


HP Pho 8253 P (Q347C


HP Pho photo p

**Related links**

» Real Life technol HP Photosmart dig cameras
» Real Life technol HP Photosmart pri All-in-Ones
» Real Life technol HP Photosmart sc

shadows. Ideal for images with extreme light/shadow contrast or after using a flash.



**Before**                    **After**

» Back to top

**Printable version**

Privacy statement            Using this site means you accept its terms            Feedback to webmaste

© 2008 Hewlett-Packard Development Company, L.P.

# Exhibit 8

REDACTED